# DEFENDANT'S

# EXHIBIT

# 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, et al. | : | Civil Action 96-1285 |
| Plaintiffs | : | |
| | : | Washington, D.C. |
| v. | : | Thursday, October 11, 2007 |
| | : | |
| DIRK KEMPTHORNE, Secretary of the Interior, et al. | : | |
| | : | |
| Defendants | : | AFTERNOON SESSION |

TRANSCRIPT OF EVIDENTIARY HEARING
DAY 2
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:

DENNIS GINGOLD, ESQUIRE
LAW OFFICES OF DENNIS GINGOLD
607 14th Street, NW
Ninth Floor
Washington, DC 20005
(202) 824-1448

ELLIOTT H. LEVITAS, ESQUIRE
WILLIAM E. DORRIS, ESQUIRE
KILPATRICK STOCKTON, L.L.P.
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6450

KEITH HARPER, ESQUIRE
JUSTIN GUILDER, ESQUIRE
KILPATRICK STOCKTON, L.L.P.
607 14th Street, N.W.
Suite 900
Washington, D.C. 20005
(202) 585-0053

DAVID C. SMITH, ESQUIRE
KILPATRICK STOCKTON, L.L.P.
1001 West Fourth Street
Winston-Salem, North Carolina 27101
(336) 607-7392

Bryan A. Wayne, RPR, CRR
Official Court Reporter

For the Defendants: ROBERT E. KIRSCHMAN, JR., ESQUIRE
JOHN WARSHAWSKY, ESQUIRE
MICHAEL QUINN, ESQUIRE
J. CHRISTOPHER KOHN, ESQUIRE
JOHN KRESSE, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 307-0010
JOHN STEMPLEWICZ, ESQUIRE
Senior Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Ben Franklin Station
P.O. Box 975
Washington, D.C. 20044
(202) 307-1104
GLENN D. GILLETT, ESQUIRE
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044
(202) 514-7162

Court Reporter: Bryan A. Wayne, RPR, CRR
Official Court Reporter
U.S. Courthouse, Room 6714
333 Constitution Avenue, NW
Washington, D.C. 20001
202-354-3186

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

Bryan A. Wayne, RPR, CRR
Official Court Reporter



P R O C E E D I N G S
THE COURT: All right. Everybody here? Let's just continue. Thank you.
(The witness resumed the stand.)
DIRECT EXAMINATION CONTINUED
BY MR. KRESSE:
Q. Ms. Ramirez, just one kind of cleanup item. Briefly I want to go back to what we called the audit trail, transactional documents. The forms that we were looking at, the various forms, you recall from those exhibits?
A. Yes.
Q. You've used that set of documents, you indicated, in a presentation you made for this case at some point, correct?
A. Correct.
Q. And that was in connection with the paragraph 19 document work?
A. That's correct.
Q. Have you used those documents in other presentations since then?
A. Yes.
Q. And when was that?
A. At the facility I'm at now, the American Indian Records Repository, we have had several opportunities to have presentations like this, or tours of different individuals that have come through the facility, to see the facility itself, and



then in some instances what is historical trust accounting doing in this facility. And that's where we would be using these documents to walk them through the process of a transaction.
THE COURT: You mean if I come down there, I've already seen it?
THE WITNESS: Well, there's a lot more to it than just these documents.
MR. KRESSE: You're right. Your Honor, this would be a presentation that would be outside of the, actually touring the facility. That's why, in one sense, why we made it here, because it does essentially require some level of testimony as opposed to just seeing.
BY MR. KRESSE:
Q. In any event, you've made this presentation several times.
A. Correct.
Q. The forms themselves, not necessarily the data on the forms, but the forms themselves, do you know roughly what period of time those forms were in use?
A. Like when they were created?
Q. Well, were those forms used, for instance, when you were working in the IIM branch? You want me to go through each one?
A. Oh, no. You mean were they using schedules of collection, were they using deposit tickets, yes. They were using them when I was there, and I saw earlier ones as well.
Q. Now, turning back to the mass cancellation documents which



we've -- exhibits which we've been looking at, we're at Defendants' Exhibit 209. Looking at the upper right-hand corner, there's a, looks like a stamp there and some handwriting. Can you tell me what that is?
A. That's my signature, K. Ramirez, 7/17 -- I think it's '92.
Q. What does the stamp indicate?
A. It's a file copy stamp that we use to stamp on our correspondence to show that different individuals saw the document prior to it going out.
Q. Let's look at Defendants' Exhibit 210. And this was the letter that indicated that Treasury had sent the 12 minireel tapes, correct?
A. That is correct.
Q. And we discussed the fact that that was cc'd to you and the individual working for Soza, the contractor; right?
A. That is correct.
Q. Let's turn to Defendant's Exhibit 207. What is this document?
A. This is a letter to Don Gray from the accounting firm, Soza & Company, where they are laying out an action plan regarding the mass cancellation project and what they view as the steps to be taken. So you see a background, and then you start, at the bottom of the page, step one, et cetera.
Q. At bottom of the page in the middle there's also your handwriting again with attachment 7?

A. That's correct. That is my handwriting.
Q. Let's look at the main paragraph under the Background subheading. The last sentence: "Additionally, the data, which could date as far back as 1954, is limited to the following items: disbursing symbol, serial number, amount and date canceled." Is that consistent with your recollection of the information that the Treasury tapes provided?
A. Yes, it is.
Q. And you had earlier testified about the date 1954.
A. Mm-hmm.
Q. Is that consistent also with your recollection of the era covered by the checks?
A. Yes. That's what I recall.
Q. Now, a little higher up in that same paragraph, five lines down, the second full sentence references individual Indian and tribal trust funds. Could you explain what that reference means?
A. Tribes used to put their money into the individual accounts, like the subsidiary system, because it had this check writing capability where if you had check stock there at your agency, you could stick a check in the typewriter and type it up. As opposed to keeping your money in a tribal trust account, where you would have to submit paperwork to a central office, like Albuquerque, who would then submit a form and some documentation to a Treasury RDO, regional disbursing office, who



would then issue or cut Treasury checks on your behalf.
So that was a time frame there that, if you didn't want to wait that period of time, it was easier to just have your money in an IIM account, an IIM type account, and then get your Treasury check typed right there and walk away with it. So they used to like to put their money in the IIM accounts. And it was tribal trust funds.
Sometimes tribes, when they're cutting per capitas, to share some of their income or revenue with their enrolled members, would have to issue a whole bunch of checks, and they didn't have either the banking ability or the accounting ability to issue all these checks to their enrolled members, and so they asked the Bureau of Indian Affairs if they could issue these Treasury checks for them. And when that happened, then they would have to put their tribal trust funds into an IIM account. We used to call them tribal IIM accounts. And then checks would be issued from that account to all the different individuals that they provided you the list of.
Q. So as far as the accounting system -- and at the time of this letter you were using IRMS, correct?
A. That's correct.
Q. So was there an IRMS subsystem for IIM accounts?
A. Yes. In the IRMS it's broken down into four -- I think they called them platforms, and one of them was IIM, which was the accounting aspect of it that had account numbers and names



and transactions and stuff like that. Another one was people that held, enrolled members, names of tribes in their enrollment number, not necessarily their IIM account number, and then there were two other platforms, and I don't recall what those other two were.
Q. But with regard to the IIM platform, as you described it, so for a tribe, how would the tribe be identified compared to an individual?
A. There was -- the account numbers are made up of a 10-digit number. The first three digits are numbers, then the fourth character is a letter, and the last six digits are numbers. The first three, those numbers usually denote the tribe you're enrolled in.
So I am Laguna, and let's say the Laguna tribal code is 103, so my account number, if I had one, would be 103, N for nonenrolled or A for original allottee, U for unallotted. If you have a tribal IIM account, there would be a T in that fourth position, and that denotes that this is a tribal IIM account. And then the last six digit s are either equal to your enrollment number with the tribe, or some other sequential number that the agency was using.
Q. So in short, the term T accounts referred to tribal IIM?
A. That is correct.
Q. Turning to the second page of Defendants' Exhibit 207, again this is the Soza letter to Mr. Gray, step 3 indicates or



states: "Sort the data provided by Treasury by disbursing symbol. This will involve separating data with disbursing symbols 4844 as well as all regional disbursing office symbols. The extracted data will be stratified by dollar amounts." Was this work done by Soza?
A. Yes. Soza I guess came up with the plan of how to go about going through the data that was obtained from Treasury. And so this is one of the things that they recommended or thought should be done, because once the data was obtained, it was 12 minireels. That was a whole lot of data. So the Bureau of Indian Affairs is the one that had the computer system that could accommodate something this big.
So we provided all the data to our tech center there in Albuquerque, who then loaded it all onto the system, and then based upon whatever direction they got either from Soza & Company or from myself or Don Gray, they would prepare whatever reports we wanted or stratify the data or extrapolate whatever it was that we wanted. So they were recommending that this kind of process occur.
Q. And we'll be discussing some of those tables in a few minutes. The next step, 4, the middle of that paragraph, about seven lines down, the sentence reads, "Also, a memo explaining the mass cancellation project will be prepared and distributed to the field." Was that done?
A. Yes. From what I remember, we did do something like that.

Page 346

Q. And then turning to the third page of Defendants' Exhibit 207, this document is -- the signator is Mary Sandoval. Do you know who she was?
A. Yes. She was the project manager for Soza & Company.
Q. Did she answer to you?
A. Yes.
Q. And then below that there's a signature block, indicates "Concur, Donald M. Gray." And again, Mr. Gray was your boss, right.
A. Yes.
Q. Turning to Defendants' Exhibit 217, this -- do you recognize this document?
A. Yes, I do.
Q. What is it?
A. It is instructions or an informational type letter, I guess you could call it, that went out to the field to explain mass cancellation and the fact that we needed the field, area and agency offices' help to identify specific check numbers to individuals.
Q. On here it indicates that, the first line, "Approximately 37,000 IIM Treasury checks which were mass canceled remain unidentified as to the area/agency and IIM account from which they were issued." Do you see that?
A. Yes.
Q. Do you remember we talked before about the universe of

Page 347

number of checks that were initially identified as mass canceled?
A. Yes.
Q. So what about the -- I guess there would have been around 60,000 you said before?
A. Approximately.
Q. So there were roughly 23,000 that had already been identified at this point? Is that what this means?
A. Yes. If that's the way the math works out.
Q. Well, in here it says as of March 31, 1993, it identifies 37,000 unidentified, correct?
A. Correct.
Q. And then later on, the fourth paragraph, the last line states, it gives the date, June 30, 1993. What was the purpose of the June 30 date?
A. So that we were asking in this letter or memorandum, we're asking the field to take a look at the different check numbers that are on these minireel tapes that are as of yet unidentified, and look at their check stock inventory or information that they have, to see which, if any, of these check numbers are affiliated with their agency. And we want information back from them no later than June 30, 1993.
Q. So we don't have a date on this first page, do we?
A. Correct.
Q. But we know it's sometime between March 31 and June 30.

Page 348

A. That's correct.
Q. And do you know who prepared this document?
A. It probably was me.
Q. And the last paragraph of the first page shows, it has your name on it, correct?
A. That's correct.
Q. And Charlene Toledo?
A. Yes.
Q. What was Charlene's role?
A. She was an accountant within the branch of IIM.
Q. And she was working with you on the project?
A. That's correct.
Q. Let's look at the next page of this exhibit, page 2. Can you tell me what this page represents?
A. This page represents all the disbursing symbols that would be affiliated with individual Indian checks. So the third line down, you see 4844, which is the symbol I spoke about earlier where all these other symbols were consolidated into one at a certain point in time. But earlier on, each symbol was affiliated with an agency superintendent, and then later on just became one symbol, 4844, which is where the bulk of the money and the checks are in this mass cancellation.
Q. And this -- on 4844, the third line down, it says symbol amount. What does that represent?
A. That means according to Treasury's data that they gave us

Page 349

on these 12 minireels, if you added up the dollar amounts in symbol 4844, it came to $1.8 million.
Q. Then the next column is titled "number of zero amount checks," correct?
A. Correct.
Q. And on the third row next to 4844 you have the number 22,407, correct?
A. That's correct.
Q. What does that mean?
A. That means that out of all the checks that are listed on this data from Treasury, 22,407 of them are zero dollar in the amount column, for symbol 4844.
Q. Why would a check have no amount?
A. It's either because it was voided and we, the Bureau of Indian Affairs, told them it was a voided check, or at this point in time, when mass cancellation occurred, they heard nothing from the Bureau of Indian Affairs regarding this particular check and they took it upon themselves to consider it void, because at this point now, any check that is out there in the United States as of September 30, '89, is void, because it doesn't say "void after one year" on the face of it. So it's not a limited payability check, therefore, it can't be issued anymore.
Q. So you're talking about the actual check stock is outstanding, correct?

A. That's correct.
Q. It doesn't mean that BIA actually issued 22,000 checks that had zero amount.
A. That's correct.
Q. So you have the one category as void, which means, what, it might have run through a printer wrong or something?
A. Correct. It could have been chewed up in the printer when they were doing it, it could have been messed up in the typewriter when they were typing it.
Q. So it's that kind of problem, and the rest is the ones where Treasury had issued check stock to BIA?
A. Yes.
Q. And then checks were never used?
A. At least Treasury was never informed that this particular check number was used, so they input a zero dollar amount.
Q. And the reason that the check stock couldn't be used is, I think you said was because it was not a limited payability check.
A. That's correct.
Q. And the legend on the front of the check needed to say that, correct?
A. Needs to say "void after one year."
Q. Now, I noticed there's no zero amount checks for these other disbursing symbols.
A. I don't know. I can't see. It's too zoomed in there.



Q. Okay. Can you back out a little?
A. You're correct. I don't see any others.
Q. Do you know why that would be?
A. No.
Q. Okay. Now, at the bottom, the last line of this document or this table says final T, the letter T.
A. Mm-hmm, yes.
Q. Meaning total?
A. That's what I'm guessing it means.
Q. Do you know who prepared this table?
A. It would have probably been prepared by the direction of Soza & Company to our computer tech center.
Q. And the total dollar amount there is $1,914,528.45, correct?
A. Correct.
Q. And the total checks --
THE COURT: Let me just interrupt you for a minute. This witness and for that matter the previous witness on occasion would answer questions, "do you know," by saying "it would probably have been." I don't quite know how to credit that, whether it's an established fact or not.
But I want you all to know that we're dealing with what is probative and what is not. This witness seems to know what she's talking about and if she tells me that there's something that probably happened or that she thinks it happened, unless



there's either an objection to it or some cross-examination on the point, I'm going to take it as established.
MR. GINGOLD: Your Honor, we're holding our objections so this should go quickly. In the cross-examination we'll deal with it.
THE COURT: That's fine.
BY MR. KRESSE:
Q. And the final column there, Ms. Ramirez, is the total number of checks, correct?
A. That's correct.
Q. And in your understanding, the 60,961, correct?
A. That's correct.
Q. Now, between the essentially 1.9 million and the approximately 61,000 checks, what do you understand those two numbers to represent?
A. All the checks that were mass canceled by Treasury that are affiliated with individual Indians or under the trust function.
THE COURT: Ms. Ramirez, is the number, the total number of checks, does that include the zero amount checks so that if you want the checks that have an amount you have to subtract 22,000 from it?
THE WITNESS: Yes, you do.
THE COURT: Okay.
BY MR. KRESSE:
Q. Right. So the net of nonzero amount checks would be



approximately 38,500 checks, I think the arithmetic comes out.
A. Okay.
Q. Does that sound right to you?
A. That sounds right.
Q. Now, Ms. Ramirez, the next document, the next exhibit, Defendants' Exhibit 221, is a three-page document, and the first page has a date in the left-hand corner of August 6, 1993. Correct?
A. That's correct.
Q. Do you know what this short text refers to?
A. It is from Harriet Brown to Jim Paris, where she's saying that there is this write-up that is going to go to the OMB, Office of Management and Budget, and if you want to revise the numbers in this write-up, go ahead and do so and give it back.
Q. And actually the first sentence says "a letter due to the Hill." Do you understand what that refers to?
A. Yes. We the Bureau of Indian Affairs were supposed to provide a report to the Hill.
Q. And then the fourth line down states that it has cleared OMB. OMB is the Office of Management and Budget, correct?
A. That's correct.
Q. Who is Harriet Brown?
A. Harriet Brown worked in Washington, D.C. I'm not sure of her exact title, but I recall that Jim Paris reported to her.
Q. The next page of this Exhibit 221, second page, do you

Page 354

recognize that document? And it continues on to the third page.
A. Yes.
Q. What is this?
A. This looks like our report that was provided to the Hill.
Q. Were you involved in preparing this report?
A. I provided a couple of decision papers or recommendations for decision papers, with statistics or information that gave a status on where we were at the time for this mass cancellation project, and they eventually used some of that information in this.
Q. Directing your attention to the second paragraph of page 2, which starts "OTFM has determined that the Department of Treasury dollar level of canceled checks to be identified as specific accounts was $1,914,528.45." That's consistent with the number we discussed just a few moments ago, correct?
A. That's correct.
Q. Further in the same paragraph, it states -- and OTFM is the Office of Trust Funds Management?
A. That is correct.
Q. Were you employed at that time by OTFM?
A. What year was this?
Q. 1993.
A. Yes.
Q. The second sentence and the third sentence addresses a number of a little over $616,000. Can you explain what happened

Page 355

with the $616,000?
A. Yes. We went through a couple of steps to identify this check information to specific account holders and eventually their accounts. The first pass was to take the data that was provided from Treasury and bounce it against the database that had all the account information, the transactions, et cetera, and if we got a match on that information, then -- and when I say match, I mean the check number matched, the dollar amount matched, and it was a legitimate -- not a legitimate -- it was an open IIM account.
Then at that point we set them aside and we did some postings back to these IIM accounts. We did it in a couple of instances, first in April of '93 and then in August of '93. In addition to that, we also, if we didn't get a hit on the check number and the dollar amount when we bounced it up against the database, then we had information that told us that this check, this particular check came from this one agency or this regional office, and so we then identified to those regions or agencies that these checks were yours, with their documentation, could they identify the account that this check came out of. And so there were a couple of steps that were used to get to this point of $616,000.
Q. So the third sentence states that of that $616,000 amount, the accounts either had the money reimbursed, or it turned out that the checks had been voided, right?

Page 356

A. That is correct.
Q. And we already discussed what it meant to have voided a check.
A. Correct.
Q. But this list doesn't provide a breakdown between those two categories, right?
A. No, not at this point.
Q. And then the fourth paragraph down indicates in the first sentence that there were remaining checks which had not been traced, correct?
A. That's correct.
Q. Turning to Defendants' Exhibit 220, and this -- can you identify this document, Ms. Ramirez?
A. Yes.
Q. What is it?
A. It is my report as of December 2 of '93 showing the status of where we are for this mass cancellation project.
Q. And it indicates it's prepared by you, correct?
A. That is correct.
Q. And the date was December 2, 1993.
A. Yes.
Q. The first paragraph, the last sentence states that "this brings to date a total of 6351 checks totaling more than $278,000 recredited to IIM accounts." Do you see that?
A. Yes, I do.

Page 357

Q. Now, is this part of the $616,000 that we were just talking about?
A. Yes, it is.
Q. So if you had 278,000 credited, then the rest of that $616,000 amount would be attributable to what?
A. Probably attributed to voids.
Q. All right. So we have a little over $300,000 of voids if that's the arithmetic, correct?
A. That's correct.
Q. So if we start out with $1.9 million and we have voids of over $300,000, now we're down to about 1.6 million, correct?
A. That's correct.
Q. And we found here, based on this document, we found another, little under 300,000, correct?
A. Correct.
Q. So we're a little closer to sort of an unfound amount of $1.3 million.
A. That is correct.
Q. Ms. Ramirez, if I could direct your attention to Defendants' Exhibit 224. This is a one-page document. Are you familiar with this table?
A. Yes. I've seen it before.
Q. And it's got a date under the heading of as of April 16, 1993, correct?
A. Correct.

Page 358

Q. And you earlier talked about tables that were generated. Do you know who generated this table?
A. It would have been off of that same database that all the minireels were loaded onto, probably at the direction of Soza & Company.
Q. And this first -- I'm sorry, you have, the first column here is a category of essentially strata of dollar amounts for these checks; correct?
A. That's correct.
Q. The first line is zero dollar amount checks, correct?
A. Yes.
Q. And it's a little over 19,000.
A. Yes.
Q. And down at the bottom -- I'm sorry. The purpose of this table is what?
A. It was to show us, the Bureau of Indian Affairs, how the check information laid out according to what was mass canceled or at this point unidentified. We didn't know an account number. I don't think we even knew an area or agency that may have issued this particular check.
So we wanted to see for this category of checks how does the information lay out? Is it big checks, medium checks, zero dollar checks? So we had this strata put in place and then the numbers run against it.
Q. And the largest category here or the largest number at

Page 359

least is the zero dollar amounts, right?
A. That is correct.
Q. And at the bottom you have the number 37,000, looks like 8?
A. 003.
Q. Does that refer back to the 37,000 -- I'm sorry. The Defendants' Exhibit 221, the second page, fourth paragraph. You see that? It references 37,003?
A. Yes.
Q. Is that the same?
A. Same number.
Q. All right. Same number. And this table shows there is a relatively small number of checks over the amount -- or $500 or above, correct?
A. Correct.
Q. Which I think if you add it up, it's less than 150 checks.
A. 500 and above. You said less than 150?
Q. Right.
A. That's correct.
Q. Why would you bother to try to identify these zero dollar amount checks? Why spend the effort? If you have a zero dollar amount, how could that help if you found out where those checks were or came from?
A. Because that would tell you that you wouldn't have to seek an IIM account to recredit. This was not a valid check.
Q. But would it help you to find other checks that were valid?

Page 360

A. Yes. As a matter of fact, that is a good point. If we knew that check No. 5 was issued from this agency and check No. 10 was issued from the same agency, but we didn't know about check No. 8, then more than likely check No. 8 was also a check that that agency issued as well. And so we at least narrowed it down to a specific agency or regional office in doing research for the unidentified checks.
Q. Ms. Ramirez, turn your attention to Defendants' Exhibit 225. And this is an eight-page document. What is the -- and this is a series of tables, correct?
A. That's correct.
Q. And it doesn't appear to have a date on it, does it?
A. No. I don't see one.
Q. All right. The title is "Mass cancellation project, analysis of Treasury listing," and then "disbursing symbol 4844 versus all others." What does that mean, that title?
A. That means that out of the 12 minireels that we received from Department of the Treasury, they provided us all the disbursing symbols for all agencies across the United States. So not only did we get any disbursing symbols that were affiliated with individual Indian checks, but everyone else as well, like IRS or Veterans Affairs or any Treasury regional disbursing office, RDO. We got everything.
Q. So looking at the last page of this document, the eighth page, at the bottom, there's what's called a condensed table.

Page 361

A. Correct.
Q. What does that condensed table show?
A. It shows that out of the disbursing symbol 4844, out of the entire database that was provided to us by Treasury, that was 10 million checks, to the amount of $5.1 billion. And out of that the 4844 symbol was 57,000 checks and $1.8 million.
Q. Turning your attention to Defendants' Exhibit 227, can you tell us what the purpose of this table was? And this is a one-page exhibit.
A. It shows that the title, analysis of checks identified to date -- is that what that says?
Q. It's spelled "indentified."
A. Identified to date. These are the checks that we had narrowed down to at least a regional office, and it could even be an IIM account. And the reason why I'm saying it could even be an IIM account is because of that handwritten annotation that you see saying "auto and manual." The only way I would have known -- and that's my handwriting -- that these were auto or manual checks is because we had bounced the data up against the IRMS database, and there are codes in that database, if you're issuing an automated check from someone's account, meaning that they're an adult, they're legally competent, there are no holds on their account and their balance reaches a certain amount, $25 or higher, then a check will automatically be issued that evening. Those are auto checks.

If for some reason their account is on hold, let's say it's a minor, and their guardian or ward comes in and makes a request to the superintendent for some funds on their behalf, then they're making a request for a manual check, and then a different code is used in the system when you cut those checks.

So the only way I would know that it's an auto or a manual check is because I bounced it against the IRMS database, or I had it done, and this is the information that came back. And so you see that out of the 20,000 checks that were identified, 6,000 plus were affiliated with the Aberdeen region, 2,300, et cetera, Anadarko region, more than 2,800 --
Q. And so on. We've just got a breakdown by region of those identified?
A. Correct.
Q. And the date on the second table on that page is June 30 of '92?
A. Yes.
Q. So is this the data -- what had happened as of that date?
A. Because the table on top isn't dated, that was probably a snapshot in time. I don't know what time. But whenever we would get statistics together for the 12 regional offices and their IIM accounts, it wasn't one central database. It was 12 databases. So we would have to take 12 reports and key them in to an Excel spreadsheet or something that gives you this kind of breakdown of the IIM accounts.



Q. So this second table is actually the number of accounts in those regions, right?
A. As of June 30, '92, correct.
Q. So there's a total of 288,593 IIM accounts.
A. Yes.
Q. Then the last table we're going to look at, Ms. Ramirez, is Defendants' Exhibit 226, several tables, and it's a two-page document. The first page, can you tell us what the purpose of that table is?
A. This one shows the unidentified checks for just disbursing symbol 4844, and that's broken down by strata, zero dollar versus anything -- a penny to 1.99, et cetera, all the way up to $10,000 and greater.

It shows you the total number of checks, 57,000. Of the 57,000 how many at this point in time were yet unidentified, 37,000. What is the percentage of the total to that one particular strata. So for example, if you look at the third line down, $2 to 999, that shows that there were 9,220 checks in that particular strata. 4,108 of them are unidentified at this point in time, or almost 45 percent are not yet identified to an account.
Q. In looking at the second page, the middle of this document, just directing your attention to the condensed table at the bottom, again we've got this zero dollar amount reference, correct?



A. That's correct.
Q. And again, just referring to disbursing symbol 4844, right?
A. Yes.
Q. Now, just to finish up on the mass cancellation, Ms. Ramirez, turning to Defendant's Exhibit 216, this is a two-page exhibit. Do you recognize this document?
A. Yes. I've seen it.
Q. What are these two documents referred to in this exhibit?
A. Let's see. Is this the first page? In this first page, we're look at something from the Osage Agency, where they're writing to Albuquerque central office, and they're saying that they received a check from the Anadarko area office, where someone came in and they hadn't cashed their check. And it was a mass canceled check, because you see the date of the check is March of 1986. And so Osage Agency is asking if this is one of the checks that was mass canceled.
Q. Now, early in your testimony about the mass cancellation project, you talked about how Treasury essentially was not going to refund the money to the BIA, correct?
A. Right. Correct.
Q. For the mass canceled checks. So in this case where would the money come from if in fact you wanted to give this person the thousand dollars they're asking for here, if in fact it proved to be a check they should have received or been able to cash?



A. The Bureau of Indian Affairs later wrote and obtained or had legislation passed or -- I don't know about legislation passed. They obtained funds, appropriated funds, to remedy any checks like this that would have been presented for reimbursement. So there was an account set up for this such case.
Q. Do you know how much money was set aside by Congress for the mass cancellation?
A. 500,000? The original amount might have been larger, but I know at a certain point in time it was at least 500,000 that was still available.
Q. All right. Ms. Ramirez, let's turn to your current responsibility, which is the American Indian Records Repository. And we have a series of photographs, which you're familiar with, correct?
A. That's correct.
Q. Ms. Ramirez, there were photographs taken of the AIRR on several occasions, correct?
A. Yes.
Q. And what was the purpose of having those photographs taken?
A. Initially the first time we had photos taken of the AIRR was for a progress report that our office, Historical Trust Accounting, was preparing, and then later on it was to be submitted as exhibits for this trial.
Q. And so, do you recall when the first set of photographs was



Bryan A. Wayne, RPR, CRR
(202) 354-3186 Official Court Reporter bryanawayne@verizon.net

Page 366

taken?
A. No, I do not.
Q. Do you remember what year it was?
A. I don't know if it was 2006 or 2005.
Q. But in any event, it was for the progress report?
A. Correct.
Q. Were you involved in the process of getting those photographs taken?
A. Yes.
Q. What was your role there?
A. I have purchasing authority on my government credit card. In addition to that, I have an administrative assistant that works for me, so I had her check with a couple of photographers in the area as far as doing photographs for us, getting quotes for them.
Q. All right. And I'm sorry to cut you off, but the individual that took the photographs, was it the same photographer for both of these occasions that you reference?
A. Yes.
Q. And were you around when the photographer was taking these photos?
A. Yes.
Q. Now, before we get into the specific photos, what are your responsibilities as the on-site manager at the AIRR?
A. I manage the contract staff that the Office of Historical

Page 367

Trust Accounting has working there at the AIRR. There are two Interior offices there at the AIRR. One is the Office of Trust Records, and they're responsible for the trust records for Indian affairs, and they're the ones who are managing the AIRR.
But my office, Historical Trust Accounting, needs these records to do this historical accounting. So we have sublet space from them to be there in that facility, so that we can search these records to do the historical accounting.
So we have two contract firms that are there. One is an accounting firm and one is an imaging and coding firm. About 130, maybe 135 people all together that are there. Half of them -- approximately half of them do document search, will actually look through the boxes for particular documents, and the other half do the imaging and coding of whatever it is we find.
Q. And the accounting contractor is what company?
A. Clifton Gunderson.
Q. And were they previously under a different name?
A. Yes. They used to be Chavarria, Dunne & Lamey.
Q. And then the other company that does the imaging and coding?
A. Ecompex, Incorporated.
Q. Can you spell Ecompex?
A. E-C-O-M-P-E-X.
Q. You indicated that the Office of Trust Records is on site

Page 368

there. Is the National Archives and Records Administration also on site?
A. Yes. The space -- the entire space that is being leased by the government is under a National Archives contract or lease, and then a portion of that is where Department of the Interior is, and then the Interior portion is divided between Office of Trust Records and my office, Office of Historical Trust Accounting.
Q. And this facility is sometimes referred to as being in a cave. Is it actually in a cave?
A. It is in a cave.
Q. It's a man-made cave?
A. Yes. It was a limestone cave that they were mining in the '60s or '70s.
Q. Now, the systems that are used at the AIRR, there are certain information systems, computer systems that are used for the document work and the historical accounting work, correct?
A. Yes.
Q. And one of those systems is the box index search system, correct?
A. That's correct.
Q. Also referred to as the BISS?
A. The BISS.
Q. And also you have the account reconciliation tool, correct?
A. Also referred to as the ART, A-R-T.

Page 369

Q. And are there other systems that are used for the purposes of the --
THE COURT: What kind of soup do they give you in the cafeteria at lunch?
THE WITNESS: Alphabet.
(Laughter)
BY MR. KRESSE:
Q. And since the Court has expressed an interest in a tour of the AIRR, Ms. Ramirez --
THE COURT: I think my enthusiasm is waning rapidly.
(Laughter)
MR. KRESSE: That wasn't my intended goal, Your Honor.
BY MR. KRESSE:
Q. Are you involved in setting up tours?
A. Yes.
Q. And what do you do?
A. Either the tour can be made as a request to the OTR trust side or to our side. It depends. The OTR side is under Office of the Special Trustee, so they have a lot of personnel that work at agencies and regional offices. Sometimes they have meetings in the Kansas City area, and they'd like for them to see this facility, because when you are doing research on a particular account or transaction and you need a specific document, you make this request to somewhere in Kansas, and people refer to this cave or AIRR, and they have a hard time

Page 370

identifying or understanding that if I want a journal voucher from 1956, what is the big deal? Why does it take so long? Why is it so hard?

Well, it speaks a thousand words when you actually go and see how big the facility is, the volume of boxes of records that are there, the steps you have to go through in identifying the box that has that particular document, and then extracting it and either photocopying it or imaging and coding it.

So it helps at least day-to-day operations, and I know it is something we have to do for the historical accounting, but it provides understanding when people actually see that it really is a cave, you can stand upright, we have electricity and plumbing facilities and everything. It's big, like 90 acres underground, because big trucks like tractor trailer rigs drive under there, and just a portion of it is what is leased by the government.

There are private companies down there that have their businesses as well, because it's a good storage facility for them. It's climate controlled, there aren't rodents down there. And when you go down there and you're driving into the cave, that's kind of unsettling because you're driving into this cave, and then you go up a street and you see a long road ahead of you with lights way down there, and you can't believe it goes that far, and then you get way to the back of the cave, which is where the NARA/AIRR space is at, you see the front entrance to

Page 371

the AIRR, and you're impressed because, wow, it really is an office.

And then you go in and there are people working in there and you take the tour and you see the shelving or the rooms that the National Archives has, with these rooms they call bays that are the size of a football field, each room, and they're up to room 12 or 13 now, from what I understand, with the shelving that is two stories tall, all the way across this room.

So that's a lot of stuff. And the Bureau of Indian Affairs or Indian Records is just one of those rooms. We are not their biggest client. From what I understand, the IRS is their biggest client, or so says the NARA individual who normally gives the NARA side of the tour. So then you see through this process that there is a whole lot of stuff and there's all these people and all this work being done, and I think it's rather impressive.

Q. Just to give a quick breakdown of the different areas. You've already described the bays that are -- that's NARA's area, right?
A. That's correct.
Q. Where the actual boxes are kept, permanently kept?
A. That is their facility, their property.
Q. And in the cave you also talked about how OTR has office space?
A. That's correct.

Page 372

Q. And OHTA has office space?
A. Yes, we do.
Q. And then you have your 130 or so contractor employees?
A. That is right.
Q. And they occupy quite a large area, which we'll see?
A. They occupy half of a bay.
Q. But there's also another part of this facility that -- it's not part of the cave itself, but it's off-site, and that's what we refer to as the annex, correct?
A. That is correct.
Q. What happens basically at the annex?
A. Basically at the annex, that's where the boxes arrive from across the United States, and that is managed or run by the Office of Trust Records. And so when the boxes get there to that facility, they unload them or offload them from these trucks. They have a staff there, a contract staff. It looks to me like 60, 80, maybe 90 people all together that are working at that facility. And their job is to index or inventory what is in these boxes, to a certain level, and then make sure the boxes are all labeled across the front and they're grouped in certain groups, like personnel records are in this group and realty records are in that group and financial documents are in this group, et cetera.

And then accession numbers are assigned to these groups of boxes, and then eventually the boxes are then transported to the

Page 373

cave and custody is handed over now from Department of the Interior to the National Archives. And the information that's obtained at this annex facility goes into a database called the BISS, B-I-S-S, and that is what we all use, whoever wants to do research with these boxes, to identify what box you want and where you're going to find that journal voucher or that deposit ticket, et cetera.
Q. All right. Well, let's go to the slides, then. I'll just ask you as they come up, I'll identify it by exhibit number and then you can just give us a very general description of what we've got.

The first slide is Defendants' Exhibit DX 163. What does that show?
A. This is what we were referring to as the annex. This is the facility that is above ground where the boxes go to be indexed.
Q. And there's a picture of a tractor trailer truck there, correct?
A. Yes.
Q. And is that backed up to the bay for the offloading of documents?
A. That's correct.
Q. Then Defendants' Exhibit 164, what does that show?
A. This is the front entrance to that facility. You have to go through a magnetometer, you are -- the employees that work



Bryan A. Wayne, RPR, CRR
(202) 354-3186 Official Court Reporter bryanawayne@verizon.net

there wear badges. If you're a visitor, you sign in and get a visitor's badge.
Q. Then the next photograph, what does that show? And I'm sorry, were you present when these photographs were taken?
A. Yes, I was.
Q. And these photographs of the annex, those were all taken at what time, do you recall?
A. It wasn't that long ago.
Q. This summer?
A. Yes. It was the summer.
Q. So what does this photograph show?
A. This shows that this particular truck that was delivering boxes that day has a seal that goes on the back of the truck. Once these trucks pick up records at a certain location, they're not to stop anywhere else, pick up anything else, because once the boxes are loaded, then they're sealed with this type of metal or aluminum or whatever looking thing she's cutting off.
Q. All right. And who is the individual, do you recall?
A. That's a Labat employee, which is a contractor for Office of Trust Records.
Q. And looking at Defendant's Exhibit 166, what's that?
A. That is the truck now open and those are the boxes inside the truck.
Q. Defendants' Exhibit 167. Can you explain what's going on there?



A. Now they're offloading the boxes that are in this truck into the facility.
Q. And are those boxes shrink-wrapped on that pallet?
A. Yes, they are.
Q. And next photo.
A. The truck is to the right, and he has come around like in a u-turn and he's going into the facility through these plastic shred things there and taking it into the area where the workers are indexing the boxes.
Q. All right. And the next slide?
THE DEPUTY CLERK: I'm going to need a number.
MR. KRESSE: I'm sorry. Defendants' Exhibit 168.
THE DEPUTY CLERK: 168?
MR. KRESSE: Yes.
THE COURT: Okay. Thanks.
MR. KRESSE: Sorry.
BY MR. KRESSE:
Q. Defendants' Exhibit 169, the next photo.
A. That shows an area where they are stacking all the pallets of the boxes that are coming off of this truck.
Q. Now, the work area, you described a group of workers who are doing the BISS index work, right?
A. Yes.
Q. And relative to this photograph, where are they located?
A. They're to the right behind the photographer.



Q. And this is a big open area?
A. Big open area.
Q. Let's go to Defendants' Exhibit 170. This is again, it looks pretty redundant but what's the difference between what we've got in 169 and 170?
A. There are a lot more pallets stacked in this one particular area, and it's taken from a different angle.
Q. So we've still got the shrink wrap, nothing else has been done, right?
A. That's correct.
Q. Now, Defendants' Exhibit 171, what does this photograph show?
A. This is showing that they have in this same open area to one side of the room there, where they, once -- where they unwrap the boxes. They break the shrink wrap, they take them off the pallets, they line them up on these shelves, and from what I understand, they line them up there so they can number them or give them these accession numbers.
Q. And who sets up the accession numbers?
A. The National Archives provides them to the Office of Trust Records.
Q. All right. Next slide is Defendants' Exhibit 172. And what is this individual doing?
A. He's probably -- no. I know he's writing the 075 number on this box.



Q. 075 being what?
A. 075 is a NARA accession number that is provided to the Office of Trust Records so that they, the National Archives, can identify this group of boxes.
Q. And going to Defendants' Exhibit 173, what does that show?
A. This shows the workers that are actually doing the indexing into the BISS.
Q. And this contractor --
A. This is Labat. They're a contractor of OTR, Office of Trust Records.
Q. So in this picture to the far right, is that shelving over there on the far right side sort of in the middle?
A. Yes.
Q. And is that the shelving that you were referring to previously after the shrink wrap had been removed?
A. That's correct. That's the shelving we just saw.
Q. Now, moving to Defendants' Exhibit 174, what does this photograph show?
A. This is a close-up of an individual keying into the system, into the BISS.
Q. All right. Can we zoom in on the display?
Now, what system is this that's shown on the CRT or the --
A. This is the BISS, the Box Index Search System.
Q. So the information that's -- for instance, the top, "tried code," do you see where that is in the upper left? "Tried

Page 378

code"?
A. Yes.
Q. "100 Portland area office." That's information input by the individual in this picture?
A. That's correct.
Q. So all this information here this person has typed in, is that your understanding?
A. I understand that some areas of this screen we're looking at are prepopulated and others they type in.
Q. All right. Let's go to Defendants' Exhibit 175. Ms. Ramirez, what does this photo show?
A. It shows that once the boxes have indexed into BISS, now they get repalletized, reshrink-wrapped for shipment now from this facility to the cave to go to National Archives.
Q. The next photograph, Defendants' Exhibit 176. What does that represent?
A. That is the truck that Labat uses to take the boxes away from this facility to the cave.
Q. And let's go to Defendants' Exhibit 177.
A. That's the entrance to the cave. One of them.
Q. And as you referenced before, this is a facility that houses other operations besides just even NARA and Interior, correct?
A. That is correct.
Q. So is Meritex -- that's the name of the place, the Meritex

Page 379

Lenexa Executive Park?
A. They own the facility or the cave and they lease to other companies.
Q. Okay. Let's go to Defendants' Exhibit 178. What does that show?
A. That shows the road that -- there are several roads in this cave. This is one of them, when you take a turn, go into the cave, you see this long road in front of you.
Q. And eventually, it leads to what's shown at Defendants' Exhibit 179, correct?
A. That's correct.
Q. And that is what?
A. The American Indian Records Repository. That's the front of it.
Q. The entrance to the office space?
A. The front entrance to the office space. And this office space is the space that the Office of Trust Records occupies.
Q. Then let's go to Defendants' Exhibit 180. What does that show?
A. This is one of the bays that NARA has, and the shelving you see is what I was talking about earlier, with all the boxes that are on the shelves.
Q. Are these Indian records?
A. I can't tell, but -- I can't tell.
Q. If you were able to look at the box --

Page 380

A. The front of it.
Q. Right. The front of the box.
A. Yes.
Q. See if we can zoom in.
A. Yes, it looks like these are the Indian records, because the box to the most right says "J.V.," and that stands for journal voucher.
Q. And FY 93?
A. Correct.
Q. Meaning what?
A. Fiscal year 1993.
Q. And the next, Defendants' Exhibit 181, just another view of the bay, correct?
A. That's correct.
Q. And are these Indian records, to your knowledge?
A. They look like it, because the boxes to the right look like they say 075, yes. 075 is the NARA accession number that is provided to Interior, and anything 075 is Indian records.
Q. Then going to Defendants' Exhibit 182.
A. That is a screen for the Box Index Search System.
Q. And who uses the Box Index Search System?
A. Our contractors for searching the boxes, as well as the Office of Trust Records, because they too are searching boxes.
Q. Now, the individuals who are searching the boxes, are they the individuals who are also reconciling transactions --

Page 381

A. Yes.
Q. -- for the historical accounting?
A. Yes. Our office has at least four accounting firms that are doing reconciliation, and one of them is Clifton Gunderson. Clifton Gunderson also happens to be our document search contractor as well.
Q. But are the individuals who are searching the boxes the same individuals who are actually reconciling transactions?
A. No.
Q. So you've segregated those functions, correct?
A. That's correct.
Q. So one of the other accounting contractors could submit a request for documents, correct?
A. Correct.
Q. And then the Clifton Gunderson searchers, right, researchers?
A. Yes, they search for that document, yes.
Q. So let's go to Defendant's Exhibit 183. What does that show?
A. That shows the manager's table for the Clifton Gunderson side where -- they are the ones who see the requests from the different accounting firms for particular documents. They query the BISS, the Box Index Search System, and then they decide which boxes are going to be ordered so that they can be searched by their staff there.

Page 382

Q. Then Defendants' Exhibit 184. What does that show?
A. This is a different area but still on the Clifton Gunderson side of the house where, we call this the BLOC, B-L-O-C, Box Logistics Operations Center. When boxes are ordered by Clifton Gunderson -- and nowadays we're doing about 300 to 350 boxes a day. When they come in from the National Archives, custody is transferred from NARA to us, Office of Historical Trust Accounting, they line these streamliners up. The thing with all the boxes piled on it with the wheels there, that's the streamliner. So they will line these streamliners up in front of this area and key in to a database that they have that they have actually received box 1 and 9 and 6 and 12 into their database.
Q. What happens once the boxes have been keyed in that are on the streamliner?
A. Once they have been keyed in, then they put them on shelves in different areas. You see behind him there are some shelves there. Also behind the photographer, what you don't see are more shelves as well. They have delineated these shelves into sections so that a particular section represents a particular project.
For example, we are working on reconciling judgment accounts, per capita accounts, special deposit accounts, the land-based type accounts. And so each box is assigned to a particular project, and therefore it goes in a certain spot on

Page 383

the shelves, and the shelves are also separated by where in the process it should be. For example, when a box first comes out from the National Archives, it goes on to a shelving section that would be annotated search.
Once it's searched, it would be moved to a different section of the shelving for quality control, or QC. Once it's QC'd then it would be moved to a different section of the shelves, or even put on a streamliner to be returned to the National Archives.
Q. So the QC is for the purpose of doing what?
A. To ensure that we didn't miss a document that we were searching for.
Q. And then Defendants' Exhibit 185, just a close-up of what we were looking at before; is that correct?
A. That's correct.
Q. All right. Then Defendants' Exhibit 186.
A. This shows an actual search team, still on the Clifton Gunderson side. They're going through boxes where they are looking for documents.
Q. Now, if they find documents, what do they do after that?
A. If they find a document in a box, and it's just one document, they'll photocopy the document. And you see photocopiers to the right there, and even a little bit on the left you see a photocopier. Because the documents that we're finding in these boxes, we're not the only ones that want to

Page 384

search these boxes for different things. The other side, Office of Trust Records, also needs these boxes to do document search. And sometimes plaintiffs come in and want to do document search or --
Q. You mean plaintiffs in other lawsuits, not this lawsuit?
A. Correct. In other lawsuits. Would like to search these boxes as well. So we don't want to tie the box up for the time that it takes to image and code that one document, so we'll pull it out, photocopy it, make the best photocopy that we can make, and then pass the photocopy on to the imaging/coding side, and return the box.
THE COURT: Ms. Ramirez, can you give me an example of what they're searching for? I mean, what would a search be?
THE WITNESS: If our office has assigned a particular accounting firm to reconcile certain transactions or certain accounts, when that accounting firm looks at this one transaction, like a posting into someone's account for $50, and it's plus, so it's a collection, the accounting firm knows from the experience and training that we've given them, that you need to find either the bill for collection or the deposit ticket or all of that, and then even further, earlier in the process you need to find the lease, because you want to ensure that it was suppose -- it is $50 that you were supposed to collect and not $80.
So that accounting firm, just in this one assignment of

Page 385

this transaction, knows that they need the bill, the schedule of collections, the deposit ticket, and the lease. So they will make that request to this facility for all those documents. And then will query through the BISS, find that it's these 10 or 20 boxes, pull those out, search them, find them, either photocopy them -- if it's a voluminous type thing, like invalidating the data that we're working with, sometimes we need a whole report, and those reports can get very big, like half of a box or something, then we will just pass the whole box on to the imaging/coding side of the house, and they'll image and code that document.
THE COURT: Thank you.
THE WITNESS: You're welcome.
BY MR. KRESSE:
Q. And you indicated you might be searching, for instance, 20 boxes for a particular document. Why can't you just find or know that a box contains the specific document or documents you're looking for?
A. Because when the inventory or indexing is occurring of these boxes up at that facility called the annex, when you open a box, they've been instructed to index or inventory to the document type level. So if you open a box that has three types of documents -- bills for collection, schedules of collection, and deposit tickets -- they're going to capture what's written on the front of the box, they're going to capture what's written

on every single file folder label, and inside each file folder they're going to capture the types of documents they see.

So if there are nine file folders and three have bills for collection, three have schedules of collection, and three have deposit tickets, you will see all nine file folder titles, and then you'll see the words "schedules of collection," "bills for collection," "deposit tickets." And then you'll see a beginning and an ending date. Like the earliest date for this particular file is March of '93, and the ending date is May of '93.

You don't know that it's the bill for collection No. 2220 dated March 13 of '93. So if there are a couple of files or a couple of boxes that have some deposit tickets or schedules of these types of documents in them, then you have to request four or five or whatever boxes and look through them until you find the deposit ticket you were looking for.
Q. And these boxes also indicate where the documents came from, right?
A. That's correct. In this BISS or Box Index Search System, they capture where the box came from. So in earlier testimony I said that, you asked how many copies of these documents are there? Well, there were a lot of copies made of these documents for different offices, so if I wanted to find a bill for collection or a deposit ticket, I could look either in the agency box, like Pawnee Agency, or I could look in the Anadarko area box for that same deposit ticket, because both of them



would have had a copy of it.
Q. Looking at Defendants' Exhibit 187, what kind of work is going on there?
A. This is now the imaging side of the room, with Ecompex, and these are preppers. They are prepping or preparing the documents for imaging. In the scenario where we pass a box on to this contractor for imaging, we have to take out staples and paper clips and take off rubber bands, et cetera, to pass the documents through imaging. We also have to reassemble these documents exactly the way they were when we took them apart. When we reassemble we use stainless steel paper clips and stainless steel staples. We do not put rubber bands back on. Those damage documents. So instead we put them in expandable file folders.

But we have to know that we took the paper clip off here or we took the staple out here, so all these different colored pieces of paper mean something to the imager: start the staple, stop the staple, start the paper clip, stop the paper clip, et cetera.
Q. And these individuals pictured here work for Ecompex, correct?
A. That is correct.
Q. And the next photograph, Defendant's Exhibit 188, these are also Ecompex people pictured in the foreground?
A. That is correct.



Q. What are these individuals doing?
A. These guys are imaging. And I know they're imaging because there are scanners in front of them and they actually have the boxes in front of them.
Q. And each individual, are they able to work on as many boxes as they want, or how --
A. You can only work on one box at a time.
Q. And Defendant's Exhibit 189, what's going on in that picture?
A. These are coders, and I know they're coders because, first of all, you don't see the scanners in front of them, nor do you see boxes in front of them. You just have computer screens and keyboards. So once the imaging is done and all the imaging is quality control checked, because we can't have it crooked, we can't have it cut off, we can't have it blurred, because we have an accounting firm in Los Angeles that needs to know that that deposit ticket is $8.29 and not $3.29.

So then images, after they're quality control checked, get passed to the coding side of the house, where these coders do a double blind code. That means that they assign the same image to two different individuals. So two different people will get the same deposit ticket or the same journal voucher, and they have to capture certain information off of these documents that was predetermined by our office and the accounting firms on what are we going to code for a deposit ticket, what are we going to



code for a journal voucher, what are we going to code for a lease.

So they will capture the information they're supposed to off the document in front of them, and then the two coders' information is bumped up against each other. If one captured $8.29 and the other one coded $3.29, then somebody quality control checks it to see was it really an 8 or was it a 3.
Q. And then the last photograph of the facility itself and the work going on there is Defendants' Exhibit 190. What does that photograph show?
A. That's a screen off of the imaging coding database that shows the document on the left side. And on the right side you see the coding information.
Q. And this in this case is a journal voucher, correct?
A. That's correct.
Q. Now, we have just several more photographs of actual documents that are in the collection at the AIRR, which you've seen before, correct?
A. Yes.
Q. And do you remember when these photographs were taken? This would be Defendants' Exhibit 191 through Defendants' Exhibit 205.
A. I believe these ones were taken earlier when we, OHTA, was preparing its progress report.
Q. Now, how were these specific documents selected, do you

Page 390

recall?
A. Washington, D.C. advised Lena Mills, who is in charge of the Office of Trust Records there at the facility, that they wanted some older type documents, like ledger books or ledger cards. So based upon some querying that either she did or she had her staff do, they were -- they pulled these ledger books out and put them in a particular room, and we had the photographer photograph them.
Q. And the first photograph is up on the screen here, Defendants' Exhibit 191.
A. Yes.
Q. And again, it speaks for itself, but this is the inside cover, correct, of a ledger book?
A. That's correct.
Q. Do you know -- well, never mind. Let's go to the next document, Defendant's Exhibit 192. Ms. Ramirez, can you see the date on that document?
A. Yes.
Q. The transaction listed at the top left corner?
A. Yes, it looks like 1879.
Q. And it indicates, the document indicates Arizona Agency, correct?
A. Yes. Well, it says agency, Arizona, so I think it's, the name of the agency is something else, but it's in Arizona. If you pan to the left, I think it actually -- and go higher. It's

Page 391

Colorado River Agency in Arizona.
Q. And you've reviewed these photographs before, correct?
A. Yes, I have.
Q. And what kind of transactions are described here?
A. Receipts and disbursements that have gone through the Colorado River Agency.
Q. And looking at Defendants' Exhibit 193, that appears to be the same ledger book, correct?
A. Yes.
Q. And Defendant's Exhibit 194?
A. Same ledger book.
Q. And those transactions, upper right corner, appear to be 1880, correct?
A. Yes.
Q. And one final one, also that ledger book it appears, correct? 195, I'm sorry. Defendants' Exhibit 195.
A. Yes, that's correct.
Q. Then the next, Defendants' Exhibit 196. What does that appear to be?
A. This is also a ledger book. It looks like it's from 1924 and 1925.
Q. And then the next photograph, Defendants' Exhibit 197. You see that?
A. Yes.
Q. And that shows transactions from what year?

Page 392

A. 1924.
Q. Then we have Defendants' Exhibit 198. Do you recall what the purpose of this photograph was when it was taken?
A. Yes. It was to show you the size of some of these ledgers. It's not recommended, but they would fill a ledger this full, and that box you see on the right is one cubic foot. So this ledger is about that big.
Q. And then the following, Defendants' Exhibit 199, shows transactions from 1932, correct?
A. That's correct.
Q. And it indicates checks paid, correct?
A. Yes, it does.
Q. And then you have Defendants' Exhibit 200.
A. Same book.
Q. Do you know what transactions are described there?
A. It also looks like checks.
Q. And Defendant's Exhibit 167. I'm sorry. Defendants' Exhibit 201.
A. That's also a ledger book.
Q. What information is shown on that page on the screen?
A. It looks like it's a report that would have been prepared by the Osage Agency, to be provided to some central office somewhere, because we were required on a monthly basis when I was in the branch of IIM to report collections, disbursements to the Treasury Department.

Page 393

Q. And the date of this document?
A. 1958.
Q. And the same, Defendant's Exhibit 202, also 1958, correct?
A. Yes.
Q. I'm sorry, and then finally -- I'm sorry for that. We have Defendants' Exhibit 203. Can you describe what that form shows?
A. Let's see. This is also the Osage Agency in Pawhuska, Oklahoma. It looks like they are reporting receipts and disbursements for particular appropriations.
Q. When you say appropriations, different accounts?
A. Correct. Different accounts.
Q. Then looking at Defendants' Exhibit 204.
A. It's the front of a box. It shows to me that in the upper left corner it's from the Anadarko regional office. I know that because of the B00 that you see. I also know that there are 51 boxes in this particular accession or group of boxes, because the upper right-hand corner says that this is box 8 of 51.
And then it also shows that the National Archives assigned it accession number 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. That's the number on the bottom left. I know it's Indian records because it's 075. I know the National Archives received this accession of boxes in the fiscal year of 2004. Those are the middle digits in that number. And then I also know that it has not only the regional office records in it, but also a couple of their agencies are in here. And I know that because the numbers in the middle of the

Page 394

box, to the left of that hand-hold hole there, say B00/B08/B05. B00 is the regional office, B08 is one of its agencies, B05 is another one of its agencies.
I also know that whoever labeled this box said that there was bills for collection in it, deposit tickets in it, schedules of canceled checks, schedules of collection, et cetera, on the front of it, and it looks like it's all for fiscal year 1999, which is written on the right-hand side of the box.
Q. Do you know what the number in red at the bottom right is for?
A. Yes. Initially when the boxes were collected in Albuquerque, New Mexico, before coming to Lenexa, Kansas, there was an inventory database. They referred to it as secure inventory 97. In that database, it was also an inventory of what's in the boxes. You had to capture a unique number for each box. And so it didn't have, I guess, the ability to use the accession number and the labeled box number, like you couldn't use that B00 number on the left and 8 of 51 for it to be its unique number. So instead, we had to go to some third field and give it a unique number, which is that red number on the bottom.
Q. Were you involved in designing the secure 97 system?
A. Yes.
Q. With a contractor?
A. Yes.

Page 395

Q. And who was that? Which contractor?
A. The accounting firm Chavarria, Dunne & Lamey.
Q. Which is now Clifton Gunderson?
A. That's correct.
Q. And the last exhibit is Defendants' Exhibit 205. What does that show?
A. That's an actual bill for collection. It's one of the plies of the seven-ply form itself.
MR. KRESSE: Your Honor, that's all I have on direct and I'd like to move these exhibits into evidence.
MR. GINGOLD: Objection, Your Honor.
THE COURT: I don't know what the objection is, but we'll -- what is the objection, Mr. Gingold?
MR. GINGOLD: Your Honor, many of the exhibits have not been authenticated, as you pointed out. In responses to questions were should, should have, could have, maybe, probably. She did not say -- she did not have any basis for determining whether or not there was any accuracy in the records at all.
THE COURT: All right. Fair enough. Well, we'll let you cross-examine if you want to on those, but we'll do that after a mid-afternoon break of about 10 minutes.
(Recess from 3:07 p.m. to 3:19 p.m.)
THE COURT: Are we ready? Mr. Gingold, you may proceed.
MR. GINGOLD: Good afternoon, Your Honor.

Page 396

THE COURT: Good afternoon.
CROSS-EXAMINATION
BY MR. GINGOLD:
Q. Ms. Ramirez, my name is Gingold, and I represent the plaintiffs in this litigation. I'd like to ask you some general questions before we go into specifics. Our goal, in accordance with our understanding of this proceeding, is to try to move it as rapidly as possible, and to the extent I'll use as few exhibits as necessary.
Let's talk about the easiest issue first, and that's the Lenexa facility. I think the government has provided photographs of numerous aspects of the facility, from the trucks bringing documents in, to the encoding of documents, to the storage, and the various contractors that are working in the facility. Is that your understanding as well?
A. Yes.
Q. Is there anything that's material with respect to the Lenexa facility that you haven't testified to in response to Mr. Kresse's questions?
MR. KRESSE: Objection, Your Honor.
THE COURT: I don't even know what the question means. I guess I'll sustain the objection, ask you to rephrase it because of the word material. You're asking her essentially a legal question.
BY MR. GINGOLD:

Page 397

Q. You were involved in at least requesting that the photographs be taken, correct?
A. Yes.
Q. And you were present with all the photographs?
A. Yes.
Q. Why were the particular photographs taken and used as exhibits?
A. Initially --
MR. KRESSE: Objection. Compound question, Your Honor.
THE COURT: Overruled.
BY MR. GINGOLD:
Q. You can answer the question.
A. At the beginning they were taken for the progress report for the Office of Historical Trust Accounting, and then most recently they were taken because I understood that the Judge showed an interest in going to this facility, and in the event that he didn't go, we wanted to show what the facility looked like.
Q. So you wanted to give a good picture of what Lenexa is today.
A. That would be accurate.
Q. And what you considered important in that regard is captured in the photographs; is that correct?
A. Me and Ms. Mills, Lena Mills.

Q. Were there a number of other photographs that were taken that weren't used?
A. Not that I know of. I thought they were all used.
Q. And was there anything else you would have liked to photograph that you didn't?
A. None, no.
Q. So essentially what -- is it fair to say what you tried to depict in the photographs was the nature of the facility itself?
A. That is correct.
Q. The type of work that's being conducted in the facility?
A. That is correct.
Q. The nature of the security of the documents?
A. Yes. That would be accurate.
Q. The volume of activity that is occurring on a daily or weekly basis?
A. I don't know that you get an idea for the volume of activity that's occurring by the pictures that you just saw.
Q. How many people are working on any one day in that facility on the record indexing and encoding?
A. I'm not too sure about the number that are working on the indexing, which is in that above-ground facility, because I'm not with the Office of Trust Records. They use a contractor, Labat, that's not my contractor. It appears to me that there are about between 50 and 90 people in that facility.
Q. How many people are working for you in the facility?



A. 130, 135.
Q. And how many are totally in the facility, whether they're working for you or OTR?
A. Well, let's see. Office of Trust Records has between 15 and maybe 25 on their side, and I don't know what the number is that's working for the National Archives.
Q. So generally speaking, what we saw in the photographs depicts what we would see in snapshots if we visited the facility. Is that a fair statement?
A. That would be accurate.
Q. And, for example, the boxes that identified the type of information that might be in the particular boxes where you had the descriptions on the outside, that would be what you anticipate were contained in the boxes, correct?
A. That is correct.
Q. But you yourself didn't actually view the inside of the box and check it, did you?
A. That one particular box we had a photograph of? No, I did not open it and view the inside of it.
Q. But generally speaking, this is what depicts what we would see, and it's as simple as that, isn't it?
A. That is correct.
MR. GINGOLD: Your Honor, based on that we wouldn't have any objection to those photographs of the Lenexa facility being admitted. There's no reason to question the witness's



statement that this is what we would see if we were there.
THE COURT: Anything after Exhibit 221 that was mentioned, 221, 220, 225, 227, 226, and then I lost track of them.
MR. KRESSE: Your Honor, if it helps --
THE COURT: We'll do it after. Let's not keep the witness waiting.
MR. GINGOLD: I'm just trying to move this along.
THE COURT: Go ahead. I'm glad you're trying to move it along.
BY MR. GINGOLD:
Q. With respect to the old ledgers that were identified in the photographs, I believe what I was able to see on the screen, and my eyes are going too, is the ledgers going back to 1875, is that correct?
A. Yes.
Q. And the ledgers that went back to 1875 preexist the Allotment Act, the General Allotment Act of 1887, didn't they?
A. Yes.
Q. So there is money going in to the government and out of the government for payment to individual Indians, correct?
A. I don't know that it was to, for individual Indians, because that ledger that you saw showed disbursements and collections, and from what I understand of the history of these agencies that were set up across the United States with these



superintendents, they conducted a lot of business with private individuals, for these forts that they had set up in these locations across the United States. I don't know that the money that they were collecting was for a particular individual Indian, or it was to buy goods and supplies for the fort itself. I don't know that.
Q. That's a fair answer. I'm just trying to get an understanding of the information that you have in Lenexa, at least some of it has nothing to do with individual Indian trust beneficiaries, correct?
A. That's correct.
Q. And as a matter of fact, some of the oldest ledgers may have nothing to do with the individual Indian trust beneficiaries?
A. They may not.
Q. And those ledgers that were identified may have nothing to do with the trust, correct?
A. That would be correct.
Q. But there are ledgers or items that show activity back, I think 1924? I think there are bank checks that were identified to I think an Oklahoma bank, I think, that you identified as perhaps trust beneficiary checks; is that correct? Or am I wrong on that?
A. I don't recall. Was it an exhibit?
Q. It was one of the photographs, where on the ledger sheet

itself it actually identified the name of a bank at the top of the ledger sheet. If it was the name of the bank on the top of the ledger sheet, is that your understanding that it relates to individual Indian trust money?
A. What's the question?
Q. Is the ledger sheet that reflects the name of a bank on the top of the ledger sheet, does that indicate that individual Indian trust money is included in that ledger, or is it something else?
A. Just because it has the name of a bank on the top of the sheet doesn't mean it's individual Indian trust.
Q. Okay. So none of the ledgers that were identified in the photographs may have anything to do with the individual Indian trust, correct?
A. They may or may not.
Q. But you don't know?
A. Don't know.
Q. And that wasn't verified before the photographs were taken.
A. That's correct.
Q. Now, with regard to the various exhibits that we went through for most of the day prior to the photographs, I think you identified a few that you prepared yourself. Is that fair?
A. That is correct.
Q. And most of the exhibits you didn't prepare, did you?
A. I don't know about the word "most," but there were some I



did not.
Q. We'll go through those exhibits then just to make sure. The original exhibits that were identified as part of a presentation that you made, do you recall those? I think the first presentation was with respect to paragraph 19?
A. Yes.
Q. And I think you said subsequently you had presentations using the same exhibits for other matters; is that correct?
A. That's correct.
Q. Now, with regard to the paragraph 19 exhibits that I think you even said you prepared for purposes of -- you compiled the exhibits for purposes of a presentation on paragraph 19, is that a correct statement?
A. That's correct.
Q. You compiled the exhibits but you actually didn't prepare the individual documents, did you?
A. Prepare, no.
Q. Didn't create the documents?
A. No, did not.
Q. You didn't create the document and you collected the documents and compiled them for purposes of a presentation.
A. That's correct.
Q. Did you verify the accuracy of the information in the documents?
A. Like?



Q. Like if $10 was collected from an agency, and let's say it was the Anadarko Agency, did you verify that that $10 was actually collected?
A. I'm trying to think of how to answer this. Those exhibits were obtained from our contractor, an accounting firm, who had already reconciled that particular transaction; which is why they had those documents at their ready for us to use.
Q. Again, before we go into the individual exhibits, I want to get a clear idea, and I think this has been very helpful. Which contractor?
A. Chavarria, Dunne & Lamey.
Q. CD&L. When did CD&L reconcile those -- were they transactions that were reconciled or accounts that were reconciled?
A. They were transactions.
Q. And when were they reconciled, do you know?
A. It would have been '90 something. '95, '96, '97.
Q. Let me see if I can help you.
A. Okay.
Q. If we're dealing with paragraph 19, which was the original purpose, was that approximately 1999 or 2000? Or was it prior to that?
A. I think it was prior to that. I don't recall.
Q. But certainly -- it was certainly not from 2000 forward at least to the best of your recollection. Fair statement?



A. What year, 2004?
Q. 2000 forward. It was probably not that, correct?
A. Probably not.
Q. Okay. So CD&L told you they reconciled those transactions, correct?
A. That would be correct.
Q. Who at CD&L?
A. Who?
Q. Who?
A. It would be one of the partners, Karen Dunne.
Q. Did she provide you the work papers so you could review them?
A. No.
Q. Do you know what she did to collect the information?
A. She requested the documents from another contractor that we had searching the boxes, that were then provided to the accounting firm, and then they utilized those.
Q. When I'm asking you a question as to what you know or don't know, I mean to limit it to what information do you know is the case, that you can testify to as a matter of fact, not what you believe occurred.
A. All right.
Q. Do you know how they collected the information?
A. Do I know?
Q. What CD&L did to collect the information to support the

Page 406

transactions they say were reconciled.
A. Well, if I'm going to a facility every day, and they're at the facility with me every day, and I see them put in requests to a different contractor every day, and I see documents provided back to them every day, I'm under the impression they're doing what we told them to do, what we contracted them to do, and that would be to collect documents and eventually reconcile.
Q. So you assumed they collected those documents that way, but you don't know as a matter of fact, do you?
A. Okay, I don't.
Q. Thank you. Again, you've been represented to us as a fact witness.
A. I understand.
Q. Not as an expert witness.
A. Understand.
Q. Thank you. With respect to -- so you don't know what CD&L reviewed and didn't consider or considered and excluded in providing you information they say are reconciled documents, do you?
A. What they excluded?
Q. Yes. What did they exclude in the process to provide you that information?
A. I don't know that.
Q. Do you know how many transactions they reconciled?

Page 407

A. No, not off the top of my head.
Q. Do you know how many transactions they couldn't reconcile before they were able to provide you that linkage?
A. No, not off the top of my head.
Q. Did you ask them?
A. We require them to provide us reports on what was reconciled and therefore what was yet to be reconciled.
Q. With regard to the particular documents that were used in the presentation for paragraph 19, did you ask them what they did in order to come up with that particular linkage, what they excluded?
A. No, I did not ask them.
Q. Did you ask them what they couldn't reconcile before they came to the particular link documents that were presented to you for presentation in the paragraph 19 search? Or presentation, sorry.
A. No.
Q. Do you believe those documents are representative of all the documents that are at Lenexa?
A. Yes, I would say they're representative.
Q. Do you believe the transactions that you described were consistently applied in the department and across the bureaus and agencies during that period of time the documents are reflected?
A. That they were consistently applied?

Page 408

Q. That's right. You're suggesting, I believe, based on the documentation, that this is the practice that occurred. When you said the agency should have done this, something would have been done that way, you're suggesting that that is a consistent practice throughout the agency.
A. That's correct.
Q. Were you aware of any audit reports from independent certified public accountants that said there was no such consistent practice during that period of time?
A. Yes. I had heard that there were, at least one that I know of.
Q. Which one?
A. I don't know if it was Arthur Andersen or a different firm.
Q. But you were -- at least you've heard that, notwithstanding your belief right now that there was a consistent practice --
A. That's correct.
Q. -- that an independent certified public accountant said there was no such consistent practice, correct?
A. Correct.
Q. Now, you're making the statement that you believe it was a consistent practice. Is this based on your personal observations?
A. Yes.
Q. Personal observations in the 80 or more agencies?
A. 90 or more?

Page 409

Q. 80 or more, depending on the period of time, there were 80 to a hundred agencies if my understanding is correct. Is that fair?
A. I only understood it to be 90 or something.
Q. Okay. We can get into that.
A. Okay.
Q. I was trying to be more conservative. Let's say 90 or more. I'll accept your number.
A. Okay.
Q. You observed the practices in the 90 or more agencies during that period of time?
A. Not all 90.
Q. How many?
A. Oh, let's see. Between 30 and 50 maybe.
Q. During that particular period of time that the documents reflected, you observed those practices in 30 to 50 agencies on a consistent basis?
A. The time that the documents were reflected or the time that I was in the eight years in the branch of IIM?
Q. The time that the documents are reflected.
A. There was a document that was 1950 something.
Q. So you couldn't have done that, could you?
A. That's correct.
Q. So let's talk about 1989.
A. Okay.

Q. 1989, did you observe those practices in 30 to 50 agencies?
A. In some of them, yes.
Q. In 30 to 50 agencies?
A. No, not 30 to 50.
Q. How many?
A. It took me eight years to eventually visit 30 to 50 agencies and 10 regional offices. So in '89 I had been in the branch probably about a year. I don't know how many agencies I had visited at that point.
Q. Do you have an idea?
A. No.
Q. You were the IIM clerk at that time, is that fair?
A. I was an accountant in the branch of our section of IIM.
Q. You were an --
A. Accountant.
Q. You graduated with a degree in accountancy; is that correct?
A. That's correct.
Q. And you're eligible to take the CPA exam, correct?
A. That's correct.
Q. And you took the CPA exam?
A. Yes, I did.
Q. And you're licensed in New Mexico?
A. No, I did not pass the exam. I do not have my license.
Q. For purposes of Interior, you don't have to be a CPA to be



an accountant?
A. That's correct, you do not.
Q. What are the qualifications at Interior for an accountant?
A. So many hours of accounting and certain number of years experience.
Q. Is it 24 hours?
A. I don't recall.
Q. And years of experience as an accountant?
A. Correct.
Q. So you can be -- and that's the years of experience, I think you said you were with Arthur Andersen before --
A. Yes. I was with Andersen and Llewellyn & Company.
Q. And how many years was that?
A. That was two years all together.
Q. And then you went to the Department of the Interior.
A. Correct.
Q. Now, did you work with Arthur Andersen while you were at -- when you were the IIM clerk at Interior at all?
A. I don't think I worked with them until -- no, I did. I worked with them when I was an accountant in the branch.
Q. And did they -- was it during the audit, is that correct?
A. I'm pretty sure it was an audit that they were performing, yes.
Q. Was it the FY89 and FY88 audits?
A. That sounds about right.



Q. Did you ever talk to Andersen employees about the nature of the audit and issues that were being raised?
A. No, not about the nature of the audit or issues that were being raised, no.
Q. What did you talk to them about?
A. About how the process worked, why did it work like this, where are these documents at.
Q. And did they have any discussion with you at that point as to whether or not they felt practices were consistent within the Bureau of Indian Affairs at that time?
A. No, they didn't have those discussions with me.
Q. But you heard rumors that they found that they were not consistent, correct?
A. When the eventual audit was completed, I heard that.
Q. Did you read the report itself?
A. No, I did not.
Q. Did anyone offer it to you?
A. Yes, they did.
Q. Was it Mr. Parris?
A. It probably was.
Q. Now, in the hierarchy at OTFM at that time was it Mr. Parris as the director?
A. Well, initially he was a branch chief and then a division chief and then a director.
Q. And then was Ms. Erwin brought in sometime, Donna Erwin?



A. Yes, she was.
Q. And she was brought in in what position?
A. As the deputy director.
Q. Did you report to Ms. Erwin?
A. No. I would have reported to a division chief, but eventually to Donna, yes.
Q. Who did you report to?
A. Don Gray was the division chief for a while.
Q. So before we go through, we're going to be going through, Your Honor, a document identified as Plaintiffs' 126, which is the Arthur Andersen audit report for 1989 and 1988.
MR. KRESSE: Your Honor, this is beyond the scope of the direct.
MR. GINGOLD: Your Honor, this deals directly with the questions as to whether or not the exhibits that were introduced are representative of what was occurring in the Department at that time.
MR. KRESSE: The exhibits that I believe Mr. Gingold --
THE COURT: It's going to come in sooner or later. I'll allow it. Let's go.
BY MR. GINGOLD:
Q. Let's deal with Defendants' 206, for example, which was one of the exhibits I think that involved a bill for collection, a calculation of money, it involved -- I think there was a total

Page 414

that was approximately -- I think it was $24,000 on the bottom of the page. You may have seen this, you've seen it a lot more than I have, so you may be more familiar with it.
But one of the questions I want to ask you is this: When these exhibits were put together, was the information at least verified as being accurately calculated?
A. Like was the face of that bill for collection accurate?
Q. For example, if you had a total of $24,000, would the number of credits equal that total of $24,000, to the best of your knowledge?
A. Yes.
Q. Maybe you can explain something to me, then. In Exhibit 206, it's Defendant's 206 -- and I'm doing this based on my handwritten notes too, so bear with me a little bit. The total was approximately $24,000?
MR. KRESSE: Your Honor, the defendants could put this exhibit up if it would be helpful.
THE COURT: Well, put it up.
MR. GINGOLD: Your Honor, I don't have any control over that.
THE DEPUTY CLERK: In speaking with Mr. Cramer, he wanted me to ask you if you hit the function F keys. You have. Okay. Let me switch it back, then.
MR. GINGOLD: Your Honor, this is the reason some of us like paper documents.

Page 415

THE COURT: Try putting the defense table up.
THE DEPUTY CLERK: I switched back to defense now.
THE COURT: There you go.
THE DEPUTY CLERK: We're going to try one more time. Your assistants asked me one more time to switch back one more time and see if it works. No? Okay.
THE COURT: Okay.
MR. GINGOLD: If you can bear with me, Your Honor, because I'm asking defendants for assistance. If we can have as much of the page as possible down to the total of 24,000 -- where it's readable for some of us who can't read this. Yeah. If you go down a little bit more. If you could drop it a bit, please, to the total. The total, there it is. $24,300.
BY MR. GINGOLD:
Q. I'm not a mathematician, but I've added that up and that comes up to approximately $7,372.77, and it shows a total on the right, if I can read this correctly, of $24,300.01. Can you explain that?
A. It looks like this is more than a one-page document, because of the word continued right in front of the 24,000. So there are more pages to this particular bill for collection that would eventually add up to 24,300.01.
Q. You assume.
A. Okay. I assume.
Q. Looks like we have some missing pages, don't we?

Page 416

A. That's correct.
Q. Was this intentional to demonstrate that some of the documentation at Lenexa is incomplete?
A. No.
Q. Okay. But this, based on your testimony, is consistent with the practices during the period of time that you were at the Department of Interior?
A. That they would continue beyond one page, yes, they would.
Q. No, that there would be documents that --
MR. KRESSE: Your Honor, he's not letting the witness finish her answer.
THE COURT: I think she did finish the answer. Go ahead.
THE WITNESS: I'm done.
BY MR. GINGOLD:
Q. That there would be documents -- if you find documents at Lenexa, the documents may not be complete but they may be related to the subject matter; is that correct?
A. No. That's not what I was saying.
Q. Okay. When you said consistency, what did you mean?
A. I meant that it's consistent that you would have a bill for collection that is more than one page.
Q. Is it consistent that you would find documents that aren't complete?
A. In Lenexa?

Page 417

Q. Correct.
A. You could.
Q. As a matter of fact, you've had experience with contractors who have told you that the boxes weren't complete, correct?
A. What do you mean when you say the boxes aren't complete?
Q. You say -- I think you index boxes and identified inventories of files in boxes, correct?
A. Yes. They would inventory boxes, yes.
Q. Were you ever told for example by NORC that boxes that they searched relating to the activity they're engaged in in the litigation support accounting did not contain the information that was reflected in the index or inventory?
A. No. NORC never told me that.
Q. Did anybody tell you that?
A. Yes. I had heard that from others.
Q. And were you also told the description of the contents of the box on the outside of the box didn't match the contents on the inside of the box?
A. I have heard that on occasion.
Q. And were you also told that some of the boxes had nothing at all in them, notwithstanding what was reflected on the outside of the box?
A. I heard about that once, yes.
THE COURT: A lot of hearsay coming into this trial.
BY MR. GINGOLD:

Page 418

Q. Well, it's because you haven't actually inventoried the boxes yourselves, have you?
A. That's correct, I do not.
Q. And you haven't actually verified any of the information contained in the documents that you testified to in response to Mr. Kresse's question, did you?
A. If you mean verified like did I reconcile the transaction? No. Did I track a particular transaction from a ledger to a bill to a something to a something? Yes.
Q. Well, that was tracked by CD&L and it was given to you, wasn't it?
A. I understand, yes.
Q. So you were given tracked documents to review, correct?
A. Yes.
Q. Now, bills of collection -- deposits don't reflect individual Indian trust beneficiary accounts, do they?
A. Deposit ticket itself does not normally quote an account holder's account.
Q. And bills of collection don't either, do they?
A. Normally they do not.
Q. And the CP&R data you've referred to, I think you've testified -- and please correct me if I'm wrong, because I don't want to misstate your testimony. I think you said information provided by Interior to Treasury is included in the CPR database; correct?

Page 419

A. That's correct.
Q. So the CPR database that comes back to you, the CPR database, that's Interior information, correct?
A. You could say that.
Q. So it should match a hundred percent all the time, shouldn't it?
A. Okay. Are you accounting for human error? Automated error?
Q. So there are potential problems with errors, correct?
A. Correct.
Q. And as a matter of fact, you've also heard that the CP&R database has been overwritten periodically, correct?
A. No. I never heard that.
Q. You've never heard that?
A. Never.
Q. Have you heard that CPR tapes are missing?
A. No. Never heard that.
Q. Have you heard whether or not the Treasury Department verified any of the information contained in the CPR tapes?
MR. KRESSE: Objection. Beyond the scope of the direct examination.
THE COURT: I thought you were going to object to the "have you heard," and I'll sustain that objection.
MR. GINGOLD: Your Honor, I'll go as far as I can go without the objections. But I understand.

Page 420

BY MR. GINGOLD:
Q. Do you know whether or not Treasury has verified the information in the CPR tapes?
A. Well, if a report comes back from Treasury that has certain check information on it that equals the database that we have, is that what you would call verification? Is that the word you're using?
Q. What is your understanding of verification?
A. We're going in a circle here.
Q. Excuse me. You just testified that the information that goes to CPR is Interior Department information, correct?
A. That's correct.
Q. It's not Treasury Department information; is that correct?
A. That's correct.
Q. So the question I asked you is do you know whether or not the Department of the Treasury verified the accuracy of the information that your agency provided to them.
A. When a check clears a bank, at that point that's verification coming from Treasury, because they take the information from a financial institution, run it through their CP&R system, and then feed the information back to the Department of Interior whether it does or does not match.
Q. Doesn't Treasury report the same information to you that you reported to Treasury?
A. Yes.

Page 421

Q. Thank you. A couple of general questions. Again, because we have some mechanical problems or technological, I'm not going to go into the exhibits I wanted to talk to you about. However, with regard to the mass cancellation that you discussed, I think you described in some detail of the efforts that were taken to try and correct the debits to individual Indian trust beneficiary accounts that occurred as a result of the mass cancellation of checks. Is that a fair statement?
A. You said that we tried to correct --
Q. There were debits to the accounts, and the debits to the accounts were caused by checks that were written that were canceled, correct?
A. Yes.
Q. And I think, at least I understood your testimony to mean you were describing the actions taken by the Interior Department to correct the debited entries because the checks were canceled and the beneficiaries received no funds. Is that a fair statement?
A. No. I would say to refund, not correct. When you say correct, I get the impression that it was incorrect.
Q. Okay. Let me -- I'm sorry for being ambiguous. When the check was written, the account was debited, correct?
A. Correct.
Q. But the individual never received the funds, correct?
A. Correct.

Page 422

Q. So your goal was to restore the account to the condition prior to the debit, correct?
A. That's correct.
Q. Now, let me ask you this question. I think you also said that appropriated funds were necessary to accomplish that task?
A. Correct.
Q. Help me with this, then. When the check is written, is -- the 14X6039 account is debited, correct?
A. That's correct.
Q. And the funds are actually transferred, or the credits are actually transferred to the general Treasury, correct? They don't leave the Treasury Department, correct?
A. That's correct.
Q. So the funds are in Treasury, in the general Treasury account, correct?
A. That's correct.
Q. If the funds are still in Treasury, why did you need appropriations? Why couldn't you just reverse the transaction?
A. Because you can't go to a different agency and get their money. They have to give it to you. Treasury did not give it to us.
Q. This was individual Indian trust money, not agency money, correct?
A. That's correct.
Q. And the money was still held at Treasury, correct?

Page 423

A. Correct.
Q. But it was your understanding, because individual Indian trust money was transferred from one account at Treasury to another account at Treasury; that it was no longer individual Indian trust money?
A. No, that's not my understanding, that it's no longer individual -- no.
Q. Then what is it?
A. It's money that is set aside for individual Indians.
Q. It's still being held by Treasury, correct?
A. That's correct.
Q. Was there a regulation that you're following in order -- that prevented you from having the transaction reversed?
A. From what I understand, if you want money from one agency -- no. If one agency is transferring money to a different agency, there's a form that's filled out and an action that's taken. If you want to go get money from the GAO or IRS or whomever, you don't fill out the form and there you go, you got it. You have to fill out a form, signatures are obtained, and then a transfer occurs. So just because I wanted the money back that belonged to these individual Indians doesn't mean I go to Treasury and get it.
Q. Well, the money is held at Treasury, not in Interior, correct?
A. Yes, that's correct.

Page 424

THE COURT: Mr. Gingold, you're starting to argue with the witness about this, and just let me see if my understanding of this is correct, because I don't think we need to spend a lot more time on this issue. As I understand the witness's testimony, after the statute was enacted and after the checks were canceled, BIA realized that some of the money that had been canceled was trust money, and it said to the Treasury, that's trust money, you can't take it away, and Treasury said, tough, you're not getting it back. That's why they had to go to Capitol Hill.
So as I understand, BIA asked for it, Treasury refused it, they went up to Capitol Hill and got an appropriation. Is that correct?
THE WITNESS: That is correct.
THE COURT: All right. What's your next question?
MR. GINGOLD: Your Honor, there's one aspect of that that may be important to consider. The money is the trust money, not the agency's money, and it remained in the Treasury.
THE COURT: I think that's what she said. But Treasury wouldn't give it back.
BY MR. GINGOLD:
Q. Did they explain to you why they wouldn't give it back?
A. Yes. In that one particular exhibit, I don't know the exhibit number, there was the letter from Treasury to Dr. Brown that explained that it was due to the disbursing authority, that

Page 425

they did not have to give the money back.
THE COURT: Exhibit number is 230.
MR. GINGOLD: Your Honor, the equipment is now operating.
THE COURT: Good.
MR. GINGOLD: If I may, Your Honor, I was going to these other exhibits because I wasn't -- so, Your Honor, I will --
BY MR. GINGOLD:
Q. Whatever happened on the mass cancellation happened, and to the extent money was restored it was restored. Is that fair?
A. That's correct.
Q. Let's go to Plaintiffs' 126. Are you able to read this, Ms. Ramirez, or do we need to make it larger?
A. That's good.
Q. I referenced earlier the audit report of Arthur Andersen. This is the audit report that I was mentioning to you. Did you ever see this before?
A. It looks familiar.
Q. So you may have read it --
MR. KRESSE: Your Honor, objection. She hasn't seen anything more than the title of this document.
MR. GINGOLD: Your Honor, she answered the question.
THE WITNESS: Yes, the title page looks familiar.
THE COURT: Overruled. Proceed.

BY MR. GINGOLD:
Q. I'd like to turn to page 3. And Your Honor, the pages that I'm referencing are not the page numbers at the bottom of the page. It's how the exhibit was produced.
Page 3, as you can see, Ms. Ramirez, is the letterhead of Arthur Andersen, "Report of independent public accountants, May 11, 1990." Do you see that?
A. Yes, I see it.
Q. Again, have you seen this before or to --
A. This page does not look familiar.
Q. Do you know -- have you heard whether or not this was the first audit that was done in the history of the trust?
MR. KRESSE: Objection, Your Honor. Seeks hearsay.
THE COURT: Sustained.
BY MR. GINGOLD:
Q. Do you know whether this is the first audit that was performed in the history of the trust?
A. I have heard that it was.
MR. KRESSE: Your Honor, same objection.
THE COURT: All right. Look, these are frankly rhetorical points, counsel. I don't care whether or not it was the first audit ever done. You've made your point. Ask your next question.
MR. KRESSE: Your Honor, by the way, we don't see this as Plaintiffs' Exhibit 126.



MR. GINGOLD: Well, no, we have two numbers. We have 0575. It's also 126 there.
MR. KRESSE: That's for this trial?
MR. GINGOLD: Yes.
THE COURT: Proceed, sir.
MR. GINGOLD: Thank you.
BY MR. GINGOLD:
Q. I'd like you to turn to the bottom of this page that we are looking at, which is page 3, not page 1 of the -- there's a page 1 in the middle of the page, but it's the third page in this exhibit. And could you just read the last paragraph and the first paragraph of the next page?
THE COURT: Read it to yourself.
MR. GINGOLD: That's what I intended.
THE WITNESS: Do I need to read it out loud?
MR. GINGOLD: No. Please read it to yourself.
(Witness reviewing document.)
THE WITNESS: All right. It continues.
BY MR. GINGOLD:
Q. Do you see with respect to this exhibit that with regard to item No. 1, that cash balances -- "cash and balances held in trust for Indian tribes, organization, individuals cannot be readily confirmed"? Do you see that?
A. Yes, I see that.
Q. Now, during the period of time you were there, did you have



discussions with Arthur Andersen about that particular issue?
A. I don't recall.
Q. Okay. The second item says, "Because of major inadequacies in the accounting records and related systems used to account for the tribal and individual Indian monies trust managed by the Bureau," this relates to why there has to be a qualified report. So we'll go into that a little bit. Were you aware that there were questions about the inadequacies of the accounting records and systems at the time?
A. That there were inadequacies in the what?
Q. Accounting records and systems.
THE COURT: I'm beginning to wonder whether I should have sustained that beyond the scope objection, Mr. Gingold. What this witness has told us basically about paper flow, she hasn't said anything about an audit. She told us about the mass cancellation and she showed me that -- she gave me a slide show about Lenexa. I don't know why you need to turn her into a witness to either verify or not verify an Arthur Andersen audit that was done in 1990.
MR. GINGOLD: Well, this is an audit that was contemporaneous with documents that were introduced or identified.
THE COURT: Well, let me tell you what I take from these exhibits that you are so upset about. I do not think that I heard this witness say that all of these exhibits that show



how the paperwork worked were invariably correct or were error free or were used in every office or that they demonstrate the perfection of the system. I heard her to be showing me how a typical paperwork exercise would work.
Now, I don't know how you can cross-examine that except to say, well, that isn't how it worked or it never worked that way. I think if you asked her -- I think in fact I'll ask her myself.
Ms. Ramirez, you showed me an SF 1098, you showed me an oil and gas mining lease, you showed me a bill for collection, you showed me a schedule of collections, you showed me a certificate of deposit, a title status report, a journal voucher, a ledger card, and a 139B with a daily disbursement report. I gather that was to show me how the paperwork generally worked during that era.
THE WITNESS: That's correct.
THE COURT: Are you telling me that it always worked that way?
THE WITNESS: No. It did --
THE COURT: Are you telling me that there were no human mistakes?
THE WITNESS: No, I'm not saying that.
THE COURT: Are you telling me that these documents all exist and didn't get lost and eaten up by rats and dumped on by birds?
THE WITNESS: I'm not saying that either.

THE COURT: Your witness, Mr. Gingold.
MR. GINGOLD: Your Honor, there's another aspect to this. For most of the period of the trust, the superintendents of the agencies handled the transactions, not the central office in Washington and not Albuquerque. So what --
BY MR. GINGOLD:
Q. Is that correct?
A. Yes.
Q. As a matter of fact, the superintendents themselves issued checks, correct?
A. That's correct.
Q. And whether or not these particular documents reflected the transaction, you can't say that they reflected a transaction in any of the agencies other than the one you're looking at at any time, can you?
A. For the period of time when I was in the branch of IIM, or in the documentation that I saw when I was in the branch of IIM, that's what I know it to be. For any other time, no, I couldn't tell you.
Q. And didn't superintendents have autonomy to handle transactions for the most part the way they wanted to?
A. At the onset, they did.
Q. How long did the onset go?
A. I have no idea.
Q. Do you know when it stopped?



A. No.
MR. GINGOLD: Your Honor, we probably don't have any further questions in that regard, then.
BY MR. GINGOLD:
Q. But as a result, you gave us a snapshot in time with regard to a linked transaction provided by CD&L. And that's it, isn't it?
A. That's correct.
MR. GINGOLD: No further questions, Your Honor.
THE COURT: Thank you. Got another witness?
MR. KRESSE: Your Honor, as to the motion to move these exhibits into evidence, is there -- in the interest of saving time --
THE COURT: Yeah. Mr. Gingold made, I think, an authenticity objection, but I had understood that authenticity was not going to be a problem in this trial unless there was some specific claim of an inauthentic document. So unless there's some specific objection to some of these, all of the exhibits shown to Ms. Ramirez will be received in evidence, with my understanding as I've just described about what they mean, and the weight of them is open for argument later on.
MR. GINGOLD: Your Honor, we believe there is no testimony as to who created the documents, what information was used, when they were prepared. We understand your view on authenticity in a way, but we believe there's too much that



hasn't been resolved in order to introduce these into evidence.
THE COURT: Okay. Well, the documents will all be received and you can argue later on about what they mean.
MR. QUINN: Our next witness will be Michelle Herman.
THE COURT: All right. Ms. Ramirez, thank you.
(The witness steps down.)
MR. QUINN: Good afternoon, Your Honor. Michael Quinn for the government. My witness will be right along. I had just come in to check on proceedings and she had taken that opportunity to go use the restroom. So she'll be here momentarily.
I did understand from my colleagues, Your Honor, that you were interested in getting a little preview from counsel as to what the witness -- we expect the witness to testify about. I'm prepared to do that now if you like, while we wait.
THE COURT: Go ahead.
MR. QUINN: Ms. Michelle Herman is a managing director of the consulting firm of FTI. She held previous positions with other accounting firms, beginning in 1995 with Arthur Andersen, and had begun work on the historical accounting in the Cobell litigation in her early positions with Arthur Andersen.
She then moved to a similar position at KPMG and continued to do work in connection with the examination of data, study of the electronic data sets, and investigation of the accounting records that the Department of the Interior had for IIM



accounts. She's continued that work over the last -- since 1996, almost over the entire length of this case.
Ms. Herman has been involved with the data completeness validation testing that's just been reported on, the reports that were issued on September 30 of this year that we've marked as exhibits in this case for the purposes of the hearing. She's also performed and overseen people doing the account reconciliations as part of the actual testing of sampled accounts, testing of high-dollar value transactions, and part of the historical accounting work, and has also worked with the Office of Historical Trust Accounting in terms of developing the historical statements of account, effectively what kind of information those accounts would -- statements would provide to beneficiaries.
THE COURT: Okay.
MR. QUINN: With that, I'd like to ask the witness, call Ms. Herman to the stand.
THE COURT: All right.
MICHELLE HERMAN, WITNESS FOR THE GOVERNMENT, SWORN
THE COURT: Particularly with that introduction you've already given me, Mr. Quinn, you don't have to give me much background.
MR. QUINN: I understand that, Your Honor. I'll attempt to do that. The only place I would like a little leeway, Your Honor, is with respect to making a record of the

Page 434

extent to which she's been involved in the data analysis over time.

DIRECT EXAMINATION

BY MR. QUINN:

Q. Good afternoon, Ms. Herman.
A. Good afternoon.
Q. Could you state your name for the record, please?
A. Michelle Herman.
Q. And for the record, give your position and the name of the company where you're employed.
A. I'm a managing director at FTI Consulting.
Q. Were you here for my summary of your work experience for the Court?
A. No, I'm sorry, I was not.
Q. What particular area of FTI do you work with?
A. I work in the financial and enterprise data analytics practice.
Q. Financial and enterprise data analytics?
A. Yes.
Q. Could you describe what the general nature is of the kind of work that you do in that group?
A. Typically our group is involved in large class action lawsuits, and fundamentally analyzing large transactional and operational data sets.
Q. And I take it since you're sitting here on the stand today,

Page 435

that you have had some involvement with the Cobell lawsuit and the historical accounting?
A. Yes, I have.
Q. When did you first become involved with any aspect of the historical accounting work?
A. In early 1997.
Q. And in what way did you become involved with the historical accounting in 1997?
A. I received a data set from the Office of Trust Funds Management and I was asked to aggregate all of that information into a single database.
Q. Was there a particular computer system that you were working with at that time?
A. Yes. The Integrated Records Management System, IRMS.
Q. IRMS, okay. And you have testified once before in this case; is that right?
A. Yes, I have.
Q. Do you recall what part of the case you testified in?
A. Trial 1.5.
Q. And were you testifying as a fact witness or an expert witness?
A. As a fact witness.
Q. Let's see if we could give the Court a sense of the experience you've had in working with the data and the accounting information that you've seen and come in contact with

Page 436

over time, okay?

Ms. Herman, do you see that on your screen, the first slide?
A. Yes, I do.
Q. It's titled -- this is, for the record, this is from the administrative record, this is marked as AR 5-65 with a title page of "Historical Accounting Project." Can you read that okay?
A. Yes, I can.
Q. Have you seen this document before?
A. Yes, I have.
Q. Could you describe it for the Court?
A. This is the historical accounting plan, as we refer to it, the green plan.
Q. Green plan. And is that the plan from 1997?
A. This is the 2007 plan.
Q. Okay. Have you seen this before?
A. Yes, I have.
Q. Have you seen the 2003 plan?
A. Yes, I did.
Q. What do you commonly refer to that as?
A. The purple plan.
Q. Go to the second slide of this same exhibit, Ms. Herman, and put up there page 5 from the 2007 plan. And if we could zoom in on the highlighted text there. Do you see that

Page 437

description on the accounting firms?
A. Yes, I do.
Q. Could we scroll down to the bottom. This is document 33-2-7, page 5 of the 1997 -- 2007 plan. In there there's a description of five accounting firms under contract to Interior to assist with the historical accounting. Do you see your firm identified there?
A. Yes.
Q. Okay. And it refers to FTI Consulting is conducting forensic accounting work?
A. Yes, it does.
Q. Among other firms. Do you recognize the other firm names?
A. Yes. These are the other firms participating in the historical accounting effort.
Q. Have you done work with these other firms in the course of your work on the historical accounting?
A. Yes, with each of these firms.
Q. What type of work is involved with the forensic aspect that's referenced there for your firm as FTI?
A. We evaluate both the electronic historical data as well as the hard copy records; the journal vouchers, the bills for collection, the transaction registers, things of that nature.
Q. Let's go to the next page, the slide also from this 2007 plan, and zoom in -- this is page 6 from the 2007 plan. Do you see that highlighted section on page 6?

A. Yes, I do.
Q. It references steps in the historical accounting process and summarizes those steps. Refers to step 1 being the first step of the historical accounting, to gather data posted to each account, and then it goes on further in that paragraph to reference, "the data exist in electronic ledger accounting systems or paper ledgers that were used to maintain the IIM accounts." Did you participate in this work?
A. Yes. Our firm was primarily responsible for gathering this data.
Q. Okay. Could you summarize for the Court just briefly at this point the kind of work that you did in terms of the gathering of the electronic information?
A. Yes. We received information from two electronic accounting systems. As I mentioned first, IRMS, the integrated records management system, and TFAS, the trust funds accounting system.
Q. A little bit farther down on that same page of AR 5-65, it has a step 2. We've highlighted a couple of sentences there. It refers to a second step in the historical accounting: "To conduct reconciliation of transactions to determine their accuracy." Have you been involved in that part of the historical accounting?
A. Yes, I have.
Q. Could you summarize briefly for the Court the nature of



your work on that step of it?
A. Our firm was one of the firms that was tasked with a component of the accounting, the litigation support accounting. We reconciled both sample transactions as well as some of the transactions that were over a hundred thousand dollars.
Q. Okay. So you looked at both some things that had been picked out as samples of transactions and some that were from the high-dollar transactions?
A. That's correct.
Q. And other accounting firms assisted with other reconciled -- identified -- reconciling transactions?
A. Yes, they did. The work was broken out by region and then assigned to the firms.
Q. If you look also on that step 2 of the plan, it identifies doing a reconciliation, which we've just identified, and we'll come back to each one of these things in a little bit more detail, just to show the Court what's involved in those steps and the kind of work that you did.
But it also mentions that, in step 2, the step includes "examining the accounting system and land records systems for completeness of the data system" -- "the data the systems contain, the accuracy of the data, how well the systems functioned." Did you play any role in that aspect of step 2?
A. Yes. Our work primarily focused on the financial systems, not the land systems.



Q. So you were looking at the financial transactions.
A. Yes, we were.
Q. Did you play any role in the development of tests for how the OHTA would analyze those transactions?
A. Yes, I did.
Q. Go to the next slide, please. I'd like to have you look at another page a little bit over on the plan also, identifying -- summarizing step 3 of the historical accounting project. Step 3, the plan refers to after gathering the transaction data, reconciling, other tests being performed, the Interior would be in a position to prepare the HSAs. What do you understand HSA to be?
A. Historical statement of account.
Q. Have you had any role in step 3 as described there in the plan?
A. Yes, I have.
Q. Could you just summarize for the Court what your role has been in that regard?
A. I created the draft statements that were provided to the Court.
Q. Those are, as far as you know, marked as evidence for this hearing?
A. That's my understanding.
Q. And you're prepared to talk about those and go through those with the Court?



A. Yes, I am.
Q. All right. Farther down on that same page 7, there's a reference to Interior evaluating the accuracy of the accounts by combination of, one, transaction-by-transaction reconciliation methods, all transactions, certain account types; number 2, reconciling high-dollar value transactions; and reconciling a statistical sample of lower dollar value transactions. And I take it from your testimony you've been involved in those various steps?
A. We've not participated in the account-by-account transactions, which is typically the judgment and per capita accounts.
Q. So FTI has not been involved in the judgment and per capita account reconciliation?
A. No, we have not.
Q. The reconciliation you've been involved in has been in the high dollar value?
A. Yes.
Q. And some of the sample transactions.
A. Correct.
Q. Go to the next slide, please. Go to page 10 of the 2007 plan. There's a reference and a description on page 10 to accounting methodology for a transaction-by-transaction reconciliation of the per capita and judgment accounts. And that's the one area you have not worked on?

Page 442

A. Correct.
Q. Go to the next page. Page 12 of the 2007 plan. And under the heading of "Statistical samplings," second paragraph there, refers to "advantages of a statistical sampling approach are enhanced when combined with other techniques. For this reason Interior's using both transaction-by-transaction reconciliation methods for large dollar value transactions as a certainty stratum of account values, and statistical methods to address the huge number of smaller value transactions." Have you been involved in that analysis?
A. Yes, I have.
Q. Just slide down the page. On that same page, under the heading "Litigation Support Accounting," there's a discussion of litigation support accounting. Do you -- have you been involved in that work?
A. Yes, I have.
Q. Can you explain for the Court and for the record what litigation support accounting is?
A. Two different components of the litigation support accounting. One were all transactions that were greater or equal to a hundred thousand dollars, both credits and debits. And the second was a sample of transactions in the land-based accounts, and those transactions were allocated among the various accounting firms, and each one of the teams reconciled the transactions back to the supporting financial documents and

Page 443

realty documents and ownership documents.
Q. Okay. So that's one of the categories of your work on the historical accounting?
A. Yes, it is.
Q. And on page 13 I have a couple of questions, another couple highlighted sections. Under the heading "Paper Era Transactions," the plan mentions that "approximately 65,000 of nearly 268,000 land-based IIM accounts and historical accounting population were opened prior to electronic ledger era." Before electronic ledger era, that is the paper era, correct?
A. Correct.
Q. And have you played a role in analyzing any information from the paper ledger era?
A. Yes, we have.
Q. Can you briefly summarize to the Court what you have done with respect to the paper ledger era?
A. We have started to identify transactions that will need to be rekeyed to the transaction ledger. We've started to identify accounts that go back to the paper ledger era, and have actually started entering those transactions at this point.
Q. Okay. What do you mean by rekeyed? What's involved in that?
A. Obviously, by definition the transactions are only available on paper, and in order to make them available on a historical statement, those transactions are data entered back

Page 444

into a database for analysis.
Q. Where is the information found to reenter them?
A. Depending on the time frame, either in IRMS transaction registers or on an actual hard copy ledger card.
Q. If you go down one paragraph on that same page of the plan, the paragraph starts with "through data completeness validation project described below, Interior is identifying all the land-based IIM accounts in the historical accounting population that were opened in the paper ledger era prior to 1985." Have you had involvement in that project?
A. Yes, I have.
Q. Go to the next slide, please. And going in a few pages more to page 17 of the 2007 plan, and under the heading at the top of the page there, you see that, Ms. Herman?
A. Yes, I do.
Q. "IIM trust fund and related system data tests." It mentions that "Interior's performing various tests on the IIM trust fund at the aggregate level in addition to those tests performed at the individual transaction or account level." Do you have an understanding of what that sentence is referring to in terms of the tests you've been involved with?
A. Yes. This is referring to the system tests that we're running against the IRMS and TFAS data.
Q. And if you look down the next paragraph, there's a series of bullet points. It refers to there being -- "identify areas

Page 445

of vulnerability in historical ledgers," and it talks about -- do you have an understanding of what these vulnerabilities are, describe what they mean for the Court?
A. Yes. The first is referring to gaps in the electronic ledger, so you need to confirm whether or not there are transactions that are missing in the electronic ledger before you can issue historical statements.
Q. Have you worked on that kind of problem?
A. Yes, I have.
Q. How about the next one, account balances were lost or inappropriately dropped from systems.
A. Yes. The first test that we performed was evaluating the transfer of accounts and balances from the IRMS system to the TFAS system, and we've actually completed that test, and we've just begun our test of the transfer from the ledger cards into the IRMS system.
Q. Okay. So if I can get a better picture of what you're doing on that, is, are you comparing the information on the new system against the old system to see if they match?
A. Yes. You compare the ending balance in the IRMS system, for instance, to the beginning balance in the TFAS system, to confirm that the two are the same.
Q. Okay. And for the IRMS to the TFAS conversion, that part of it's been completed?
A. Yes, it has.

Page 446

Q. But you're still working on the paper to the IRMS?
A. Yes, we are.
Q. The third vulnerability in this bullet point list in the plan refers to calculation of interest being performed accurately. Can you describe what that refers to?
A. This is going to be a comparison of the interest that was posted to an individual account, versus the interest that should have been posted based on the historical rules that were in place at each point in time.
Q. Do you have involvement in the tests being performed to examine the interest calculation?
A. No, I do not.
Q. What firm is involved in the interest calculation work?
A. Clifton Gunderson.
Q. That's one of the other contracting -- accounting firms under contract to the Department of the Interior?
A. Yes, they are.
Q. The fourth bullet point here refers to vulnerability of monies collected by Interior that were actually deposited into the IIM trust fund. What does that refer to?
A. This is a test going from the land records into the accounting records. So you start with the land, you re-create a revenue history of that land, and then you determine whether or not the funds that should have been collected were collected.
Q. Have there been tests developed to look at that aspect,

Page 447

that vulnerability?
A. Yes, there have.
Q. Have you participated in those tests?
A. Yes, I have.
Q. And the last vulnerability refers to land ownership records being fit for use in the historical accounting. Can you describe your understanding of that vulnerability to the Court?
A. The land ownership records are utilized in the litigation support accounting to test the allocation of the funds that were collected, and so this was a test of the LRIS system to determine whether or not it was adequate for use in that LSA effort.
Q. Has that been looked at to your knowledge?
A. Yes, it has.
Q. Have you been involved in that aspect?
A. No, I have not.
Q. Do you know what contractor or other firm was involved?
A. NORC.
Q. A little bit farther down on that same page of the plan, page 17, it refers to having land title records officer, LTRO test. Did you have any involvement in the LTRO test?
A. No. This is the test that was executed by NORC.
Q. The next item on that same page at the very bottom is the data completeness validation or DCV. Did you have involvement in the data completeness validation work?

Page 448

A. Yes, I did.
Q. Okay. Let's go to the next page. Page 18. The plan at the second full paragraph describes the DCV project, it says is mapping debit and credit transactions within and between the IRMS and TFAS systems. Could you give the Court a brief description of the two systems that are referenced there, the IRMS and the TFAS? You mentioned IRMS, but could you describe the relationship between the two systems?
A. Of course. IRMS was the first system in the electronic ledger era.
Q. Do you know what the -- do you remember what the abbreviation stands for?
A. Integrated records management system.
Q. And the TFAS?
A. TFAS is the trust fund accounting system, and it's the current system.
Q. And as part of your work in analyzing the data from these systems, did you obtain any data from the IRMS?
A. We have electronic data from IRMS from approximately February of 1985 through March of 2000.
Q. What kind of data did you collect from IRMS?
A. We collected two primary types of data, transaction al data and account-level data.
Q. Was this from a particular subsystem of the IRMS system?
A. Yes. It was from the IIM subsystem.

Page 449

Q. Did, as far as you know, every agency, region within the Department of the Interior use the IIM subsystem?
A. That's my understanding.
Q. Was the IRMS a centralized computer system?
A. No, it was not.
Q. How was it set up?
A. IRMS was run on a regional level.
Q. And how many regions are there presently in Interior?
A. 12.
Q. So if that same regional structure carried back in time, there should be 12 regional IRMS sets of records?
A. Yes, there were.
Q. How do you know that these records exist?
A. We were provided approximately 56 million transactions in the transactional file for IRMS.
Q. When you say "we," are you referring to --
A. I'm sorry, FTI, yes.
Q. What did you do with these 56 million pieces of information that you obtained?
A. We loaded them into a database program referred to as SQL server.
Q. For what purpose were you creating this other data base?
A. To analyze the completeness of the historical transactions provided.
Q. The database that you used to conduct that examination, is



Bryan A. Wayne, RPR, CRR
(202) 354-3186 Official Court Reporterbryanawayne@verizon.net

Page 450

that connected to the Internet in any way?
A. No, it is not.
Q. How do you access it?
A. Through a local private network in our offices.
Q. In addition to the transactional information, what other account information did you obtain from IRMS?
A. We received information from something referred to as a master file, and the master file contains account-level data, so an account number, an account name, an address, balance information for that account, at different periods of time.
Q. Okay. In addition to the master file, did you also obtain -- what were the transaction files called that you obtained?
A. The transaction files initially were stored in two different files. One is referred to as an ITRAN file, or an immediate transaction file, and one is referred to as a HISTRAN file, or a history transaction file.
Q. For the IRMS, approximately when was that phased out in favor of TFAS?
A. The conversion was phased between August of 1998 and March of 2000.
Q. And which system runs and records IIM transactions today for Interior?
A. TFAS.
Q. I have a couple other highlighted sentences on page 18 of

Page 451

the plan. The first one, from one of the middle paragraphs after the bullet points, mentions that the project, the DCV project you've just described, in part implements the electronic data gaps and system conversion tests described in the 2003 plan.
Can you describe your understanding of what that's referring to?
A. The data gaps test was the assessment of whether or not the IRMS record was complete. And the system conversion test was referring to the conversion from IRMS to TFAS.
Q. And it's my understanding from your testimony you've been involved in both of those?
A. Yes. I designed the tests.
Q. In the next paragraph you have one more highlighted sentence. Refers to DCV project also reviewing all changes to account numbers, to ensure that all transactions for an individual's account are accurately reflected in the HSA.
Can you describe your understanding of what that sentence is referring to?
A. There are several different account level tests that we perform on the data. The first is to identify accounts that may have been reused over time. The second is to identify account number changes that have happened over time, such that all of the transactions for a given account are reflected on a statement correctly.

Page 452

Q. Why is it important to understand whether an account number has been reused? What difference does that make to the accounting?
A. In terms of the accounting, the importance is really in issuing the historical statement, because you don't want to provide one account holder's information to a second account holder.
THE COURT: How is that possible that an account is reused?
THE WITNESS: Unfortunately, historically, once an account had been closed, occasionally the account number became available for use again. So now when we look back in time, we can see that the account started out let's say in my name, Michelle, and then switched and later turned to Michael's name. And so the balance would have gone to zero under my name and would have reopened again under Michael's name.
MR. QUINN: Not that there's actually an account like that for us, Your Honor.
THE COURT: No, I understand. It's like the numbers weren't retired, like Mickey Mantle's number.
THE WITNESS: Exactly.
MR. QUINN: And we actually have some examples we could put up on the screen to show you, if you like.
THE COURT: Understood.
BY MR. QUINN:

Page 453

Q. To just finish the overview of your data collection efforts, you collected information from IRMS, you mentioned. Did you also collect data from TFAS?
A. Yes, we did. We have data from the beginning of the TFAS system through July of 2007 at this point.
Q. Were there other computer systems that Interior used that you looked at or gathered certain pieces of information for to aid your analysis?
A. Yes. We looked at the LRIS system in connection with our LSA project, and we also looked at, to a lesser degree, the TAAMS system in connection with our account number analyses.
Q. Could you describe what the LRIS system is?
A. The LRIS system was the historical system that tracked title.
Q. Does it stand for land records information system?
A. Yes, it does.
Q. To your understanding, what role did LRIS play in administering IIM information?
A. LRIS was the system that tracked the title for each individual allotment, and to some extent the encumbrances on that title.
Q. And you collected some information off of LRIS?
A. We only collected information for the accounts that had been assigned to us in the sampling in the LSA project.
Q. As part of the reconciliation effort you looked at that?

A. Exactly.
Q. And not as part of the data completeness validation work.
A. No.
Q. The data completeness validation being tied more directly to the transactional information.
A. To the financial transactions.
Q. Could you describe briefly for the Court what TAAMS is?
A. TAAMS is the current system that tracks title and also realty for Interior.
Q. Did you obtain for any of your analyses any information from TAAMS?
A. We obtained some information on account holders, dates of birth, dates of death, things of that nature, and occasionally some what are referred to as tract history reports, THRs.
Q. And all this data that you've collected, has this all been put into your FTI database?
A. Yes, it has.
Q. Okay. Let's talk a little bit more specifically about the analysis of data that you've been involved with. I'd like to direct your attention to the data completeness validation because you just finished some major effort with that analysis. Did you at FTI produce a report with respect to the data completeness validation work you've done recently?
A. Yes, we've produced seven reports, actually.
Q. Could you describe what the reports consist of?



A. The first is an overall report that shows our progress to date on analyzing all 12 regions. And the next six reports are one report per region of the six, with our 12 obviously that we'll issue at the end of the day, but the first six that we've performed our work on.
Q. Okay. So you have an overall report that covers work that's gone on across the country?
A. Yes.
Q. And then another six separate, more detailed, regional reports?
A. Yes. That chronicle our findings for that particular region.
Q. Does that mean you're finished looking at those regions?
A. We will most likely look at those regions again as we move on to the final six regions. Occasionally as you look at later regions it impacts earlier regions.
Q. You find things that cause you to go back and look at something you did before?
A. Yes.
Q. And how did you select the six regions to report on.
A. The first three regions were selected -- we started this project looking from the conversion from IRMS to TFAS, and the first three regions that were selected were the first three regions that converted from IRMS to TFAS. The next three regions were selected because of the number of accounts in those



regions, in an effort to evaluate regions with the most accounts first.
Q. Okay. Any chance you've left out the six most problematic ones for later?
A. We're going to report on those six in the coming years.
Q. Could we go to the next slide?
THE COURT: I'm not sure that answer was responsive, and I'd like to hear what the answer is.
THE WITNESS: No, Your Honor. As you'll see in the overall report, we reported on all 12 regions our findings so far. It's simply a matter of time to get to all 12.
THE COURT: I know, but his question was how did you select the first six and are the last six the most problematic ones.
THE WITNESS: The first six were the largest ones, so I wouldn't suspect that the last six will be more problematic than the first six. It's just a matter of taking the time to evaluate them.
THE COURT: Thank you.
MR. QUINN: Thank you, Your Honor.
BY MR. QUINN:
Q. Let's finish up with the plan and we can go and discuss more specifically the data completeness analysis. There are two other test areas mentioned in the 2007 plan. At page 19 there's a posting test, landed dollars test. Have you had involvement



with the posting, landed dollars test?
A. Yes, I have.
Q. And there's also a mention of a test, interest recalculation. And you testified about interest work being done by another firm, but I just want to confirm for the record here with the Judge whether you have involvement with the interest recalculation work.
A. No, I do not.
Q. And that's being done by?
A. Clifton Gunderson.
Q. Ms. Herman, I put up in front of you a document marked for identification as Defendants' Exhibit 152, and ask you if you can identify that document for the record, at least by looking at its cover.
A. This is the cover to the binder that contains our overall report.
Q. Electronically this entire set of reports fits onto one CD, but when you have it printed out, it looks something like this binder, at least one volume?
A. Yes, it does.
Q. Do you know approximately -- when you take the overall report pages and the regional report pages, approximately how many pages the report is?
A. Just over 10,000 pages.
Q. Could you describe for the Court the overall goal of the

Page 458

data completeness validation work?
A. There's several goals to the data validation. The first and foremost is to assess the completeness of the electronic ledger era for historical statements, and when I mention completeness, it's of the data today versus the data as posted historically.
Q. We had discussed a little bit about reused accounts and account number information. Can you describe how that is -- how account numbers are examined as part of the data completeness analysis?
A. Yes. Account names, the account holder's name is associated in several different places in the electronic data. As I mentioned earlier, you have within IRMS two primary files, the master file and the transactional file. So the account holder name is stored in the master file but it's also stored on every record in the transactional file.
And in TFAS, the account holder name is associated only with the account file. So we've taken all of these records and we've aggregated them into one singular file for analysis purposes.
Q. Could you describe for the Court the steps involved in undertaking the analysis, what it was you were looking at with the name information?
A. We wanted to determine whether or not accounts had been reused historically. As I mentioned earlier, we didn't want to

Page 459

issue statements to one beneficiary with transactions that may pertain to another beneficiary. So we compared all of the names that had ever been associated with the accounts in the electronic data to evaluate whether or not an account had more than one name associated with it.
Q. When you say all the electronic data, what date range are you speaking of?
A. All of our analyses cover the entire electronic time frame, so it begins in 1985 through 2007, and we receive new data each month from OST.
Q. Does your name account investigation look at more information, more accounts than the accounting population that's been made part of the scope of the historical accounting project?
A. Yes, it does.
Q. Does it look at every account that's been opened with some name from 1985 through the present?
A. Yes, it does.
Q. Do you know approximately how many unique account names you've come across?
A. We've evaluated approximately 645,000 accounts. I don't know how many unique names are associated with those.
Q. Could you describe for the Court the process by which you identify unique accounts and make that information traceable by the Office of Historical Accounting?

Page 460

A. We've assigned a number to each account that we refer to as a NAAN.
Q. A NAAN?
A. A NAAN. N-A-A-N.
Q. What does a NAAN stand for?
A. Native American account number.
Q. Could you describe for the Court what the significance is of a NAAN to the historical accounting process?
A. When we issue statements, that's going to be the identifier for issuing statements. As we mentioned earlier, because account numbers can be reused over time, we can't use the account number itself for issuing statements. And historically, it was possible to also change account numbers over time.
So if you were to simply use the account number itself, you wouldn't be able to pull all of the related transactions. And so this is an identifier that we've created to be able to pull all of the transactions related to an account.
Q. So if the NAANs are assigned properly, then you can identify that unique account information?
A. Yes, you can.
Q. Is there another set of number -- codes that you developed and assigned to aid that process?
A. Yes. The other code that we developed is referred to as an NABN.
Q. What does that stand for?

Page 461

A. Native American beneficiary number.
Q. Could you describe for the Court what the difference is between a NAAN and a NABN?
A. Just like many of us, if you have more than one account, an NABN could be associated with multiple NAANs. So you could have one person with multiple accounts or multiple NAANs.
Q. What's the purpose of the NABN then?
A. We use that number in several of our analyses. But in terms of the historical statement, it allows us to pull the most current address for an individual in the hopes that we can mail the statement to a current address.
Q. Let's talk about this, because some of the data that's in the data completeness reports that you prepared uses a term that has a slightly different meaning as some of us have used it here in court, and that term is through-put. This is again marked for identification Defendant's Exhibit 152 at page 15. If you could zoom in on that table.
Could you identify, first of all, for us, Ms. Herman, what this document is that we're looking at right now?
A. This is an excerpt from our overall report.
Q. This is the narrative text that appears in the first part of the report?
A. Yes, it is.
Q. And there's a table there, and ahead of that table, above it, is a paragraph describing the term "through-put." Could you

describe for the Court what the term "through-put" means as it relates to the data completeness analysis?
A. Through-put in terms of the data completeness analysis looks at every single credit transaction and every debit transaction in the system. And so in this instance you're going to add up every transaction and that's going to equal through-put.
Q. Why do you do that? What's the purpose of doing that?
A. We trace the flow of funds in the system, and so in order to measure the amount of work that we're doing, this is how we look at the data.
Q. So with your use of "through-put," then, you're marking every bookkeeping entry --
A. Yes.
Q. -- as it goes through? Could you describe -- you have a table there on the pages up on the screen on page 15. Could you walk through that example for the Court?
A. Yes. This example is of a credit coming into a special deposit account, an SDA.
Q. What is an SDA?
A. An SDA is a temporary holding account.
Q. So a collection to an SDA could be what? What examples that you've encountered?
A. Lease collection, for instance.
Q. Money paid in on a lease?



A. Exactly.
Q. Go ahead with your --
A. So in this example you would have a credit in of a hundred dollars, let's say a lease payment, and then a transfer of that hundred dollars to the beneficial owners, to the individual Indian accounts. So you'd have a debit out of a hundred dollars and a credit into those individual accounts of a hundred dollars. And then the final line in that chart is the associated debit out of that same $100.
Q. So for this one $100, unique $100 amount of money, how much through-put is calculated in your example?
A. In this example we would consider this $400 of through-put.
Q. So when you speak of through-put in connection with the data completeness validation, you're talking about adding up -- every time that hundred dollars flows through another pot in the system, it gets counted.
A. Exactly.
Q. Do you have an understanding of how "through-put" has been discussed here in the courtroom in a different sense?
A. Yes, I do.
Q. Okay. Could you describe your understanding of this other use of the term "through-put"?
A. It's my understanding that it's of initial collection into the system and disbursements from the system.
Q. So in this latter use of the term, do you have an



understanding it's about money flowing into and then -- received into, and then disbursed out of the system?
A. Exactly.
Q. Would you expect the two through-put numbers to measure up against each other in the same way?
A. No. In this example, for instance, if you were looking at the through-put as defined the second way, it would be $200, not $400.
THE COURT: That's not the way I look at it. I think you've got $100 of through-put. That's my --
MR. QUINN: Cash flow, Your Honor.
THE WITNESS: Well, a hundred dollar collection, yes.
THE COURT: I'm just interested in how much money has flowed through the system from the intake end to the output end.
MR. QUINN: I understand, Your Honor. I want to clarify this, if we go back to read any of the reports, which we hope you will, on the data completeness, that you not be thrown by any of the numbers that appear there.
THE COURT: I'm just glad that Ms. Herman doesn't work for the IRS and call all those taxable events.
(Laughter)
THE WITNESS: Me too.
BY MR. QUINN:
Q. You testified about reused accounts and account number changes. What other tests have been done as part of the DCV?



A. Another one the tests we've performed is on transfers and reversals. We refer to it as transaction mapping.
Q. Are there other tests that you've gone through, other checks?
A. Yes. We have evaluated disbursements and looking at those relative to the Treasury records, we've evaluated accounts in terms of whether or not the account and the balance in the account agree.
Q. If you could give the Court a sense of the level of effort that FTI, people who work with you on the DCV, have had to expend in analyzing this data.
A. Typically, our team ranges from 10 individuals to 45, but in a given year in excess of 50,000 man-hours.
Q. 50,000 hours in a year spent?
A. Yes.
Q. In your experience on the data completeness? Is that for just your firm?
A. That's only our firm.
Q. And I take it there are other firms that have assisted with this work?
A. Yes. As I mentioned earlier, in many instances we need to turn to hard-copy documentation, so there's a firm stationed in the AIRR in Lenexa that searches for those documents, and once they're identified, they also have to be imaged and coded.
Q. And there are other contracting firms that provide those

Page 466

services?
A. Yes, there are.
Q. Do you request a lot of documents as part of your analysis?
A. Our first step is to try to resolve these issues using the electronic data, but yes, we've requested probably in excess of 85,000 documents.
Q. Do you know how many documents you presently are waiting to hear back on at the AIRR?
A. Between 30- and 35,000.
Q. 30- and 35,000 documents as part of the ongoing work on the data completeness?
A. Yes. There are 20 searchers devoted to our project.
Q. Ms. Herman, do you recognize this chart?
A. Yes. It's an excerpt from our overall report.
Q. From the September 30, 2007, report?
A. Yes, it is.
Q. Can you describe for the Court what this chart reveals about the data you've looked at?
A. The blue colors on the chart are the number of transactions in each one of the buckets reflected on the bottom of the chart, and the green bars are the dollars associated with the transactions.
Q. So in the zero to $1 range, that first bar graph, what is that telling you?
A. There are 9.1 million non-interest credits in that bucket.

Page 467

Q. And the dollar value associated with those 9 million transactions is?
A. 2.6 million.
Q. If you move down to the larger transactions, the last chart -- the last bar graph on your chart, the $10,000 and above transactions, what does that indicate?
A. There's 60,000 transactions -- and now I need bigger glasses -- I believe that's 4 billion.
Q. 4 billion something in dollar value, right?
A. Yes.
Q. Now, this chart that you prepared, does that correlate directly to the accounting population that's part of the plan?
A. No, it does not.
Q. This covers a broader data set?
A. Yes, it does.
Q. Everything that you've looked at from 1985 forward?
A. This goes from '85 through 2000, but it includes land-based, judgment, per capita, special deposit, all of the accounts in the system.
Q. Could you describe what this little table you have below the chart is -- what information it's conveying about the makeup, composition of the data set?
A. This is summarizing the percentage of transactions and the associated percentage of dollars in each stratum that was represented on the chart. So that as you can see, most of the

Page 468

transactions in the system are very small in dollar amount.
Q. If I read this right, 88 and a half percent of all transactions are below that hundred dollar, at or below?
A. Of the non-interest credits, yes.
Q. When you say non-interest credits, why is that the definition you're using for purposes of this data presentation?
A. I didn't want the chart to be skewed by the interest transactions, which may be lower in dollar value.
Q. And for this data set, for dollar transactions over a hundred thousand dollars, what did you find in terms of how they're represented in this data set?
A. Very few transactions make up the majority of the money in the system.
Q. Now, the totals here, can you explain what they relate to, what they represent?
A. Again, this is non-interest credits between 1985 and 2000.
Q. And this is all types of credits to all types of accounts?
A. Correct. So it includes special deposit accounts, judgment accounts, land-based accounts.
Q. Defendants' Exhibit 152, that's the overall report, the actual report?
A. Yes, it is.
Q. I'd like to walk you briefly through -- let's go to the next page. Could you describe -- this is Defendants' Exhibit 153. Could you identify this document for the record, please?

Page 469

A. This is the cover to our Alaska region report.
Q. One of the six regional reports you issued in September?
A. Yes, it is.
THE COURT: You say you're going to walk through each of them?
MR. QUINN: I'm just going to identify them for the record, Your Honor, unless you'd just like me to move them into evidence.
THE COURT: Well, I assume you've got a good ways to go with this.
MR. QUINN: I don't think we'll finish in the next 15 or hour.
THE COURT: Let's break for the evening then. It's after our regular quitting time. We'll be in recess until 9:30 tomorrow morning. Thank you very much. Have a pleasant evening.
And I don't think you need to introduce each one of them. Just introduce them. There's six reports?
MR. QUINN: Tomorrow's Friday. We're not holding court tomorrow?
THE COURT: Lost my head.
MR. QUINN: I was lost in the moment, Your Honor. I didn't even realize.
THE COURT: Monday morning. Monday morning.
(Proceedings adjourned at 5:03 p.m.)

INDEX

WITNESS: PAGE:

Katherine Ramirez Direct Examination Continued...... 339
Cross-Examination................. 396
Michelle Herman Direct Examination................ 434



* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

__________________

BRYAN A. WAYNE



Bryan A. Wayne, RPR, CRR
(202) 354-3186 Official Court Reporter bryanawayne@verizon.net