# DEFENDANT'S

# EXHIBIT

# 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, et al.<br><br>Plaintiffs,<br><br>v.<br><br>DIRK KEMPTHORNE, Secretary of the Interior, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:96CV01285<br>(Judge Robertson) |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING THE EVIDENTIARY HEARING THAT COMMENCED ON OCTOBER 10, 2007**

PROPOSED FINDINGS OF FACT ........ 1

I. Background/Development Of 2007 HSA Plan ........ 1

A. Data Systems and Documents ........ 1

1. Accounting systems used by DOI in the administration of IIM trust accounts ........ 1

a. Paper Records ........ 1

b. Integrated Records Management System (IRMS) ........ 1

c. Trust Funds Accounting System (TFAS) ........ 2

d. LRIS/TAAMS ........ 4

e. Trust Funds Receivable System (TFR) ........ 4

2. Inconsistencies between agency and regional offices ........ 4

3. Destruction of documents ........ 6

B. Predecessor Historical Accounting Plans ........ 13

C. IIM-related Projects Preceding Those In The 2007 Plan ........ 16

1. Paragraph 19 project ........ 16

2. Mass cancellation project ........ 23

3. 20-year tribal reconciliation project ........ 27

4. TIME project ........ 28

5. Straw Man project ........ 29

6. Various audits ........ 29

7. Treasury and GAO Settlement of Account Packages ........ 31

D. Establishment Of The AIRR In Lenexa ........ 34

E. Changes To Historical Accounting Project Reflected In 2007 Plan ............................ 38

1. Historical accounting schedule ................................................................ 38

2. Statistical sampling design...................................................................... 39

3. Judgment and Per Capita accounts ............................................................ 43

4. Special Deposit Accounts ........................................................................ 44

5. Office that will provide land asset statement assets................................................ 45

F. Rationale For 2007 Plan .......................................................................... 46

II. Areas Within The Scope Of The 2007 HSA Plan............................................................ 49

A. Information Contained Within Historical Statements Of Account.............................. 49

B. Beneficiaries Receiving HSAs Under 2007 HSA Plan .............................................. 51

C. Transactions To Be Reconciled Under 2007 HSA Plan ............................................. 53

1. Judgment/Per Capita Accounts .................................................................. 55

2. Land-Based Accounts ................................................................................ 55

a. "Electronic Ledger Era" (1985-2000) - completed as a result of the Litigation Support Accounting Project........................................................................ 57

b. "Paper Ledger Era" (pre-1985).................................................................. 65

D. Reconciliation Process ............................................................................... 68

1. Accounting Standards Manual ..................................................................... 68

2. Materials relied upon ................................................................................ 71

3. Systems relied upon .................................................................................. 73

4. Contractors involved ................................................................................. 76

5. Error rate; definition of "error" ..................................................................... 78

6. Data from Eastern Region reconciliation project ........ 79

E. Mailing HSAs To Beneficiaries ........ 80

F. Anticipated Administrative Appeals Process ........ 80

G. Data Completeness Validation Project ........ 81

1. DCV work completed as of Sept. 30, 2007 report ........ 83

2. Evidence regarding percentage of missing data restored through the DCV project thus far ........ 91

H. Posting Test/Land-to-Dollars Test ........ 94

1. Pilot test at Horton Agency - conclusions, limitations ........ 94

2. Plans for future posting tests ........ 97

I. Interest Recalculation Project ........ 97

J. Land Title Records Office Test ........ 98

III. Areas Outside The Scope Of The 2007 HSA Plan ........ 102

A. Account Sampling (i.e., reconciliation of all transactions within sampled accounts) 102

B. Reconciliation Of Account Balances ........ 103

C. Reconciliation Of Opening Balances ........ 104

D. Reconciliation Of DOI Records And Treasury Records ........ 104

1. Daily reconciliation of receipts and disbursements by OST ........ 105

2. Regulatory reporting to Treasury by OST ........ 106

E. Asset Statements ........ 108

F. Special Deposit Accounts ........ 109

G. Predecessor Accounts ........ 112

H. Probate Determinations ........ 113

I. Cadastral Surveys ........ 118

J. IIM Trust Funds Managed By Compacting/Contracting Tribes Utilizing Their Own Record System ........ 121

K. Direct Pay Accounts ........ 122

L. Routine Collection Of Third Party Records ........ 123

M. Analysis of MMS Systems ........ 126

N. Administrative Fees Deducted From IIM Accounts ........ 130

O. Youpee Escheated Interests ........ 131

P. Accounts And Transactions Outside The Temporal Scope Of The HSA Plan ........ 132

IV. Cost Of Performing The Historical Accounting ........ 133

A. Cost Of Historical Accounting Work Completed So Far ........ 133

B. Anticipated Cost Of Completing 2007 HSA Plan ........ 135

C. Estimated Cost Of Performing The Accounting Demanded By Plaintiffs ........ 135

D. Congressional Appropriations For HSA Work ........ 137

V. Throughput ........ 138

A. Total Amount Of Money Collected By The Government On Behalf Of IIM Beneficiaries ........ 140

B. Total Amount Of Money Distributed To IIM Beneficiaries ........ 147

VI. Certification Of The Administrative Record ........ 155

CONCLUSIONS OF LAW ........ 155

I. Law of the Case Circumscribes The Court's Review of Interior's Plan and Available Remedies ..... 155

II. Interior's Plan is Reasonable in Light of Time and Cost Considerations ..... 162

III. The Secretary Properly Exercised Discretion In Adopting And Executing The 2007 Plan For Completing The Historical Accounting ..... 167

A. Interior's Plan Makes Reasonable Use Of Statistical Sampling ..... 167

B. Interior's Plan Reasonably Anticipates Additional Work Needed To Complete The Historical Accounting ..... 168

C. Interior's Plan Complies With Applicable Statutory Requirements ..... 170

1. Interior's Plan Satisfies the 1994 Act's Mandate to Account for "All Funds" ..... 171

2. Interior's Plan Provides for Historical Accountings to All IIM Account Holders With Accounts Open on or After October 25, 1994 ..... 173

a. Legislative History Underlying the 1994 Act Confirms Congressional Intent That the Accounting Requirements Set Forth in the 1994 Act Apply With Respect To Funds Held In Trust On Or After the Date of the Statute's Enactment ..... 177

b. The Court of Appeals Has Not Resolved the Issue Whether the 1994 Act Mandates Accounting Duties for Accounts That Closed Prior to Passage of the Statute ..... 179

3. Consistent With the Express Statutory Language of the 1994 Act, Interior's Plan Reviews Transactions Going Back to the Later of the Initial Transaction Opening Of An Account or the Act of June 24, 1938 ..... 181

4. The 1994 Act Does Not Establish an Obligation to Perform Historical Accountings for the Closed Accounts Of Deceased IIM Account Holders........................................ 181

a. Concerns About the Account Balances of Deceased IIM Account Holders Are Properly Addressed by Comprehensive Probate Proceedings.................................... 181

b. Plaintiffs Lack Standing to Assert Any Alleged Rights of Deceased IIM Account Holders........................................................................................................... 182

5. The 1994 Act Does Not Establish an Obligation to Perform Historical Accountings for Amounts That Never Entered the IIM Trust, Such as Direct Payments to IIM Beneficiaries ................................................................................................. 184

D. Plaintiffs' Claims of "Impossibility" Are Premised On Requirements That The Court Has Rejected ................................................................................................ 186

IV. Notwithstanding More Generous Elements of Interior's Plan, Claims for Accounting of Transactions Prior to October 1, 1984, are Barred by the General Six-Year Statute of Limitations, 28 U.S.C. § 2401, and Tolling Language in Annual Appropriations Riders Since 1990............................................................................................................. 188

CONCLUSION............................................................................................................... 190

# PROPOSED FINDINGS OF FACT

## I. Background/Development Of 2007 HSA Plan

### A. Data Systems and Documents

#### 1. Accounting systems used by DOI in the administration of IIM trust accounts

##### a. Paper Records

1. In the period prior to February 1985, which the Department of the Interior (Interior) refers to as the Paper Ledger Era, Interior had transaction registers, paper printouts of early computer transactions, as well as hard copy paper ledgers. Tr. 443:5-444:4 (Herman).

##### b. Integrated Records Management System (IRMS)

2. For the reconciliation of Individual Indian Money (IIM) financial transactions during the Electronic Ledger Era, two computer systems are the most relevant: the Integrated Records Management System (IRMS) and the Trust Funds Accounting System (TFAS). The IRMS was the first system in the Electronic Ledger Era. Tr. 435:14, 448:9-13 (Herman).

3. Beginning in the 1970s at some locations and continuing into the 1980s, Interior implemented the IRMS on a regional basis. Tr. 288:13-20 (Ramirez).

4. In the early days of IRMS, the area office had a centralized computer that would keep the IRMS data for the agencies in that area. Tr. 2059:16-2060:1, 2060:21-2061:8 (Christie).

5. IRMS came online at Interior gradually. IRMS was first installed in the Billings regional office (now the Rocky Mountain region) in the late 1970s. Tr. 1743:24-1744:2 (Infield);

By 1988 or 1989, Interior required that all regions use IRMS. Tr. 1743:17-21 (Infield). Tr. 2058:24-25, Tr. 2059:2-3 Tr. 2060:2-12 (Christie); see also Tr. 691:6-9 (Herman).

6. The IRMS system was designed with several subsystems, or platforms, to keep track of lease information, ownership information, and personal account information. Tr. 2041:1-2 (Christie).

7. The IRMS system included an IIM subsystem which had accounting information for IIM transactions, including account numbers and names. Tr. 343:23-344:1 (Ramirez).

8. One of Michelle Herman's first projects was to help aggregate all of the data relating to the IIM subsystem of the IRMS into a single database. Tr. 435:7-14 (Herman); see also Tr. 571:19-24 (Herman).

**c. Trust Funds Accounting System (TFAS)**

9. The other important system is the Trust Funds Accounting System (TFAS), which is the current system. Tr. 448:14-16 (Herman).

10. Interior's processing of IIM Trust funds from the late 1990s through the present relies upon TFAS, as well as several other automated systems. See DX-239 (Trust Funds Processing flow chart), identified at Tr. 867:10-18 (Winter).

11. Interior's conversion to TFAS began in August 1998 and was completed in March 2000. Tr. 866:10-14 (Winter).

12. This conversion permitted Interior to produce and mail quarterly IIM account statements to beneficiaries since at least March 2000. Tr. 866:15-867:9 (Winter). These statements include the beginning balance, all transactions that occurred in their account, with a description of those transactions, and an ending balance. Tr. 867:1-3 (Winter).

13. TFAS also keeps track of the pooled investments of IIM funds. Tr. 872:10-12 (Winter). TFAS identifies accounts as restricted or unrestricted, the latter type permitting automatic disbursements when the account balance reaches $15. Tr. 872:13-22, 874:5-9 (Winter).

14. Restricted accounts include those of a minor or an estate account or a whereabouts unknown account, where the balance is being held either because Interior does not have a valid address or because the beneficiary is a minor and cannot yet legally receive the funds. Tr. 872:16-19 (Winter).

15. Some beneficiaries request that money be held above the regular $15 threshold so that they only receive the money upon request or to pay a bill for the individual Indian. Tr. 873:13-23 (Winter). In the case of oil and gas income, the threshold is $5 instead of the usual $15 amount for automatic disbursement. Tr. 874:10-24 (Winter).

16. Beginning in about October of 2005, OST implemented a lockbox system for depositing IIM collections. Tr. 867:20-868:5 (Winter).

17. As of September 2007, all of the BIA agencies had converted to TAAMS, which produces invoices that are sent to lease holders, who “then turn around and send their monies back with the invoice to the lockbox.” Tr. 868:6-11 (Winter).

18. OST also processes funds received as “manual batches,” where the information is entered directly into TFAS. Tr. 875:10-16 (Winter). These batches include oil and gas interfaces and checks for agencies not yet converted to the lockbox. Tr. 875:10-16 (Winter).

19. Since the mid- to late- 1990s, all TFAS entries have been subjected to extensive quality assurance checks. Tr. 875:17-876:11 (Winter).

20. As part of the audit of OST’s financial statements, TFAS has been “audited for internal controls . . . through generally accepted auditing standards for financial statement

control." Tr. 898:18-22 (Winter). Whether OST's auditors follow – or are required to follow – standards of the Committee of Sponsoring Organizations of the Treadwell Commission (COSO) was not established, see Tr. 898:23-899:18 (Winter).

**d. LRIS/TAAMS**

21. The Land Record Information System (LRIS) includes a database that records the history of ownership for all tracts of Indian Trust land. AR-405 at 5. LRIS was not used for current income disbursements or day-to-day financial transactions, which were handled by other systems, like the IRMS. AR-405 at 5.

22. To perform historical accounting work, LRIS may be used to certify the accuracy of a historical land-based income transaction. AR-405 at 5.

23. The Trust Asset and Accounting Management System (TAAMS) is the successor to LRIS that Interior has converted to since 2005. Tr. 69:6-13 (Cason); Tr. 867:24-868:11, 870:4-7 (Winter). Among other things, TAAMS provides information "as to when a payment is due" to Interior's recently implemented Trust Funds Receivable (TFR) System. Tr. 869:14-19, 903:10-904:5 (Winter).

**e. Trust Funds Receivable System (TFR)**

24. In addition to the above systems, by early 2006, Interior had rolled out and has now fully implemented its Trust Funds Receivable System (TFR), an accounts receivable system for those agencies that have converted to TAAMS. Tr. 902:23-903:14 (Winter).

**2. Inconsistencies between agency and regional offices**

25. IRMS was based regionally. Tr. 449:4-12 (Herman). All 12 regions, however, used the IIM subsystem of IRMS. Tr. 448:21-448:3 (Herman).

26. The use of IRMS was "voluntary" at the BIA regions in the 1970s and early 1980s. Tr. 2040:9-16; 2062:8-10 (Christie). As IRMS was implemented in other BIA agencies beyond Billings, there was not a standard usage of IRMS, as each agency accommodated the system to their particular way of doing things. Tr. 2062:2-20 (Christie).

27. Different regions over time used different processes of bookkeeping entries that were followed consistently within a region but varied across regions. Tr. 572:19-573:15 (Herman). This variation made the data more difficult and time-consuming to analyze, but did not impair the reliability or integrity of the data. Tr. 573:6-10 (Herman).

28. Historically, the Osage Tribe did its own accounting for oil and gas revenues and did not use the Bureau of Land Management (BLM) staff to conduct their field operations. Tr. 1737:10-24 (Infield). Money generated for Osage allottees was deposited directly into an Osage account at Treasury; subsequently it flowed to a Special Deposit Account (SDA) held by Interior and then to each allottee. Tr. 1738:2-21 (Infield). However, in 1988, the Osage entered their prior balances into IRMS and thereafter used IRMS to handle their annuity payments. Id. at 1740:6-24. Therefore, IRMS contains oil and gas revenue data for Osage allottees, but for pre-1988 revenues, information other than balances would be obtained from paper ledgers and other systems, including, IBM system 36, and TFAS. Id. at 1740:24-1741:6.

29. Historically, the Muskogee Tribe's (as well as the Osage's) ownership records were kept at as many as 70 different county courthouses. The Muskogee Tribe began using IRMS in approximately 1988 or 1989. Tr. 1743:17-21 (Infield).

### 3. Destruction of documents

30. With few exceptions, the Indian Trust records needed for the historical accounting exist, are being located with success, and are being used to reconcile IIM account transactions. AR-565 at 8.

31. Despite the passage of time and the disposal of some records pursuant to Government record retention schedules, Interior's experience with the historical accounting has unearthed much supporting material. As of March 31, 2007, the Accounting Reconciliation Tool ("ART") used by OHTA and its contractors to perform historical accounting work contained 9.1 million coded IIM images and 8.1 million coded tribal images. These images constitute 2.5 million IIM and tribal documents. AR-533 at 5.

32. Of the approximately 80,000 document requests made by FTI Consulting, the OHTA contractor conducting the Data Completeness Validation (DCV) testing (described in detail below), about 35,000 document requests were pending as of the date of the trial. Approximately 20 full-time searchers working in Lenexa, Kansas at the AIRR support FTI's DCV work. Tr. 465:25-466:12 (Herman).

33. Although documents related to IIM transactions have been lost or destroyed, Tr. 1263:4 (Angel), the evidence shows that multiple copies of transactional documents were typically created and distributed to multiple Interior offices, so that this loss has not proven material. See Tr. 1264:8-11 (Angel). Typically, even where a document was destroyed, more than one copy of a particular document was created. Tr. 1282:6-7 (Angel). BIA employees typically made three copies of leases and multiple copies of some of the financial transaction documents. Tr. 1282:4-6 (Angel).

34. OHTA accountant and On-Site Manager of the AIRR, Katherine Ramirez, has over 20 years of experience at BIA, OST and OHTA, including being in charge of the Paragraph 19 document search and working at the Branch of IIM where she visited dozens of the BIA agencies, Tr. 298:1-299:19 (Ramirez); Tr. 409:10-14 (Ramirez). She is familiar with the documentation relevant to the historical accounting and how it was distributed among BIA agency, area and regional offices. Tr. 299:22-323:6 (Ramirez) (discussing DX-215 (Lease), DX-206 (Bill for Collection), DX-222 (Schedule of Collections), DX-208 (Deposit Ticket), DX-223 (Summary of Collections), DX-228 (Title Status Report), DX-214 (Journal Voucher), DX-212 (Ledger Card), DX-213 ("139-B" check application, "DDR Daily Disbursement Report," and check carbon), Tr. 339:7-340:24 (Ramirez).

35. The series of exemplar, form documents described by Ms. Ramirez was assembled during the Paragraph 19 search project to show the audit trail or accounting process of a transaction. Tr. 300:10-20 (Ramirez). Those forms were used before and during Ms. Ramirez's tenure at the IIM branch in the late 1980s and early 1990s. Tr. 340:16-24 (Ramirez).

36. The ample availability of such "audit trail" documents results from the number of copies (originals, carbons, and photocopies) that Interior routinely generated in processing IIM transactions and from the geographic distribution of those copies. Tr. 299:22-323:6, Tr. 339:7-340:24 (Ramirez). The following table estimates the number of copies of each type of IIM transactional document that BIA typically generated, and where those copies were usually distributed:

| **Type of Document** | **No. of Copies** | **Locations** | **Exh. No.** | **Transcript Cite** |
|---|---|---|---|---|
| Lease | 3 | realty office; land title records office; agency jacket file | DX-215 | Tr. 300:2-301:5 (Ramirez) |
| Bill for Collection | 7 | lessee; realty office; Branch of IIM; area/region; LTRO | DX-206 | Tr. 301:20-303:2 (Ramirez); Tr. 2044:6-7 (Christie) |
| Schedule of Collections | 1+ | agency; area/region | DX-222 | Tr. 303:3-5, 307:10-17 (Ramirez) |
| Collections Summary | 3+ | area/region; multiple agencies | DX-223 | Tr. 306:23-307:2, 307:24-308:9 (Ramirez) |
| Deposit Ticket | 5+ | bank; central office; region; multiple agencies | DX-208 | Tr. 308:11-16, 309:5-14 (Ramirez) |
| Title Status Report | 2 | agency (printout); LTRO (electronic) | DX-228 | Tr. 309:23-25, 311:8-23 (Ramirez) |
| A&E Card | 2 | area/region; agency | (none) | Tr. 311:24-312:16 (Ramirez) |
| Ledger Card | 2+ | agency, region, account holder | DX-212 | Tr. 315:10-316:10, 318:5-17 (Ramirez) |
| 139B Check Application | 2 | agency &/or area/region | DX-213 | Tr. 319:10-16, 322:16-24 (Ramirez) |
| Daily Disbursement Report | 2 | central office; agency or region | DX-213 | Tr. 319:10-12, (Ramirez) |
| Check Carbon | 2 | agency or region; central office | DX-213 | Tr. 319:19-22, 322:4-12 (Ramirez) |

In sum, BIA typically generated at least two contemporaneous copies of these audit trail forms, resulting in duplicate records usually maintained in at least two locations; see Tr.

386:18-387:1, Tr. 393:12-394:21 (Ramirez) (describing how, within the AIRR, many boxes from different BIA offices may contain copies of the same document, and how information on the exterior of the boxes stored at the AIRR is used to locate documents).

37. There are additional documents relevant to the historical accounting. For example, a distribution worksheet was a document created contemporaneously from information in the IRMS system that would give a snapshot of what owners were involved in a particular lease, what their percentage of ownership was, how much was collected for the lease, how that was then distributed via the ownership record and the percentage against the amount collected, and then how much was put into the accounts. Tr. 2041:12-23 (Christie).

38. Copies of distribution worksheets were located during the tribal trust reconciliation, discussed below. Tr. 2082:15-18 (Christie). In fact, during the search for documents as part of the tribal trust reconciliation project, "massive" amounts of records were found, including "thousands and thousands of boxes" coming by tractor trailer loads, including a mix of tribal and IIM records. Tr. 2094:6-22 (Christie).

39. A Journal Voucher, which was used to document the transfer of money from a Special Deposit Account (SDA) (described in detail below) into an individual's IIM account would identify to whom the money was going and what their share was. Tr. 2089:18-2090:20 (Christie).

40. A "transaction register" would also document the money flow into an IIM account. Tr. 2091:1-4 (Christie).

41. Thus, there is a vast amount of Indian records available for Interior's historical accounting and Plaintiffs produced no evidence to the contrary. There are approximately

"43 miles of [Indian] records" at the National Archives and at the AIRR, although not all would necessarily be useful to the accounting. Tr. 1198:14-21 (Angel). These 43 miles consist of approximately 67,000 cubic feet of NARA records and approximately 160,000 cubic feet at the AIRR. This is in addition to the "approximately 10,000 cubic feet of [MMS] and USGS records that would be potentially useful for a historical accounting." Tr. 1181:5-8 (Angel).

42. Along with their utility for the accounting, these historical Indian records also demonstrate a historic regularity and reliability in Interior's IIM fund process. Tr. 1195:12-13, 20 (Angel) ("[T]here was a regularity relating to recordkeeping" and a "regularity to reporting.").

43. To the extent that trust records were in poor shape at the time of the 1994 Act, work at the AIRR remedied many of those problems. Tr. 1197:2-3; 8-9 (Angel).

44. To preserve Indian trust records used for historical accounting, OHTA continues to work with NARA on the transfer of ART data and documentation to NARA's Electronic and Special Media Records Services Division. AR-533 at 6. During the second quarter of FY2007, OHTA prepared 75 cubic feet of inactive records to be transferred to AIRR for permanent storage and preservation. AR-533 at 6.

45. Nearly all testimony elicited by Plaintiffs concerning the destruction of documents or the availability of data, whether on cross-examination of Government witnesses or through their own witnesses, involved dated information that neither rebuts nor addresses more recent developments such as the Paragraph 19 project results, the Litigation Support Accounting (LSA) results or the DCV results. E.g., Tr. 426:11-429:15 (Ramirez); Tr. 720:2-721:24, 737:-738:3 (Herman); Tr. 1739:25-1742:14 (Infield).

46. Plaintiffs' trust expert, Paul Homan admitted that he had no current understanding regarding the reconciliation work performed on the LSA project or for the Judgment and Per Capita accounts. Tr. 1593:18-1594:5 (Homan) ("I'm not aware of the current situation at all.")

47. Plaintiffs' statistical sampling expert, Mr. Dwight Duncan, conceded that the fact that some data or documents have been destroyed does not mean that other copies of sources of the information are unavailable. Tr. 1479:3-13 (Duncan).

48. Although Plaintiffs' expert Richard Fitzgerald contended that Interior cannot perform a fiduciary accounting because the records are incomplete, Tr. 1911:4-15 (Fitzgerald), he conceded on cross-examination that he had not personally reviewed any of the documents used in the administration of the IIM accounts. Tr. 1918: 17-24 (Fitzgerald). Nor has he been to the AIRR. Tr. 1928:16-18 (Fitzgerald).

49. Plaintiffs' auditing expert, Mr. Don Pallais, has never worked with the records used by Interior to conduct the accounting, Tr. 1819:16-21 (Pallais), and his opinions are thus more theoretical than those of Defendants' expert, Ms. Caren Dunne, who has worked with the documents extensively over several years. Tr. 2117:2-3 (Dunne). In her experience, Ms. Dunne has witnessed that the records are largely available and accessible, and can be used and are being used currently in the reconciliation process. Tr. 2117:3-5 (Dunne); see also, Tr. 2125:3-5 (Dunne). The documents are sufficiently reliable and are not lacking corroborating evidence. Tr. 2118:11-12 (Dunne).

50. Plaintiffs' witness, Mona Infield, an Interior employee, provided anecdotal information about her experience with what she claimed were missing data on IRMS. Ms. Infield did not (nor did any other Plaintiffs' witness) state whether information was subsequently

restored or whether the alleged missing data was contained elsewhere. She also did not explain whether such information was material to providing Historical Statements of Account. Tr. 1746:9-1747:14 (Infield).

51. Ms. Infield also provided anecdotal information concerning the overwriting of recycled files on the RDRS system; however, she did not state whether any data were lost and if so, how extensive any loss was. Tr. 1749:24-1751:13 (Infield). She testified that certain data had to be manually entered into the RDRS system or it could be lost. Id. at 1750:8-23. Since 2003, weekly back-up files containing such data are kept in perpetuity. Id. at 17851:5-6. Ms. Infield did not indicate - and no evidence in the record demonstrates - that this manual process for a particular subset of leases resulted in any actual loss of data or has impaired Interior's ability to prepare Historical Statements of Account.

52. During the time that Mr. Joe Christie was Superintendent of the Hoopa Agency (in the early 1980s) , the scaling ticket – a document used in the management of money collected into the IIM system pursuant to timber contracts – was not kept electronically. Tr. 2044:1-2 (Christie). However, more than one copy of the scaling ticket was usually kept. Tr. 2044:5-6 (Christie). During the search and collection of documents for the tribal trust reconciliation, Mr. Christie observed that some scaling tickets were routinely destroyed either at the BIA agency or as part of routine document destruction at Federal Records centers. Tr. 2044:20-2045:3; Tr. 2054:17-2055:6 (Christie). Mr. Christie did not testify that the only copy of any particular scaling ticket was destroyed, or that the information from a destroyed scaling ticket was not contained elsewhere or was essential to the preparation of an HSA.

**B. Predecessor Historical Accounting Plans**

53. Performing a historical accounting for individual Indian Money (IIM) accounts has been an immense task for which the Department of the Interior has had no clear model or roadmap to follow. Tr. 55:21-56:7 (Cason). As a result, it has constituted a learning experience for Interior, and Interior has made refinements and adjustments to how it would perform the historical accounting work in a way to maximize the use of the funds that have been appropriated by Congress for the task. Tr. 56:8-12 (Cason).

54. As explained by James Cason, the Associate Deputy Secretary for the Department of the Interior, "there has not been in the past and still as of today, no previous model about how exactly we should go about this job. . . . we're finding that we learn a lot as we go through the process, and that that's an iterative process where we learn and redesign, learn and redesign." Tr. 65:1-9 (Cason).

55. Although Plaintiffs' counsel argued repeatedly that the January 6, 2003 Historical Accounting Plan for Individual Indian Money Accounts (2003 Plan) and the May 31, 2007 Plan for Completing the Historical Accounting of Individual Indian Money Accounts (2007 Plan) "are plans 8 and 9," see, e.g., Tr. 141:5-6 (Mr. Dorris), Plaintiffs failed to present any testimony or evidence that either identified eight or nine separate "plans" to perform a historical accounting or established a basis for the allegation that there were eight or nine historical accounting "plans." See Tr. 92:16-93:6 (Cason).

56. The July, 1998 High Level Implementation Plan ("HLIP"), for example, cannot accurately be characterized as a predecessor historical accounting plan. The HLIP is a trust reform document that addresses 13 sub-projects within Interior intended to foster improvements in support systems (such as records management, training, policy and

procedures, and internal controls). PX-4154 at 3-4. It contains no plan to perform the historical accounting.

57. The July 2, 2002 report to Congress represents Interior's initial iteration of how it planned to perform the historical accounting. AR-561; Tr. 58:5-9 (Cason).

58. The July 2, 2002 report to Congress fulfilled a request of the House and Senate appropriations committees for Interior, made first during the FY2001 budgeting process and then reaffirmed in the FY2002 budgeting process. AR-561 at 21.

59. In 2001, the House committee stated that "[b]efore the Department agrees to any method for undertaking a historical IIM accounting, the Committee directs the Department to submit a comprehensive report to the Committee detailing the costs and benefits and likely results associated with any proposal." AR-561 at 21, quoting H.R. Rep. No. 107-103, at 89 (2001).

60. Also in 2001, the conferees stated that they "remain very concerned about the costs associated with [a historical] accounting," and that funds appropriated to Interior "may not be allocated prior to the report requested by the Committees detailing the methods and costs associated with a historical accounting." AR-561 at 21, quoting H.R. Conf. Rep. No. 107-234, at 99 (2001).

61. The July 2, 2002 report to Congress called for a transaction-by-transaction accounting for each account. AR-561 at 41-42, 90; Tr. 109:1-11 (Cason).

62. Interior estimated that the total cost for the historical accounting set forth in the July 2, 2002 report to Congress would be $2.4 billion. AR-561 at 16.

63. In a December 9, 2002 letter to Secretary of the Interior Gale Norton, the House Committee on Resources responded to Interior's July 2, 2002 report, indicating that it

found the report "troubling in several areas." AR-184. Writing for the Committee, Chairman James V. Hansen stated, in part:

> Given the length of time required to complete the broad accounting outlined in the Report, as well as the costs associated with such an activity, which are likely to come at the expense of other key Indian programs, we request that you promptly consider ways to reduce the costs and the length of time necessary for an accounting.
>
> * * *
>
> The Report notes that the Department will encounter "gaps in documentation" during the historical accounting, and that various options, including forensic accounting methods, can be used to address such gaps. The Committee asks that before committing significant resources to the broad approach described in the Report, the Department consider all available options regarding the use of alternative accounting methods.

AR-184.

64. Shortly thereafter, on January 6, 2003, Interior issued its Historical Accounting Plan for Individual Indian Money Accounts (2003 Plan). PX-507.

65. The work described in the 2003 Plan was expected to take five years to complete and was preliminarily estimated to cost approximately $335 million. The 2003 Plan expressly noted that its successful implementation was "dependent upon sufficient appropriations." PX-507 at 1.

66. Interior did begin historical accounting work under the 2003 Plan prior to 2007, when it began reconciling transactions under the LSA project. Tr. 95:20-98:2 (Cason).

### C. IIM-related Projects Preceding Those In The 2007 Plan

#### 1. Paragraph 19 project

67. Years before OHTA completed the LSA project, the Paragraph 19 search and collection process demonstrated that sufficient records to conduct the historical accounting exist and are retrievable.

68. In 1999, Interior and Treasury engaged the firm Arthur Andersen to assist them in searching for and collecting documents required to be produced pursuant to Paragraph 19 of the First Order for Production of Information (Paragraph 19). Trial 1.5 Tr. 38:2-22 (Brunner 6/6/03 PM). Paragraph 19 required the production of all documents, records or tangible things that embody, refer or relate to the IIM accounts of the named Plaintiffs or their agreed upon predecessors in interest. Trial 1.5 Tr. 39:5-11 (Brunner 6/6/03 PM).

69. Robert L. Brunner was the individual at Arthur Andersen who oversaw the firm's work on behalf of Interior and Treasury. Trial 1.5 Tr. 38:2-22, 46:10-47:2 (Brunner 6/6/03 PM). Mr. Brunner spent 15 years at Arthur Andersen, where he was a Principal, the national partner in charge of the firm's Complex Data Management and Class Action practice, and the partner in charge of the firm's Value Solutions Litigation Consulting Practice for the Pacific Northwest. Trial 1.5 Tr. 28:10-17 (Brunner 6/6/03 PM). In May of 2002, Mr. Brunner joined KPMG, where – at the time he testified in June 2003 – he was a principal in the forensic practice and national partner in charge of the class action and complex data management practice. Trial 1.5 Tr. 28:2-7 (Brunner 6/6/03 PM).

70. With respect to Treasury, Arthur Andersen assisted in four primary areas related to compliance with Paragraph 19: the development of a plan; the development of protocols and procedures for implementing the search and collection process; the development and

implementation of quality control procedures to ensure the effectiveness and comprehensiveness of the search; and the issuance of an opinion as to the thoroughness and adequacy of the search. Trial 1.5 Tr. 39:16-40:9 (Brunner 6/6/03 PM). Arthur Andersen performed these tasks and completed its work for Treasury by January 31, 2001. Trial 1.5 Tr. 40:10-51:14 (Brunner 6/6/03 PM).

71. After the completion of its work for Treasury, Andersen rendered its professional opinion that Treasury's response to Paragraph 19 had been "a thorough, well-executed search that met or exceeded industry practices." Trial 1.5 Tr. 51:15-52:9 (Brunner 6/6/03 PM). Treasury ultimately produced approximately 2,300 documents in response to Paragraph 19. Trial 1.5 Tr. 52:10-12 (Brunner 6/6/03 PM).

72. Arthur Andersen's role with respect to Interior's Paragraph 19 response was to provide management advice and consulting, as well as assistance with the development of search and collection procedures. Trial 1.5 Tr. 52:13-53:3 (Brunner 6/6/03 PM). The search and collection process with respect to Interior was in some respects facilitated by the fact that recordkeeping is often tied to the geography of the corresponding IIM account holder. Trial 1.5 Tr. 53:16-54:5 (Brunner 6/6/03 PM).

73. Interior ultimately searched approximately 80 facilities for documents responsive to Paragraph 19. Trial 1.5 Tr. 54:6-55:8 (Brunner 6/6/03 PM). Katherine Ramirez, currently OHTA's On-Site Manager at the AIRR, was then in charge of the document search effort for OST. Tr. 276:9-14 (Ramirez). Criteria employed to determine whether documents were responsive included the names and aliases of the named Plaintiffs and predecessors, account numbers, associated tract numbers, associated lease numbers, and transactions. Trial 1.5 Tr. 56:1-57:7 (Brunner 6/6/03 PM).

74. Interior implemented a number of procedures to ensure quality control in every aspect of its Paragraph 19 search and collection process, including quality control checks and certifications by team members that they had properly and completely performed searches. Trial 1.5 Tr. 61:11-62:4 (Brunner 6/6/03 PM). The quality control procedures implemented by Interior exceeded those typically employed in the context of private business litigation. Trial 1.5 Tr. 62:2-4 (Brunner 6/6/03 PM).

75. Interior's Paragraph 19 response encompassed the "appropriate universe of records," "applied the appropriate search criteria," was based on a "well-planned and well-organized search," and included "a component of quality control throughout that entire process;" as such, it was "a well-executed, well-thought out search that . . . exceeded industry practices." Trial 1.5 Tr. 65:12-66:4 (Brunner 6/6/03 PM). Interior produced approximately 160,000 documents in response to Paragraph 19. Trial 1.5 Tr. 66:5-7 (Brunner 6/6/03 PM).

76. In early 2001, the Department of Justice retained the firm Ernst & Young to review documents that had been gathered pursuant to Paragraph 19 and to analyze those documents with respect to the accounts of the named Plaintiffs and predecessors encompassed by Paragraph 19. Trial 1.5 Tr. 53:5-54:12 (Rosenbaum 6/9/03 AM). Ernst & Young prepared a list of the transactions that appeared in ledgers maintained by Interior and determined whether those transactions could be verified by comparing them to the relevant supporting documents that were gathered pursuant to Paragraph 19. Trial 1.5 Tr. 54:5-12 (Rosenbaum 6/9/03 AM).

77. The individual at Ernst & Young with primary responsibility for this project was Joseph R. Rosenbaum. Trial 1.5 Tr. 53:14-20 (Rosenbaum 6/9/03 AM). At the time of his 2003

testimony, Mr. Rosenbaum was a partner with Ernst & Young and practiced in its Global Investigations and Disputes Advisory Services Practice. Trial 1.5 Tr. 6:17-7:4 (Rosenbaum 6/9/03 AM). Mr. Rosenbaum was a Certified Public Accountant in California and also held a law degree and a master's degree in business administration. Trial 1.5 Tr. 5:17-22; 9:14-25 (Rosenbaum 6/9/03 AM). At the time of Trial 1.5, Mr. Rosenbaum had over 20 years of experience as an accountant with international firms, specializing in the area of forensic accounting related to investigations, analysis of historical information, dispute resolution, and litigation consulting services. Trial 1.5 Tr. 5:23-9:13, 12:19-14:18 (Rosenbaum 6/9/03 AM); AR-522 at 4 (Mar. 28, 2003 Expert Report of Joseph R. Rosenbaum).

78. To perform its assigned work, Ernst & Young completed a number of specific tasks: (1) assembly of transaction histories; (2) identification of ownership information; (3) linking of transactions to supporting documents; (4) identification of any variances between transactions and documentation; (5) comparison of expected revenue from leases to transaction entries; and (6) recalculation of interest paid on the subject accounts. Trial 1.5 Tr. 61:25-63:21 (Rosenbaum 6/9/03 AM); AR-522 at 5.

79. Ernst & Young assembled complete transaction histories, from the inception of the accounts, for 25 named Plaintiffs and predecessors. The transactions analyzed ranged in time from 1914 through 2000. Trial 1.5 Tr. 64:3-66:7 (Rosenbaum 6/9/03 AM); AR-522 at 6, 12; Tr. 62:12-16 (Cason).

80. Ernst & Young obtained from Interior account balances as of December 31, 2000, as set forth in the TFAS, and compared those balances to balances Ernst & Young calculated as of the same date, with no differences noted. AR-522 at 6-7.

81. Ernst & Young's successful assembly of transaction histories demonstrates that the documents collected pursuant to Paragraph 19 are sufficient to create a listing of the transactions, including monies collected and disbursed, for 37 IIM accounts of 25 individuals who are named Plaintiffs or predecessors of named Plaintiffs. Trial 1.5 Tr. 56:15-22 (Rosenbaum 6/9/03 AM); AR-522 at 3, 6, & 12.

82. Ernst & Young verified ownership information relating to allotments owned by the named Plaintiffs and their predecessors to ensure that the payments allocated to those individuals accurately reflect the percentage of their ownership interests in such allotments. Trial 1.5 Tr. 70:20-71:17 (Rosenbaum 6/9/03 AM). Ownership information was verified by reviewing the Land Record Information System, and then confirming that information by examining probate documents collected pursuant to Paragraph 19. Trial 1.5 Tr. 71:8-17 (Rosenbaum 6/9/03 AM).

83. Many of the named Plaintiffs and their predecessors held small, fractionated interests in allotments, which resulted in a substantial number of transactions for small dollar amounts – nearly 60 percent were for less than $10.00. Trial 1.5 Tr. 67:15-24 (Rosenbaum 6/9/03 AM); AR-522 at 4. For example, one individual owns a 7/58,320 fractionated interest in a particular allotment which generates lease income of $858.54 per year; because of the tiny fractional interest, the income allocable to the individual is only ten cents per year. Trial 1.5 Tr. 46:17-51:14 (Rosenbaum 6/9/03 PM); DX-155 at D155-0124–D155-0155.

84. The total balance for all of the accounts of the named Plaintiffs and their predecessors analyzed by Ernst & Young as of December 31, 2000, is less than $3,000. Trial 1.5 Tr. 77:20-78:10 (Rosenbaum 6/9/03 AM).

85. Ernst & Young was able to locate supporting documentation for 86 percent of the 12,617 transactions it reviewed, representing 93 percent of the total dollar value of those transactions, which was approximately $1.1 million. Trial 1.5 Tr. 75:5-76:19, 77:6-19 (Rosenbaum 6/9/03 PM); AR-522 at 3, 13, 14.

86. The fact that sufficient supporting documentation could not be found with respect to a small percentage of the transactions reviewed by Ernst & Young does not suggest that such transactions were erroneous, only that adequate supporting documentation could not be found; rather, given that a large percentage of the transactions reviewed were successfully linked to supporting documentation, it is likely that supporting documentation existed at one time also for those transactions for which no support could be found. Trial 1.5 Tr. 76:20-77:5 (Rosenbaum 6/9/03 AM).

87. Ernst & Young's experience confirms that sufficient data exist to perform an accounting for the named Plaintiffs (and their predecessors), and that Interior's IIM records related to their accounts are substantially accurate. Ernst & Young's analysis demonstrates that the documents collected pursuant to Paragraph 19 are sufficient contemporaneous evidence that 86 percent of the transactions reviewed by Ernst & Young, representing 93 percent of the dollar value of those transactions, did occur and were recorded in ledgers. Trial 1.5 Tr. 56:23-57:2 (Rosenbaum 6/9/03 AM); AR-522 at 3, 8 & 13-15.

88. Except for one $60.94 collection that was erroneously credited to an individual whose account number was similar to that of the intended recipient, Ernst & Young found no indication that there were any transactions that had not been recorded in the available IIM ledgers. Trial 1.5 Tr. 57:3-7, 78:11-79:2 (Rosenbaum 6/9/03 AM); AR-522 at 3. Ernst & Young discovered the single error by performing an analysis of the expected payments

that should have been made and those that were actually made pursuant to the relevant lease. Trial 1.5 Tr. 31:11-39:22 (Rosenbaum 6/9/03 PM).

89. For the $1.1 million in total transaction value that Ernst & Young reviewed, the total net variance was $3,235.18, or less than one percent of the total transaction value. Trial 1.5 Tr. 53:14-54:1 (Rosenbaum 6/9/03 PM); AR-522 at 15. Of 452 individual variances discovered, 401 were for $1.00 or less, and approximately 270 were off by approximately one penny, which was most likely due to rounding differences. Trial 1.5 Tr. 54:2-9 (Rosenbaum 6/9/03 PM); AR-522 at 15.

90. As part of its analysis, Ernst & Young also performed an "expected versus actual" comparison, that is, it compared available lease information to transaction listings by reviewing the available farming and oil/gas leases, analyzing payments due under such leases (which were then multiplied by the appropriate fractionated interests), and comparing those amounts against the amounts indicated in the ledgers. Trial 1.5 Tr. 54:17-55:10 (Rosenbaum 6/9/03 PM); AR-522 at 9-10.

91. In connection with its lease analysis, Ernst & Young identified and analyzed 80 percent of the leases (representing 98 percent of the dollar value) relating to farm lease income, and 95 percent of the relevant oil and gas leases.[1] Trial 1.5 Tr. 57:20-58:3 (Rosenbaum 6/9/03 PM).

92. Ernst & Young researched each discrepancy it found in the lease comparison to ascertain whether there was an explanation for the discrepancy. Trial 1.5 Tr. 55:11- 56:1 (Rosenbaum 6/9/03 PM). Where Ernst & Young could not find an explanation for

---

[1] Ernst & Young's lease analysis with respect to oil and gas income included bonus and rental payments, but not royalties. AR-522 at Ex. D.

differences between the amounts due under the relevant lease and the amount listed in the transaction ledger, the differences were noted as "Unexplained Differences." Id. at 55:21-56:1 (Rosenbaum 6/9/03 PM); AR-522 at 16. The total unexplained difference between the expected lease payments and amounts reflected in the ledgers for all of the transactions in all of the accounts analyzed by Ernst & Young was $32.04, or .01 percent. Trial 1.5 Tr. 57:11-13 (Rosenbaum 6/9/03 PM); AR-522 at 16. Thus, the amounts shown in the leases were accurately and appropriately reflected in the account ledgers. Trial 1.5 Tr. 58:13-17 (Rosenbaum 6/9/03 PM); AR-522 at 16.

93. OHTA has learned from and taken advantage of that which Interior, Treasury and Arthur Andersen learned in going through the Paragraph 19 search. Trial 1.5 Tr. 67:19-21 (Brunner 6/6/03 PM).

94. The work undertaken in response to Paragraph 19 showed that "when Interior and Treasury were required to find documents, they could find documents . . . of any nature." Trial 1.5 Tr. 67:4-8 (Brunner 6/6/03 PM); Tr. 62:12-16 (Cason).

95. The Paragraph 19 project demonstrated that, although there were errors in the accounts, the errors were relatively few, the errors tended to be small, and the errors occurred on both sides of the ledger. Tr. 62:12-21 (Cason).

**2. Mass cancellation project**

96. The provisions of the Competitive Equality Banking Act of 1987 (CEBA) that initiated "limited payability" of Treasury checks took effect on October 1, 1989. DX-231 at 1, 18; Tr. 323:17-324:4 (Ramirez).

97. Since October 1, 1989, Treasury checks – which include IIM checks – may only be cashed for one year from the date of issuance. DX-231 at 1; Tr. 323:17-324:4 (Ramirez).

98. CEBA also required the cancellation of all issued Treasury checks that were at least one year old by April 1, 1991. DX-231 at 1, 3; Tr. 323:17-324:4, 325:13-20 (Ramirez).

99. Some issued and still outstanding checks dated back as far as 1954. Tr. 324:8-14 (Ramirez); DX-217 at 1.

100. To terminate the Treasury's obligation to pay those old checks, CEBA mandated a Government-wide "mass cancellation" of over 10 million checks with an aggregate value over $5 billion. DX-225 at 8 (table comparing BIA disbursing symbol 4844 "vs. ALL OTHERS").

101. These 10 million checks included approximately 61,000 IIM checks with a face value of about $1.9 million. DX-217 at 2; Tr. 324:15-20, 327:9-18 (Ramirez); Tr. 346:11-13, 348:13-16, Tr. 351:5-15, 352:8-17 (Ramirez).

102. Katherine Ramirez was the manager of BIA's "Mass Cancellation Project." Tr. 323:11-15, 332:8-20 (Ramirez). BIA's "Mass Cancellation Project" sought to identify the specific IIM checks that had been mass-canceled and, to the extent possible, re-credit affected IIM accounts in the amounts of the uncashed checks. Tr. 331:8-14 (Ramirez); DX-207 at 1.

103. The first obstacle to re-crediting the IIM accounts was CEBA's provision that "no moneys will be available to agencies from this cancellation." See DX-231 at 4; Tr. 326:9-20 (Ramirez). In other words, the U.S. Treasury retained the money that any Federal agency – including BIA – had deposited to cover the payment of checks that were ultimately canceled. Tr. 329:18-330:6 (Ramirez); DX-230.

104. To overcome this obstacle, Interior pursued and obtained an appropriation for re-crediting IIM accounts. P.L. 102-381 at 1391 (Oct. 5, 1992) ("$3,000,000 shall be available [] to

liquidate obligations owed tribal and individual Indian payees of any checks canceled pursuant to section 1003 of [CEBA], 31 U.S.C. 3334(b)"); Tr. 365:1-11 (Ramirez).

105. In the meantime, BIA requested and received from the Department of the Treasury computer tapes containing Treasury's database of the mass-canceled checks for the entire U.S. Government in July 1992. DX-209; DX-210; Tr. 330:7-331:2, 333:8-13, 334:4-9 (Ramirez).

106. As Contracting Officer Technical Representative ("COTR") on the project, Ms. Ramirez worked with a contractor, Soza & Company, Ltd., Tr. 332:21-333:4 (Ramirez), to trace the data on the tapes to specific individual IIM and Tribal IIM accounts, DX-207 at 1; Tr. 342:14-343:18 (Ramirez). The data consisted of a disbursing symbol, check serial number, check amount, and the date canceled. DX-207 at 1; Tr. 334:14-16, Tr. 341:17-342:8 (Ramirez). The list, however, did not indicate the checks' date of issuance. DX-207 at 1; Tr. 332:2-13 (Ramirez).

107. BIA started by focusing on the checks that used IIM's current (as of 1992) "disbursing symbol," 4844, as well as other symbols previously used for IIM checks. Tr. 334:10-335:13, Tr. 348:13-22 (Ramirez) (discussing table of IIM disbursing symbols, DX-217 at 2).

108. From the data, Interior determined that over 22,000 checks were "zero dollar" checks that had either been: (1) voided by BIA because, for example, they were accidentally damaged in the printing process, or (2) voided by Treasury because Treasury had received no issuance information for checks in BIA's old "check stock" that pre-dated mass cancellation; those old checks were unusable because they did not bear the post-CEBA, limited payability legend "void after one year." Tr. 349:3-350:22 (Ramirez)

(discussing DX-217 at 2). After subtracting the 22,407 "zero dollar" checks from the universe of 60,961 canceled IIM checks, 38,554 checks remained to be traced to individual accounts. DX-217 at 2; Tr. 352:18-353:4 (Ramirez).

109. By August 6, 1993, BIA had traced $616,736.31 (32 percent of the face value of those 38,554 mass-canceled IIM checks) to specific accounts that were either reimbursed or to checks that had actually been voided rather than canceled. DX-221 at 2; Tr. 353:5-8, Tr. 354:11-356:7 (Ramirez).

110. At that point, the data showed that less than $1.3 million of the mass-canceled checks ($1.914,528.45 - $616,736.31 = $1,297,792.14) remained to be resolved. See DX-221 at 2. As of December 2, 1993, BIA reported that more than $278,000 was re-credited to IIM accounts, leaving a balance of at least $338,000 ($616,736.31 - $278,000) attributable to voided checks. Tr. 356:12-357:9 (Ramirez); see DX-220 and DX-221 at 2.

111. Therefore, of the 38,554 "non-zero dollar" mass-canceled IIM checks issued in the 35-year period from 1954 through 1989, the amount of uncashed checks totaled no more than $1,576,528.45 ($1,914,528.45 - $338,000). Tr. 357:10-12 (Ramirez).

112. By comparison, during one week in 1989, BIA disbursed over $1.6 million in IIM checks. Tr. 288:21-289:17 (Ramirez); DX-218 at 3-4.

113. The documents presented at trial do not show the results of the BIA Mass Cancellation Project beyond December 1993. See DX-220. However, Interior continues to maintain a fund totaling approximately $500,000 to pay claims on mass canceled checks, although no claims against the fund have been made recently. Tr. 364:4-365:11 (Ramirez) (discussing Osage Agency inquiry regarding IIM check issued in 1986 (DX-216)); Tr. 844:21-845:11 (Winter).

**3. 20-year tribal reconciliation project**

114. Using agreed-upon procedures, the 20-year reconciliation project was intended to reconcile Tribal Trust funds, funds that are separate and distinct from IIM funds. Tr. 2071:10-19 (Christie).

115. The period of the Tribal Trust to be reconciled was July 1, 1972 through September 29, 1992. Tr. 2074:9-10 (Christie).

116. The 20-year reconciliation project began in December 1992 and was terminated in 1995, with reports issued to the tribes in late 1995 and early 1996. Tr. 2073:8-17 (Christie). "Fill-the-gap" work was still being performed on the project when it was ordered shut down. Tr. 2084:6-20 (Christie).

117. Interior was able to accomplish the tribal trust reconciliation even though they encountered missing documents. Tr. 2076:17-21 (Christie). Interior used varying standards to describe whether a particular transaction was considered reconciled according to the agreed-upon procedures and the extent of the reconciliation was noted. Tr. 2077:21-2078:19 (Christie). The tribes could then review the results and decide whether they accepted the level of reconciliation. Tr. 2078:19-21, Tr. 2080:6-9 (Christie).

118. There were approximately 320 reconciliations provided to the tribes, covering their one or more accounts in the Tribal Trust fund. The tribes received a virtual ledger on CD-ROM and copies of documentation supporting each transaction, covering approximately 98 percent of revenue and 85 percent of disbursements. AR-507.

### 4. TIME project

119. In 2000, DataCom Sciences, Inc., carried out what was called the "TIME project." The stated purpose of the project was to "examine the accuracy of the current ownership document information in LRIS by comparing mandatory elements." PX-4352 at 4. In its report, DataCom asserted an error rate in LRIS postings from the Rocky Mountain region of approximately 30 percent. PX-4352; AR-405 at 8.

120. DataCom's asserted error rate in LRIS postings is inconsistent with the results of NORC's 2003 pilot study of the accuracy of probate entries in Tract History Reports ("THRs") held in LRIS. NORC found no evidence to support a 30 percent error rate. AR-405 at 8. Although NORC's sample was modest in size and, therefore, not suitable for estimating an "error rate" among probate entries, NORC found no material errors contained in the LRIS database. AR-405 at 4.

121. Statistical variance alone cannot explain the discrepancy between NORC's findings and DataCom's assertions. Instead, DataCom identified more discrepancies within LRIS as "errors" because it did not assess whether the "error" actually would affect the "fitness for use" of the data. AR-405 at 6-8; Tr 1079:3-9 (Scheuren).

122. Dr. Fritz Scheuren of NORC believes DataCom's definition of what constituted an error is problematic in the TIME project analysis. Tr. 1078:21-25 (Scheuren).

123. DataCom's definition of error has been criticized because it focused on conformance to requirements, rather than fitness for use, for example, treating a misspelled word as an error, even if the document could still be used appropriately. Tr. 1079:1-9 (Scheuren).

124. DataCom's TIME project report does not address "fitness for use." PX-4352. DataCom recorded as a "data entry error" any instance in which the information in LRIS and

information contained in the original document was “inconsistent.” PX-4352 at 6. DataCom’s report did not describe or characterize the “inconsistencies” found. In addition, if a document number had an alpha at the end of it, DataCom also considered that to be a “data entry error.” PX-4352 at 7.

125. Of nine documents described within the TIME project report as “Acts of Congress,” only one was found to have no error, while five were reported as having “data entry errors” and three were reported as “not available,” for a reported error rate of 88.89 percent. PX-4352 at 8.

**5. Straw Man project**

126. Dr. Scheuren wrote a document about a proposed “Straw Man Pretest” as one of his early works, in approximately August-September 2001. Tr. 1080:4-21 (Scheuren); AR-170; AR-634 (complete copy of document).

127. Dr. Scheuren’s document presented a series of questions for Interior in his early efforts to learn more about relevant facts. Tr. 1081:8-1082:7 (Scheuren).

128. The “Straw Man Pretest” was offered not as a final recommendation to Interior but as a proposed starting point for the gathering of data, following listening meetings that NORC attended. AR-170; AR-634.

**6. Various audits**

129. In developing the 2007 Plan, OHTA considered various audits as background for its accounting project. While the exact number of audits is unknown, NORC reviewed 263 audits as part of its meta-analysis of audit and reconciliation studies. AR-440 at 2. As noted by their inclusion in the Administrative Record, in developing the 2007 Plan, OHTA considered independent auditor reports from December 1996 (AR-379), January

1998 (AR-378), March 1999 (AR-377), May 2000 (AR-376), January 2001 (AR-375), June 2001 (AR-374), April 2002 (AR-369), March 2003 (AR-355), December 2003 (AR-352), November 2004 (AR-350), November 2005 (AR-347) and December 2006 (AR-343).

130. Many of these independent audits contain qualified opinions due to the following: cash balances were greater than amounts reported by the U.S. Treasury; deficiencies in internal controls; potential liability to the Federal Government as a result of lawsuits by trust beneficiaries; and trust beneficiaries disagreed with balances recorded on their accounts. See AR-343, AR-347, AR-350, AR-352, AR-355, AR-369, AR-374 to AR-379.

131. Mr. Pallais opined that Interior's records could not be relied upon to perform a historical accounting due to the deficient internal controls noted in these annual audits. Tr. 1820:3-9, Tr. 1867:3-9 (Pallais). However, he admitted that he has never examined or performed an audit of Interior's trust records. Tr. 1819:16-21 (Pallais).

132. Moreover, when reconciling accounts, "the fact that there are qualified independent audit reports or opinions out there does not render the documents that are generated by the entity as unreliable." Tr. 2119:24-2120:1 (Dunne). When finding evidence of internal control weaknesses, the ASM addresses such weaknesses "by seeking to apply corroborating evidence, expanding testing procedures . . . and increasing the sample size, which is consistent with the auditing guidance of audit sampling." Tr.2120:16-20 (Dunne). Auditors "can increase the scope of their substantive testing to sufficiently satisfy themselves that the numbers stated in the financials represent or present fairly in all material respects the activity of the entity." Tr.2128:25-2129:4 (Dunne).

### 7. Treasury and GAO Settlement of Account Packages

133. NARA holds 8,315 boxes of GAO records that are potentially useful for the historical accounting. Tr. 1192:7-13 (Angel). OHTA's contractors have reviewed these GAO "settlement packages" as part of the historical accounting, and have also reviewed similar Treasury Department "settlement packages." AR-344; AR-348; AR-436; AR-626 at 5-25.

134. Between 1890 and 1950, Congress authorized the Treasury Department and, later, the GAO to "settle the accounts of all Federal agents who handled public monies," which included Indian agents who were typically the superintendent of BIA agencies. AR-348 at 34, 81. "The agents transmitted financial data first to the Bureau of Indian Affairs (BIA) headquarters, which reviewed the Indian agent's account. After this initial review, the account package was either returned to the Indian agent for further information, or the BIA forwarded the account package to the GAO for its review and settlement." AR-348 at 34. Essentially the same process occurred for packages that Treasury reviewed. Compare AR-348 at 25 (Treasury flow chart) with AR-348 at 81 (GAO flow chart). The auditor concluded the process by issuing a Certificate of Settlement of Account. AR-348 at 25, 81; see AR-348 at 83 (July 21, 1931 GAO certificate for Ft. Bidwell Indian Agency).

135. The Certificates of Settlement of Account used the words "certify" and "examined," which were common terms during those time periods associated with audits. Also, correspondence in the settlement packages raising questions for response by the agents frequently used the word "audit." AR-348 at 2; AR-348 at 5 ("settlement packages were audited").

136. A Certificate was not issued until the audit official handling the settlement examination had every question or issue answered to his satisfaction. Correspondence in the settlement packages involved sums of less than a single dollar in some instances. AR-348 at 2.

137. Settlement packages were audited by the Department of Treasury, Office of the Auditor for the Interior Department, for the period 1890 through 1920. AR-348 at 5.

138. In addition to the certificate, the GAO settlement package usually contained:

- A Cash Flow Summary of (1) balance at prior settlement date, (2) aggregated receipts and disbursements, (3) transfers, and (4) balance at current settlement date with separate columns for Tribal, IIM, appropriated and other funds.
- Receipt data support.
- Disbursement data support.
- Correspondence between the Agency Superintendent/Special Disbursing Agent and the Commissioner of Indian Affairs and/or GAO Auditor.

AR-348 at 30. The GAO packages contained BIA-generated documentation such as IIM account cards, financial vouchers, and collection schedules. Tr. 1176:20-24 (Angel); see DX-243 through DX-257 (GAO settlement packages). The Treasury packages usually contained the same documents except for the cash flow summary. AR-348 at 6.

139. In 1921, Congress passed the Budget and Accounting Act (42 Stat. 20). This act transferred the settlement function from Treasury to the newly-created General Accounting Office. As a result of this legislation, auditors from Treasury moved to the GAO and continued their settlement duties for the GAO. AR-348 at 34.

140. By settling these accounts, Congress, through GAO, and Treasury provided indirect oversight to BIA's activities. See Tr. 1195:24-1196:3, Tr. 1282:15-16 (Angel).

141. OHTA's contractors have reviewed "Settlement of Account" packages prepared by Treasury and the GAO from 1890 to 1950. AR-344; AR-348; AR-436; AR-626; AR-533

at 3. The Treasury and GAO samples were randomly selected from a sampling population of 20,700 Treasury and 23,000 GAO account settlement packages, located at the NARA Archives II facility in College Park, MD. AR-533 at 3.

142. NORC was the OHTA contractor involved in selecting the sample of settlement packages for review. AR-436 at 15, 30; Tr. 1022:8-1023:9 (Scheuren); see AR-344 at 3.

143. OHTA contractor Reznick Group reviewed the settlement packages from an accounting perspective. AR-344 at 2-3 (report regarding Treasury packages); AR-346 at 6.

144. The historical evidence is inconclusive whether auditing IIM account balances was a consistent part of the Treasury and GAO oversight, AR-533 at 2, but the entire certification process was detailed enough to establish that internal controls did exist in the processing of Indian Trust funds for the Treasury and GAO settlement periods. AR-533 at 2-3; see AR-436 at 35-36, 39.

145. Reznick found that “[i]n general, the [Treasury] packages were reasonably organized, the documents ranged from good to poor condition (taking into account the documents were 86 to 116 years in age), and the types of funds in the settlements included IIM funds, Tribal funds, Indian Money Proceeds of Labor (IMPL) or Proceeds of Labor (PL), special deposits, interest, miscellaneous collections, sundry receipts and government appropriated funds.” AR-344 at 4.

146. Reznick similarly concluded that the GAO packages were well organized, the documents ranged from being in good to poor condition, and the types of funds in the settlements included IIM. AR-346 at 4. Reznick found that a systematic audit process was consistently carried out regularly over time. AR-346 at 6.

### D. Establishment Of The AIRR In Lenexa

147. The American Indian Records Repository in Lenexa, Kansas was opened in 2004. AR-563 at 11-12 (Historical Accounting for Individual Indian Monies - A Progress Report (Sep. 1, 2005) (Progress Report)).

148. The AIRR is located adjacent to the National Archives and Records Administration's Federal Records Center (FRC) in Lenexa, and Indian trust records are stored in the FRC. Tr. 371:3-22 (Ramirez); see AR-563 at 12. It is within an underground limestone mine. Tr. 378:19-379:17 (Ramirez); DX-177, DX-178, DX-179 (AIRR photos).

149. As of September, 2005, Interior was storing more than 120,000 boxes totaling about 250 million pages of Indian records. AR-563 at 12. The FRC now contains over 160,000 boxes of Indian Records. Notice of Filing of September 2007 Status Report by the Department of the Interior Office of Trust Records at 3 (Oct. 16, 2007) (Dkt. No. 3436).

150. The FRC's storage bays containing Indian trust records have been constructed in accordance with higher standards for the preservation of archival records than most other U.S. records storage facilities. In addition to lower temperature and humidity controls, the FRC has controls for particulate matter and ultraviolet light. AR-563 at 12; Tr. 370:17-19 (Ramirez).

151. The FRC also has sufficient capacity to hold all of Interior's American Indian records. Documents will continue to be shipped to AIRR as BIA and Office of the Special Trustee for American Indians headquarters and regional field offices retire records. AR-563 at 12.

152. OHTA and the Office of Trust Records ("OTR") maintain offices within the AIRR. Tr. 367:1-8, Tr. 371:23-372:2 (Ramirez). OHTA's on-site manager at the AIRR, Katherine

Ramirez, manages OHTA's contract staff who work there. Tr. 276:9-14, 366:25-367:1 (Ramirez). Off-site from the AIRR, OTR manages an annex where a contract staff of 60 to 90 people indexes and inventories boxes received from across the country. Tr. 372:7-19 (Ramirez); DX-163-DX-176 (photos of Annex).

153. OHTA employs two contractors with about 130 contract staff at the AIRR, about half of whom search for documents and about half of whom image and code the documents that the researchers find. Tr. 367:9-15 (Ramirez). Clifton Gunderson (formerly Chavarria, Dunne & Lamey), an accounting firm, performs the document search work, and Ecompex performs the imaging and coding. Tr. 367:16-22 (Ramirez).

154. Sealed shipments of boxes, shrink-wrapped on pallets, are delivered by truck and offloaded at the Annex, Tr. 373:12-21, Tr. 374:3-375:20 (Ramirez); DX-163, DX-165, DX-166, DX-167, DX-168, DX-169, DX-170 (Annex photos). OTR marks the boxes with accession numbers provided by NARA that identify boxes as Indian records. Tr. 376:11-377:4, Tr. 380:15-18 (Ramirez); DX-171, DX-172 (Annex photos).

155. The box accession numbers and indexing information for the documents in each box are input by contractor personnel (Labat-Anderson) to the BISS database at the Annex, which database enables OHTA researchers to search for documents. Tr. 372:18-373:7, 377:5-378:9, 385:19-386:19, 385:25-386:11 (Ramirez); DX-173, DX-174 (Annex photos of BISS data input); DX-204 (exterior of records box showing information captured by BISS).

156. After indexing, custody of the boxes is transferred from OTR to NARA for storage at the AIRR, where they are available to OHTA's accountants who are performing historical accounting work. Tr. 371:9-22, 372:25-373:2, 378:10-378:18, 379:18-379:22, 380:19-

381:17, 381:7-14 (Ramirez); DX-175, DX-176 (Annex photos of handling of boxes); DX-180, DX-181 (AIRR photos of boxes stored in NARA bays).

157. Once the boxes are stored with NARA, the documents in them become available for OHTA's four accounting firms who are performing historical accounting work. Tr. 380:19-381:17 (Ramirez). Those firms submit requests for particular documents. Tr. 381:7-14 (Ramirez).

158. One of the accounting firms, Clifton Gunderson, has staff who are assigned solely to search for requested documents. Tr. 381:3-10, Tr. 383:16-19 (Ramirez); DX-186 (AIRR photo). Clifton Gunderson managers query the BISS to identify the boxes most likely to contain the requested documents, and then order those boxes from NARA for actual searching. Tr. 381:18-25 (Ramirez); DX-183 (AIRR photo).

159. NARA is currently delivering 300 to 350 requested boxes daily to OHTA's Box Logistics Operations Center for sorting and tracking, also part of Clifton Gunderson's AIRR work. Tr. 382:1-383:9 (Ramirez); DX-184, DX-185 (AIRR photos).

160. Ms. Ramirez gave the Court an example of how the search process works:

> If our office has assigned a particular accounting firm to reconcile certain transactions or certain accounts, when that accounting firm looks at this one transaction, like a posting into someone's account for $50, and it's [a] plus, so it's a collection, the accounting firm knows from the experience and training that we've given them, that you need to find either the bill for collection or the deposit ticket or all of that, and then even further, earlier in the process you need to find the lease, because you want to ensure that it was suppose -- it is $50 that you were supposed to collect and not $80. So that accounting firm . . . knows that they need the bill, the schedule of collections, the deposit ticket, and the lease. So they will make that request to this facility for all those documents. And then [we] will query through the BISS, find that it's these 10 or 20 boxes, pull those out, search them, find them, either photocopy . . . [the documents or if the documents are large] pass the whole box on to the imaging/coding side of the house, and they'll image and code that document.

Tr. 384:12-385:12 (Ramirez).

161. OHTA quality control ensures that boxes have been properly searched. Tr. 383:5-12 (Ramirez).

162. The final step of the research process at the AIRR is the work by contractor Ecompex to image and code the documents found in response to the accounting firms' requests. Tr. 383:20-384:11, Tr. 385:3-11, Tr. 387:2-389:15 (Ramirez); DX-187, DX-188, DX-189, DX-190. The imaging process converts the original paper records into electronic images. The coding process captures specific identifying information (e.g., IIM account number, date, type of transaction and amount), from an imaged document so that the imaged document can be retrieved at a later time. A document may consist of several related records (images) that can be grouped together for further analysis. AR-533 at 5.

163. The imaged documents are then quality-control checked to ensure that the image is not crooked, cut off, or blurred. Tr. 387:23-388:17 (Ramirez); AR-533 at 5.

164. After being imaged, the documents are "double blind" coded with information as determined by OHTA and the accounting contractors. Tr. 388:18-389:5 (Ramirez). Quality control of the coding subsequently ensures that any inconsistency in the coding is resolved correctly. 389:5-7 (Ramirez).

165. Coded images are then loaded into the Accounting Reconciliation Tool ("ART") system for use by OHTA in conducting historical accounting work for individual Indians as well as tribes. AR-533 at 5 (Status Report to the Court No. 29 (May 1, 2007)); Tr. 368:15-25 (Ramirez).

166. As with other IIM transaction data used to perform the historical accounting, OHTA and its contractors have never stored ART on a system connected to the Internet. AR-533 at 5.

167. Among the paper records found at the AIRR are ledger books of Indian transactions handled by Interior dating back to 1879. Tr. 389:16-391:1, Tr. 400:12-401:18 (Ramirez) (discussing photographs of ledger book, DX-191, DX-192, DX-193, DX-194, DX-195, showing receipts and disbursements for 1879 and 1880). Additional examples of ledger books from the AIRR document individual Indian transactions from 1924-25, 1932 and 1958. Tr. 391:18-394:16, Tr. 401:19-402:19 (Ramirez) (discussing photographs of ledger books, DX-196, DX-197, DX-198, DX-199, DX-200, DX-201, DX-202, DX-203, showing receipts and disbursements).

### E. Changes To Historical Accounting Project Reflected In 2007 Plan

168. Interior has been implementing the 2003 Historical Accounting Plan. The 2007 Plan represents a new iteration and the continuation of the work accomplished under the 2003 Plan, as well as a road map of the activities that Interior plans to undertake to finish the historical accounting. Tr. 66:22-67:3 (Cason); AR-565 at 4-5.

169. A 22-page "options paper" that was created by OHTA was presented to Mr. Cason, providing various options for possible changes to the 2003 Plan. Tr. 1947:1-1948:1 (Zippin); AR-600.

#### 1. Historical accounting schedule

170. One of the changes to the historical accounting project reflected in the 2007 Plan is a change to the schedule for completing the historical accounting work. In the 2003 Plan, Interior estimated that the accounting work could be completed in approximately five

years, at a cost of $335 million. The 2007 Plan estimates that the work will now be completed by approximately the end of 2011. Tr. 67:21-25 (Cason); AR-566 at 24-25.

171. Interior was not able to complete the historical accounting work by the end of 2007 because, in large part, Interior had underestimated the size of the task and how expensive it would be to perform, and because Interior overestimated the amount of funding it would be able to obtain from Congress. Interior asked for considerably more money from Congress than Congress appropriated and that lengthened the timeline to perform the work. Tr. 67:24-68:7 (Cason).

172. While the cost of reconciling a transaction proved to be considerably higher than Interior had anticipated in 2003, the work performed prior to the 2007 Plan indicated that the transactional error rate was sufficiently low that Interior would not have to reconcile as many transactions to reach reliable conclusions about the relative accuracy of its accounting system as it believed would be needed when it prepared the 2003 Plan. This served as aw "trade-off" that lowered the overall cost of the historical accounting project. Tr. 68:8-19 (Cason).

**2. Statistical sampling design**

173. The 2007 Plan is different in character from the 2003 Plan regarding land-based accounts, because the number of transactions Interior plans to sample and reconcile from the Electronic Ledger Era is considerably smaller. Tr. 93:24-94:14 (Cason). Based upon its original assumptions regarding the availability and quality of necessary documents, Interior planned to reconcile approximately 233,000 transactions, but it now anticipates reconciling approximately 6,600 transactions in the Electronic Ledger Era. Tr. 95:2-19; 98:3-17 (Cason); AR-566 at 22-23.

174. That change is based upon NORC's recommendation that far fewer transactions needed to be reconciled in the Electronic Ledger Era, as a result of the high degree of accuracy revealed through the LSA project. Tr. 94:4-14 (Cason).

175. When NORC designed the sample for Interior's 2003 Plan, it proposed sampling land-based transactions under $5,000 and reconciling all larger transactions because of initial concerns as to whether Interior would be able to find records. Tr. 963:15-964:1 (Scheuren); Tr. 968:2-20 (Scheuren); AR-402 at 6.

176. The sample design for the 2003 Plan proposed sampling 160,000 land-based transactions in the Electronic Ledger Era within two strata, i.e., 80,000 transactions under $500 and 80,000 transactions in the $500-5,000 range. Tr. 969:2-8 (Scheuren); AR-402 at 6.

177. The plan to sample 160,000 land-based transactions in the Electronic Ledger Era was extremely large for the population. AR-566 at 23.

178. NORC recommended a very large sample for the 2003 Plan based upon "what people thought was wrong with the system" and the "possibility of local problems in some agencies." Tr. 969:11-16 (Scheuren).

179. NORC's recommendation for the 2003 Plan was an "adaptive approach" that would allow for increasing sample size in situations where problematic data was encountered. Tr. 969:17-970:7 (Scheuren); AR-566 at 23.

180. NORC's concern pertained to anticipated mistakes in the accounting and missing data Tr. 970:8-18 (Scheuren).

181. NORC's sample design for the 2003 Plan was based upon hypotheses about missing data and high error rates. Tr. 971:8-15 (Scheuren).

182. After initial analysis of very small value transactions, NORC reduced the sampling work for small transactions because the cost of reconciling them was significant, and Interior was not learning anything from reconciling small transactions, particularly credits, because very few understatement errors were found. Tr. 964:23-965:16 (Scheuren).

183. Contrary to NORC's initial assumptions about missing records when they designed the sample for the 2003 Plan, the LSA project results revealed "an astonishingly successful outcome" in that Interior's accountants found over 99 percent – "virtually all" – randomly selected records. Tr. 977:15-22 (Scheuren); AR-438 at 4.

184. In the 2003 Plan, Interior planned to ensure that a sample was taken from each agency for purposes of the statistical analysis, but the results of the LSA project convinced Interior that this was unnecessary in the 2007 Plan. Tr. 1950:23-1952:10 (Zippin). Every account and every agency remained subject to sampling. Tr. 1952:13-15 (Zippin).

185. The LSA project randomly selected land-based transactions from all 12 BIA regions. Tr. 977:23-24 (Scheuren); AR-438 at 4.

186. In light of the results of the LSA project work for the sampled land-based transactions, NORC concluded that even if the remaining unreconciled transactions were erroneously recorded – a "severe model assumption" – that would not alter NORC's conclusions to be drawn from the reconciled transactions. Tr. 978:3-14 (Scheuren); AR-438 at 4.

187. With regard to debits (that is, disbursements), NORC concluded that the debit difference rate was 0.4 percent, which is a very low error rate, even in the commercial world. Tr. 978:15-23 (Scheuren); AR-438 at 4.

188. With regard to debits, NORC concluded that with a 99 percent assurance level, the error rate for the debit population was 1.3 percent or less. Tr. 978:24-979:4 (Scheuren); AR-438 at 4.

189. With regard to debits, NORC concluded that with a 99 percent assurance level, the "disadvantageous" error rate for the debits population – payments to beneficiaries below what should have been received – was 0.7 percent or less. Tr. 979:5-20 (Scheuren); AR-438 at 4.

190. With regard to debits, NORC concluded that with a 95 percent assurance level, the "disadvantageous" error rate for the debits population – was 0.6 percent or less. Tr. 980:7-10 (Scheuren); AR-438 at 4.

191. NORC's conclusions about error rates found through the LSA project was an attribute analysis. Tr. 980:11-15 (Scheuren).

192. With regard to debits, NORC performed a variable analysis and concluded that with a 99 percent assurance level, the "disadvantageous" dollar estimate was $4 million or less. Tr. 980:19-981:5 (Scheuren); AR-438 at 4. NORC concluded that with a 95 percent assurance level, the "disadvantageous" dollar estimate was $2 million. Tr. 981:11-16 (Scheuren); AR-438 at 4.

193. With regard to credits (that is, receipts), NORC concluded that the credit difference rate was 1.3 percent. Tr. 981:22-25 (Scheuren); AR-438 at 4.

194. With regard to credits, NORC concluded that with a 99 percent assurance level, the error rate for the credit population was 7.0 percent or less. Tr. 981:17-982:4 (Scheuren); AR-438 at 4.

195. With regard to credits, NORC concluded that with a 99 percent assurance level, the "disadvantageous" error rate for the credits population – mistakes not in favor of beneficiaries – was under 4.0 percent. Tr. 982:5-12 (Scheuren); AR-438 at 4.

196. With regard to credits, NORC concluded that with a 95 percent assurance level, the "disadvantageous" error rate for the credits population – was 3.0 percent, not exactly half of the 4.0 percent due to rounding. Tr. 980:7-10 (Scheuren); AR-438 at 4.

197. With regard to credits, NORC performed a variable analysis and concluded that with a 99 percent assurance level, the "disadvantageous" dollar estimate was $86 million or less. Tr. 982:17-23 (Scheuren); AR-438 at 4. At the 95 percent assurance level, NORC's "disadvantageous" dollar estimate was $42 million. Tr. 982:20-24 (Scheuren); AR-438 at 4.

198. NORC's analysis revealed that errors in the system were "even-handed" in that errors were statistically equal in terms of being both "advantageous" and "disadvantageous" to beneficiaries. Tr. 982:25-983:21 (Scheuren); AR-438 at 4.

**3. Judgment and Per Capita accounts**

199. Interior has reconciled over 83,700 Judgment and Per Capita accounts, leaving approximately 13,600 yet to be reconciled in the historical accounting population. AR-565 at 10; AR-533 at 3 (table). Substantial work has been completed with respect to reconciling those accounts, including gathering most supporting documents and verifying transactions. AR-566 at 18, 24.

200. In the 2007 Plan, Interior "reprioritized" the work being performed on the judgment and per capita accounts, so that it could target appropriated funds more effectively toward progress on the accounting for land-based accounts. Tr. 80:16-20 (Cason); AR-533 at 3.

At least for the balance of 2007, and possibly beyond, Interior has deferred work on reconciling the remaining Judgment and Per Capita accounts to marshal its scarce resources. AR-566 at 18, 24; AR-533 at 3.

201. Interior still intends to provide all of the more than 96,800 account holders with an HSA for their Judgment and Per Capita accounts. AR-566 at 24.

**4. Special Deposit Accounts**

202. In the 2003 Plan, Special Deposit Accounts (SDAs) were treated as a fourth type of account to be addressed through the historical accounting project. PX-507 at III-1. SDAs were deemed outside the scope of the 2007 Plan because, as a result of their unique nature and the purpose of the historical accounting, the SDAs did not fall within the historical accounting work being performed. AR-566 at 27. The objective of the historical accounting is to provide each covered IIM account holder with an accounting of the transactions in their individual IIM account up through December 31, 2000.

203. SDAs, however, are by definition not associated with a specific IIM account holder. SDAs are temporary holding accounts for the deposit of monies that could not immediately be credited to the proper owners. AR-566 at 27; AR-533 at 4; see Tr. 70:3-15, Tr. 156:15-24 (Cason). Historically, monies deposited into SDAs came from various sources, and could belong to tribes, individuals or other parties. AR-566 at 27; AR-533 at 4; see Tr. 2065:2-24 (Christie).

204. SDAs may include funds received in connection to a particular contract relating to multiple allotments or multiple fractional interests in an allotment. Non-IIM Trust funds sometimes were collected into SDAs, such as tribal money and bid deposits submitted in competitively bid contracts. AR-566 at 27; Tr. 742:2-24 (Herman). Sometimes

administrative fees charged by Interior to lessees or other contracting parties (not beneficiaries) would first be deposited into an SDA when paid by the third party. Tr. 742:2-24 (Herman).

205. Once the proper ownership of the money placed in an SDA account is determined, the money is distributed to those owners. At that point, the current account statements of those account holders would take account of that deposit. Tr. 70:16-22 (Cason); see Tr. 157:20-158:1 (Cason); Tr. 2042:23-2043:13 (Christie).

**5. Office that will provide land asset statement assets**

206. The 2003 Plan had called for OHTA to provide, for land-based accounts, a statement identifying the land assets that a beneficiary had at the time Interior issued the beneficiary's HSA. The 2007 Plan eliminated that part of the historical accounting project because a similar land asset statement is now being developed by the Office of Special Trustee, as part of a project that is converting the old legacy LRIS system into the more robust land title system, TAAMS. AR-566; Tr. 68:20-69:22 (Cason).

207. The Special Trustee is planning to issue, along with the periodic statements of accounts that beneficiaries currently receive, a record of the land each individual owns, whether it is leased or not. Tr. 69:14-17 (Cason).

208. This change in the Plan regarding which office will provide the land asset statement was made on or around May, 2007. Tr. 151:4-22 (Cason).

209. The change represented a management decision to streamline the process. With the change, OHTA can focus on the IIM funds accounting and OST and BIA will be responsible for including the asset statements as part of their quarterly account statements. Tr. 153:2-17 (Cason).

### F. Rationale For 2007 Plan

210. The accounting work performed by Interior prior to 2007 demonstrated that the records necessary to perform the historical accounting do exist, that those documents can be indexed and used by the accounting firms to perform the historical accounting work, and historical statements of accounts can be assembled. Tr. 66:3-6 (Cason).

211. The previous accounting work performed by Interior revealed no evidence of systemic accounting errors or systemic fraud. Tr. 66:10-13 (Cason).

212. In performing the historical accounting, Interior has weighed the limited resources it has received against the need to complete the accounting work in a timely manner, and made trade-offs and choices about the work it will perform. Tr. 71:19-72:16 (Cason).

213. The more complicated the accounting process is made within the same budget, the longer it will take for Interior to produce the accounting required by the Court. Tr. 72:17-20 (Cason).

214. Interior has attempted, therefore, to balance competing factors, because as the demand for accuracy and completeness of data rises, more time is required to complete the accounting, in light of the greater expense and a constrained budget. Tr. 72:21-73:2; Tr. 84:11-25; 85:5-9 (Cason).

215. Based upon the results of the LSA project, NORC reassessed the sample design in Interior’s 2003 Plan. Tr. 1003:3-11 (Scheuren); AR-442.

216. NORC reassessed the sample design for the 2003 Plan because the results of the LSA project provided additional information about the population of electronic transactions and, as a result, NORC concluded that the 2003 Plan sample design was over-engineered and unnecessarily large. Tr. 1003:12-19 (Scheuren); AR-442.

217. NORC reassessed the sample design for the 2003 Plan because the results of the LSA project indicated that, contrary to initial expectations, Interior could find documents, and the error rates were "quite low" relative to expectations. Tr. 1003:20-1004:4 (Scheuren).

218. Based on the LSA project results, NORC recommended that no further reconciliation work be performed for posted electronic transactions, because the cost of additional work would not result in a sufficient lowering of the margin of error around the estimate for the error rate. Tr. 1004:17-1005:7 (Scheuren).

219. The cost of performing the reconciliation work for a second replicate[2] would have been "a little under" $20 million, and the cost to complete all four replicates would have been "close to" $60 million. Tr. 1006:9-14 (Scheuren).

220. The 2003 Plan indicated that an adaptive approach would be followed, and that would have led to larger sample sizes if error rates had been higher than expected. Tr. 1006:15-1007:1 (Scheuren); AR-442 at 2.

221. Based upon the results of the LSA project, NORC recommended no further testing for debit transactions based upon the low error rates and variable dollar estimates. Tr. 1007:24-1008:4 (Scheuren); AR-442 at 3.

222. Based upon the results of the LSA project, NORC recommended no further testing for credit transactions because the cost of performing the reconciliation work would not result in a sufficient reduction in the margin of error for the low error rates and variable dollar estimates to justify such an expenditure. Tr. 1008:5-24 (Scheuren; AR-442 at 3).

---

[2] A "replicate" is a representative sub-sample of an overall sample. Tr. 993:7-14 (Scheuren).

223. If Interior had reconciled a second replicate, the point estimate for the error rate might not have been the same as after the first replicate, i.e., 1.3 percent, but the more important consideration was the upper bound, and NORC concluded that the cost of performing the second replicate would not result in a sufficient reduction from 7.0 percent to be cost-effective. Tr. 1009:11-1010:14 (Scheuren).

224. Interior adopted NORC's recommendation that reconciling a second replicate of credit transactions would not be cost-effective. Tr. 1010:10-14 (Scheuren).

225. Based upon the LSA project results, NORC recommended that no further reconciliation of transactions from the sampling frame – posted electronic transactions – be performed. Tr. 1010:20-1011:5, Tr. 1012:4-7 (Scheuren); AR-427 at 2-5.

226. Based upon the LSA project results, NORC recommended that additional work be performed with regard to transactions not in the LSA project sampling frame. Tr. 1011:23-1012:7 (Scheuren); AR-427 at 4-5.

227. One element of additional work recommended by NORC was with regard to "posting" tests, such as the Horton Agency Land-to-Dollars pilot test. Tr. 1012:2-1013:5 (Scheuren); AR-427 at 5; AR-435.

228. A second element of additional work recommended by NORC was with regard to "clean-up" testing, such as sampling from transactions restored as a result of FTI's DCV work. Tr. 1014:6-17 (Scheuren); AR-427 at 5.

229. While the 2003 Plan used a 99 percent assurance level, the 95 percent assurance level is sufficient for the sample design stage and determining sample size. Tr. 1024:21-1025:7 (Scheuren); DX-6 at 16.

230. Regardless of which assurance level is used at the sample design stage, Interior will be able to report results at 95 percent and 99 percent assurance levels, based on the same sample size. Tr. 1025:3-21 (Scheuren); DX-6 at 16.

231. Contrary to the initial written opinion of Mr. Dwight Duncan, the 2007 Plan's sampling conclusions were not based solely upon attribute sampling, and Mr. Duncan subsequently retracted that opinion. Tr. 2154:24-2155:5 (Hinkins) (discussing PX-4284, at 5 (Executive Summary)).

232. Mr. Duncan also conceded that sampling of transactions is "one of the tools" that could be used "to assess the integrity of a system." Tr. 1497:22-24 (Duncan).

## II. Areas Within The Scope Of The 2007 HSA Plan

### A. Information Contained Within Historical Statements Of Account

233. Upon completion of the historical accounting, Interior plans to provide each covered IIM account holder with an accurate and complete HSA package that details their account transaction history. AR-565 at 4.

234. Interior plans to provide its conclusions regarding the relative accuracy of the account transaction history contained within the HSAs, and the relative accuracy of the accounting system. AR-565 at 4; Tr. 73:9-15, Tr. 107:10-108:23 (Cason).

235. For the land-based IIM accounts, the HSAs will be part of an HSA package distributed to IIM account holders. The package will include the Historical Statement of Account, with a statement of known differences attached to it, a transmittal letter that explains why the account holder has received this statement, a statement of limitations that would include a summary of the work that was performed on the account, and a question and answer brochure. Tr. 644:16-647:8 (Herman).

236. The HSA package contents were still in a draft stage at the time of the evidentiary hearing, but the components of the package are specified in the ASM. Tr. 644:16-645:2 (Herman); see AR-8 at 12.

237. Ms. Herman prepared several draft HSAs for OHTA and these exemplars were submitted to the Court during the evidentiary hearing. Tr. 440:6-441:1 (Herman). See also DX-113, DX-114, DX-115, DX-116, DX-117, DX-119 (exemplar HSAs).

238. Plaintiffs offered no evidence to contest the adequacy of the information to be provided in the draft HSA packages.

239. The HSAs, including a statement of known differences, are expected to be similar to the draft HSAs prepared by Michelle Herman. DX- 113, DX-114, DX-115, DX-116, DX-117, DX-119.

240. To aid HSA recipients' understanding of their HSAs, Interior plans to provide an explanatory brochure that will explain the components of HSA. Tr. 621:6-622:2 (Herman). The content of the brochure remains in the draft stage, but a mock up of an HSA explanatory sheet was introduced at the hearing. DX-109.

241. The statement of known differences appears after the transaction listings on each of the exemplar HSAs. See DX- 113, DX-114, DX-115, DX-116, DX-117, DX-119. These statements will disclose any differences identified through the Data Completeness Validation work, the LSA work, the interest recalculation work (described in detail below), or any other tests that OHTA is performing that is not reflected in the HSA transaction listings. Tr. 623:18-624:7 (Herman); see also Tr. 520:1-521:1 (Herman).

242. Interior is preparing an explanation sheet to accompany the statement of known differences that will aid IIM account holders in interpreting the information contained on

their statements. Tr. 624:8-625:5 (Herman). A draft explanatory sheet for the statement of known differences was introduced. DX-120.

243. Another planned component of the HSA packages for land-based accounts is a statement of limitations. This statement will address known issues that may affect the information contained in the HSA, such as further reconciliation sampling to be undertaken, any interest recalculation that remains to be performed, or further transaction information pending from reconciliation work extending back into the Paper Ledger Era. Tr. 645:22-647:8, Tr. 647:22-648:15 (Herman). The statement will be similar to the corresponding statement of limitations that Interior has included with the Per Capita and Judgment based HSAs. Tr. 647:22-648:15 (Herman).

**B. Beneficiaries Receiving HSAs Under 2007 HSA Plan**

244. In its July 2, 2002 report to Congress, Interior estimated that, as of December 31, 2000, there were 235,984 open IIM accounts (excluding Special Deposit Accounts). AR-561 at 15-16; see AR-566 at 26 (chart).

245. In its July 2, 2002 report to Congress, Interior estimated that those 235,984 IIM accounts represented approximately one-quarter to one-third of all the IIM accounts that have existed since Interior began taking money into trust. AR-561 at 16.

246. Depending on assumptions made regarding the average life-span of land-based IIM accounts, the number of land-based accounts existing at any time between 1910 and 2006 is now estimated at between 490,960 and 643,424. DX-97 at 1-6; Tr. 1122:1 - 1123:4 (Haspel). The number of land-based accounts existing at any time between 1938 and 2006 is now estimated at between 480,837 and 619,804. DX-97 at 1-6; Tr. 1122:9 -

1122:19 (Haspel). See generally DX-101 (illustrating how the number of IIM accounts grows over time); Tr. 1124:6-19 (Haspel).

247. Depending on assumptions made regarding the average life-span of judgment and per capita accounts, the number of such accounts existing at any time from 1910 to 2006 is estimated at between 264,288 and 409,458. DX-97 at 7-12; Tr. 1123:5 - 1124:5 (Haspel). The number of judgment and per capita accounts existing at any time between 1938 and 2006 is estimated at between 262,520 and 405,3335. DX-097 at 7-12.

248. Interior plans to provide a historical accounting for all IIM accounts that were open as of October 25, 1994 through December 31, 2000. That includes accounts that were open as of October 25, 1994, but were closed after that date.

249. That also includes accounts open as of October 25, 1994, that reached a "zero balance" at some point after that date. In fact, most accounts reached a zero balance at some time after October 25, 1994. Tr. 182:11-183:24 (Cason).

250. Where an account was open as of October 25, 1994 but was not identified on IRMS or TFAS, and Interior subsequently discovers through its accounting work the existence of that open account, Interior will perform a historical accounting for that account. Tr. 183:25-184:18 (Cason).

251. An HSA package will also be provided for all accounts open as of October 25, 1994, even if the account was part of a decedent's pending probate proceeding initiated prior to that date. See Tr. 872:13-19, 889:11-17 (Winter) (discussing estate accounts as open IIM Trust fund accounts); Tr. 183:21-24 (Cason) (Interior's intent is to provide an HSA for "any account that was open as of October 25, 1994").

252. Roughly three-quarters of all the land-based accounts open on or after October 25, 1994, originated after 1985, with all of their transactions recorded in electronic ledgers. AR-566 at 18. See AR-565 at 15 ("[a]pproximately 65,000 of nearly 268,000 land-based IIM accounts in the historical accounting population were opened prior to the electronic ledger era"). Interior will first prepare HSA packages for the beneficiaries of those land-based accounts. See Tr. 80:21-81:11 (Cason).

### C. Transactions To Be Reconciled Under 2007 HSA Plan

253. The 2007 Plan provides for the historical accounting to be completed in six steps. AR-565 at 8.

254. The 2007 Plan describes the six steps as follows:

> The first step. . . is to gather the data posted in each account - credit transactions showing money coming into an account, debit transactions showing money disbursed from an account, and interest transactions showing money earned from investments. These data exist in electronic ledger accounting systems or in paper ledgers that were used to maintain the IIM accounts. These account transactions are examined for accuracy and constitute the HSA to be provided to account holders. AR-565 at 7.
>
> The second step is to conduct the reconciliation of transactions to determine their accuracy. This requires locating the records that were contemporaneously created and associated with a transaction at the time the transaction is posted to an IIM account. Interior verifies the accuracy of a transaction by reconciling or comparing the amount of the actual posted transaction with the amount expected to be posted, based on the contemporaneous records. This step includes examining the accounting system and land records systems for the completeness of the data the systems contain, accuracy of the data, and how well the systems functioned. Additional tests are performed to create a complete historical accounting. This step ensures that the HSA provided to account holders is complete and is the basis for including with the HSA a separate statement on the accuracy of the transactions that appear on an HSA. AR-565 at 7.
>
> [Third,] after the transaction data have been gathered, reconciled, and other tests are performed, Interior has the data from which it is in position to prepare the

> HSAs and accompanying materials--the HSA package. At this point Interior can petition the Court for approval to begin assembling and mailing the HSA package. AR-565 at 8.
>
> [Fourth,] the information for the HSA package is developed in Steps 1 to 3. However, the actual printing of the hard copy of the HSA and accompanying materials for mailing must await permission to mail from the Court. The reason Interior will await permission to mail is to ensure that the mailing uses the most current address available when printing the HSA package. (Interior has learned that even small delays between assembly and mailing of the HSA package can result in missed address changes that affect the success of the mailing.) AR-565 at 8.
>
> [The fifth] step is mailing the HSA package. Interior's duty to account - the historical accounting - is met with mailing the HSA. When received, it moves forward the process of reaching agreement with account holders as to the correct balance in their account. The assembled HSA package will be mailed to the most current address available, but many of the HSA packages will be prepared and sent to former account holders for whom Interior does not have current address information. Many of these may be returned. Also, many of the current account holders are "whereabouts unknown" for whom Interior does not have a good address. Interior will pursue a number of due diligence steps to obtain an address for these whereabouts unknown. AR-565 at 8.
>
> [Sixth,] account holder[s] receiving an HSA package may have questions or wish to challenge or lodge a concern regarding the accuracy or completeness of the HSA. Interior is establishing an administrative appeal process for account holders. AR-565 at 8.

255. In its July 2, 2002 report to Congress, Interior estimated that, for the period 1985-2000, the total number of transactions for IIM accounts is 44 million. AR-561 at 15.

256. The transactions from 1985 through 2000 are generally numerous and very small. Of the non-interest credit transactions from February 1985 through December 2000, over 64 percent were worth less than $10. Over 88 percent of the non-interest credit transactions were worth less than $100, and those transactions represent only four percent of the credit throughput for the time period. Conversely, credit transactions of $100,000 or more represent only 0.03 percent of the number of transactions, but constitute over 42 percent

of the dollar value of all those transactions. PX-869. Most debit (disbursement) transactions during this period were similarly small. PX-870 (review of dollar stratum for debit transactions from 1985 to 2000); DX-152 at 16 and Tr. 567:19-568:1 (Herman) (addressing dollar stratum of debit transactions covered by the DCV project).

257. A large number of disbursement transactions occur in the $10 to $100 stratum because of an automatic disbursement arrangement under which Interior disburses the balance in an IIM account whenever it reaches a certain amount, typically $15. Tr. 569:5-17 (Herman).

**1. Judgment/Per Capita Accounts**

258. Interior uses transaction-by-transaction reconciliation for Judgment and Per Capita accounts. To date, Interior has reconciled approximately 86 percent of 96,823 accounts. AR-565 at 12.

259. Since 2002, Interior has received approval to mail 17,096 HSAs for Judgment and Per Capita accounts and has mailed approximately 12,280 of those HSAs. An additional 822 HSAs have been mailed and returned because some current or former account holders' whereabouts are unknown. AR-566 at 13. Currently, Interior is awaiting Court approval to mail an additional 66,130 HSAs to Judgment and Per Capita beneficiaries, AR-533 at 4; AR-565 at 13.

**2. Land-Based Accounts**

260. The 2007 Plan uses statistical sampling to assess the accuracy of the land-based IIM account transaction histories. AR-565 at 14-15.

261. Statistical sampling is a well-accepted scientific technique that allows one to draw systematically a sample and make an inference about the population from which the sample is drawn. Tr. 936:3-12 (Scheuren).

262. Interior's sampling plans incorporated "probability sampling," which involves drawing a sample where the selection of units is done with a known probability of being selected. Tr. 939:24-940:7 (Scheuren).

263. The process of determining an appropriate sample size is the product of discussions between the party drawing the sample and its client and considerations regarding the data to be sampled. Tr. 936:16-937:3 (Scheuren).

264. The determination regarding an appropriate sample size can evolve over time. Tr. 936:3-937:3 (Scheuren).

265. When determining sample size, the sampler starts with a hypothesis about the population's error rate to determine a provisional sample size. Tr. 937:11-18 (Scheuren).

266. If the sampler assumes high error rates, the provisional sample size will be larger to achieve the same level of precision than would be the case with a low error rate. Tr. 938:16-22 (Scheuren).

267. If the sampler's initial hypothesis is not borne out by actual sample results, the sample design should be changed. Tr. 938:8-15 (Scheuren).

268. Sample size determination involves a four-step approach: initial planning, initial sampling, drawing inferences from sample, and redesign based on what has been learned from the sampling. Tr. 964:23-966:6 (Scheuren).

269. Interior's sampling plans allowed one to estimate both attributes, i.e., error rates, and variables, i.e., quantification of dollars in error. Tr. 941:5-17 (Scheuren).

270. The concepts of precision or "margin of error" refers to the confidence interval, such as "95 percent confidence," and when referring to a 95 percent confidence interval, it means

that when one draws a sample, the estimate will fall within a range (confidence interval) with the correct value 95 percent of the time. Tr. 944:16-945:2 (Scheuren).

271. Interior's 2003 Plan used a 99 percent assurance level, which means that the confidence interval would be larger than the confidence interval for a 95 percent assurance level. Tr. 945:13-18 (Scheuren).

272. A 99 percent confidence level is not standard in business settings; it is extreme, and a 95 percent confidence level is appropriate for most business settings. Tr. 967:17-968:1 (Scheuren).

273. NORC used a 99 percent confidence level because of the nature of the Cobell case, and that resulted in a sample design with considerably larger sample sizes. Tr. 967:17-968:1 (Scheuren).

274. The relationship between sample size and precision is not linear, i.e., doubling sample size does not lead to twice as precise an estimate, and at some point, increasing the sample size will not make a difference in terms of precision. Tr. 960:22-962:8 (Scheuren); DX-006 at 5 (Table 1).

**a. "Electronic Ledger Era" (1985-2000) - completed as a result of the Litigation Support Accounting Project**

275. NORC drew a sample of land-based transactions from the Alaska Region using the 2003 Plan sample design, but a "hold" was placed on the 2003 Plan work because of expressed judicial and congressional concerns. Tr. 971:16-972:9 (Scheuren).

276. NORC drew a sample from accounts that existed on or after October 1994. Tr. 972:24-973:6 (Scheuren).

277. After sampling accounts for the Alaska Region, NORC sampled transactions within the sampled accounts. Tr. 984:11-985:5 (Scheuren); AR-438 at 26.

278. After the 2003 Plan was placed on hold, Interior and NORC proceeded with the LSA project. Tr. 973:7-16 (Scheuren).

279. The Litigation Support Accounting project was so-named because of directions Interior received from Congress in the FY2004 appropriations bill. The bill limited the type of work Interior could perform on the historical accounting. Therefore, to make progress on land-based accounts consistent with Congress' instructions, Interior had a statistical sample of land-based accounts designed to provide factual information to support this litigation and then-ongoing, Congressionally directed, settlement discussions. AR-566 at 13; Tr. 62:2-64:5 (Cason).

280. The purpose of the work performed under the LSA project was not principally to limit the liability of the Government. Tr. 96:18-20 (Cason). Instead, the LSA project allowed Interior, under the constraints of Congress' appropriation language, to learn where the funds were located, what the relative errors actually were, what the difficulty in finding the data actually was, and whether Interior needed to design the historical accounting process in a different way. Interior used the LSA project to become knowledgeable about what it should expect to find in the land-based accounts from the Electronic Ledger Era and, thus, become better informed for any discussions related to a possible settlement, to present a more well-founded position. Tr. 96:20-97:10, 201:20-25, 205:16-19, 208:22-209:14 (Cason).

281. In October-November 2003, NORC was asked to draw a sample in connection with the LSA. Tr. 974:7-12 (Scheuren).

282. NORC recommended that a large sample of 1,000 accounts be drawn, with an average of 20 transactions per account. Tr. 974:13-17 (Scheuren).

283. NORC's focus in the LSA project was different than in the 2003 Plan in that they were trying to get an understanding of the system – not necessarily to generate estimates for a historical accounting – to assess how much work would be needed. Tr. 974:18-975:1 (Scheuren).

284. NORC expected to find higher error rates, and if the results of the LSA project sample work were consistent with their expectations, then much more work would have been required. Tr. 974:23-975:3 (Scheuren).

285. After performing the work for the Eastern Region and the Alaska Region, Interior proceeded to analyze transactions in the remaining ten Regions. Tr. 988:4-11 (Scheuren); AR-438 at 22-26.

286. The LSA had two components. Tr. 442:17-443:1 (Herman). One part involved all transactions that were greater or equal to $100,000, both credits and debits in land-based IIM accounts. The second was a sample of transactions in the land-based accounts. Those transactions were allocated among the various accounting firms, and each team reconciled the transactions back to the supporting financial documents, realty documents, and ownership documents. Tr. 442:17-443:1 (Herman).

287. NORC drew the sample for the remaining ten Regions in December 2003, utilizing transaction data which had undergone data validation procedures conducted by OHTA's contractor, FTI. Tr. 988:12-989:12 (Scheuren); AR-438 at 22.

288. The sample design for the LSA project provided for a 100 percent reconciliation of all transactions of $100,000 or more, as compared to the $5,000 threshold set forth in Interior's 2003 Plan. Tr. 990:12-991:7 (Scheuren).

289. NORC's sample for the remaining ten Regions was drawn from transactions valued at under $100,000, using population information supplied by FTI Consulting, one of OHTA's historical accounting contractors. Tr. 989:12-17, 989:22-990:8; (Scheuren) AR-438 at 22. NORC's sample design for the remaining ten Regions drew a sample of 1,020 accounts. Tr. 989:18-21 (Scheuren); AR-438 at 22.

290. The sample of accounts was to be allocated across the remaining ten Regions in rough proportion to the number of accounts in the Regions, with a minimum of 20 accounts to be selected for each Region to ensure representativeness across geography, time, and transaction type. Tr. 992:18-993:1 (Scheuren); AR-438 at 22.

291. NORC initially designed a sample of 20,000 transactions for the ten Regions, to be divided into four replicates, i.e., representative sub-samples of the overall sample. Tr. 993:3-994:7 (Scheuren); AR-438 at 22.

292. Interior completed one of the four replicates during the LSA project, and as a result, the statistical inferences to be drawn from the single replicate included larger margins of error. Tr. 994:8-17, 994:22-995:5 (Scheuren); AR-438 at 25.

293. For the LSA project, NORC selected a sample of 2,372 debit transactions, and the accounting firms engaged by OHTA reconciled all but nine of the transactions and found no errors in the reconciled debit transactions. Tr. 997:1-12 (Scheuren); AR-438 at 13 (Table 4).

294. From a statistician's point of view, Interior's ability to reconcile 2,363 out of 2,372 was "an astonishingly good result." Tr. 997:13-18 (Scheuren).

295. In drawing statistical inferences from the LSA project results for the debit transactions, NORC used a very conservative assumption that the nine unreconciled transactions were all erroneous. Tr. 998:2-24 (Scheuren); AR-438 at 14.

296. NORC's assumption that all unreconciled debit transactions were erroneous was not based upon any knowledge that the transactions were, in fact, erroneous. Tr. 999:14-22 (Scheuren).

297. NORC also selected a sample of 2,128 credit transactions in the LSA project, and the accounting firms engaged by OHTA reconciled all but 11 of the transactions. Tr. 1000:2-12 (Scheuren); AR-438 at 16 (Table 7).

298. In drawing statistical inferences from the LSA project results for the credit transactions, NORC based its analysis on findings of 36 errors, including the 11 unreconciled transactions. Tr. 1000:7-20 (Scheuren); AR-438 at 16 (Table 7).

299. In drawing statistical inferences from the LSA project results for the credit transactions, NORC used "the most conservative missing data model" by assuming that the 11 unreconciled transactions were all erroneous. Tr. 1000:21:1001:11 (Scheuren); AR-438 at 17.

300. NORC's assumption that all unreconciled credit transactions were erroneous was not based upon any knowledge that the transactions were, in fact, erroneous. Tr. 1001:12-15 (Scheuren).

301. Interior's accountants were able to reconcile all of the transactions with values of $100,000 or greater. Tr. 1001:16 - 1002:6 (Scheuren); AR-437.

302. Because the transactions valued at $100,000 or more constituted such a small percentage of the total number of transactions (0.02 percent of all debit transactions and less than 0.01 percent of all credit transactions), the overall estimates reported in NORC's September 30, 2005, Report (AR-438) were largely driven by the results for the statistically sampled transactions. AR-437 at 3.

303. NORC's report dated September 30, 2005 (AR-438) noted that based on the data, differences found were as likely to advantage as to disadvantage the individual Indian account holder, and that conclusion was not altered after NORC considered the additional work performed to reconcile transactions of $100,000 or more. AR-437 at 3.

304. "Coverage" issues are important to statisticians because they are asked to draw a sample and to make inferences about a population, based on the sample. Tr. 2148:6-10 (Hinkins).

305. To address coverage concerns, every element of the population must have a chance of being selected from the sampling frame. Tr. 2148:10-13 (Hinkins).

306. The population tested by the LSA project is only one part of the total population to be tested under Interior's 2007 Plan. Tr. 2149:1-8; (Hinkins); Tr. 2150:1-22 (Hinkins) (discussing DX-4, at 10).

307. The LSA project was not intended to substantiate statements about the entire Electronic Ledger Era. Tr. 2169:19-22 (Hinkins).

308. Plaintiffs' expert, Mr. Duncan, erroneously concluded that NORC used the results of the LSA project to make inferences about the entire Electronic Ledger Era population. Tr. 2151:3-18 (Hinkins).

309. The target population in the LSA project does not include all transactions in the Electronic Ledger Era. Tr. 2170:3-6 (Hinkins).

310. OHTA was aware when the initial sample population was drawn that not all eligible data had been compiled into the population data set. Tr. 689:11-24 (Herman). NORC knew that other projects, such as the DCV work and the Interest Recalculation work (described in detail below), could identify additional transactions beyond those in the LSA project sampling frame. Tr. 2170:11-25 (Hinkins); see AR-533 at 4.

311. Interior's 2007 Plan addresses additional tests of Electronic Ledger Era transactions beyond those included in the LSA project sampling frame, including the DCV and Land-to-Dollars work. Tr. 2171:5-18, 2172:1-5 (Hinkins). The expectation is that there will be another sample drawn once the data set is restored. Tr. 702:16-24, 704:10-14 (Herman).

312. To the extent transactions are identified as part of the DCV analysis that occurred during the sampling time frame for the LSA project but were not originally included in the sampled populations, OHTA is going to consider such transactions in adjusting the population. Tr. 574:8-575:5 (Herman).

313. Consistent with proper statistical practice, NORC was careful to only draw inferences as to the portion of the population sampled. Tr. 2152:9-16, Tr. 2152:17-2153:3 (Hinkins).

314. NORC drew a sample of transactions to gather information about the overall soundness of the accounting systems in terms of the number of errors and dollar error rates. Tr. 2153:24-2154:16 (Hinkins).

315. Initial transactions that opened new accounts, and thus established an opening balance, were subject to sampling by NORC. Tr. 2154:17-20, Tr. 2178:24-2179:16 (Hinkins).

316. Mr. Duncan admitted during his direct examination that he did not understand the target population in NORC's LSA project analysis when he issued his initial expert report in August 2007. Tr. 1391:18-1392:6 (Duncan).

317. Mr. Duncan agreed with Dr. Hinkins' explanation in her rebuttal expert report that the LSA project sample is only being used to make inferences about the population from which that sample was drawn. Tr. 1392:7-12, 1444:20-1445:8 (Duncan).

318. Mr. Duncan's attempt to estimate work remaining for the Electronic Ledger Era – PX-4486 – overstates months of "missing" electronic data because he erroneously included many months where Regions had not yet converted from paper records to IRMS. Tr. 1469:19-1472:23 (Duncan).

319. Mr. Duncan's attempt to estimate work remaining for the Electronic Ledger Era – PX-4486 – overstates months of "missing" electronic data because he erroneously failed to consider that some agency offices did not process transactions on a monthly basis when he counted those months as "missing." Tr. 1474:17-1475:11 (Duncan).

320. Mr. Duncan's attempt to estimate work remaining for the Electronic Ledger Era – PX-4486 – overstates the dollar impact of "missing" electronic data because he did not consider the disproportionate impact of very large dollar transactions in his calculation of "average throughput per transaction." Tr. 1475:12-1476:4 (Duncan).

321. Mr. Duncan's attempt to estimate work remaining for the Electronic Ledger Era – PX-4486 – overstates the impact of "missing" electronic data because he erroneously failed to consider that interest was posted every six months, rather than monthly, during the early periods of the Electronic Ledger Era. Tr. 1476:5-18 (Duncan).

322. Mr. Duncan agreed that he did not know the relative sizes of the sampled population, i.e., the LSA project sample, and the entire Electronic Ledger Era population and that he should have noted that the third page of his related demonstrative exhibit, PX-4485, was "not necessarily to scale." Tr. 1484:1-16 (Duncan).

323. Mr. Duncan conceded that when he criticized Interior's sampling plan, he failed to take into consideration the 2007 Plan's discussion of work to be completed, such as the DCV, Land-to-Dollars test, and other tests. Tr. 1493:17-24 (Duncan).

324. Mr. Duncan conceded that the DCV, Land-to-Dollars test, and other tests could identify the types of transactions which he originally concluded would be "missing, erroneous, or omitted" from the sample. Tr. 1506:13-20 (Duncan).

325. Mr. Duncan conceded that his original expert report was in error when he criticized Interior's sampling plan as solely employing attribute sampling. Tr. 1502:17-1503:10 (Duncan).

326. Mr. Duncan conceded that when he criticized Interior's sampling plan as failing to detect transactions that were "intentionally altered, accidentally altered, or erroneously entered," he did not know what "alternative procedure[s]" were contemplated by the ASM. Tr. 1506:21-1507:3 (Duncan).

327. Mr. Duncan stated that he was not offering opinions as to what would constitute "adequate reconciliation procedures." Tr. 1485:19-24 (Duncan).

**b. "Paper Ledger Era" (pre-1985)**

328. The 2007 Plan follows a NORC recommendation made in a May 25, 2007 memorandum that Interior test an initial hypothesis that the Paper Ledger Era would produce an error

rate similar to the Electronic Ledger Era. Tr. 1014:18-1015:13 (Scheuren); AR-426; AR-565 at 15.

329. An initial hypothesis test would allow Interior to draw a smaller sample at the outset and in a cost-effective manner, and if the initial hypothesis is wrong, Interior can then increase the sample. Tr. 1015:22-1016:8; 1016:17-1017:16; 1019:4-9 (Scheuren).

330. If testing demonstrates that the initial hypothesis is accepted, Interior's work will be completed with regard to assessing the error rates in the Paper Ledger Era. Tr. 1018:18-1019:3 (Scheuren); AR-426 at 3.

331. Cost is a valid statistical consideration in sample design. Tr. 1017:18-1018:6 (Scheuren).

332. In its May 25, 2007 memorandum, NORC recommended that Interior first draw a sample of accounts from a list of accounts believed to have Paper Ledger Era transactions and, second, draw a sample of transactions from the sampled accounts. Tr. 1018:9-17 (Scheuren); AR-426 at 2-3.

333. The 2003 Plan called for the reconciliation of approximately 260,000 transactions in the Paper Ledger Era; however, that work has not materially started. Tr. 98:22-99:3 (Cason).

334. Interior, however, has been collecting the information needed to perform reconciliations in the Paper Ledger Era. Tr. 99:3-4 (Cason); AR-565 at 13.

335. Based on the results of the reconciliation work so far, Interior anticipates that it can use a statistical sample of transactions in the Paper Ledger Era similar to the sample in the Electronic Ledger Era, as representative of the whole. Tr. 100:16-23 (Cason).

336. Interior believes that if the error rate in the Paper Ledger Era is similar to that found in the Electronic Ledger Era, it will be able to complete the historical accounting project

within the time frame set forth in the 2007 Plan, that is, by the end of 2011. Tr. 100:4-23 (Cason).

337. If Interior finds an error rate materially different than that established in the Electronic Ledger Era, then the schedule may have to be adjusted to complete the work. Tr. 100:24-101:1, Tr. 269:7-19 (Cason).

338. Meta-analysis is an accepted technique utilized by statisticians to combine studies from many sources on similar or related subjects. Tr. 1019:14-19 (Scheuren).

339. NORC conducted meta-analysis in connection with developing the proposal for the Paper Ledger Era initial hypothesis test to determine whether any prior work indicated that the initial hypothesis would necessarily be rejected. Tr. 1020:9-1021:6 (Scheuren).

340. NORC's meta-analysis only played a minor role in formulating Interior's plan for initial hypothesis testing of the Paper Ledger Era. Tr. 1021:16-1022:2 (Scheuren).

341. If NORC's meta-analysis had revealed a serious problem with the initial hypothesis being proposed, it would have stopped NORC from recommending testing the initial hypothesis. Tr. 1022:4-7 (Scheuren).

342. In addition to the meta-analysis, in the process that led to its recommendation for the Paper Ledger Era testing, NORC considered work performed by Treasury and the GAO during the 1890-1950 period (discussed in detail above), AR-533 at 3, reviewed reservation histories, and performed some early pilot testing reviewing Paper Ledger Era activity. Tr. 1022:8-1023:9 (Scheuren).

343. Contrary to the initial written opinion of Mr. Duncan, NORC's meta-analysis was "a very minor part of the 2007 Plan," and Mr. Duncan subsequently retracted his opinion. Tr. 2157:4-14 (Hinkins) (discussing PX-4284 at 5 (Executive Summary)).

344. Michelle Herman also participated in the beginning analysis of "Paper Ledger Era Transactions," and has helped to identify IIM accounts that extend back into the Paper Ledger Era. Tr. 443:5-20 (Herman). The 2007 Plan states that approximately 65,000 of nearly 268,000 land-based IIM accounts within the historical accounting population were opened prior to 1985. AR-565 at 10.

## D. Reconciliation Process

### 1. Accounting Standards Manual

345. The ASM was developed by Interior, working with the firms engaged for the historical accounting. AR-566 at 10.

346. Five accounting firms and NORC have contributed to the development and updating of the Accounting Standards Manual (ASM). AR-008 at 2. The ASM was designed to ensure quality and consistency among the firms in terms of the final product, and serves as a standard against which quality control is measured by a quality control contractor. Tr. 2109:20-24 (Dunne). All work is subject to review by Grant Thornton, the quality control contractor, to ensure quality and consistency across the firms performing reconciliation work. Tr. 2143:15-17 (Dunne).

347. The ASM is a dynamic document that is updated as necessary; as the accounting firms have worked on the historical accounting and learned new things about available records and business processes, additions and changes to the ASM have been proposed. Tr. 580:17-581:10 (Herman); Tr. 2110:24-25 (Dunne).

348. The ASM supports the accuracy objective of the historical accounting by establishing, in advance, definitive standards as a guide to performing and reviewing the reconciliations. AR-566 at 10.

349. The ASM contains policies and procedures for conducting the historical accounting, the documents to be used in support of the accounting, and a work program for performing the reconciliation. Tr. 579:2-7 (Herman).

350. The accounting standards considered and incorporated into the ASM were evaluated by CPAs and reviewed by members of the professional standards practice of the accounting firms, such as KPMG, that were contracted to assist with the historical accounting. Tr. 580:2-12 (Herman).

351. Ms. Herman, others at FTI, and workers from the other accounting firms referred to and used the ASM to guide them through the account reconciliation work they performed. Tr. 579:8-15 (Herman).

352. The ASM is useful for reconciliations both in the Electronic and Paper Ledger Eras. Tr.2111:9-19 (Dunne).

353. The ASM specifies a three-step process for account reconciliation work. AR-8 at 13.

354. The first step is document collection: the identification of document types that would support the transaction and the physical search for these documents. The second step involves taking the transaction that is selected for reconciliation and then tracing that back to the first posting in the IIM system, using the found documents to verify the transaction. The third step involves quality control checks, both within the accounting firm that performs the reconciliation and through independent quality control checks performed by another firm, Grant Thornton. AR-8 at 13; Tr. 597:18-599:15 (Herman).

355. The ASM specifies a document coding approach to record the level of support found in the documents for a particular verified transaction. AR-8 at 150-151.

356. Mr. Pallais based his expert opinion on the erroneous assumption that the historical accounting is an audit and that Interior's Plan and the ASM must comply with all auditing standards applicable to the audit of a company's financial statements. The 2007 Plan, by its own terms, is not an audit, and the firms performing the work are being asked to reconcile transactions rather than conduct an audit of financial statements. See Tr. 1820:1-4 (Pallais) ("If this were to be an audit and relied on the auditing standards, the procedures called for in the ASM wouldn't meet the audit – the evidence rules in an audit."); Tr. 1822:15-18 (Pallais) ("the auditor – the independent accountant is not doing an audit and choosing the evidence to achieve audit goals."); see also Tr. 1823:8-10, 1828:5, Tr. 1829:7, Tr. 1831:18, Tr. 1836:19 (Pallais) (other "audit" references).

357. Mr. Pallais admitted that he formed his opinion without being familiar with the requirements of the 1994 Trust Reform Act. Tr. 1873:25-1874:2 (Pallais).

358. Mr. Pallais opined that the objectives of Interior's 2007 Plan could not be accomplished "if" Interior's internal records are unreliable; however, he admitted that he has never examined or performed an audit of Interior's trust records. Tr. 1819:16-20 (Pallais). Instead, he assumed that Interior's records were unreliable solely because Interior's annual financial audits were qualified due to a lack of internal controls. Tr. 1820:3-9, Tr. 1867:3-9 (Pallais).

359. Although the ASM references auditing standards, Interior's accounting project is a consulting engagement, and not a financial statement audit. Tr. 2119:10-13 (Dunne). As such, while the ASM reaches to the auditing standards for guidance, it is not bound by those standards. Tr. 2119:16-19 (Dunne). Because the project is a consulting engagement, it is not structured so that an accounting firm can offer an opinion regarding

the accuracy of the account balances. Tr.2142:13-17 (Dunne). As noted by the Court, the accuracy of the accounting will be addressed by Interior. Tr. 2142:7-9 (Dunne).

360. To the extent the ASM requires the auditing standards be considered when evaluating the evidence used to reconcile a transaction, Interior's accounting expert, Caren Dunne, explained that various provisions in the 2007 Plan and the ASM require that reconcilers rely on source documents rather than internal controls. DX-2 at 3, 6-11; see AR-8 at 12-16 ("III. Reconciliation Procedures").

361. Mr. Pallais's emphasis on internal controls also ignored other aspects of Interior's Plan, such as Interior's conservative sampling approach. Mr. Pallais admitted that he did not analyze Interior's sampling approach, even though he agreed it should be considered in assessing Interior's 2007 Plan. Tr. 1873:12-19 (Pallais).

362. Mr. Pallais also failed to consider expert historian testimony regarding the availability of historical documents. Tr. 1875:10-14 (Pallais).

363. Mr. Pallais admitted that he had not seen any direct evidence of fraudulent financial reporting by Interior in the numerous documents he reviewed to prepare his report. Tr. 1873:1-4 (Pallais).

364. Mr. Pallais admitted that he did not consider cost when he expressed a preference for a certain type of audit engagement instead of Interior's 2007 Plan. Tr. 1875:7-9 (Pallais).

**2. Materials relied upon**

365. The large volume of historical Indian records is not merely accessible. Tr. 1200:7-10 (Angel). Rather, the accountants are actually using these records to perform the accounting. Tr. 1192:20-23 (Angel); Tr. 1199:4-14 (Angel). Not only are the

accountants using the records found by the historians, they are also finding records themselves through use of the BISS and other finding aids. Tr. 1199:14-16 (Angel).

366. The ASM specifies that transactions identified for reconciliation are to be verified by reference to supporting documentation. The ASM specifies that physical collection of supporting records is the first step in the reconciliation process. AR-8 at 13.

367. In reconciling account balances, the ASM calls for the use of "level 1" and "level 2" documents. Tr. 2112:12-13 (Dunne); AR-8 at 9. Level 1 refers to "documents that would be . . . utilized or created by the federal government in the normal operations of processing transactions of IIM beneficiaries to their IIM accounts." Tr. 2112:15-19 (Dunne). "A level 2 document would be a document that would be created by the federal government in the process of managing the trust, but perhaps not specific to the processing of a transaction to an individual Indian account." Tr. 2112:23-2113:1 (Dunne).

368. In the absence of level 1 or 2 documents, the reconciler would use alternative procedures, validating the transaction by using either analyses or documents not contemplated by the ASM. Tr. 2113:8-11 (Dunne). Alternative procedures have been used infrequently, Tr. 2113:19-23 (Dunne), and they are not defined specifically in the ASM because they need to be determined on a case-by-case basis. Tr. 2113:14-17 (Dunne).

369. In reconciling transactions, the ASM calls for supporting documentation for both receipts and disbursements. For receipts, it calls for obtaining and reviewing the terms of the contractual obligations, such as leases, which is evidence of the expectation of collection. Tr. 2121:21-23 (Dunne). For disbursements, the ASM calls for obtaining evidence that a check was issued, such as a check register or a check carbon, or authorization for

disbursement in the event the check is written to a third party. Tr. 2122:2-5; 12-18 (Dunne).

370. Although the documents used to verify the account entries in the first instance comes from Interior's files or archival materials deposited with the National Archives and Records Administration, these files are not limited to Government records. Over the years, Interior has collected documents from many third party sources and kept those records as part of individual beneficiaries' "jacket folders" or jacket files. Testimony at trial demonstrated that jacket files may contain such third party records as a birth certificate, a death certificate, a marriage or adoption certificate, sometimes financial documents such as tax checks and stocks, Tr. 490:5-14, 514:5-16 (Herman), as well as probate files, Tr. 633:18-634:6 (Herman), and other items. Other records maintained by Interior, such as lease agreements, see Tr. 639:3-18 (Herman), and third party checks are also "third party" records in the ordinary sense of the term.

371. Mr. Duncan conceded that he did not review any of the documents that Interior's accountants reviewed in reaching their conclusions that transactions were reconciled. Tr. 1488:8-24 (Duncan).

**3. Systems relied upon**

372. Using the Box Index Search System ("BISS"), the accountants have been able to locate a significant number of the requested documents out at the AIRR in a relatively effective manner. Tr. 2116:13-15 (Dunne).

373. For the Electronic Ledger era, from early 1985 through the end the 2000, the historical accounting verifies transactions using the electronic data set derived from the IRMS and TFAS, as tested and augmented by the DCV analyses. AR-565. All this data was

compiled into a database by FTI for purposes of the reconciliation work and the DCV testing. Tr. 449:13-24, 450:5-17, 453:1-454:17 (Herman).

374. The ART is the Accounting Reconciliation Tool, a software program that was custom designed to aid the historical accounting project. Tr. 505:21-506:4 (Herman).

375. ART was developed in 2002 as a closed network computer system for use by different accounting firms performing the historical accounting reconciliation. Tr. 594:20-24 (Herman); AR-566 at 11.

376. Ms. Herman and others at FTI led the conceptual design for the ART. Tr. 595:3-16 (Herman).

377. For accountants performing reconciliations, the ART is an effective means to analyze the activity, view the documents and perform the reconciliation, and use that as a mechanism to communicate the results to Interior. Tr. 2115:7-14 (Dunne).

378. The 2007 Plan rationale ascribes several purposes to the ART: "to ensure consistent accounting by the different firms, as a system to store, search for, retrieve, and link needed supporting document images to specific transactions, as indicated by the ASM." Another purpose is "to provide a replicable accounting process to facilitate quality control review by an independent certified public accounting firm and to archive reconciliation results." AR-566 at 11.

379. The ART assures consistency in the accounting through its standard interface which provides a common template for the entry of account reconciliation information. Tr. 595:17-596:8 (Herman).

380. The ART also stores not only the financial accounting data but also coded images of supporting documentation. Tr. 596:12-25 (Herman).

381. The ART provides a basis for a replicable accounting process and supports quality control review by archiving all reconciliation results, from the worksheets of the reconciliation work and links to the supporting transactions and documentation. Tr. 597:1-17 (Herman).

382. Ms. Herman presented a live demonstration of the ART program during the evidentiary hearing. She used a live working copy of the ART to walk through the reconciliation steps of five actual transactions that were part of the LSA project, showing how each was reconciled using the ART, what types of supporting documentation was found, and how those transactions may be reflected in the HSAs. Tr. 599:1-644:14 (Herman).

383. ART screen shots documenting the reconciliations demonstrated live in court using ART were introduced for the court's reference. DX-103-107. Draft exemplars of the HSAs for the accounts associated with the reconciled transactions demonstrated in court were also introduced. DX-113-117, DX-119.

384. The supporting documentation used in the course of the five illustrative ART reconciliations demonstrated in court were also introduced for the court's reference. DX-125-28, DX-130-134, DX-140-143, DX-145, and DX-146.

385. Plaintiffs did not present any contrary evidence concerning the reliability or usefulness of the ART program.

386. The first reconciliation example was a range distribution, involving a credit to an IIM beneficiary account of 58 cents. Ms. Herman proceeded step-by-step, explaining the tasks performed during the reconciliation process. Tr. 603:13-619:25 (Herman). Ms. Herman demonstrated how the search for documentation yielded three types of documents: a grazing permit, a bill for collection and a journal voucher. Tr. 609:9-14

(Herman). The 58-cent transaction related back to range income of $6,234, that was divided among multiple allotments and the among multiple fractional owners in the allotments. In the reconciliation demonstrated, the beneficial fractional interest was 84 out of 117,600. Tr. 614:18-615:5 (Herman). Ms. Herman also walked through how the reconciled 58-cent transaction would be disclosed on the beneficiary's HSA. Tr. 620:1-625:5 (Herman); DX-115 (draft HSA).

387. The second reconciliation example was a manual distribution from 1994 for $618,700, and Ms. Herman used the ART to demonstrate how the transaction was reconciled. Supporting documents for this example included an individual Indian account application, signed by the account holder, and information from Treasury's Check Payment & Reconciliation System (CP&R). Tr. 625:6-630:1 (Herman); see DX-116 (draft HSA).

388. The third reconciliation involved a check distribution, which involved use of a supporting canceled check copy obtained from Treasury. Tr. 631:2-631:22 (Herman).

389. The fourth example reconciliation involved a probate distribution, where the entire probate file was found in a jacket file maintained by Interior. Tr. 632:5-637:12 (Herman). In this example, the reconciliation revealed an overpayment of $1584.42 to the IIM account holder. Tr. 637:4-638:12 (Herman).

390. The final example was a reconciliation of a 2-cent income transaction from a fractional interest in farm and pasture contract. Tr. 637:16-640:20 (Herman).

**4. Contractors involved**

391. Interior has engaged a number of consulting firms to assist it in the historical accounting effort, including five accounting firms, two historian firms which have specialized in

Indian issues for many years, and firms to assist in statistical matters, and other areas pertaining to historical accounting. AR-565 at 7.

392. Five accounting firms are under contract to Interior and working on projects underway. Three firms--Clifton Gunderson LLC (new firm through 2007 merger with Chavarria, Dunne & Lamey LLC), Deloitte & Touche LLP, and Reznick Group, P.C.--are performing reconciliations and account analyses; one--FTI Consulting, Inc.– is conducting forensic accounting; and one--Grant Thornton LLP--is performing quality control reviews of all aspects of the historical accounting. AR-565 at 7.

393. FTI has had a role in assisting Interior with completion of the first three steps in the historical accounting as detailed in the 2007 Plan. Tr. 438:2-441:20 (Herman).

394. FTI was primarily responsible for gathering account data on IIM transactions Tr. 438:2-10 (Herman). FTI has worked on reconciliation work as part of the LSA project, along with the other accounting firms. Tr. 438:18-439:13 (Herman).

395. Michelle Herman is a Managing Director of FTI Consulting. Tr. 434: 7-11 (Herman). She has worked with each of these contractor firms over the course of her decade of involvement with the historical accounting work. Tr. 437:9-17 (Herman).

396. As part of FTI's work on the LSA project, Ms. Herman has performed actual reconciliations of certain land-based sampled transactions and also high dollar (greater than $100,000) transactions. Tr. 438:18-439:9, 441:2-20 (Herman).

397. Ms. Herman became involved with the Department of the Interior's historical accounting efforts in early 1997 and has worked on numerous aspects of the historical accounting for more than ten years. Tr. 435:4-6 (Herman).

398. The National Opinion Research Center (NORC), an affiliate of the University of Chicago, works on statistical matters in the historical accounting. AR-565 at 7.

399. Morgan, Angel & Associates, L.L.C., and Historical Research Associates Inc., which have specialized in Indian issues over the years, provide information on leasing, the allotment process, reservation histories, and other matters. AR-565 at 7.

400. Five accounting firms – Chavarria, Dunne & Lamey (now Clifton Gunderson), Deloitte & Touche, FTI Consulting, Grant Thorton, and The Reznick Group – and NORC have contributed to the development and updating of the ASM. AR-8 at 2.

401. NORC was engaged to address measurement and quality issues for Interior's July 2, 2002 report to Congress; statistical sampling was not a significant consideration at that time. Tr. 932:12-20 (Scheuren); AR-561.

402. NORC was also engaged to design and propose a sampling approach for Interior's January 2003 Plan. Tr. 934:11-15 (Scheuren).

403. NORC designed the sample for testing by Grant Thornton with respect to performing quality assurance reviews of reconciliation work performed by Interior's accounting contractors. Tr. 1032:9-17 (Scheuren).

**5. Error rate; definition of "error"**

404. In the course of the reconciliation work, a one-cent deviation could be attributed to rounding, but any disparity of two cents or more was to be reported by the firms performing the reconciliation as an error. Tr. 615:21-616:2 (Herman).

405. Contrary to the initial written opinion of Plaintiffs' expert, Mr. Duncan, NORC's statistical analysis did not net overpayments and underpayments in an effort to limit

litigation exposure, and Mr. Duncan subsequently retracted that opinion. Tr. 2153:4-23 (Hinkins) (discussing PX-4284, at 5 (Executive Summary)).

406. In drawing statistical inferences from the LSA project results for the debit transactions, NORC used a very conservative assumption that the nine unreconciled transactions were all erroneous. Tr. 2155:6-2156:11 (Hinkins) (discussing PX-4284, at 5 (Executive Summary), and AR-438 at 12-17).

407. In doing the transaction-by-transaction reconciliation it was decided that if data could not be found to support a transaction it would be treated as an error in the statistical analysis. Tr. 1949:15-20; 1958:15-17 (Zippin).

**6. Data from Eastern Region reconciliation project**

408. OHTA's first reconciliation efforts were with respect to the Eastern Region. Tr. 985:6-14 (Scheuren); AR 438 at 27.

409. The initial plan for the Eastern Region was to reconcile all transactions, i.e., a "100 percent census." Tr. 985:17-25 (Scheuren); AR 438 at 27.

410. The process of attempting to reconcile every transaction proved to be extremely difficult, and that led to the decision to draw a sample for the Eastern Region for transactions that had not already been reconciled. Tr. 985:17-986:5 (Scheuren); AR 438 at 27.

411. NORC was able to perform a statistically valid assessment of the Eastern Region because they maintained data regarding the probability of selections. Tr. 986:14-20 (Scheuren).

412. The Eastern Region was Interior's first effort at reconciling transactions for purposes of performing the historical accounting work, and because Interior kept track of work performed and was systematic in performing the work, when it encountered challenges

during the Eastern Region work, NORC was able to modify the sampling plan and achieve valid results. Tr. 986:14-987:1 (Scheuren).

### E. Mailing HSAs To Beneficiaries

413. The assembled HSA package will be mailed to the most current address available, but many of the HSA packages will be prepared and sent to former account holders for whom Interior does not have current address information. Many of these may be returned. Also, many of the current account holders are also “whereabouts unknown” for whom Interior does not have a good address. Interior will pursue a number of due diligence steps to obtain an address for these whereabouts unknown. AR-565 at 8.

### F. Anticipated Administrative Appeals Process

414. Interior is currently drafting regulations to propose an administrative appeals process whereby an IIM beneficiary who has concerns about the information in a Historical Statement of Account, because he or she either believes an error has been made or has further information regarding the account, can raise the matter with OHTA. Tr. 87:9-88:1 (Cason); AR-566 at 20-21.

415. Interior will present its proposed administrative appeals process through the issuance of a notice of proposed rule-making in the Federal Register, seeking public comments upon the proposed rule. Tr. 88:2-15, Tr. 221:24-222:11 (Cason).

416. Pursuant to 43 C.F.R. § 4.1, the Office of Hearings and Appeals (“OHA”) has had the authority to review appeals from HSAs issued by OHTA since September 2002. 67 Fed. Reg. 57,121-22 (Sept. 6, 2002).

### G. Data Completeness Validation Project

417. Michelle Herman has helped devise and has directed the Data Completeness Validation ("DCV") project. Tr. 447:23-448:1, 454:18-455:25 (Herman).

418. Overall, FTI has had four to eight full-time employees working three to four years to conduct the DCV testing of the 113 million transactions to date. Tr. 502:19-503:9 (Herman).

419. The DCV analyses have several goals. The first and foremost is to assess the completeness of the Electronic Ledger Era for use in preparing the HSAs. Tr. 457:25-458:6 (Herman).

420. The 2007 Plan provides for the conduct of the DCV testing in order to ensure that HSAs are complete and contain all transactions recorded during the electronic ledger era. The DCV project's goals are (1) identifying and resolving gaps in electronic data, (2) verifying the transfer of accounts and balances through system conversions (from paper ledgers to the IRMS and from IRMS to TFAS), and (3) assessing the integrity of the underlying electronic data. Additionally, in order to support the issuance of HSAs, the DCV project analyzes the use and reuse of account numbers and the association of account numbers to individuals. AR-565 at 19 and 20.

421. The DCV analyses also implement, in part, the Electronic Data Gaps and System Conversion tests described in the 2003 Plan. AR-565 at 20.

422. To facilitate the DCV and other historical accounting tasks, Ms. Herman and her team compiled a database stored in a Microsoft SQL Server that collected all data from the IIM subsystem of IRMS and all transaction information contained in TFAS, the Trust Funds Accounting System. Tr. 499:4-24 (Herman).

423. The DCV tests examine data for periods extending far beyond the scope of the historical accounting project. The DCV analyses cover all data in the entire electronic time frame, beginning in 1985 through 2007, and FTI receives new transactional data each month from OST. Tr. 459:6-10 (Herman).

424. The DCV analyses have involved a painstaking level of effort. FTI has averaged about 50,000 man hours on DCV analysis, exclusive of the additional hours devoted by other Interior contractors to this work, such as Ecompex, the firm that images and codes supporting documentation. Tr. 465:9-21 (Herman).

425. The DCV work involves checks on the compiled electronic data set, followed by examination of other entries in the data set to try to resolve apparent discrepancies, and the use of document searches, as needed, to resolve questions about the data set that persist. Tr. 497:18-499:1 (Herman). Ms. Herman gave an example of how FTI researchers can write a computer search script to have the computer cull through the compiled database to find a particular transaction type by its code for a specific time frame, and how this identified data subgroup is looked at and compared manually to confirm the data's validity. Tr. 499:4-502:18 (Herman).

426. As part of this process, FTI and the other firms assisting with the DCV make document search requests to OHTA, which get forwarded to the AIRR. Tr. 504:16-505:2 (Herman). As described in detail above, contractors at the AIRR search for the requested documents, image and code the located documents, and load the coded images to ART. Tr. 505:15-20, Tr. 506:5-9, Tr. 506:23-507:10, Tr. 508:9-14 (Herman); see AR-533 at 5. The accounting firms then retrieve these materials through the ART to conduct the DCV analyses (as well as to perform reconciliations). Tr. 509:1-16 (Herman).

427. FTI has submitted 80,000 document requests just in connection with the DCV work. Tr. 505:3-7 (Herman).

428. Document searches can require a week to over a year to complete. Tr. 505:11-14 (Herman).

429. The DCV tests reveal some general characteristics about the IIM data set for the Electronic Ledger Era. First, most transactions in the IIM system are for small dollar amounts, while very few transactions comprise the majority of the dollar value that has flowed through the IIM system. Tr. 467:20-468:22 (Herman); DX-152 at 16.[3] See also PX-869, PX-870. Much of this is due to fractionation, which is the result of inheritances over generations that have resulted in multiple owners each holding very small interests. Tr. 559:2-560:21 (Herman).

### 1. DCV work completed as of Sept. 30, 2007 report

430. Ms. Herman and FTI prepared detailed interim report on the overall Data Completeness Validation ("DCV") analyses, along with six regional reports, each dated September 30, 2007, that altogether are more than 10,000 pages in length. Tr. 457:11-24 (Herman).

431. The DCV overall report, DX-152, contains a summary of all the work that has been done on all 12 regions. It covers the data sets that were used, how much information has been restored to the electronic record, a summary of the transaction mapping results, and account number analyses. Tr. 480:18-22 (Herman). The overall report also includes

[3] DX-152 through DX-158 comprise FTI's DCV reports as issued. FTI subsequently corrected certain typographical and other errors, and the corrected version was admitted as DX-152A through DX-158A. Because Ms. Herman's direct testimony, however, refers to the original version of the reports, that version will be cited here.

summaries of the progress with the DCV analyses in regions that do not yet have a separate regional report. Tr. 480:23-481:1 (Herman).

432. In addition to the overall report, FTI issued DCV regional reports for 6 regions. These are: Alaska Region (DX-153); Pacific Region (Sacramento Area) (DX-154); Western Region (Phoenix Area) (DX-155); Northwest Region (Portland Area) (DX-156); Great Plains (Aberdeen Area) (DX-157); and Rocky Mountain (Billings Area) (DX- 158). The regions refer to the current organization used in TFAS, while the area references correspond to the regional names used during the IRMS era. Tr. 481:2-482:15 (Herman).

433. Each region's report is organized in a similar manner with a narrative report in the first section, followed by sections reporting on data availability by agencies within the region; data completeness results for the region; IIM account number analyses for the region; and transaction mapping results in the region. Tr. 482:22-484:12 (Herman).

434. One DCV test examines IIM account numbering. It considers every IIM account that has been of record from 1985 through the present, a total of approximately 645,000 accounts. Tr. 459:11-22 (Herman).

435. The DCV account number analysis involved computerized and manual searching for account records with duplicate numbers or account names. FTI took all of the available names within the system (from the IRMS master files, the IRMS transaction files, and the TFAS account files) and combined them into a single table so FTI could analyze all of the names associated with a given account number. Tr. 489:2-6 (Herman).

436. Ms. Herman testified about the resolution of two account name cases to demonstrate FTI's data evaluation of account names and reused account numbers, and the steps involved in this DCV test.

437. In one case from the Northwest Region, one account number was found to have four names associated with it. See DX-156 at 108. The account names referred to two different individuals, a Ms. Pichette and a Ms. Paddock. DX-156 at 108. FTI requested jacket files relating to the named individuals and found a death certificate indicating that one had been born in 1910, DX-156 at 109, while the IRMS Master File indicated a birth date in 1937 for the other individual. This indicated that two different individuals had IIM accounts using the same number. Tr. 491:12-25 (Herman). FTI then assigned two separate NAANs to each individual's respective account and have forwarded this information to OHTA so that separate HSAs can be prepared for each individual's respective account. Tr. 492:3-16 (Herman).

438. As a second example of the DCV project's examination of reused account numbers, Ms. Herman testified about a case in the Rocky Mountain Region where FTI found multiple names associated with an account number. See DX-158 at 158. FTI requested jacket files for the names and through research of the jacket files, FTI found documents indicating that the account belonged to an emancipated adult whose mother had previously been listed on the account during the account holder's youth. FTI made this deduction after reviewing several documents, including a completed IIA Change Order form, signed by the local Superintendent, DX-158 at 159, and a handwritten letter from one of the named individuals, Thomas Piper. DX-158 at 160. The letter explains that Mr. Piper's mother, Beverly, had previously received his IIM distribution checks, but he wanted the checks sent directly to him instead. DX-158 at 160; Tr. 493:8-22 (Herman). Based on this information, FTI concluded that the account belonged solely to Mr. Piper

and forwarded this information to OHTA for use during HSA preparation. Tr. 494:23-496:4 (Herman).

439. On cross-examination, Plaintiffs questioned Ms. Herman about DX-158 at 159 and 160, suggesting that Thomas Piper was born on June 25, 1979, based on an entry on the IIA Change form, DX-158 at 159. Plaintiffs' questioning asserted that the account was changed while Mr. Piper was only 13 years old. Tr. 670:11-671:3 (Herman). The letter written by Thomas Piper, however, also found in the jacket file, states that Mr. Piper reached majority on June 25, 1979, which rebuts Plaintiffs' interpretation of the record. DX-158 at 160 ("I turned 18 on 6-25-79. Before that my mother got my check . . . .").

440. Transaction mapping is another extensive evaluation that FTI has performed as part of the DCV project. The overall and each regional report discloses the transaction mapping results to date. Tr. 484:7-485:17 (Herman). The transaction mapping compares offsetting debit and credit transactions in the system and then investigates those that do not sum to zero (that is, transactions that do not completely offset one another). Tr. 484:7-485:17 (Herman). FTI's DCV team then studies the bookkeeping entries for the mismatched transactions, considers other data in the IIM systems that may explain the mismatch, and may request documentation to resolve or explain the transactions. Tr. 486:3-14 (Herman).

441. There are several possible mapping outcomes, and these are reported on in detail in the DCV reports. DX-152 to DX-158 (in particular, Tab E of each regional report). One result is an explained "exception," where FTI confirms that the transactions are booked properly and, for some identified reason (or "exception"), are not supposed to offset each other. One example is where an $800 transaction is incorrectly entered as $1000. Instead

of reversing the $1000 error and then entering the correct $800 amount, some bookkeepers simply reversed $200 of the $1000 entry, which leads to the same correct result. In such cases, the failure of the transactions to offset is correct and, thus, an explained exception. See Tr. 486:7-16 (Herman).

442. Ms. Herman presented an example of explained exceptions during her testimony. She recounted how a credit for $18.50 had led to three more postings, each attempting to correct a 20-cent error made when a $18.30 tax refund check for an IIM beneficiary was incorrectly credited as $18.50. Tr. 510:16-516:22 (Herman). The record ultimately reflected the correct $18.30 credit balance, and so this became one of the explained exceptions in the DCV report. DX-154 at 188-200. This history was confirmed by finding documents in the AIRR, such as a copy of the tax refund check and a bill for collection that confirmed the bookkeeping entries. Tr. 514:22-24 (Herman); DX-154 at 189-200.

443. Another mapping result can be a potential misposting. In such instances, FTI finds documents indicating that the bookkeeping was probably entered incorrectly. FTI reports these potential posting errors to OHTA for it to use in preparing the statement of known differences in the HSAs for affected IIM accounts. Tr. 520:1-521:1 (Herman).

444. Ms. Herman presented an example of a potential misposting from the Rocky Mountain region, where a credit of $583.26 was distributed among several IIM beneficiaries, but in amounts that left $9 undistributed. DX-158 at 2125-27. FTI investigated the supporting journal voucher, which confirmed the receipt of the $583.26 and the distributed sums, but failed to explain what happened to the remaining $9. This was reported as a potential misposting to OHTA. Tr. 517:1-521:1 (Herman).

445. The second potential misposting example involved a transaction in the Northwest Region. It came to FTI's attention because several of the associated entries were labeled "original ledger balance," indicating that the entries were related to the establishment of an opening balance during the movement from paper records to the IRMS system. Tr. 521:14-522:17 (Herman). The various entries did not balance, however, so FTI requested the jacket file and found a ledger card. Tr. 522-18-523:13; DX-156 at 2850. Based on that study, FTI concluded that the IIM account had been shorted $166.31 when the opening balance was posted and has reported this potential misposting to OHTA. Tr. 523:16-525:12 (Herman).

446. In some other instances, mapping may reveal an account that does not roll forward, not because of a posting error or an explained exception, but because there is a gap in the electronic data. FTI has identified potential data gaps in its DCV reports. See, e.g., DX-154 at 44-45.

447. Other missing data has been restored to the electronic ledger from paper records, which in many instances involves the use of transaction registers, which are large hard copy printouts on green bar paper, some of which date back to the 1970s. Tr. 529:19-532:23 (Herman).

448. When data has been re-keyed, it is given a transaction code prefix of "4." Tr. 529:5-529:18 (Herman).

449. So far, FTI has restored over 275,000 transactions to the electronic data set. Tr. 721:21-722:15 (Herman).

450. The DCV work is proceeding on a regional basis and continues to unearth more supporting data. Ms. Herman testified that, for the Great Plains Region, microfiche of balance files had recently been found in the AIRR. Tr. 788:13-789:11 (Herman).

451. Some mapping transactions are still being investigated, and those are identified as "unresolved" in the DCV reports. Tr. 486:18-22 (Herman); DX-153-158 (Tab E and subtabs identifying "unresolved transactions").

452. Ms. Herman presented an example of a data gap, using a table from the Pacific Region report. DX-154 at 44. The table listed 31 accounts for the region where the balance and the transaction listing sum do not equal each other. Tr. 526:8-18 (Herman). Some discrepancies are in the account holder's favor, while others are in the Government's favor, for a net discrepancy of $34,139.08. DX-154 at 44. Ms. Herman discussed the first listed account in detail to illustrate the issues that arise. In the first listed account there was $812.96 missing from the data, and Ms. Herman testified how the other available data suggest that a "missing" disbursement had been made, but the transaction record is missing from the electronic data. Tr. 526:19-535:1 (Herman).

453. Ms. Herman walked through a second example of another identified data gap, also from the Pacific Region. Using the worksheet included as part of the DCV report for that region, DX-154 at 58, Ms. Herman demonstrated how an IIM account set up to automatically disburse funds to the account holder had a pattern of receipts followed by a disbursement of a corresponding amount, except for one period of time. Based on the account pattern and the automatic nature of the disbursements before and after the data gap, Ms. Herman's team concluded that there was a distribution that's corresponding posting is missing from the electronic data set. Tr. 541:12-543:3 (Herman). A

comparison of the transaction listing with a balance file for the account supports this conclusion, as well. Tr. 543:20-547:15 (Herman); see DX-154 at 42.

454. FTI has also mapped, as part of the DCV project, disbursements by check. FTI has so far mapped over 6 million of the 6.4 million checks issued for IIM accounts during the Electronic Ledger Era. Tr. 535:2-536:13 (Herman). The mapping process involves comparing the disbursement transaction listed in the IIM data set against records provided by the Department of the Treasury. One such record is the CP&R file, which is the Check Payment and Reconciliation system that includes symbol 4844, which is the individual Indian money check symbol. Tr. 535:4-14 (Herman).

455. As part of the check mapping, FTI looks for checks that have not been negotiated and then looks at the account history to see whether the check amount had been credited back to the appropriate IIM account. Tr. 537:4-14 (Herman). Of the more than six million checks mapped so far, as of the date of the DCV reports, relatively few posting errors of this type had been found. See DX-153A at 153-00019 (24 checks in the Alaska region); DX-154A at 154-00023 (78 checks in the Pacific region); DX-155A at 155-00022 (562 checks in the Western region); DX-156A at 156A-02896-2915 (97 so far in the Northwest region); DX-157A at 157-00023COR (497 checks in the Great Plains region); and DX-158A-00023COR (134 checks in the Rocky Mountain region).

456. FTI compared check numbers, amounts, and dates to compare the Treasury records with the IIM data set. Tr. 537:19-25 (Herman).

457. This analysis identified some data entry errors, where a series of Treasury check numbers were off by one digit from the Interior record, while the amounts and other information matched. Tr. 537:19-538:15 (Herman). No significant errors, however, were detected in

the course of the more than 6 million check disbursement records examined so far. Indeed, for disbursements between 1987 through December 2002, FTI has successfully mapped 6,278,229 of these records, or 97.9 percent, back to the corresponding record. DX-152 at 37, Tr. 565:2-566:6 (Herman).

458. The DCV Overall report contains tables that summarize the work completed to date as well as the results of that work. For example, page 20 of the report contains a chart that summarizes the number of transactions available from the IRMS and TFAS systems, along with a synopsis of the number of transactions that have been rekeyed or restored to the electronic data set. DX-152 at 20.

#### 2. Evidence regarding percentage of missing data restored through the DCV project thus far

459. As noted in the 2007 Plan, Interior concluded, based on the DCV experience that, despite common assumptions about the management of IIM accounts and the vulnerability of transactional data, the accounting systems have a high degree of integrity and reliability that allow Interior to prepare HSA packages that meet the accuracy and completeness objectives of the historical accounting. AR-565 at 20.

460. The DCV Overall reports show that, as of September 30, 2007, FTI had restored 276,118 transactions to the Electronic Ledger Era data set. DX-152 at 20. This work is continuing. See Tr. 721:14-722:9 (Herman).

461. As part of the DCV testing, FTI conducted balance comparison tests and confirmed that 266,285 accounts for all regions, with a total of $372,869,449 in balances, were converted from the IRMS computer system to TFAS. FTI confirmed that the ending

IRMS balance corresponded with the opening TFAS balance. No exceptions were noted. DX-152 at 20.

462. FTI developed a unique identifying code for each unique IIM account, known as a Native American Account Number (NAAN). FTI also developed a Native American Beneficiary Number (NABN), which a assigns a unique number to each individual IIM beneficiary. These numbering schemes allow OHTA to identify specific accounts and individuals, regardless of whether account numbers had been recycled or inadvertently duplicated in the field. Tr. 459:23-461:11 (Herman).

463. Of the 645,000 accounts identified, only about 786 remain to be resolved in terms of the account name. Tr. 487:19-24 (Herman).

464. FTI's balance testing work and restoration of data to gaps found in the Electronic Ledger Era has whittled the remaining work down to 54,618 out of a total of 355,320 unique accounts (NAANs) falling within the population for the historical accounting. DX-152 at 271 n. 1. FTI reports that the "majority of these differences are likely due to the lack of a balance file dated prior to 1989." Id. at n. 2. The work to locate and rekey this balance data or find alternative sources for this information is ongoing. Tr. 552:4-21 (Herman). Indeed, Ms. Herman testified about a recent find in the Great Plains region relating to the 13,400 unresolved NAANs in that region, including accounts that are outside the sampled population for the historical accounting. See DX-152 at 270; Tr. 552:18-553:3 (Herman).

465. FTI's DCV report identifies a relatively small fraction of accounts and transactions that remain to be resolved or mapped. As of the date of the DCV reports, FTI had mapped approximately 93.9 million IRMS and TFAS transactions, representing 97.3 percent of the total population of transactions that were identified for mapping consideration. DX-

152A at 35COR. Because many transactions are related, there are really only a few hundred thousand transaction groups left to examine. This is demonstrated by FTI's calculation that there are only about 192,619 documents left to examine in connection with the historical accounting period in the Electronic Ledger Era (that is, early 1985 through 2000). See DX-152 at 279; Tr. 561:19-562:13 (Herman).

466. Ms. Herman's experience with the DCV tests demonstrates that although the data sets are complex, FTI has been able to find answers to most of the items that they have investigated so far. Tr. 569:18-23 (Herman).

467. The DCV evidence was uncontroverted and unrebutted at trial. Plaintiffs have had access to the IRMS data sets since early 1997, but presented no competing analysis of that data. See Tr. 571:19-572:10 (Herman).

468. Prior to the hearing, the Court permitted Plaintiffs to discover electronic IIM account records for any of up to 100 beneficiaries that Plaintiffs selected. Plaintiffs requested and obtained discovery with respect to 67 names they chose. At the hearing, however, Plaintiffs elicited no testimony by any of those beneficiaries nor proffered any evidence based on that discovery.

469. Mr. Duncan conceded that he did not consider analyzing any of the IRMS data provided to Plaintiffs ten years earlier in 1997. Tr. 1489:12-20 (Duncan).

470. Mr. Duncan agreed that the DCV efforts were among the types of efforts discussed in the Reference Manual on Scientific Evidence (2d ed. 2000) to be undertaken when the target population includes inaccessible members or members whose identity cannot be ascertained in advance of drawing the sample. Tr. 1497:16-24 (Duncan).

### H. Posting Test/Land-to-Dollars Test

471. The "Land-to-Dollars" test is part of an effort to look for any revenue from outside the IIM system, starting with the land, and determining whether or not funds that should have been collected were posted to the IIM accounting system. Tr. 581:16-23 (Herman). The Land-to-Dollars testing "is intended to test for situations where revenue was collected but was not posted to the IIM accounts." Tr. 2121:13-15 (Dunne); see also AR-533 at 2.

472. Through the Land-to-Dollars testing, Interior examines income expected to have been generated from leased allotments, based on contemporaneous contract or production records, to verify that the money was in fact received and entered into the IIM trust fund system. AR-565 at 21.

473. The Land-to-Dollars testing began in 2006. AR-565 at 21.

474. The test starts by creating a map of all allotments in a given reservation managed by a BIA agency and then sampling allotments from within that reservation. The sample allotments are then studied to create a revenue history for each. If revenue is identified within a particular time frame for an allotment, the accounting firms review the transaction to determine whether the revenues were captured within the IIM accounting system. Tr. 582:8-17 (Herman).

#### 1. Pilot test at Horton Agency - conclusions, limitations

475. The Land-to-Dollars testing at the Horton Agency (Potawatomi Tribe) was the first pilot study for the completeness of the receipts in land-based IIM accounts. AR-435 at 1; Tr. 584:1-4 (Herman).

476. The Horton Agency was selected as the location for the first study because it handles mostly farming and grazing leases that would likely result in a straight-forward document

collection, and because the Horton Agency staff had not previously been burdened with the LSA project. AR-435 at 2.

477. The Land-to-Dollars testing at the Horton Agency was, therefore, not selected as a representative case and other locations should be expected to be more challenging. AR-435 at 2.

478. The Horton Agency records were in exceptionally good order. Leases and bills for collection were usually filed together and detailed revenue distribution schedules were available for individual owners. AR-435 at 2.

479. The Land-to-Dollars testing at the Horton Agency uncovered no evidence that money that should have been received was not. The test also demonstrated that all the money received moved into IIM accounts. AR-565 at 21.

480. NORC made a random selection of 21 allotments and OHTA's accounting contractor, FTI, was assigned specific leases and time periods to study. Tr. 583:24-584:4, 584:14-21 (Herman); AR-435 at 3.

481. All the leases or contracts and other supporting documents were located for all 33 of the randomly-selected cases in which annual revenues were examined. AR-435 at 4.

482. The accountants tested 33 cases to verify that the revenue was received by all the listed owners. AR-435 at 4. One case was outside the scope of the study (that is, it was before the Electronic Ledger Era). AR-435 at 4; Tr. 586:1-7 (Herman). For the other 32 cases studied, the expected payments were successfully traced to the IIM accounts. AR-435 at 4. FTI found postings in the IRMS and TFAS systems reflecting all the leases that had been provided for study. The revenue streams indicated by the leases were captured by the IIM accounting systems. Tr. 586:8-587:2 (Herman).

483. Plaintiffs have not demonstrated that the unavailability of some lease documents will negatively affect the outcome of Land-to-Dollars testing. At trial, Plaintiffs quoted out of context a portion of the March 31, 2007 NORC report regarding the Land-to-Dollars testing at the Horton Agency (Potawatomi Tribe). See Tr. 245:16-23 (Cason). Plaintiffs selectively focused on language within the report indicating that developing a "comprehensive list of all leases or contracts or permits that have been issued for the Electronic Records Era, however, is often intractable." Plaintiffs failed, however, to acknowledge that the report further indicated that such a comprehensive list would be needed for completeness testing only if documents were used as the sampling frame, and that a number of other available options could be used and had been used for other studies. AR-435 at 1-2. The report indicated that NORC could develop a comprehensive list of trust land (for example, allotments) or select land areas from reservation maps and determine whether any portion of the sampled land area was in trust during the time period being tested. AR-435 at 2.

484. As indicated in the March 31, 2007 memorandum from NORC, Interior's completeness testing does not have to be based on a complete inventory of documents. AR-435 at 2.

485. Although there may be some difficulty in obtaining a comprehensive list of all leases held by BIA, there are many leases available and there is no basis to conclude that the absence of some leases will pose a problem for the Land-to-Dollars testing. Tr. 246:11-21 (Cason).

486. It has not been established that Interior has to have a perfect list of all of the leases that have ever been recorded at BIA to use a sample of those available documents to perform a valid Land-to-Dollars test. Tr. 247:5-17 (Cason).

### 2. Plans for future posting tests

487. The completeness test at the Horton Agency was only the first of the additional Land-to-Dollars tests OHTA intends to conduct. AR-435 at 1.

488. OHTA plans to conduct more Land-to-Dollars tests. OHTA plans to conduct at least one such test for each BIA region. Some of these were underway at the time of the evidentiary hearing. Tr. 587:3-17 (Herman); AR-566 at 18.

## I. Interest Recalculation Project

489. Interior will be providing an HSA that shows the interest that was actually posted to the account in the electronic record. Tr. 115:22-25 (Cason).

490. As one of its tests of the accuracy of the accounting system, Interior, after posting on the HSA the interest stated on the historical ledgers, is then performing a separate independent recalculation of the interest to determine if the posted amount in the ledgers was accurate. Tr. 114:15-19 (Cason).

491. Under the 2007 Plan, all of the interest postings in an account will be recalculated using the interest factor that was applied either by BIA or OST to a particular transaction. Tr. 1963:23-1964:4 (Zippin). For each interest period, interest that has been earned by the pooled funds is moved into a Special Deposit Account, and that is divided by the dollars that are in the accounts to which this interest is applicable, generating a decimal fraction that is the “factor” that is then applied to calculate interest in all accounts that are eligible to receive interest. Tr. 1965:12-1967:13 (Zippin).

492. The ASM contemplates a procedure of recalculation using the historical method, which is applying the interest factor to the balances of the IIM account. Tr. 2122:8-10 (Dunne)

493. The HSA will thus identify the interest actually posted on the ledger and then, separately within the HSA package, Interior will inform the beneficiary that Interior performed a recalculation of interest. The beneficiary will be advised of the results of the completely new, independent calculation of interest; that is, the beneficiary will be informed that he or she either received the right amount of interest, should have received more interest, or should have received a lower interest payment. Tr. 114:21-115:2 (Cason).

494. The interest recalculation is being done because OHTA had concerns about whether interest was calculated and credited properly and wanted to perform a recomputation in order to report to beneficiaries as part of the historical accounting. Tr. 1964:5-9 (Zippin). Any limitations as to the interest earned will be reported in the HSA package. Tr. 1968:23-1969:4 (Zippin).

495. Regarding Judgment and Per Capita accounts, the interest recalculation project has demonstrated that, for the most part, any differences in individual accounts were minor, with either a dollar over or two dollars under the posted interest amount. Tr. 116:4-9 (Cason).

### J. Land Title Records Office Test

496. Beginning in the fall of 2001 and continuing through the first half of 2002, as a precursor to beginning its historical accounting work, Interior tested the land title records kept at eight different BIA Land Title Records Offices (LTROs). Using statistical sampling, Interior examined randomly selected allotments and traced ownership histories, including probates, to verify the system records nationally, with a view towards their use in the historical accounting work. AR-407 at 3; AR-565 at 19.

497. The LTRO testing effort was undertaken by the staffs of NORC and OHTA. AR-407 at 3.

498. Eight BIA LTROs were visited by the staffs of NORC and OHTA, from November 2001 through May 2002. These offices were in Aberdeen, Alaska, Albuquerque, Anadarko, Billings, Muskogee, Portland, and Sacramento. AR-407 at 3-5; see AR-456 (memorandum from OHTA employee Steve Alcorn regarding May 16, 2002, meeting at the Eastern Oklahoma Region Office in Muskogee, Oklahoma).

499. The LTRO testing was intended to address specifically (1) the completeness and accuracy of the tract records that underlie the IIM accounts; (2) the extent to which ownership changes resulting from probate were accurately captured; and (3) ways of connecting the land and related lease records to the historical accounting. AR-407 at 4-5.

500. As a result of the Court's December 5, 2001 Temporary Restraining Order related to IT security, the LRIS computer database was shut down during a significant period of the testing. Moreover, each of the LTRO's filing system and operating procedures were found to be, at least to some extent, unique. Therefore, NORC had to tailor its efforts to analyze each LTRO. AR-407 at 4-6; see AR-456 at 3; AR-404 at 37 (alternative approach needed at Muskogee LTRO because of the number of allotments that could not be sampled due to the high number of tribes who had opted for self-governance and maintain their own land records).

501. Despite these obstacles, by 2003, NORC and OHTA were successful in obtaining the needed sample of tract records from each of the LTROs. AR-407 at 7. This was accomplished in various ways. The first visit to an LTRO occurred in Albuquerque in November 2001. AR-407 at 5. Because that visit occurred before the Court's shutdown

of Interior's computers, Albuquerque was the only LTRO for which Interior was able to make full use of LRIS reports. AR-404 at 18. In contrast, LRIS was unavailable in Alaska by March 2002, but NORC was able to visit the BLM office in Anchorage and directly compare individual BLM land use application data with a similar field in the Title Plant database used in the Anchorage LTRO because the data were in stand-alone offline systems. AR-407 at 7; AR-404 at 12.

502. The sample tract records were drawn from each LTRO to be reliable at a national level, not on a regional or state level. See, e.g, AR-404 at 7, 13, 20.

503. The results of the LTRO testing related to completeness and accuracy (coverage) were favorable. For example, in Aberdeen, NORC was able to complete the needed checking of allotments and to establish that, for the sample drawn, all tracts were consistently accounted for. AR-404 at 7.

504. Aberdeen is the largest LTRO. It had a title service area that covered the Great Plains and Midwest BIA regions, 50 reservations and public domain areas across seven states (120 counties), comprising approximately 7.2 million acres of Indian allotted and tribal trust lands. AR-404 at 6.

505. At the time of NORC's visit to Aberdeen, there were approximately 850,000 land title documents in its files (consisting of more than 30 different types), dating from 1887 to the present day. NORC observed original allotment books in Aberdeen and described the LTRO's procedures as "[a] very impressive setup." AR-404 at 6.

506. At the Aberdeen LTRO, NORC drew a required random selection of 50 tracts and then drew a sub-sample of 12 tracts for more detailed study. AR-404 at 7. Based on that study, NORC reported that "the contents of the Aberdeen LTRO systems that we

examined appear complete and accurate, within the scope of the checking we did. We therefore are ready to recommend their fuller use in the historical accounting to come." AR-404 at 8.

507. As its work continued, NORC was able to check the necessary allotments for the tracts in the other LTROs, determine that, for the samples drawn, the tracts were properly accounted for, and recommend their use in the historical accounting. AR-407 at 7, 13; AR-565 at 19; AR-404 at 13 (Anchorage), 25-26 (Anadarko), 32-33 (Billings), 44-45 (Portland).

508. The ownership portion of the LTRO testing, involving ownership changes described in probate orders, was narrowed to focus on recent beneficiaries through the electronic data base covering approximately the mid-1980s forward. This portion of the testing was, therefore, independent of the coverage portion of the LTRO testing and was conducted separately during the first quarter of 2003. AR-407 at 7; AR-405.

509. The results of the ownership testing were based on a random sample taken from LRIS Tract History Reports ("THRs") in the Aberdeen, Albuquerque, Anadarko, Billings, and Portland LTROs. AR-405 at 4.

510. The sample used for this testing addressed probate entries for 99 probates and was, therefore, not large enough for estimating an "error rate" among the probate entries at conventional assurance levels. AR-405 at 4, 5.

511. Nevertheless, NORC found no material errors in the LRIS probate entries it sampled. AR-405 at 4.

512. NORC compared the heirs listed in the probates or orders of distribution against the actual recipients of the land who appeared on the THRs within LRIS. NORC verified

that all heirs had received the correct share of the land as specified on the probate or order of distribution. From this, NORC determined that all 99 probates that it selected were "accurately" recorded on the corresponding THRs. AR-405 at 4, 6-7.

513. NORC did find some inconsistencies in the LRIS data, such as minor misspellings, the use of maiden names, wrong account numbers, and late entries because of the probate backlog. NORC did not consider these recorded inconsistencies to be errors because they do not affect the data's "fitness for use" for the historical accounting. For example, although two probates had not yet been entered into LRIS because of the backlog in data entry, the relevant documents were readily available at the LTRO, and NORC was able to confirm the ownership information with a representative of the LTRO. AR-405 at 6-7.

## III. Areas Outside The Scope Of The 2007 HSA Plan

### A. Account Sampling (i.e., reconciliation of all transactions within sampled accounts)

514. In the historical accounting of land-based accounts, no single account is having every transaction in it reconciled. However, it is incorrect to characterize the statistical sampling being employed as not providing information about the land-based accounts. Tr. 111:4-13 (Cason).

515. On the LSA project, the average number of transactions that were reconciled within each of the sampled accounts was 20. Tr. 1084:5-25 (Scheuren).

516. Not every transaction within a sampled account is being reconciled because of the cost of reconciling all transactions within the sampled land-based accounts, and the high accuracy demonstrated through the reconciliation work performed to date. Tr. 1085:3-7 (Scheuren).

**B. Reconciliation Of Account Balances**

517. It is misleading to state that the reconciliation of account balances is outside the scope of the 2007 Plan. Account balances are simply the addition and subtraction of credits and debits resulting from transactions. Tr. 2154:17-23 (Hinkins). If a transaction occurred after June 24, 1938, that transaction is subject to reconciliation as part of a statistical sample. Moreover, transactions that opened an account within the population and thus established an opening balance were subject to reconciliation sampling. Tr. 2154:17-20, Tr. 2178:24-2179:16 (Hinkins).

518. Relatedly, Interior has worked to reconcile differences that existed between the total balance of all "subsidiary" IIM accounts and Interior's "general ledger" IIM balance. Tr. 909:5-16, 910:23-912:24 (Winter). Although the difference between subsidiary IIM accounts and Interior's general ledger was reported to be approximately $25 million in 1982, the current difference has been reduced to approximately $5.2 million. Tr. 907:19-912:24 (Winter).

519. Of the remaining $5.2 million difference between the subsidiary ledgers and Interior's general ledger, $2.5 million has been attributed to an over-distribution of interest to account holders due to improper amortization calculations in the early 1990s Tr. 912:22-913:4 (Winter). This distribution of $2.5 million resulted in IIM account holders receiving more than to what they were entitled, that is, they received more interest than had actually been earned. Tr. 916:2-917:8 (Winter).

520. Determining how the remaining unexplained difference of $2.7 million came to be would require "tens of millions of dollars." Tr. 913:5-8 (Winter).

521. The current $5.2 million difference represents a difference between the IIM pool of assets (the general ledger) and the IIM liability balances in the beneficiaries' favor; that is, the balance of the beneficiaries' accounts in aggregate is $5.2 million greater than what Interior holds in the asset pool. Tr. 914:17-23, Tr. 915:17-917:25 (Winter).

### C. Reconciliation Of Opening Balances

522. It is not correct to state that the reconciliation of opening balances is outside the scope of the 2007 Plan. Transactions that resulted in the creation of an opening balance were part of the sampled population in the LSA project and were available for selection as part of the reconciliation work. Tr. 2154:17-20 (Hinkins). If the opening balance of an account arises from a transaction that occurred after June 24, 1938, that opening balance is subject to reconciliation as part of a statistical sample.

523. Interior employed transaction-by-transaction reconciliation for Judgment and Per Capita accounts. For each specific Judgment or Per Capita distribution, nearly all of the related IIM accounts have identical opening balances. Thus, opening balances were reconciled for Judgment and Per Capita accounts. AR-565 at 12.

### D. Reconciliation Of DOI Records And Treasury Records

524. Robert J. Winter, a CPA and Director of OST's Office of Reporting and Reconciliation ("ORR"), described the processes in place since 1992 for reconciling IIM funds transactions using data received directly from Interior and data obtained from Treasury. See generally Tr. 844:5-20, 847:9-854:6 (Winter). ORR performs a myriad of cash and investment reconciliations on a daily, weekly, and monthly basis, as well as financial statement and regulatory reporting. Tr. 847:9-25 (Winter).

525. Regulatory reporting of cash transactions involves Forms 224, 1219 and 1220 that ORR submits to Treasury. Tr. 847:20-25 (Winter).

526. During Fiscal Year 2003, a historical difference between the cash balances reported by Interior and Treasury for the tribal and IIM trust funds was eliminated. AR-352 at 22. To eliminate the difference, at OST's request, Treasury processed adjustments to Treasury's reported balances to reflect the **t**rust asse**t** balances maintained by OST. AR-352 at 22.

### 1. Daily reconciliation of receipts and disbursements by OST

527. Every morning, ORR prepares a Daily Cash Reconciliation report ("DCR"), DX-233 at 1-3, a Daily Cash Statement ("DCS"), DX-233 at 4, and "TFAS Download," DX-235. Tr. 848:1- 849:2 (Winter). The DCR combines what is reconciled between the DCS and the TFAS transactional download; ORR compares all the cash that either came in or went out of Treasury on a daily basis, for the trust, to every transaction that has happened up through the previous day in TFAS, to ensure that all cash is properly account for. Tr. 849:3-11 (Winter).

528. OST has since at least 1992 employed a "tick and tie" method, as shown on the DCS, DX-233 at 4-6, and TFAS Download, DX-235, to reconcile the transactions on a daily basis. Tr. 849:12-18, 851:17-852:13 (Winter).

529. If a receipt or disbursement shows in the Treasury information (DCS) but was not recorded in TFAS, or if a transaction is recorded in TFAS but not in the DCS, then ORR provides that information to its accounting group each morning so that discrepancies or reconciliation items can be addressed immediately. Tr. 849:19-850:1 (Winter).

530. Treasury faxes the information on the daily cash statement directly to ORR, because Interior cannot access the information via Cash-Link because of the court-imposed Internet restriction. 852:17-22 (Winter) (discussing DX-233).

**2. Regulatory reporting to Treasury by OST**

531. BIA and, since the late 1990s, OST have submitted monthly accounting reports to Treasury that are required by regulation. Tr. 847:9-25, Tr. 855:3-16 (Winter) (discussing DX-240).

532. When IIM funds are deposited to a Treasury general account at a bank, they are identified by Interior's Agency Location Code (ALC), Tr. 879:9-11 (Winter). The ALC identifies the funds as being Indian trust, but Treasury at that point does not know whether the funds are Tribal Trust or IIM trust. Tr. 879:11-20 (Winter). Subsequently, Interior reports to Treasury to say "what buckets each of those receipts go into." Tr. 879:16-20 (Winter). The Treasury Financial Manual informs OST of the Treasury rules and regulations with which OST needs to comply in its financial reporting. Tr. 881:1-20 (Winter).

533. The primary report is an SF-224, "Statement of Transactions," to which is attached an SF-1219, "Statement of Accountability," and an SF-1220, "Statement of Transactions," that concerns a subset of line items referenced on the SF-1219. DX-240; Tr. 847:20-25, Tr. 855:13-16 (Winter).

534. The SF-224 shows Treasury how OST has accounted for transactions in its various Indian trust accounts, including the 14X6039 IIM account. Tr. 853:23-856:20 (Winter); DX-240 at 1. However, the SF-224 is not helpful for determining through-put numbers, or trying to determine accurate receipts or disbursements. Tr. 855:17-22 (Winter).

535. The SF-224 also shows the aggregate of receipts and disbursements into and out of OST's "overnighter" investments with Treasury, each of which were approximately $1.4 billion in July 2007. DX-240 at 1; Tr. 857:22-858:19 (Winter). Each afternoon, the balance in the 14X6039 account is swept out to purchase overnight investments, which constitutes a disbursement; then each morning, the redemption of the investment is moved back into the 14X6039 account, which constitutes a receipt. Tr. 858:3-859:5 (Winter).

536. At $50 to $80 million each day, the aggregate receipts and disbursements into and out of OST's overnighter investments builds up to approximately $1.4 billion, a phenomenon that is not dependent on truly new deposits – or throughput – into the 14X6039 account. Tr. 858:1-19 (Winter); see also Tr. 859:14-862:13 (explaining Treasury-generated SF-224, DX-277 at 1-3, which shows daily transactions for overnighter investments in 14X6039 account). Extrapolated to an annual total, those receipts and disbursements would be about $17 billion. Tr. 20-22 (Winter).

537. OST also receives by facsimile transmission from Treasury a monthly "GWA Account Statement," DX-279, which shows ending balances that OST uses to reconcile all of its Treasury accounts that are divided between IIM and different tribal Treasury accounts. Tr. 862:14-22, 863:2-9 (Winter) (defining GWA as "the Government Wide Accounting initiative").

538. In addition, Treasury provides OST with "statement of differences" information for its IIM disbursing symbol 4844. Tr. 863:11-866:9 (Winter); see DX-282. This information allows OST to see the number of checks that were returned to Treasury and then canceled, because of, for example, a bad address. Tr. 864:6-15 (Winter). OST then uses

this information to credit those checks to the related individual accounts. Tr. 864:16-20 (Winter).

539. Once OST receives the information on canceled checks and reports back to Treasury on the activity for the prior month (i.e., on August 4, 2007 for activity in July 2007), OST would have no statement of difference. Tr. 865:12-19 (Winter).

540. Checks are also canceled by Treasury pursuant to the Competitive Equality Banking Act of 1987, P.L. 100-86 (CEBA). Since 1989, CEBA has required that uncashed IIM checks, like all Treasury-issued checks, be canceled after 13 months. DX-231 at 1; Tr. 846:12-19 (Winter). On a monthly basis, Treasury sends Interior the affected funds and relevant information for the canceled checks via the Intragovernmental Payment and Collections System (IPAC). Tr. 846:19-24 (Winter). OST re-credits the appropriate accounts, usually within 30 days. Tr. 846:25-847:8 (Winter).

**E. Asset Statements**

541. The Department of the Interior still plans to provide IIM account holders who own land that generates revenue with a statement regarding their land assets. The only change from the 2003 Plan is that Interior will accomplish the task in a different way, through different offices within the department. Tr. 153:21-154:13 (Cason).

542. As noted above, the 2003 Plan contemplated OHTA providing IIM beneficiaries who had land assets that were part of the historical accounting with a statement identifying the land assets that the beneficiary had at the time Interior issued the beneficiary's HSA. The 2007 Plan eliminates this particular task as part of the historical accounting project because a similar land asset statement is now being developed by OST, as part of the

project that is converting the old legacy LRIS system into the more robust land title system, TAAMS. AR-566; Tr. 68:20-69:22 (Cason).

543. The Special Trustee will now issue, along with the periodic statements of account that beneficiaries currently receive, a record of the land each individual owns, whether it is leased or not. Tr. 69:14-17 (Cason).

544. The asset statement is not going to be provided as part of the historical accounting process. This change is being made so that OHTA can focus on providing Historical Statements of Account regarding the funds held in trust on behalf of IIM account holders. Tr. 148: 23-149:11, Tr. 149:25-150:7 (Cason).

### F. Special Deposit Accounts

545. The Department of the Interior has been working to resolve SDAs for several years and has completed approximately 75 percent of the work, in terms of dollar value. That is, for approximately 75 percent of the funds that have been held in SDAs, a determination has been made as to the proper owner of the funds and proceeds have been distributed. Tr. 85:21-86:2, Tr. 158:9-17 (Cason).

546. As of July, 2002, there were approximately 21,000 SDAs with approximately $68 million in balances. AR-561 at 13; see AR-566 at 27 (“At the time Interior prepared the 2003 Plan, more than $67.9 million in residual balances were in SDAs awaiting distribution”); Tr. 157:8-12 (Cason).

547. As of October, 2007, approximately $16-17 million remain in SDAs. Tr. 158:17-19 (Cason). OHTA has, in fact, made good progress in distributing those funds. Tr. 157:10-12 (Cason). See AR-566 at 27 (of the $67.9 million in SDAs that existed in 2003,

Interior has reclassified or resolved the proper ownership of and distributed more than $51 million in residual SDA balances.).

548. Plaintiffs' witness, Robert McCarthy, confirmed the positive results of the SDA cleanup project. On direct examination, Mr. McCarthy offered a single example of an SDA that he believed had not been properly resolved. PX-4494; Tr. 1697:7-1698:3 (McCarthy). Mr. McCarthy had delivered a letter to James Cason on April 22, 2005, to alert him to the status of this particular SDA, SDA 81. However, SDA 81 was part of the SDA cleanup project and by November 15, 2004, the BIA had already investigated SDA 81 and had paid the funds from the SDA, including interest, to the appropriate IIM account holder. DX-366; DX-367; DX-368; DX-369; Tr. 1715:8-1724:16 (McCarthy).

549. Although SDAs are not part of the historical accounting work under the 2007 Plan, Interior is continuing to review them to ascertain proper ownership of the money within the SDAs and reduce SDA balances by distributing funds to the proper recipients. Interior is spending approximately $2.5-$3 million a year on reviewing the SDAs. Tr. 70:23-71:1 (Cason). As of May 31, 2007, Interior spent approximately $48 million distributing residual balances from SDAs. AR-566 at 27.

550. Although SDAs are not now considered part of the historical accounting work and are not referenced in the 2007 Plan, Interior's plan is still that part of OHTA's work will be to allocate eventually all of the funds in the SDAs. Tr. 159:3-6 (Cason); AR-566 at 27.

551. In reviewing the outstanding SDAs, Interior is generally reviewing SDAs with the largest dollar volumes, to distribute money out of those as rapidly as it can. Tr. 71:1-3, Tr. 158:20-22 (Cason).

552. Interior's ongoing SDA cleanup work has helped to narrow differences between the total balance of all subsidiary IIM accounts and Interior's general ledger IIM balance. For example, the work with SDAs has revealed what Interior refers to as "phantom balances," where a balance is indicated in an SDA that should, in reality, not be there. Interior has found those types of instances in many SDAs. Tr. 909:5-16, Tr. 910:23-912:24 (Winter).

553. OHTA is concentrating on 2002 and earlier SDA balances, while BIA and OST are working on SDA balances created after 2002. Tr. 752:4-7, Tr. 752:22-25 (Herman).

554. Mr. Jeff Zippin, the Deputy Director of OHTA, oversees the special deposit cleanup work. Tr. 1935:23-24 (Zippin).

555. In performing the DCV tests, FTI included SDAs in its transaction population, and FTI has performed transaction mapping and other DCV tests on SDAs as well as on IIM accounts. Tr. 746:4-23 (Herman). SDA transactions were also examined as part of the reconciling IIM account transactions under the LSA project. Tr. 746:4-23, Tr. 753:16-21 (Herman).

556. In the course of the DCV mapping project, FTI mapped each one of the debits from the Special Deposit Account if it were a transfer or reversal. If there were checks issued from that SDA, those were matched to the CP&R file. Tr. 538:24-539:5 (Herman).

557. As part of the DCV analysis, if monies are transferred out of an SDA to the tribal trust or to another Interior account, FTI is requesting documentation to determine why the funds were being transferred. Tr. 754:25-755:25 (Herman).

558. Thus, the DCV testing evaluated all accounts – including SDAs – in the system. Tr. 539:10-17 (Herman).

### G. Predecessor Accounts

559. Interior does not intend to perform a historical accounting of predecessor accounts, if those accounts closed prior to October 25, 1994. This position is, in part, based upon Interior's respect for probate decisions as final and conclusive adjudiciations, as described below. Tr. 144:25-145:8 (Cason).

560. This issue was a topic of a considerable discussion within Interior. As described by Mr. Cason, Interior's rationale was:

> [H]ow do we approach this job in a way that we can actually finish on an account-by-account basis the tasks that we have to do this historical accounting.
>
> And approaching the job in this particular way, that you could never finish a current account until you did all the accounting of every predecessor account to 1887, appeared to be problematic. And so from our standpoint, we made a decision that said there is a legal, sufficient process for distributing predecessor in interest accounts through estate probate work and that, for our purposes in doing the accounting, that for the individuals who had an account open as of October 25, 1994, that we would do their account all the way back to the opening balance of their account, and if that opening balance was a result of a probate procedure, then we would accept whatever the probate said was entitled to them, and that would become the opening balance amount, but we would not go back further into the probate and try to do that.

Tr. 145:14-146:10 (Cason).

561. Thus, Interior considered the need to expedite furnishing an accounting to living beneficiaries as part of the reason for taking this position. Tr. 146:11-16 (Cason).

562. In addition, it was Interior's view that the probate process constitutes a separate legal proceeding for distributing the assets of an estate, and that it could rely upon that legal process to determine how the proceeds from the estate of a predecessor in interest would be distributed. That process affords an opportunity to raise questions concerning the

assets in the estate, and Interior did not want to add another process on top of that legal process. Tr. 146:17-24 (Cason).

### H. Probate Determinations

563. Interior's intention, as set forth in both the 2003 Plan and the 2007 Plan, is to view the probate of an estate as being final and conclusive with respect to the particular IIM account that is involved in the probate. Tr. 141:5-10 (Cason).

564. During the probate process, the Bureau of Indian Affairs (BIA) gathers information regarding the assets of an individual and that information, along with other material, is provided to the Office of Hearings and Appeals (OHA) for a determination of distribution of assets to appropriate heirs. Tr. 139:21-140:4 (Cason); AR-622 at 2 (chart describing basic steps of the probate process).

565. As part of the probate process, potential heirs and others associated with the probate have an opportunity to address the OHA and indicate that there is a problem because the assets of the deceased have not been appropriately identified. Tr. 140:12-16 (Cason).

566. The testimony of Plaintiffs' own witness, Administrative Law Judge (ALJ) Sally Willett, confirms these facts and supports Interior's rationale. For example, she confirmed that "the purpose of Indian probate is to wind up the affairs of the decedent, and to transfer the assets into new ownership." Tr. 1990:19-22 (Willett).

567. ALJ Willett also confirmed that BIA initiates the probate by preparing a probate package that is submitted to OHA. The probate file prepared by BIA contains data for an heirship finding, a family history form, an inventory of assets based on the records at the time, a death certificate, and any documents pertaining to relationships, such as marriages,

divorces, or adoptions. Tr. 1992:7-15, Tr. 1999:20-2000:17 (Willett); see PX-4507 (Form OHA-7).

568. The data sheet prepared by BIA contains a specific statement of what funds are in the decedent's IIM account on the date of death. In cases handled by ALJ Willett, she also asked BIA to prepare a statement of what was in the IIM account on the date of submission. Tr. 1993:15-Tr. 1994:5, Tr. 2000:24-2001:7 (Willett).

569. As necessary during the course of hearings, ALJ Willett would ask the BIA superintendent to supplement the record on whatever issue arose during a particular hearing. BIA then respond with the supplemental information and OHA would make that information part of the official record. Tr. 1994:20-Tr.1995:17 (Willett).

570. After OHA reaches a decision, the probate file -- which includes the data sheet with the statement identifying what is in the IIM account, the inventory, the will, any creditor claims, and any of the other documents identified above -- is filed with the Land Title and Records Office (LTRO) that serves the particular area. The LTRO is the Indian Country equivalent to a county recorder office. The LTRO then records the change in ownership of the assets. Tr. 1996:1-20 (Willett).

571. When there is an issue raised by a party concerning the accuracy and completeness of BIA's representation of the Trust funds in an estate, OHA could look into the party's allegations, depending on their specificity. Tr. 1999:3-13 (Willett).

572. The inventory of assets that is listed on the Form OH-7 can be challenged by heirs. In fact, ALJ Willett was unequivocal in stating that "[a]nything in that record can be challenged by an heir." Tr. 2026:13-15 (Willett).

573. Heirs who wished to challenge the listing of assets could present background documents to ALJ Willett, and she would consider those documents in reaching her probate decision. Tr. 2026:16-19 (Willett). She explained that if someone presented documents to her during a probate hearing, she would either (1) refer them to the BIA realty office and have that office consider the records; or (2) in an appropriate case, she would have the individual bring the records to her to determine if something had been omitted. Tr. 2030:3-13 (Willett).

574. Where there was a question regarding the accounting for IIM assets that required further investigation, ALJ Willett would refer the matter back to the BIA for BIA to develop the information and reach a decision. Tr. 2002:20-Tr. 2003:8, Tr. 2029:15-23 (Willett). If there was a "hole" in the probate record, she would request that BIA update the record and inform her and the involved individuals once that was done. Tr. 2030:3-21 (Willett).

575. In considering whether it is appropriate for Interior to assume the correctness of a property distribution resulting from an OHA probate decision, ALJ Willett acknowledged that an OHA order generally applies to all assets that are covered by it and made part of the record during the probate. Tr. 2015:24-Tr. 2016:2 (Willett).

576. Further, if other assets were not included in the probate file or some assets were improperly included in the file, BIA modifies the file and submits the modifications to the OHA administrative law judge. In such a case, the administrative law judge then modifies the probate order to ensure that the correct assets are part of the probate decision. Tr. 2015:24-Tr.15, Tr. 2031:1-7 (Willett).

577. Any modifications to the probate order are subsequently entered into the BIA LRIS system. They are entered into LRIS coded as "document type 12," or "administrative modifications/corrections," and the original entry remains unchanged. AR-405 at 11, 19.

578. Generally, once the omitted property is brought before the OHA administrative judge, it is then distributed among the heirs. Tr. 2031:8-11 (Willett); AR-622 at 3 (chart describing basic steps of the probate process, including the preparation of a journal voucher and subsequent distribution of income).

579. A decedent's assets are frozen as of the date of death and, therefore, stay in that decedent's IIM account until it is distributed through a probate decision, which represents the "release and transfer"of the assets. Consequently, income from allotted property builds up in the IIM account while the estate is probated. Tr. 2022:3-25 (Willett); see AR-405 at 11 ("the decedent's IIM account is converted to an account for the 'estate of [name of the decedent].'"). Therefore, IIM funds are addressed through the probate process.

580. In response to Plaintiffs' counsel's question whether she "had any personal experiences trying to get an accounting of your mother's interest," ALJ Willett could only recount an Oklahoma state court condemnation proceeding related to one-eighth of her grandmother's allotted land. Tr. 2001:14-Tr.2002:7, Tr. 2003:18-Tr. 2004 (Willett).

581. At the time of the condemnation proceeding, her grandmother was deceased and the interest in the allotment was her mother's. The allotment was located in Oklahoma. Tr. 2006:22-2007:9 (Willett). ALJ Willett expressed frustration that the local BIA office in Oklahoma did not seek to have the matter removed to Federal court. Tr. 2001:18-22 (Willett). That is not an issue pertaining to Interior's historical accounting.

582. Unique legislative circumstances control the probate of estates in Oklahoma. As a result of a 1947 Federal statute, state courts have been conferred exclusive jurisdiction to administer guardianship, estate, and probate proceedings related to the Five Civilized Tribes and the Osage Tribe. Probate matters regarding the Five Civilized Tribes and the Osage Tribe are decided under Oklahoma state law. The Eastern Oklahoma LTRO in Muskogee has no authority to probate estates. Rather, this task is handled completely by state courts. AR-404 at 38; Tr. 2032:10-Tr.2033:2 (Willett).

583. The members of the Five Civilized Tribes are the Choctaw, Chickasaw, Cherokee, Creek, and Seminole. AR-404 at 37. ALJ Willett's family are members of the Cherokee Nation of Oklahoma. Tr. 1987:3-7 (Willett). Although ALJ Willett expressed frustration that "no money was ever given to anyone in the family" for that condemnation, Tr. 2002:1-4 (Willett), Plaintiffs did not establish that the matter was not in probate in an Oklahoma state court pursuant to Federal law.

584. As a result of the unique Federal statues conferring state courts with jurisdiction to entertain probate cases involving the Five Civilized Tribes, ALJ Willett did not deal officially with probate cases involving those tribes. Tr. 2033:3-5 (Willett).

585. In response to a question from Plaintiffs' counsel, another of Plaintiffs' witnesses, Sharon Red Thunder, could identify only one instance in which an heir ever requested an accounting of the amount they were receiving from an estate. In this case, one lady questioned the account in her deceased brother's estate. Tr. 1334:17-25 (Red Thunder).

586. In this one instance, the decedent died in approximately 2005, well after this litigation commenced. Tr. 1344:20-25 (Red Thunder).

587. Although Ms. Red Thunder advised the lady questioning her brother's account to contact the Special Trustee, Ross Swimmer, Ms. Red Thunder was not aware whether the lady's representative ever contacted Mr. Swimmer. Tr. 1344:15-19 (Red Thunder).

588. Legal matters involving any leases, including oil and gas leases, related to allotments of members of one of those tribes are also handled in state courts. Tr:1682:17-25 (McCarthy).

### I. Cadastral Surveys

589. A cadastral survey is a land survey of sufficient scale to show the extent and measurement of property boundaries, performed under the rules established by the Bureau of Land Management (BLM). BLM is the official Government surveyor for land interests of the Federal Government, including Indian Trust lands. Tr. 174:1-4 (Cason); AR-366 at 3.

590. BLM establishes the standards for survey for the Federal Government, and performs many of them. Tr. 174:6-8 (Cason).

591. Cadastral surveys are not a part of Interior's historical accounting work. AR-394 at 5; see AR-565 at 8-9.

592. Because cadastral surveys are part of the system that links IIM accounts back to realty documents and eventually the land itself, OHTA, BLM, and NORC developed a small-scale cadastral resurvey pilot project that was performed from October 2001 through the fall of 2002. AR-394 at 3-5.

593. The main objective of the pilot was achieved: to clarify through examples how potential acreage and location errors might affect the distribution of income from tracts of

individual Indian Trust land. Although the study was not conclusive, it indicated that "there can be little or no direct income impact" from errors of approximately five percent in acreage and, even when sought, large errors of greater than five percent were "hard to find" and "infrequent." AR-394 at 3.

594. As part of the pilot project, surveys and re-surveys of 22 tracts (allotments) owned by Cobell plaintiffs were examined. The resulting erroneous acreage value per allotment ranged from plus 0.7 percent to negative 0.8 percent, or stated in acres per allotment, from plus .056 to negative 0.92 acres. AR-366 at 2. An examination of 15 tracts (allotments) not owned by Cobell plaintiffs, but adjacent to or similar to their tracts were examined. The resulting erroneous acreage value per allotment ranged from plus 20.7 percent to negative 8.9 percent. AR-366 at 2.

595. In another part of the pilot, OHTA requested that BLM perform a dependent resurvey of two tracts of Indian land in Oklahoma, to determine whether the survey data related to acreage and location used by BIA were accurate and whether income from those two tracts could potentially be affected by survey errors. AR-304; AR-395 at 4. BLM's dependent resurvey established that "acreage and location had been determined with very high precision - the observed deviations were less than 1%." AR-395-5; see AR-304 (one tract was owned by a plaintiff and the resurvey showed the tract "was off by about a foot on one boundary and was encroaching on a neighbor.").[4]

596. In addition, BLM reviewed townships containing parcels owned by plaintiffs. That review revealed that the plaintiff-owned parcels selected for review had almost no change

---

[4] A "dependent resurvey" is a "retracement and reestablishment of the lines of the original survey in their original positions according to the best available evidence of the positions of the original corners." AR-395 at 23 (citation omitted).

in acreage as evidenced by a review of an original survey and the most recent resurvey performed since the allottee took possession of the allotment. There were a total of 175 parcels that were plaintiff-owned and, of that number, none had a mathematical change in acreage (MCIA), as defined by the study. AR-366 at 10.

597. Because BLM found the results of the review of the townships to be more accurate than its experience suggested would be the case, BLM also reviewed two townships (four parcels) in Washington State (where there are no named Cobell plaintiffs). As expected, because these represented "worst cases," this review found much larger deviations in the surveys. AR-395 at 4; AR-394 at 8.

598. Noting that the limited data obtained from this small pilot was not conclusive, NORC advised that, "[w]hile more research clearly seems needed using BLM records, refining the measurement of the income impact of boundary errors may not be warranted for OHTA, given other priorities." AR-394 at 12.

599. In approximately 2001-2002, BLM conducted a program that instructed Indian tribes how to apply for funds for cadastral surveys. The program taught how to identify what needed to be surveyed and how to obtain assistance from the BLM. Plaintiffs' witness Sharon Red Thunder was an instructor on the program for BLM while she was in California. Tr. 1329:5-20; 1330:20-1331: (Red Thunder).

600. Funding for this program regarding cadastral surveys was curtailed because there was not enough of a response from the Indian people. Tr. 1329:21-1330:4 (Red Thunder).

601. Cadastral surveys were conducted under the program, within funding limitations. The BLM program continues today (without the training element), providing a means to request a cadastral survey. Tr. 1331:13-19 (Red Thunder).

602. Although Ms. Red Thunder testified that she herself experienced a problem with a cadastral survey on her allotment, she also testified that no income was derived from that allotment. Tr. 1327:7-19 (Red Thunder).

### J. IIM Trust Funds Managed By Compacting/Contracting Tribes Utilizing Their Own Record System

603. There are only two tribes that use their own record systems to collect, process and distribute IIM beneficiary funds. Tr. 119:6-18 (Cason).

604. The 2007 Plan does not address a historical accounting for the IIM funds being collected by those two tribes. Tr. 120:17-25 (Cason). Interior is considering how it can address the IIM funds collected by those two tribes, but has not yet developed a specific plan to do so. Tr. 122:20-123:6 (Cason).

605. The record does not establish when those two tribes actually received the responsibility to perform the work of collecting, processing, and distributing the IIM funds. Tr. 125:5-13 (Cason). Therefore, it is not clear how much, if any, of these IIM funds were collected by these tribes prior to December 31, 2000.

606. While three other tribes have responsibility for collecting and processing IIM funds, and managing distribution of the funds, those three tribes use the same computer systems Interior uses and those IIM funds are, therefore, accounted for through the 2007 Plan. Tr. 119:6-9, Tr. 120:8-16 (Cason).

607. Although Plaintiffs presented Ms. Red Thunder as an employee of a compacting tribe, the Colville Confederated Tribes, Ms. Red Thunder made it clear that this tribe was responsible for handling only real estate transactions and did not contract for IIM work. Tr. 1340:14-25 (Red Thunder).

608. The Colville Confederated Tribes use the Department of the Interior's electronic systems. They post real estate transactions on the IRMS and LRIS databases. Tr. 1341:8-17 (Red Thunder).

### K. Direct Pay Accounts

609. Funds from direct pay accounts that go directly to individual Indian payees never go through IIM accounts. Tr. 1344:12-14 (Red Thunder).

610. Plaintiffs do not dispute this fact. Even Mr. Joe Christie, Plaintiffs' witness, acknowledged that his personal experience is that the direct pay money never went into an SDA or an IIM account but went directly from the person renting the property to the beneficiary who owned the property. Tr. 2087:14-21 (Christie).

611. IIM accounts thus do not exist for direct payments made to an individual Indian. Tr. 268:8-18 (Cason).

612. The operative facts for Interior in construing its responsibilities to perform a historical accounting is that Interior never takes the funds from a direct pay relationship into trust with the United States. Instead, the funds go directly to the land owner. Tr. 129:15-24 (Cason).

613. In its July 2, 2002 report to Congress, Interior advised Congress of its position on direct pay accounts:

> Allotment owners may elect direct payments from surface and subsurface lessees to pay respective rents and royalties to the allotment owner(s). In these situations, no funds are taken into trust by the Interior IIM Trust Fund and, accordingly, no funds are deposited into the respective allotment owner's IIM account. Accordingly, Interior does not contemplate including such arrangements within the historical accounting.

AR-561 at 14. Congress has not subsequently questioned that position.

614. When BIA draws up a lease, the lease can involve an Indian landowner who has a relationship with a lessee. The landowner can request that the lease be a direct pay lease and, in that instance, BIA includes a provision within the lease that there is direct pay to this individual landowner. Tr. 1336:22-1337:8 (Red Thunder).

615. A landowner's receipt of direct pay is recorded in IRMS so that, when BIA calculates rental payments, it does not include that landowner because the landowner had already received direct pay. Tr. 1344:12-14 (Red Thunder).

616. Direct pay is reported by the BIA agencies to regional offices only on an annual basis and only as part of a larger report that identifies acreage of tribal land, alloted land, the income of all transactions (including leases and land sales), and direct pay. Tr. 1338:24-1340:5 (Red Thunder).

617. Direct pay is reported in this manner annually only because direct pay is identified by the lease and it is included within the lease information. Tr. 1340:3-5 (Red Thunder).

618. Mr. Christie testified that, while he was Superintendent at the Winnebago Agency, he required his realty office to obtain copies of the canceled direct pay checks in case they needed to verify that a direct pay payment had been made. Tr. 2037:16-2038:2, 2039:5-7 (Christie). Mr. Christie conceded that this was his policy for the limited period that he was superintendent at that agency and was not done pursuant to a nationwide BIA directive. Tr. 2039:21-2040:3 (Christie).

### L. Routine Collection Of Third Party Records

619. The Department of the Interior is not engaged in a broad process to seek whatever records are available through third parties. Interior has found that the records available to

perform the historical accounting are "pretty sufficient," and a determination has been made not to go through a duplicating exercise. Tr. 137:8-18 (Cason).

620. As James Cason, the Associate Deputy Secretary, testified: "we [Interior] have a certain budget to get this job done, and we can go spend a lot of money on pursuing third-party records, but we have not found the need to do so so far." Tr. 137:18-21 (Cason).

621. Interior is empowered to ask third parties for records and could exercise that power if there is some specific issue for which Interior believes those third-party records would be helpful. Tr. 137:10-12 (Cason).

622. A departmental policy and procedure exists for gathering third-party documents, as contained in the departmental manual. The policy states, in relevant part, that "Collections of such information will supplement existing federal records and assist in those instances where federal records are incomplete or missing." PX-4465; Tr. 138:5-139:6 (Cason). As a general rule, the procedures set forth in the departmental manual are not being implemented because the documentation Interior has right now is sufficient to perform the historical accounting as set forth in the 2007 Plan. Tr. 139:7-13 (Cason).

623. Although Interior is not engaging in a sweeping effort to collect third-party documents, Interior has been using third-party documents throughout its historical accounting work. OHTA in fact went out and surveyed third-party records that might be useful in the historical accounting. Tr. 1954:1-3 (Zippin); see generally AR 461-475.

624. Jeffrey Zippin, Deputy Director of OHTA, recalled two specific reconciliations in which the accountants used third-party records to reconcile transactions. Tr. 1954:3-15 (Zippin).

625. Although the documents used to verify the account entries in the first instance come from Interior's files or archival materials deposited with the National Archives and Records Administration, these files include what are commonly considered to be third-party records. Over the years, Interior has collected documents from many third-party sources and kept those records as part of individual beneficiaries' "jacket folders" or jacket files. Testimony at trial demonstrated that jacket files may contain such third-party records as a birth certificate, a death certificate, a marriage or adoption certificate, sometimes financial documents, such tax checks and stocks, Tr. 490:5-14, 514:5-16 (Herman), as well as probate files, Tr. 633:18-634:6 (Herman), and other items. Other records maintained by Interior, such as lease agreements, see Tr. 639:3-18 (Herman), and third-party checks, are also "third party" records in the ordinary sense of the term.

626. Mr. Pallais opined that Interior should rely on third-party documents rather than internal documents because of historically weak internal controls at Interior; Tr. 1847:16-19 (Pallais). Mr. Pallais conceded, however, when cross-examined about several specific documents that he considered "internal," that there was nothing inherently unreliable about any of those documents. Tr. 1867:10-1868:4 (Pallais). Mr. Pallais also conceded that his opinion that Interior should rely strictly on third-party records was made without regard to cost. Tr. 1875:7-9 (Pallais).

627. Mr. Pallais's criticism of Interior's reliance on "internal" records is misplaced. Certain Federal records contain corroborating evidence that could be viewed as third-party documents because a third party would maintain these same records, such as a lease or a check or documents of that nature. Tr. 2118:16-2119:4 (Dunne).

**M. Analysis of MMS Systems**

628. The Minerals Management Service (MMS) processes oil and gas lease payments and other payments on behalf of the Federal Government. When Interior receives a statement from a lessee regarding their production on a particular oil or gas lease, that information comes through the MMS. Tr. 132:9-13 (Cason).

629. Technically, money paid by the lessee is delivered into the Department of the Treasury and the MMS receives production reports. At that point, the funds are not yet posted to an individual Indian's account. Tr. 160:21-161:3 (Cason).

630. Although MMS systems contain lease records, MMS systems do not contain information regarding how proceeds from such leases are allotted among individual Indians. Tr. 1182:23-1183:9 (Angel); Tr. 161:23-25, Tr. 162:18-19 (Cason).

631. When oil and gas monies are received by MMS, MMS collects the data and sends OST a facsimile stating the "bulk" collected amounts. Tr. 919:15-19, 920:11-13 (Winter). OST posts that amount to "a general holding account." Tr. 919:19-20 (Winter). Then, on a bimonthly basis, MMS sends data to BIA that BIA processes through its Royalty Distribution and Reporting System (RDRS), which determines ownership. Tr. 919:21-24 (Winter). BIA then conveys the ownership information to OST into TFAS, where the disbursements are made to the account holders from the holding account. Tr. 919:24-920:1 (Winter). OST relies on BIA for the accuracy of the ownership information. Tr. 920:17-20 (Winter). OST also relies on MMS for the accuracy of its transactional data, but MMS is ultimately audited. Tr. 921:1-9 (Winter).

632. Interior moves approximately $500 million to a billion dollars a month through the MMS system. Most of those funds, 98-99 percent of it, constitute Federal Government

payments. Only one to two percent of those funds belong to Indian oil and gas lessors. Tr. 132:13-17; Tr. 165:11-16 (Cason).

633. Given the aggregate high level data MMS possesses, it would not be feasible or meaningful for the Department of the Interior to perform an "historical accounting" of MMS's systems, as contemplated in this case. Related to Interior's task of providing IIM account statements, MMS does not know who are the proper recipients of the royalty payments made. MMS only has lease level information. Tr. 162:24-163:10 (Cason).

634. The 2007 Plan does not address the issue of whether MMS's lease-level information is correct. That is because the focus of Interior's work is to prepare HSAs on an account-by-account basis, as opposed to auditing the entire process, including MMS. Tr. 165:22-166:2 (Cason).

635. In the historical accounting work, there is no operative assumption that every Interior agency, including MMS, got everything right. In the reconciliation process, Interior is examining specific transactions that were posted and determining whether it can identify a check or underlying lease or other ownership documents to determine whether Interior distributed the money to the right parties and in the right proportions. It is not just a matter of assuming all agencies in the process did everything right. Tr. 166:10-22 (Cason).

636. Although the issue is not a part of this litigation, MMS systems likely would contain data on whether MMS collected less lease money on Indian lands than on other lands, but asset undervaluation is not part of the accounting. Tr.1183:17-1184:4 (Angel).

637. Kevin Gambrell, a former Interior employee who was the director of the Farmington Indian Minerals Office (FIMO), testified on behalf of Plaintiffs. Mr. Gambrell testified

638. The FIMO was created as a result of a lawsuit filed by individual Indian landowners in the Four Corners area, who claimed they were not being paid royalties. The FIMO became a permanent office and was departmentalized in 2001, and was created specifically for individual Indian mineral owners. Tr. 1767:9-1768:5, Tr. 1814:10-11 (Gambrell).

639. Although Mr. Gambrell testified that he observed "a lot of issues" with MMS's systems during his tenure as a financial analyst for MMS and that the Navajo "could never really trust" MMS's database, he provided only one vague example in which he claimed to have identified a million dollar payment being allocated to the wrong Navajo beneficiary. Tr. 1769:17-1771:2 (Gambrell). Mr. Gambrell did not provide any testimony as to the frequency of such errors, whether errors were typically of that magnitude, or whether MMS allocation errors were typically found and corrected. Tr. 1770:17-1771:2 (Gambrell).

640. Mr. Gambrell testified about the detailed work FIMO performed to track lease unit allocation, but he conceded that he did not have any knowledge as to whether MMS or anyone outside FIMO conducted the same sort of work. Tr. 1774:20-1775:1 (Gambrell). While testifying about the inadequacies of the MMS database that he claimed to have uncovered while at FIMO, Mr. Gambrell also stated that MMS made corrections to its

database when inadequacies were brought to its attention. Tr. 1775:25-1776:3 (Gambrell).

641. Mr. Gambrell testified that MMS historically did conduct some audits of royalty payments but, over time, their audits gave way to compliance reviews, although FIMO continues to conduct audits. Tr. 1780:9-20 (Gambrell). Mr. Gambrell did not, however, specify how much time elapsed between MMS conducting audits and FIMO performing the audit functions. Tr. 1780:9-20 (Gambrell).

642. Mr. Gambrell testified about a disagreement he had with MMS over its valuation method for natural gas. Tr. 1785:9-1786:22 (Gambrell). He claimed that the valuation he used was superior to the "bump method" used by Interior to audit natural gas revenues, Tr. 1785:9-1786:22 (Gambrell). Mr. Gambrell also testified that the valuation method he advocated took approximately 30 times longer to conduct – "20 hours" for the bump method versus "600 hours" for the method advocated by Mr. Gambrell – and he did not indicate whether his method was cost-prohibitive. Tr. 1786:15-19 (Gambrell). Further, Mr. Gambrell did not testify as to any specific instances in which the valuation method used by MMS resulted in an actual loss to an IIM account holder. Tr. 1785:9-1786:22 (Gambrell).

643. Mr. Gambrell testified that while he worked at FIMO, he "often" observed lease allocation problems that occurred after the money was deposited in bulk into the Treasury, but he did not specify how frequent "often" was. Tr. 1793:20-1794:4 (Gambrell).

644. When FIMO discovered those allocation problems, FIMO would notify the Office of Trust Funds Management (OTFM) that there was an incorrect distribution, and the

OTFM would then correct the posting in the IRMS database. Tr. 1794:12-18 (Gambrell). Mr. Gambrell did not know whether MMS followed the same procedure as the OTFM. Tr. 1794:21 (Gambrell).

645. Mr. Gambrell provided very generalized testimony about technical difficulties MMS had transitioning between and among various computer programs, yet he provided no specific testimony about whether such difficulties permanently affected data and if they did, to what extent. Tr. 1798:20-1800:18). Mr. Gambrell initially claimed that transition problems to new computer systems resulted in unreconciled accounts, but he later conceded, in response to a question from the Court, that he did not know whether any of the accounts to which he referred remained unreconciled. Tr. 1804:7-11 (Gambrelll).

### N. Administrative Fees Deducted From IIM Accounts

646. Plaintiffs have not established that administrative fees are deducted from funds once they are placed in IIM accounts or are assessed to pay for the accounting of IIM funds. Instead, the evidence demonstrates that, based upon statutory authority, Interior or tribes may in limited instances charge fees for specific land transactions. Thus, there are administrative fees charged on the sale of timber, at an amount up to 10 percent of the total timber sale. Tr. 1343:11-21 (Red Thunder). Those fees are charged for reforestation of the forest, or “reseeding.” Tr. 1344:9-11 (Red Thunder).

647. Administrative fees may also be charged for performing the administrative acts associated with the sale of land. Tr. 1702:18-1704:6 (McCarthy).

648. In the ART demonstration presented by Ms. Herman, the range distribution reconciliation example contained an administrative fee of $117.34, but this was charged to the party leasing the property, not to the IIM account holder. Tr. 610:16-611:15 (Herman).

649. Ms. Herman testified that in her extensive experience studying the transactional data from the Electronic Ledger Era, she did observe fees charged at times by Interior to permittees and lessees. Tr. 705:11-706:4 (Herman). She did not testify to observing any management fees charged to IIM account holders by Interior.

650. In recording a transaction within an HSA, Interior will identify the funds received by an individual, rather than listing a gross amount collected and deducting the amount of an administrative fee. Tr. 231:4-12 (Cason).

651. The topic of how to address administrative fees within the HSAs was not discussed within Interior and was not the subject of a decision by the Associate Deputy Secretary, James Cason. Tr. 233:1-14 (Cason).

### O. Youpee Escheated Interests

652. In 1983, the United States Congress passed the Indian Land Consolidation Act (ILCA) determining that those land interests which fell below a minimum threshold should not be inherited by individual Indians but instead escheated to the tribe to prevent excessive fragmentation of the land. This Act was ruled unconstitutional by the U.S. Supreme Court in Hodel v. Irving, 481 U.S. 704 (1987), and an amendment to the ILCA was subsequently rejected by the Supreme Court in Babbit v. Youpee, 519 U.S. 234 (1997). See AR-405 at 19-21 for a thorough summary of the history related to the issue of Youpee escheated interests.

653. As a result of the constitutional challenge to having individual land interests of two percent or less escheat to the tribes, BIA was instructed to place the affected money into a special account. Tr. 1335:21-1336:8 (Red Thunder).

654. Once the Supreme Court decision in Youpee was issued, BIA was instructed to transfer ownership of the land back to the proper heirs and to also get the money back to the proper landowners. Tr. 1336:9-16 (Red Thunder); AR-405 at 21.

655. Youpee escheated interests are very tiny interests, and it is very costly for Interior to reverse its actions and return those interests. However, Interior is acting on the matter. Tr. 237:5-12 (Cason).

656. Fractionation has significantly increased the number of Youpee escheated interests that Interior has to try to recapture and return. Tr. 237:13-238:8 (Cason).

657. Interior does not intend to account to beneficiaries for the escheated interest as part of the historical accounting because that would constitute an accounting for land, and the historical accounting addresses the accounting of funds. Tr. 239:20-25 (Cason).

658. Interior has not addressed whether or how it will account for any income that has derived from the lands that were covered by the escheated interest. This issue has not been discussed directly within Interior, and no decision has been made. Tr. 240:3-14 (Cason).

### P. Accounts And Transactions Outside The Temporal Scope Of The HSA Plan

659. The Department of the Interior interprets the 1994 Act as not requiring it to provide a historical accounting to beneficiaries for accounts that were closed prior to October 25, 1994. Tr. 90:3-91:1; Tr. 92:3-9 (Cason).

660. In recognition that the courts may disagree with Interior regarding what the 1994 Act requires, Interior has also examined the costs and benefits of performing a historical accounting for accounts that were closed prior to October 25, 1994. Tr. 83:17-84:10, Tr. 85:10-18; Tr. 90:17-91:24 (Cason). Interior concluded that it was less important to provide accountings for individuals over the entire course of the last 100 years than it was to provide accountings for individuals with whom it had a continuing trust relationship. Tr. 83:17-25 (Cason).

661. Transactions in an account that precede June 24, 1938, are outside the temporal scope of the 2007 Plan. 1957:24-1958:2 (Zippin).

662. Nevertheless, the DCV tests examine data extending far beyond the scope of the historical accounting project. The DCV analyses cover all data in the entire electronic time frame, beginning in 1985 through 2007, regardless of when any account closed, and FTI receives new data each month from OST. Tr. 459:6-10 (Herman).

## IV. Cost Of Performing The Historical Accounting

663. The accounting work set forth in the 2003 Plan is now estimated to cost approximately five times the original estimate and, if the amount of appropriations remains constant, would take decades to complete. AR-566 at 5.

664. A large part of the costs associated with the historical accounting is the time and effort it takes to locate the relevant documents. Tr. 248:17-249:1 (Cason).

### A. Cost Of Historical Accounting Work Completed So Far

665. Approximately $127 million has been spent so far on the historical accounting work Tr. 1133:6-9 (Haspel); AR-566 at 9.

666. Interior's four years of experience in performing the historical accounting work has demonstrated that the current cost to reconcile a single transaction averages between $3,000 and $3,500, depending on how many documents must be located to support a transaction. The major cost factors are searching for records, imaging and coding documents located, computer support, accounting services time, quality assurance review, and statistical analysis. AR-566 at 9.

667. All of the resources appropriated by Congress are being dedicated to the historical accounting work. As of the end of FY2006, OHTA had spent 99.5 percent of its total budget. AR-175 at 2. (OHTA has approximately 35 employees and manages about 400 contractors. Tr. 1936:4-7 (Zippin)).

668. The DCV analysis has taken several years of full time work. The computerized component of the data analysis has taken Ms. Herman's own staff of four to eight full-time employees several years, to study 113 million individual transactions. Tr. 502:6-503:9 (Herman).

669. In answering a question from the Court about the cost of reconciling a 58-cent transaction, Ms. Herman estimated that it required about ten hours of work just from her staff, or approximately $2,000 in billable time, for her firm to complete. Tr. 824:4-15 (Herman).

670. To detect and resolve one 20-cent posting error in the IRMS data involving the posting of a deposited IRS tax refund check to a beneficiary, the effort by FTI required far in excess of the actual 20-cent error to correct. Tr. 515:22-516:10 (Herman).

671. Regarding the time cost, document searches (for reconciliation or DCV work) can require a week to over a year to complete. Tr. 505:11-14 (Herman).

### B. Anticipated Cost Of Completing 2007 HSA Plan

672. Interior estimates that it will cost an additional $144 million to complete the historical accounting as presented in the 2007 Plan. AR-565 at 3; AR-566 at 9.

673. The total cost of the historical accounting from the implementation of the 2003 Plan is estimated to be $271 million. AR-565 at 3.

### C. Estimated Cost Of Performing The Accounting Demanded By Plaintiffs

674. The estimated cost associated with providing HSA packages for all IIM accounts that existed between 1909 and 2006 is between $2.921 and $3.410 billion. DX-098 at 9; Tr. 1124:20 - 1125:11 (Haspel). This estimate includes between $2.797 and $3.220 billion to perform the accounting for land-based accounts and between $124 and $190 million for judgment and per capita accounts. DX-098 at 9. This number does not include the cost of performing cadastral surveys, which, according to BLM, would add $1.1 billion to the cost. Tr. 1138:14-19 (Haspel). It does not include the cost of accounting for direct pay transactions, IIM funds managed by compacting or contracting tribes, or funds never collected. Tr. 1138:20 - 1139:8 (Haspel).

675. The most costly step associated with accounting for all IIM accounts for the period 1909 through 2006 is linking closing balances in predecessor accounts to successor accounts, a step estimated to cost between $1.365 and $1.817 billion. DX-098 at 9; see also Tr. 1120:18 - 1121:7 (Haspel) . Linking closing balances in predecessor accounts to successor accounts is not an element of the 2007 Plan. Tr. 1121:9-11 (Haspel). However, if the accounting demanded by Plaintiffs were required, this step would be necessary in order to determine who should receive a statement for closed accounts and

to determine whether amounts transferred from a closed account moved properly into successor accounts. Tr. 1121:12-23 (Haspel).

676. Along with linking closing balances in predecessor accounts to successor accounts, two additional steps would drive the cost of providing HSAs for all IIM accounts that existed between 1909 to 2006. Interior estimates that imaging and coding all boxes of ledgers, probates, and financial documentation for such an accounting would cost approximately $766 million, and that digitizing transactions not included in sampling would cost $637 million. DX-098 at 9; see also DX-098 at 2; Tr. 1119:16-1120:16 (Haspel).

677. Interior determined that imaging and coding all of the documents was no more expensive than searching only for those documents known to be needed for the historical accounting, and that it would be more beneficial because it would both enable electronic searching and make available documents that may be needed later. Tr. 1139:23-1140:11 (Haspel).

678. If the historical accounting period is limited to the years 1938 to 2006, the estimated cost associated with providing HSAs for all IIM accounts that existed during that period is between $2.304 and $2.586 billion. DX-099-COR; Tr. 1125:12-16 (Haspel).

679. In 2005, Interior estimated that the cost of complying with the structural injunction imposed by the district court would have been between $9 and $19 billion. DX-100; Tr. 1125:19-1126:14 (Haspel). These costs would be higher today. Tr. 1126:12-14 (Haspel).

680. Mr. Pallais admitted on cross-examination that he did not consider cost when he opined that a certain type of auditing engagement should be performed instead of Interior's 2007 Plan. Tr. 1875:7-9 (Pallais)

### D. Congressional Appropriations For HSA Work

681. Funding is a limitation upon how much Interior can accomplish and how rapidly it can perform the historical accounting work. Tr. 73:16-22 (Cason).

682. For three years, Interior asked Congress for well over $100 million annually to perform the historical accounting work, but Congress "basically sent the message back in their appropriations decisions that they were not willing to spend that much money on the historical accounting process." Tr. 73:23-74:10 (Cason); DX-102.

683. As a result of this funding history, Interior requested only $54 million to perform the historical accounting in FY2007. Mr. Cason explained that, when Interior requests $100 million for a specific task and receives only $50 million, Interior loses the ability to request the remaining $50 million be used somewhere else specifically within Interior's budget. Interior cannot then ask that the funds be applied to another program and those funds become available for Congressional appropriators to use on an area important to them. Therefore, after three years, when it became clear that Congress was unwilling to appropriate $100 million a year for historical accounting work, Interior requested a level of funding that Congress seemed willing to provide. Tr. 74:11-22, 75:15-76:16 (Cason).

684. The appropriations process is a two-year process. Therefore, when the current administration took office, the FY2001 budget had already been set by the previous administration and Interior was required to shift funds from other programs to establish the Office of Historical Trust Accounting. Tr. 78:12-24; Tr. 79:3-19 (Cason).

685. In 2003, Congress appropriated $15.896 million for the work of the Office of Historical Trust Accounting. DX-102.

686. In 2004, Congress appropriated $44.446 million for the work of the Office of Historical Trust Accounting. DX-102.

687. In 2005, Congress appropriated $57.194 million for the work of the Office of Historical Trust Accounting. DX-102.

688. In 2006, Congress appropriated $56.353 million for the work of the Office of Historical Trust Accounting. DX-102.

689. The estimated appropriation for 2007 is $56,384,000. DX-102.

690. From 2004 through 2006, the President's budget request was substantially higher than the amount appropriated by Congress. DX-102.

691. At this time, Interior does not have a FY2008 budget in place and is working on the FY2009 budget. Tr. 78:25-79:2 (Cason).

**V. Throughput**

692. Throughout the history of the IIM trust, the Government mostly kept "throughput" data on the individual level, rather than on the aggregate level. Although there is "some annual receipt and disbursement data for the entire [IIM] fund, . . . that's . . . more the exception than the rule." Tr. 1161:15-17 (Angel). The "Total IIM" shown on Dr. Angel's summary document (DX-094) reflects, when available, "year-end account balances," but not receipts and disbursements for 1909-1985. Tr.1171:16-18 (Angel).

693. There is evidence that the United States did not track annual Indian receipts and disbursements on a consistent basis until 1997, Tr. 1166:17-1167:12 (Angel) (discussing DX-259), and did not track annual IIM receipts and disbursements until 1998. Tr. 1168:10-17 (Angel) (discussing DX-260). See also Tr. 1175:2-12 (Angel). Until 1998,

therefore, throughput data regarding IIM accounts mostly is limited to year-end trust balances. Tr. 1169:17-24 (Angel) (discussing DX-94); Tr. 1171:16-19 (Angel).

694. Beginning in 1997, however, the United States published its "first effort to produce an annual statement of both receipts and disbursements" across the Government. Tr.1167:2-4 (Angel) (discussing DX-259). Along with receipts and disbursements, this report also showed year-end fund balances. Tr.1167:11-12 (Angel). Though the 1997 report did not distinguish between IIM and tribal funds, beginning in 1998, subsequent consolidated financial statements of the United States Government have differentiated between these two types of Indian funds. Tr.1168:10-17 (Angel) (discussing DX-260); DX-260-DX-268). These reports have continued to the present. Tr.1167:24-1168:1 (Angel).

695. These reports demonstrate the following IIM receipts, disbursements, and year-end balances:

| **Year** | **Receipts** | **Disbursements** | **Beginning-Year** | **Year-End** | **DX** |
|---|---|---|---|---|---|
| 1997[5] | $1.2 billion | $1 billion | $2.7 billion | $2.9 billion | 259 |
| 1998 | $313.6 million | $354.1 million | $519.7 million | $479.2 million | 260 |
| 1999 | $306.7 million | $336.6 million | $479.2 million | $449.3 million | 261 |
| 2000 | $245.2 million | $294.6 million | $449.3 million | $399.9 million | 262 |
| 2001 | $225.9 million | $221.7 million | $399.9 million | $404.1 million | 263 |
| 2002 | $191.3 million | $184.1 million | $404.1 million | $411.3 million | 264 |
| 2003 | $194.2 million | $192.5 million | $411.3 million | $413 million | 265 |
| 2004 | $204.6 million | $221 million | $413.1 million | $396.7 million | 266 |
| 2005 | $301.6 million | $278.4 million | $396.7 million | $419.9 million | 267 |

[5] As stated above, the Government did not separate IIM from tribal numbers until 1998.

| | | | | | |
|---|---|---|---|---|---|
| 2006 | $372.9 million | $374.5 million | $419.9 million | $418.3 million | 268 |

### A. Total Amount Of Money Collected By The Government On Behalf Of IIM Beneficiaries

696. Before Interior converted to its current lockbox system for collecting and depositing revenue related to Indian land, Tr. 853:20-854:16 (Winter), the proximity of a Federal Reserve Bank dictated whether receipts were deposited by BIA's agency or area/region office staff. Tr. 306:23-307:23 (Ramirez). If the agency deposited the money, the specific deposits would be shown on a schedule of collections (DX-222). Tr. 307:5-9 (Ramirez). If the area office made the deposit, then in addition to a schedule of collections from each agency, the area staff would prepare a summary document that showed the total deposit from each agency and the total deposited on that date by the area (DX-223). Tr. 307:10-23 (Ramirez). Each agency would receive a copy of the summary document. Tr. 307:24-308:10 (Ramirez). In addition, when the area office made the deposit, each agency would likely receive a copy of the "deposit ticket" or "certificate of deposit" for the bank deposit (DX-208), which would have been attached to the summary document. Tr. 308:11-309:21 (Ramirez).

697. In its July 2, 2002 report to Congress, Interior set out an estimate of the "cumulative throughput on all current and former IIM accounts of approximately $13 billion," from 1909 through 2001. Based on research provided by Morgan, Angel & Associates, Interior reported that the first Trust Fund balance was $6.5 million at June 30, 1909. Interior also estimated that, during the period 1877 through 1971, receipts into the Trust Fund were roughly $3 billion. Interior further indicated that total receipts received from

1972 through 2001 was approximately $10 billion. AR-561 at 64; see AR-430 (NORC 2002 report addressing the $13 billion estimate and noting that "the approximation [is] only a rough one").

698. The estimate of $13 billion in receipts, based on historical documents, has been recognized by Interior to be an interim figure until Interior actually completes the historical accounting. Tr. 258:1-6 (Cason); see AR-430 (NORC 2002 report indicating that "a definitive answer . . . will have to wait for the complete set of accounts to be built").

699. The estimate of $13 billion in receipts does not include funds from direct pay relationships. Tr. 124:15-25 (Cason).

700. Michelle Herman has assisted Interior, from time to time, with the efforts to estimate the total dollars of actual throughput (dollars deposited as IIM funds and distributed over time to account holders). The first time Ms. Herman worked on such estimates was in 1998. She did not participate in the $13 billion throughput estimate that Interior submitted to Congress in 2002. Ms. Herman has, however, assisted in an effort to review and refine the $13 billion estimate. Tr. 648:18-650:1 (Herman).

701. As part of the refinement effort, FTI aggregated the results of the revenue analyses from other firms, performed a revenue analysis for the 1986 through 2005 period, and subdivided the receipt of funds into broad categories. Tr. 649:1-7 (Herman). FTI's work drew on work done by FTI and by OHTA's historians and statisticians. See Tr. 651:10-20 (Herman).

702. FTI also divided the throughput estimate into discreet revenue types and used information acquired through the DCV testing to remove instances where the same dollars were included more than once. Tr. 650:2-6 (Herman).

703. FTI segregated the credits into the system into several categories: Interest, Osage Quarterly Annuity, Tribal IIM, Judgment and Per Capita, and Other Receipts. Tr. 650:7-11 (Herman).

704. This throughput analysis is represented graphically by a color-coded chart that is part of the Administrative Record. AR-171-COLOR; Tr. 650:23-651:6 (Herman). The color codes used on the chart indicate the sources for the revenue estimates reflected on the chart. AR-171-COLOR at 2.

705. The first column indicates the fiscal year, running from 1909 through 2005. The periods 1909-33 and 1933-71 result from revenue estimates made by NORC. Tr. 657:4-15 (Herman).

706. The other columns have letter headings, from Column A through Column K. AR-171-COLOR. Column A represents the balance of all IIM funds at the beginning of the year. Column B lists the interest revenue for the year. Column C indicates an annual amount of funds attributed to the Osage quarterly annuity. Column D reflects funds received in connection with per capita and judgment payments. Tr. 651:21-652:6 (Herman). Column E reflects tribal IIM revenue. Column F indicates other receipts. Tr. 651:7-9 (Herman).

707. "Other receipts," reported in Column F, is the gross difference between the beginning balance in Column A and the amounts reported in Columns B, C, D and E, for each year. Tr. 654:5-19 (Herman). Ms. Herman testified that because estimates of per capita and

judgment revenues for 1985 and earlier years are not presently available, Column D is blank for those periods, meaning that "Other Receipts" for those years includes such revenues. Tr. 654:13-22 (Herman).

708. The Osage quarterly annuity figures are based on available listings from 1909 through 2005. Tr. 657:25-658:2 (Herman). The annuity reflects a fixed dollar amount of oil and gas revenues, based on a share owned by an individual tribe member, and some of those payments flowed through the IIM trust system. They reflect revenues from mineral rights owned by the Osage Tribe and not income from allotted lands. Tr. 658:3-659:21 (Herman). Some of the oil and gas revenues in the tribal trust is disbursed into particular individual IIM accounts, typically into accounts for minors and adults deemed legally incompetent. Tr. 654:23-655:5 (Herman).

709. Tribal trust money has been deposited into the IIM system over the years. This money is not income relating to allotted lands. It is tribal money. Tr. 659:22-660:10 (Herman).

710. Tribes would often put their money into an IIM account for various reasons such as the relative administrative ease of cutting checks from the IIM system compared with tribal systems. Tr. 342:14-343:18 (Ramirez). These accounts are referred to as "Tribal IIM" accounts and the funds in these accounts are "Tribal IIM" money. Tr. 343:16-18 (Ramirez). These accounts were also called "T accounts" because the letter T would appear as the fourth character in the 10 character account numbers in the IRMS system. Tr. 344:9-23 (Ramirez).

711. FTI, using information from Interior's historians as well as NORC, IRMS and TFAS, see Tr. 660:11-662:10 (Herman), estimates that between 1934 and 2005, approximately

$1.513 billion in tribal money flowed into the IIM system. AR-171-COLOR (Column E).

712. The total amount of money collected by the Government, excluding tribal IIM money, during the period covered by the 2007 Plan, 1938 through 2000, is estimated at $10.696 billion. DX-365 at 4-6. If the coverage period is extended to include the years 2001 through 2006, the total amount collected is estimated at $12.186 billion. DX-365 at 7-9. If the coverage period is further extended to include the years 1909 through 1938, the total amount collected is estimated at $13.186 billion. DX-365 at 1-3.

713. Depending on the time period covered and on assumptions made regarding the average life-span for IIM accounts, Interior estimates that the 2007 Plan will prove – that is, provide accuracy testing or completeness testing for, Tr. 1114:25-1115:2 (Haspel) – between 52 percent and 68 percent of these amounts. DX-365. Between 31 percent and 52 percent will be proven by transaction reconciliation testing and interest recalculation; the remainder will be proven by the DCV process. DX-365; see Tr. 258:10-20 (Cason) (Mr. Cason was informed that the 2007 Plan will account for approximately 50 to 55 percent of the money received into IIM accounts).

714. The amount of money credited to IIM accounts is currently estimated at 77 percent of total collections, but this number is an estimate subject to change upon further analysis. DX-365. Using this estimate, for the period 1938 through 2000, the amount credited to IIM accounts would be approximately $8.193 billion, DX-365 at 4-6; for the period 1938 through 2006, the amount would be approximately $9.335 billion, DX-365 at 7-9; and for the period 1909 through 2006, the amount would be approximately $10.101 billion, DX-365 at 1-3. Depending on the time period covered and on assumptions made regarding

the average life-span for IIM accounts, Interior estimates that the 2007 Plan will prove between 56 percent and 74 percent of these amounts. DX-365. Between 40 percent and 68 percent will be proven by transaction reconciliation testing and interest recalculation; the remainder will be proven by the DCV process. DX-365.

715. The daily movement of IIM Trust funds in and out of the Treasury "overnighter" investment or other investments -- which in 2007 would total approximately $17 billion in both disbursements (investments) and receipts (redemptions) -- should not be counted in determining throughput for IIM accounts. Tr. 881:21-883:25 (Winter); DX-240 at 1 and DX-277 at 1, 3 (showing over $1.4 billion in July 2007 investments and redemptions into overnighter for IIM trust account number 14X6039); see also AR-120 (Bert Edwards, OHTA Executive Director e-mail to Roger LaRouche, OIG (Aug. 22, 2001) ("revenue and expenditure data in [KPMG] audits is a far better picture of 'throughput' in the IIM Trust Fund than Forms 224" because if "overnighter investments of the Fund are treated as receipts and disbursements, [then it] gross[es] up the data by about $15 billion").

716. Plaintiffs' contention that "overnighter" transactions should be added to throughput is without support. See Tr. 883:2-25 (Winter), Tr. 45:108-46:14 (Plaintiffs' opening statement, 10/10/07 AM) (referencing AR-120).

717. Plaintiffs' financial modeling expert, Richard Fasold, testified that he was engaged by Plaintiffs in Spring 2000 to calculate IIM trust revenues generated since 1887 using documents not generated by Interior, to the extent possible. Tr. 1606:5-13 (Fasold).

718. Mr. Fasold testified that his report encompassed data from 1887 to 2002, and that it was not updated. Tr. 1606:14-22 (Fasold).

719. Mr. Fasold's model was designed to generate an estimate of revenues using, in some cases, estimates of production. Tr. 1669:6-21 (Fasold).

720. Mr. Fasold did not have values for production associated with an individual allottee's interest. Tr. 1669:22-24 (Fasold).

721. Mr. Fasold's model was designed to generate an estimate of revenues using estimates of prices paid for the estimated production. Tr. 1669:25-1670:4 (Fasold).

722. Mr. Fasold's model was designed to generate an estimate of revenues using estimates of royalty rates for the estimated production. Tr. 1670:5-6 (Fasold).

723. Mr. Fasold's model estimated revenues for total reservation lands and allocated a portion of the revenues to individual allottees. Tr. 1634:14-23 (Fasold); Tr. 1670:7-11 (Fasold).

724. Mr. Fasold's model used historical data in some cases (land leases and land sales). Tr. 1612-14 (Fasold).

725. Mr. Fasold's model included an estimate for subsurface rights of Osage. Tr. 1670:15-17 (Fasold).

726. Mr. Fasold testified that, after compiling his estimates of receipts from various natural resources, he estimated "Other" receipts as being the difference between the total receipts reported by Interior to Congress in July 2002 – $13 billion – and the total of his natural resource receipts estimates. Tr. 1653:21-1654:13 (Fasold) ("So I trued up my number to $13 billion as of that date."); Tr. 1674:8-1675:3 (Fasold).

727. Mr. Fasold confirmed that "there is no detail supporting" his model's "Other" estimate of $2.6 billion. Tr. 1673:18-1674:1 (Fasold).

728. Mr. Fasold confirmed that his model's "Other" estimate of $2.6 billion was comparable to the "Other" estimate of $3.8 billion in his 2003 analysis. Tr. 1674:2-7 (Fasold).

729. Mr. Fasold confirmed that Defendants were never provided access to the spreadsheet data supporting his estimates. Tr. 1659:10-1660:14 (Fasold).

730. Mr. Fasold confirmed that Defendants were never provided access to any of the data for his 2003 calculation of $9.6 billion for receipts from oil and gas, minerals, land sales, and land leases. Tr. 1675:7-10 (Fasold).

731. Mr. Fasold conceded that if his model had estimated natural resource revenues as $8 billion rather than $9.6 billion, then his "Other" revenue estimate would have increased to $5 billion. Tr. 1675:11-23 (Fasold).

732. Mr. Fasold agreed that "direct pay" receipts never entered the IIM trust, but he acknowledged that his model included estimated direct pay receipts in his estimate of IIM trust receipts. Tr. 1671:5-9 (Fasold).

733. Mr. Fasold confirmed that the word "throughput" does not appear in his expert report. Tr. 1676:2-4 (Fasold).

**B. Total Amount Of Money Distributed To IIM Beneficiaries**

734. Plaintiffs failed to present evidence that Trust funds have not been disbursed to beneficiaries. Instead, evidence demonstrates that IIM beneficiaries did routinely receive and cash their IIM checks, and there is no support their contention that those checks were for the incorrect amount. Tr. 296:4-297:25 (Ramirez).

735. In its July 2, 2002 report to Congress, Interior set out an estimate of the disbursements made from 1972 through 2001. The estimate was approximately $10.02 billion. AR-561 at 64.

736. The recent throughput estimate prepared by FTI for Interior indicates that total disbursements from 1972 through 2005 were approximately $10.682 billion. AR-171-COLOR at 1 (Column G).

737. OST disburses funds to IIM beneficiaries in three basic ways: by check, ACH ("Automated Clearinghouse"), or direct deposit (by EFT/electronic funds transfer). Tr. 872:20-873:7 (Winter); see DX-239.

738. During the late 1980s, when BIA was using both automated and manual check processing, IIM check information was fed into an ISSDA check reporting system. Tr. 278:15-24, 284:18-285:11 (Ramirez); see Tr. 279:7-280:2 (Ramirez) (defining "ISSDA" as Indian Service Special Disbursing Agent). The data were transmitted weekly to Treasury by magnetic tape, which allowed Treasury to determine whether IIM checks had been cashed. Tr. 279:5-280:16, 283:3-284:7, 285:12-286:18 (Ramirez), DX-218.

739. Another means of tracking whether IIM checks were cashed was the use of a form SF1098, see, e.g., DX-219, by which Treasury reported to BIA that it had cancelled a check that had been returned as undeliverable. Tr. 290:14-291:2 (Ramirez). This process was used for IIM checks issued by Treasury's Regional Disbursing Office in San Francisco, rather than by BIA directly. Tr. 290:14-24 (Ramirez). Treasury provided BIA with enough information so that BIA could re-credit the appropriate IIM account as well as the "general ledger" for IIM monies. Tr. 292:4-296:3 (Ramirez).

740. As a result of the Mass Cancellation project, it is possible to determine the total number of checks issued at points in time prior to November 1986, the start date for the CP&R system, and the total dollar value of those checks. A calculation of check cancellations

was performed with the old Check Payment and Reconciliation System and processed on the Treasury records. Tr. 1309:1-14 (Cymbor).

741. As discussed above, of the 38,500 non-voided, mass-canceled IIM checks issued in the 35-year period from 1954 through 1989, the amount of uncashed checks totaled no more than $1,576,528.45 ($1,914,528.45 - $338,000). Tr. 357:10-12 (Ramirez).

742. Subsequently, from January 1991 through December 2005, the Bureau of Indian Affairs issued 6,574,534 checks to payees under its Agency Location Code (ALC) 4844. DX-275; Tr. 1301-03 (Cymbor). This information is contained within the Check Payment Reconciliation System (CP&R) system. Tr. 1308 (Cymbor).

743. The total dollar value of the 6,574,534 checks was approximately $2.8 billion. DX-275; Tr. 1301-02 (Cymbor).

744. Checks that are not cashed by a payee within one year are now cancelled by the Department of the Treasury. Treasury refers to these cancellations as “limited payability cancellations.” Tr. 1294:16-1295:18 (Cymbor).

745. Treasury’s Financial Management Service, Check Resolution Division, ensures that funds from limited payability cancellations are transferred back to the disbursing agencies that initially issued the check. Tr. 1294:16-1295:18, Tr. 1300:15-24 (Cymbor).

746. The Check Resolution Division employs the IPAC System to transfer the funds back to the disbursing agencies, including the Bureau of Indian Affairs. Tr. 1295:4-18; Tr. 1300:15-24 (Cymbor).

747. The record generated by the IPAC System reflects the credit back to the Bureau of Indian Affairs both by individual check and through a summary total. Tr. 1310:5-9 (Cymbor).

748. From January 1992 through December 2006, the Department of the Treasury transferred back to the Bureau of Indian Affairs approximately $5.2 million from limited payability cancellations. DX-273; Tr. 1297:8-1300:24 (Cymbor).

749. The approximately $5.2 million that was transferred back to the Bureau of Indian Affairs from January 1992 through December 2006 constitutes the total value of 46,197 checks issued under BIA's ALC 4844 that were not cashed within one year of issuance. DX-273; Tr. 1301-03 (Cymbor).

750. Of the approximately 6.5 million checks issued by the BIA between January 1991 and December 2005, only approximately 46,000 checks were not cashed. DX-273; DX-275; Tr. 1300:15-1302:19 (Cymbor). These checks that were not cashed represent approximately 0.7 percent of the approximately 6.5 million checks that were issued by the BIA. DX-275.

751. Of the 46,197 checks that were not cashed within one year and transferred back to the BIA (ALC 4844) between January 1992 and December 2006, over 61 percent was for a dollar amount under $25.00. DX-275.

752. Of the approximately $2.8 billion worth of checks issued by BIA between January 1991 and December 2005, only checks totaling approximately $5.2 million were not cashed. DX-273; DX-275; Tr. 1300:15-1302:23. The $5.2 million represents approximately .2 percent of the $2.8 billion total dollar value of checks issued by the BIA.

753. To account for the limited payability cancellation process that transfers funds back to the BIA, Treasury's Financial Management Service, Check Resolution Division, uses an accounting system called the Treasury Receivable Accounting and Collection System (TRACS). Tr. 1294:23-1296:6 (Cymbor).

754. TRACS was implemented in August 1991. Tr. 1296:8; Tr. 1307:2-6 (Cymbor). It keeps track of individual checks and provides information about each check such as the ALC, the check serial number, the issue amount, the date of issue, and -- if provided by the agency -- the payee ID. Tr. 1296:23-1297:5; Tr. 1309:17-22 (Cymbor).

755. TRACS is used not only for checks issued by the Department of the Interior. It contains information from any agency that requests that the Financial Management Service issue Treasury checks or from any non-Treasury disbursing officers who have the authority to issue Treasury checks. Tr. 1296:9-22 (Cymbor).

756. The CP&R system was operational in the Department of the Treasury's Hyattsville data center. Tr. 1310:14-19 (Cymbor).

757. The CP&R system contains information regarding checks that were issued as far back as November 1986. Tr. 1308:11-22 (Cymbor).

758. The banking institution that cashes a check issued by the Bureau of Indian Affairs is responsible for confirming that the payee on the check is in fact the person who cashes the check. Tr. 1306 (Cymbor).

759. According to Katherine Ramirez, beneficiaries were quick to raise possible issues with Interior regarding the receipt of their checks:

> [S]ometimes an account holder themselves would call Albuquerque and speak to us and say that "Christmas is coming, the checks haven't been issued from blank-blank agency, what's the holdup? What's the problem?" So we would turn around and call the agency back to see what the problem was. It could have been any number of problems. So they were aware that they should be getting a check, and then they were aware that it was taking a long time for the checks to actually be issued. Sometimes once the checks were issued, every so often we would get a call from an account holder who would say that they got their check but it was different than so-and-so. And they were pretty sure they had the same ownership, so: Why is his check 50 cents higher than mine? So they were also aware that they should be getting a certain dollar amount, as well. I heard a lot of

Tr. 297:5-297:25 (Ramirez).

760. Even Plaintiffs' witness Ms. Red Thunder, who worked in the Bureau of Indian Affairs for approximately 37 years, identified only two instances where she was concerned about the possibility that disbursements were not going directly to a beneficiary and, in each case, the matter was either being resolved or found not to be an issue. Tr. 1313:2-1314:15; Tr. 1324:17-1326:17 (Red Thunder).

761. In the first instance that concerned Sharon Red Thunder, a staff member in the Colville Agency had misinterpreted a probate decision approving a will, and a payment went to the wrong person. However, Ms. Red Thunder's staff was aware of that single error and was attempting to correct it by getting the money back from the recipient so that it could be paid to the proper heirs. Tr. 1324:17-1325:3 (Red Thunder).

762. The second instance that concerned Sharon Red Thunder occurred while she was serving as a realty officer in Sacramento. She reported what she thought was an improper action by a BIA social worker exercising a power of attorney for individuals with alcohol problems or who were non compos mentis. Although she stated that she "blew the whistle" regarding this matter, she was later informed that, in fact, no wrongdoing had been uncovered. Tr. 1325:4-1326:17 (Red Thunder).

763. Plaintiffs' witness Mona Infield testified that, based on her observation as part of the Interior's "Tiger Team," one of the problems with MMS is that BIA was never sure that MMS sent BIA all the money it received for distribution; however, Ms. Infield did not

identify any instances in which MMS actually failed to distribute money that should have been paid to IIM account holders. Tr. 1755:1-20 (Infield).

764. On May 31, 2000, Treasury issued a Study of Check Negotiation Practices for Office of Trust Funds Management-Issued Checks, DX-242 ("Check Study"). The Check Study established that for a twelve-month period from September 1998 through August 1999, OTFM issued $177 million in IIM checks. Of those IIM checks, less than one percent, with a value of approximately 0.2 percent of the total dollar value, were not cashed. DX-242 at 13, 16-17 (based on sample of 2,700 checks with value of approximately $1.23 million); Tr. 884:25-885:13 (Winter). Of the 27 uncashed checks, Treasury canceled 15 due to limited payability, meaning they had not been presented for payment for at least 12 months after the date of issuance. DX-242 at 13 & n.13.

765. In August 2004, OST performed a reconciliation to address possible inconsistencies between the $177 million in check disbursements noted in the Check Study and the approximately $336 million in IIM disbursements reported in OST's Fiscal Year ("FY") 1999 financial statements. Tr. 884:5-2, 885:14-24 (Winter); see DX-238 at 1 ("Disbursement Activity" table referencing $336,637,000 "FIN STMT" total). A Disbursement Activity table, DX-238, showed that for FY1999 (October 1998 through September 1999), a period one-month different from that used for the Check Study, OST issued $175 million in physical checks. Tr. 886:15-22 (Winter); DX-238 at 1 ("4844 CHECKS" shown in first column of table, referencing IIM disbursing symbol). The rest of the difference between the two amounts were accounted for by either electronic payments or transfers. Tr. 886:22-23 (Winter). OST reconciled each of the categories of disbursements, including ACH/EFT (Automated Clearinghouse, Electronic Funds

Transfer) of $26 million and BB transfers from IIM to tribal trust accounts of $73 million. Tr. 887:7-889:3 (Winter); DX-238 at 1.

766. After subtracting all of the above-referenced disbursement categories, OST determined that "Intrafund Transfers" totaling $54 million were made between IIM accounts in FY1999. Tr. 889:4-19 (Winter); DX-238 (bottom-left entry on table). Intrafund transfers include funds disbursed from an SDA to an individual's account and transfers from an estate account of a deceased account holder to an heirs' accounts. Tr. 889:13-17 (Winter).

767. Further confirming the amount of intrafund transfers, a counterpart "Receipt Activity" table for FY1999, DX-238 at 2, "matches up very closely to the disbursement intrafund transfer" amount. Tr. 889:20-890:7 (Winter); DX-238 at 1, 2 (difference between intrafund transfers on two tables is $42,567.36 or less than 0.1 percent). After correcting for inter- and intra-fund transfers, FY1999 disbursements to IIM beneficiaries actually totaled $202 million with $175 million paid by check and $26 million by EFT. These amounts were similar to FY2003 when OST disbursed $192 million, with $129 million by check and $63 million by EFT. DX-236 at 1-2 (Composition of Disbursements tables for FY1999 and FY2003); Tr. 893:13-894:7 (Winter).

768. In sum, the Check Study and OST's reconciliation study in 2004 demonstrated consistent disbursements.

769. Plaintiffs provided no competing or contrary evidence on disbursements. Mr. Fasold testified that his model calculated interest payable on IIM receipts based on an assumption of "zero disbursements" since 1887. Tr. 1660:16-25 (Fasold).

770. Mr. Fasold explained that Plaintiffs' counsel had directed him to assume zero disbursements and that he "[didn't] know the valid disbursements numbers." Tr. 1661:1-12 (Fasold). Mr. Fasold confirmed that he was not "charged with quantifying disbursements" and that "the only way [his model] addressed disbursements is as a percentage of receipts." Tr. 1676:10-24 (Fasold).

### VI. Certification Of The Administrative Record

771. On September 19, 2007, Mr. Jeff Zippin, Deputy Director of OHTA, filed a certification that the Administrative Record, including a supplement, filed with the Court, was the complete Administrative Record for the January 6, 2003 and May 31, 2007 Plans. Tr. 1942:16-1943:11 (Zippin); Interior Defendants' Notice of Filing Certification of the Administrative Record (Sept. 19, 2007) (Dkt. No. 3400). All of the documents that were considered by Interior in formulating the Plans were included in the AR. Tr. 1946:10-13 (Zippin).

# CONCLUSIONS OF LAW

### I. Law of the Case Circumscribes The Court's Review of Interior's Plan and Available Remedies

1. The Court's jurisdiction in this case rests solely upon the Administrative Procedure Act ("APA"), which in turn guides the Court's review and limits the remedies available, all of which this Court and the Court of Appeals have fully addressed in several prior decisions in this case. See Cobell v. Kempthorne, 455 F.3d 317, 304 (D.C. Cir. 2006) ("Cobell XVIII"); Cobell v. Babbitt, 30 F. Supp. 2d 24, 31-33 (D.D.C. 1998) ("Cobell I").

2. The only enforceable duty is the rendering of an accounting and not a duty "to take the discrete individual steps that would facilitate an accounting." Cobell v. Norton, 240 F.3d 1081, 1106 (D.C. Cir. 2001) ("Cobell VI"). Failure to take numerous subsidiary steps together might be evidence of a breach of the overall accounting duty, but the steps themselves are not enforceable obligations. Id. at 1105-06 (stating that "defendants should be afforded sufficient discretion in determining the precise route they take").

3. The Court of Appeals has clearly delimited the boundaries of this Court's review of the agency action at issue. Cobell VI at 1110.

> It remains to be seen whether in preparing to do an accounting the Department takes steps so defective that they would necessarily delay rather than accelerate the ultimate provision of an adequate accounting, and the detection of such steps would fit within the court's jurisdiction to monitor the Department's remedying of the delay; beyond that, supervision of the Department's conduct in preparing an accounting may well be beyond the district court's jurisdiction.

Id. "[U]nder the APA, courts may only review specific agency action or unreasonable delay by an agency . . . ," Cobell XVIII, 455 F.3d at 305, and "jurisdiction is limited to addressing specific agency action or inaction." Id. at 307.

4. This Court's role is bounded on one end by the "inability to order broad, programmatic reforms" and "in the opposite direction by an inability to require the agency to follow a detailed plan of action." Id.

5. Plaintiffs are not pursuing common law claims but, instead, only the enforcement of the government's duty under the 1994 Act to provide an accounting. Cobell v. Babbitt, 91 F.Supp.2d 1, 31 (D.D.C. 1999) ("Cobell V"); Cobell I, 30 F. Supp. 2d at 31-33 (dismissing common law claims).

6. Plaintiffs' claim is "that all of the money that should be held collectively in their IIM accounts is already there; the plaintiffs simply contend the individual account balances are misstated," and ask for an accounting of "money already existing in the [IIM] account[s]." Cobell I, 30 F. Supp. 2d at 39, 40.

7. Plaintiffs "seek to enforce their statutory right to an accounting as that phrase is meant under the provisions of 25 U.S.C. § 162a(d)(1)-(7) and 25 U.S.C.A. § 4011." Cobell V, 91 F. Supp. 2d at 27.

8. "The plaintiffs' single 'live' cause of action seeks a remedy for this legal breach [failure to provide an accounting], and the remedy that this Court has fashioned is limited to ensuring that the defendants produce the requisite accounting of the Indian trust." Cobell v. Norton, 226 F.R.D. 67, 77 (D.D.C 2005).

9. Accordingly, issues related to asset management or the restoration of trust funds have been specifically removed from the case and are not relevant. Cobell I, 30 F. Supp. 2d at 40 n.18. This Court has consistently held that "'asset management is not part of this lawsuit.'" Cobell, 226 F.R.D. at 82 (quoting Cobell V, 91 F. Supp. 2d at 18). Matters such as cadastral surveys, mineral review management, the assessment of administrative fees, asset monitoring systems, and the restoration of Youpee escheated land interests are not germane to this Court's review of Interior's 2007 Plan.

10. "[P]laintiffs' substantive rights are created by – and therefore governed by – statute. To the extent plaintiffs seek relief beyond that provided by statute, their claims must be denied." Id. at 75 (quoting Cobell V, 91 F. Supp. 2d at 29). "[I]t is the statutes and regulations that create and define the enforceable trust relationship. . . . Whatever the

scope of the government's legal duties under the IIM trust, the source is statutory law." Cobell V, 91 F. Supp. 2d at 30.

11. Relevant statutes work like the terms of the trust instrument in the law of private trusts. Trial 1.5 Tr. 59: 8-12 (Langbein 6/2/03 PM).[6] The Uniform Trust Code provides that "[t]he terms of a trust prevail over any provision of the common law codified therein, subject to enumerated exceptions not relevant here." Unif. Trust Code § 105(b) (2000); see also Unif. Prudent Investor Act of 1994 § 1(b) ("The prudent investor rule, a default rule, may be expanded, restricted, eliminated, or otherwise altered by the provisions of a trust"). The Court must look to the statute or regulation establishing the trust relationship to determine the nature of the specific obligations owed, rather than simply applying all of the common-law trust duties. See, e.g., White Mountain Apache Tribe v. United States, 537 U.S. 465, 474 (2003) (citing United States v. Mitchell, 463 U.S. 206, 224-26

[6] Defendants' expert, John H. Langbein, is the Sterling Professor of Law and Legal History at Yale University. Trial 1.5 Tr. 24:12-20 (Langbein, 6/2/03 AM). He has specialized in the related fields of trust, fiduciary administration, probate administration, and pension and employee benefits for more than three decades. Trial 1.5 Tr. 41:20-42:10 (Langbein 6/2/03 AM); see also id. at 39:24-40:1. In addition to his faculty position at Yale, he has held academic appointments at the University of Chicago, Stanford University, the University of Michigan, and educational institutions in Europe. Id. at 40:2-41:4. Since 1984, Professor Langbein has continuously served as a Uniform Law Commissioner, as a gubernatorial appointee. From 1991 to 1997, he chaired the Commission's probate and trust division. Id. at 44:24-45:16. He was a reporter and principal drafter of the Uniform Prudent Investor Act (1994), which governs fiduciary investing in "virtually every American jurisdiction." Id. He has been a member of the drafting committee for the Uniform Trust Code of 2000 and the Uniform Probate Code; he also participated in work on the Uniform Principal and Income Act, the Uniform Custodial Trust Act, and the Uniform Testamentary Additions to Trust Act. Id. at 56:21-57:8. He has served as an adviser on the Restatement (Third) of Trusts, as well as the Restatement of Property: Donative Transfers. Id. at 54:2-14. He has authored numerous scholarly articles, id. at 26:15-27:1, and has served as a testifying or consulting expert on trust and fiduciary practices, id. at 27:12-28:7. He is one of the foremost experts on trust and fiduciary matters today. See id. at 31:20-32:8; 54:15-55:8. During the Phase 1.5 trial, the Court permitted Professor Langbein to testify as an expert in trust matters and equity matters relating to trust. Id. at 65:19-23, 30:4 (6/2/03 PM).

(1983) (Mitchell II); see also Cherokee Nation of Okla. v. United States, 21 Cl. Ct. 565, 573 (1990) (the relationship between the United States and Indians "is not comparable to a private trust relationship"). With respect to Interior's obligation to account for IIM funds, section 102 of the 1994 Act, 25 U.S.C. § 4011, specifies in more detail the funds to be accounted for and the information to be provided to beneficiaries, compared with Section 172 of the Restatement (Second) of Trusts, which merely recites a general duty "to keep and render clear and accurate accounts with respect to the administration of the trust."

12. Plaintiffs cannot seek any remedy based upon a common law accounting. Cobell V, 91 F. Supp. 2d at 31; see also Cobell VI, 240 F.3d at 1104 ("No common law claim for an accounting is cognizable. . . ."); Cobell v. Norton, 392 F.3d 461, 472 (D.C. Cir. 2004) ("Cobell XIII") ("Insofar as plaintiffs may have said that [they could invoke all the rights that a common law trust entails against the government in this case], they were wrong.") (quoted in Cobell, 226 F.R.D. at 76 n.6). The Court does not possess the discretion of a "private-law chancellor" in fashioning any remedy. Cobell v. Norton, 428 F.3d 1070, 1077 (D.C. Cir. 2005) ("Cobell XVII").

13. In conducting its review of Interior's Plan, the Court must accord "substantial deference" to the Secretary of the Interior's decisions. Cobell XVII, 428 F.3d at 1076. The 1994 Act reaffirms the requirement that the Secretary complete an accounting, but "its text offers little help in defining the accounting's scope." Id. at 1074. "Neither congressional language nor common law trust principles (once translated to this context) establish a definitive balance between exactitude and cost." Id. at 1076. "The choices at issue require[] both subject-matter expertise and judgment about the allocation of scarce

resources, classic reasons for deference to administrators." Id. at 1076. This Court recognizes that it is law of the case that "money is relevant" to the decisions taken. Tr. at 1018:4-6. This Court, therefore, "must allow Interior to exercise its discretion and utilize its expertise in complying with broad statutory mandates." Cobell XVIII, 455 F.3d at 307 (citations omitted).

14. The term "accounting" is not defined by the 1994 Act, and the term has various meanings in the field of trusts depending on the context. There may be as many as five distinct meanings of the word "accounting" in trust parlance. Trial 1.5 Tr. 87:5-90:3 (Langbein 6/2/03 PM). The Uniform Trust Code has ceased use of the term "accounting" altogether, because of the confusion about what the term means. Trial 1.5 Tr. 85:12-18 (Langbein 6/2/03 PM); see UNIFORM TRUST CODE § 813 cmt. (2000) ("Code employs the term "report" instead of "accounting" in order to negate any inference that the report must be prepared in any particular format or with a high degree of formality"). Thus, the Court should defer to the Secretary of the Interior, as the individual charged with execution of the 1994 Act, in interpreting what the accounting under the Act entails.

15. It also is law of the case that such deference requires the Court to permit use of statistical sampling in rendering the accounting. Cobell XVII 428 F.3d at 1077-79. Other decisions by the Secretary are entitled to the same deferential "principles" that the Court of Appeals "applied here" to sampling. Id. at 1079.

16. Plaintiffs elected to prosecute their claim as a class action, and the Court certified "a plaintiff class consisting of present and former beneficiaries of Individual Indian Money accounts (exclusive of those who prior to the filing of the Complaint herein had filed actions on their own behalf alleging claims included in the Complaint)." Order of Feb. 4,

1997 at 2-3 (Dkt. No. 27). This definition does not include every owner of allotted land but only those who have had IIM accounts. It also expressly excludes individuals who had pursued claims on their own prior to the commencement of this case. The definition does not include anyone who "should have" had an account but did not. Plaintiffs, therefore, lack standing to pursue any claim on behalf of persons who never had an IIM account. (Also excluded are those who never had an IIM account until sometime after the date of class certification, February 4, 1997.)

17. As a class action, the only co-plaintiff parties before the Court are the five named individual plaintiffs, four of whom are certified to represent the defined class, Elouise Cobell, Mildred Cleghorn,[7] Thomas Maulson, and James Louis LaRose. See Memorandum and Order of March 5, 2003 at 9-10 (Dkt. No. 1864). The claims of the four class representatives stand as Plaintiffs' chosen vehicle through which the claims of all class members are to be judged and resolved. See generally Hansberry v. Lee, 311 U.S. 32, 41 (1940) ("[T]he judgment in a 'class' or 'representative' suit, to which some members of the class are parties, may bind members of the class or those represented who were not made parties to it."); Geoffrey B. Hazard, *The Effect of the Class Action Device Upon the Substantive Law*, 58 F.R.D. 307, 310 (1973). Plaintiffs, however, introduced no evidence during the hearing addressing the circumstances of any named plaintiff, nor

[7] Mildred Cleghorn died on April 15, 1997, and her interests have since been represented informally by her daughter and executrix, Penny Cleghorn. See Plaintiffs' Memorandum of Supplemental Information [Change of Counsel and Effect on Class Certification Issues] (March 22, 1999) (Dkt. No. 221) ("Mildred Cleghorn has died. Penny Cleghorn, her daughter, has now been appointed as her executrix and should be substituted as a plaintiff in that capacity.") Defendants do not know whether circumstances are now appropriate for Penny Cleghorn to be formally substituted for her mother as a party-plaintiff pursuant to Federal Rule of Civil Procedure 25(a).

did they demonstrate how any named plaintiff's entitlement to an accounting is impaired, much less unduly delayed, by Interior's actions as reflected in its 2007 Plan.

18. The Department of the Interior is presumed, as is every executive agency, to act in accordance with the law, and its actions enjoy a presumption of regularity. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971); United States v. Chemical Foundation, Inc., 272 U.S.1, 14-15 (1926).

19. As this Court has previously recognized, Tr. at 958:15-21, Plaintiffs bear the burden of proof for this hearing. See also Cobell v. Kempthorne, 455 F.3d 317, 334 (D.C. Cir. 2006) ("Cobell XIX") ("In two [decisions], the district court imposed an inappropriate evidentiary burden on Interior (Cobell XII and XIII)"); Cobell XIII, 392 F.3d at 474 ("we can see no basis for reversing the usual roles in litigation and assigning to defendants a task that is normally the plaintiffs' – to identify flaws in the defendants' filings"). As set out below, Plaintiffs have not carried that burden.

**II. Interior's Plan is Reasonable in Light of Time and Cost Considerations**

20. Any "inference that [Congress] intended to order the best imaginable accounting without regard to cost" is "inherently implausible." Cobell XVII, 428 F.3d at 1075.

21. Interior's accounting obligations (and, indeed, all of its trust responsibilities) are constrained by congressional limitations, including appropriation limits. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." OPM v. Richmond, 496 U.S. 414, 425 (1990).

22. The Anti-Deficiency Act, 31 U.S.C. § 1341, prohibits "officer[s] and employee[s]" of the federal government from authorizing an obligation or expenditure exceeding an appropriation, or in advance of an appropriation. See generally Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States, 48 F.3d 1166, 1171 (Fed. Cir. 1995) ("[A]n agency may not spend more money for a program than has been appropriated for that program . . . .").

23. Agencies must also comply with the Purpose Statute, 31 U.S.C. § 1301(a), which requires that "[a]ppropriations . . . be applied only to the objects for which the appropriations were made except as otherwise provided by law." Id. Therefore, Interior, like every Federal agency, is constrained not only by how much money Congress appropriates to it, but also by the requirement that it spend appropriated funds in accordance with the purpose for which the appropriations were made.

24. Interior's discharge of its responsibility to perform an accounting of IIM funds (and all of its trust responsibilities) is subject to these constraints. See Trial 1.5 Tr. 59:8-61:11 (Langbein 6/2/03 PM).

25. Congress is the settlor of the individual Indian trusts. Trial 1.5 Tr. 53:13-14, 59:5 (Langbein 6/2/03 PM); see also Mitchell II, 463 U.S. at 234 n.8 (Congress, as settlor, must manifest intent to make statutory duties trust duties) (Powell, J. dissenting); Mitchell v. United States, 445 U.S. 535, 547 (1980) (Mitchell I) (settlor of the Indian trust is the United States) (White, J. dissenting). Congress defines the terms of the trusts through legislation, and common law trusts principles are subordinate to congressional

direction, including funding legislation.[8] Trial 1.5 Tr. 100:2-4 (Langbein 6/2/03 PM); Trial 1.5 Tr. 39:25-40:1 (Langbein 6/3/03 PM).

26. The Secretary of the Interior, unlike a private trustee, depends on annual appropriations from Congress to discharge his duties and may expend funds only to the extent that Congress has appropriated them. Trial 1.5 Tr. 67:4-13 (Langbein 6/2/03 PM); Trial 1.5 Tr. 12:25-13:10 (Langbein 6/3/03 AM); Trial 1.5 Tr. 67:4-6 (Langbein 6/3/03 AM); Trial 1.5 Tr. 38:17-18 (Langbein 6/3/03 PM).

27. Funding constraints may suspend or modify an agency's statutory obligations. See Forest Guardians v. Babbitt, 174 F.3d 1178, 1188-89, 1193 (10th Cir. 1999) (requiring Interior to take action because congressional funding moratorium had ended); Environmental Def. Ctr. v. Babbitt, 73 F.3d 867, 871 (9th Cir. 1995) (stating that, while appropriations restriction did not repeal Secretary's duty, it "prevent[ed] him from taking final action . . . at this time"); N.Y. Airways, Inc. v. United States, 369 F.2d 743, 748 (Ct. Cl. 1966) (per curiam) (stating that "failure to appropriate funds to meet statutory obligations prevents the accounting officers of the Government from making disbursements").

28. Outside of the trust context, "the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." N.Y. Airways, 369 F.2d at 748 (internal citations omitted). However, trustee duties can be modified or even waived. See, e.g., Trial 1.5 Tr. 50:23-51:13 (Langbein 6/2/03 PM).

---

[8] Even the common law would dictate this result because the common law prudence standard, which underlies many common law trust duties, is situational; that is, the applicable standard is that of a reasonable person similarly situated. Thus, the prudence standard applicable to Interior "is deeply contextual" and "asks, what would someone else do in these situations?" Trial 1.5 Tr. 47:16-19 (Langbein 6/2/03 PM).

"[E]ven the loyalty rule, which is the most fundamental rule of trust law, is waivable by the settlor. . . ." Trial 1.5 Tr. 50:25-51:1 (Langbein 6/2/03 PM); see also id. at 52:24 (the "instrument itself may alter the prudence norm"). It is not uncommon for a trust instrument to be subject to amendment by the settlor. Trial 1.5 Tr. 61:8-11 (Langbein 6/2/03 PM). Congress, as settlor, retains the right to amend the trust instrument by further enactments. Enactments by Congress, including appropriations measures, that affect the ability of the trustee delegate to carry out prescribed duties, therefore operate as amendments to the trust instrument. Professor Langbein explained that "if Congress passes a budget appropriation that gives you inadequate funds to carry out something that Congress has earlier said you should carry out, that is the same thing as if Congress says we hereby amend the trust to order you not to carry out the earlier duty." Trial 1.5 Tr. 59:25-60:4 (Langbein 6/2/03 PM).

29. Courts may not order an agency to obligate funds contrary to congressional funding restraints. "It is beyond dispute that a federal court cannot order the obligation of funds for which there is no appropriation . . . . Nor can it be contended that a court may appropriate funds from which an obligation may be made." Rochester Pure Waters Dist. v. EPA, 960 F.2d 180, 184 (D.C. Cir. 1992) (per curiam) (internal citations omitted). "It is a well-settled matter of constitutional law that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation." City of Houston v. HUD, 24 F.3d 1421, 1424 (D.C. Cir. 1994).

30. Forty years ago, the Supreme Court noted that the BIA "is faced 'with an almost staggering problem in attempting to discharge its trust obligations with respect to

thousands upon thousands of scattered Indian allotments.'" Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 374 (1968) (quoting H.R. Rep. No. 2503, 82d Cong., 2d Sess., 23 (1952)). In a similar vein, Associate Deputy Secretary James Cason testified that, regardless of Interior's ability to provide accountings to individuals on a case-by-case basis, the task of providing an accounting all at once to all account holders covering a huge span of time was overwhelming. See Tr. 251: 6-11 (Cason).

31. Interior thus weighed the limited resources provided by Congress against the need to complete the accounting work in a timely manner, and made trade-offs and choices about the work it will perform. Tr. 71:19-72:16 (Cason). As Mr. Cason stated, "If we design a historical accounting that requires $5 billion worth of work, and we have $50 million a year, that indicates that we would be at this for the next 100 years." Tr. 71:24-72:2 (Cason).

32. In examining the costs and benefits of performing a historical accounting for accounts that were closed prior to October 25, 1994, at a cost of $3 billion or more, DX-98 at 9; Tr. 1124:20 - 1125:11 (Haspel), Interior concluded that it was less important to provide accountings for individuals over the entire course of the last 100 years than it was to provide accountings for which Interior had a continuing trust relationship. Tr. 83:17-25 (Cason).

33. Given that the most costly step associated with accounting for all IIM accounts for the period 1909 through 2006 is linking closing balances in predecessor accounts to successor accounts, a step estimated to cost between $1.365 and $1.817 billion, DX-98 at 9; see also Tr. 1120:18 - 1121:7 (Haspel), one would expect to see compelling evidence of the necessity for such an undertaking. Plaintiffs' simple contention that the law so

requires, which underlies its case against the 2007 Plan, is insufficient. As the Court of Appeals pointedly stated, "the preference of a party that will bear none of the monetary costs can't sweep the cost issue off the table." Cobell XVII, 428 F.3d at 1078. Nor may this Court "assume a fictional plaintiff class of trust beneficiaries completely and uniformly free of bars or limitations that the common law may provide." Id. at 1079. Under the circumstances, the 2007 Plan represents a reasonable approach to achieving an adequate accounting.

## III. The Secretary Properly Exercised Discretion In Adopting And Executing The 2007 Plan For Completing The Historical Accounting

### A. Interior's Plan Makes Reasonable Use Of Statistical Sampling

34. The Court of Appeals, as noted above, expressly approved the use of statistical sampling as a component of Interior's plan to prepare HSAs. Cobell XVII, 428 F.3d at 1077-79. The appellate court was particularly persuaded by evidence, also borne out during the instant hearing, that "the average cost of accounting, per transaction, would exceed the average value of the transactions." Id. at 1078. The Court of Appeals concluded that "Interior's decision to use statistical sampling seems especially reasonable." Id. No basis exists to depart from this conclusion in light of evidence adduced at the hearing.

35. Interior is using statistical sampling as a component of transaction reconciliations for land-based IIM accounts where a transaction-by-transaction reconciliation would be clearly impracticable. Interior is performing a full reconciliation, without sampling, for the Judgment and Per Capita accounts. AR-565 at 10.

### B. Interior's Plan Reasonably Anticipates Additional Work Needed To Complete The Historical Accounting

36. Interior's Plan reasonably contemplates additional work it will need to perform in order to complete the historical accounting. Such work includes the steps to assess the completeness of the data Interior uses to prepare HSAs – the "Data Completion Validation" and "Land-to-Dollars Posting Test" work – and the testing of the posting of interest to accounts. AR-565 at 19-21.

37. Interior's Plan properly contemplates additional steps to identify missing addresses for account holders, known as "Whereabouts Unknown" accounts. AR-565 at 22. This formidable task involves thousands of accounts which lack accurate addresses for a variety of reasons. See Quarterly Report 29 at 39 (Dkt. No. 3318) (May 1, 2007).

38. The ongoing reconciliation work is being performed by Interior contractors, which include four major CPA firms. The American Institute of Certified Public Accountants (AICPA) has promulgated "Statement on Standards for Consulting Services No. 1" (SSCS No. 1) which "appl[ies] to any AICPA member holding out as a CPA while providing Consulting Services." SSCS No. 1, ¶ 4.[9] Cf. Brookshire Brothers Holding, Inc. v. Total Containment, Inc., 2007 WL 2008524 (W.D. La. July 9, 2007) (denying "Daubert" motion where challenged expert provided "professional services rendered . . . in accordance with the AICPA's SSCS.").

---

[9] Statement on Standards for Consulting Services No. 1 is accessible at http://bvfls.aicpa.org/Resources/Laws+Rules+Standards+and+Other+Related+Guidance/AICPA+Professional+Standards/Statement+on+Standards+for+Consulting+Services+No.+1.htm

39. All services performed by AICPA members, including consulting services, are subject to the general standards of the profession, which are set forth in Rule 201 of the AICPA Code of Professional Conduct. SSCS No. 1, ¶ 6.

40. Rule 201 of the AICPA Code of Professional Conduct requires members to undertake only those professional services they can reasonably expect to complete with professional competence; to exercise due professional care in the performance of professional services; to adequately plan and supervise the performance of professional services; and to obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed. SSCS No. 1, ¶ 6 (summarizing Rule 201).

41. AICPA members performing consulting services are subject to additional general standards, including the duty to serve the client interest by seeking to accomplish the objectives established by the understanding with the client, while maintaining integrity and objectivity, and to inform the client of significant reservations concerning the scope or benefits of the engagement and significant engagement findings or events. SSCS No. 1, ¶ 7.

42. Finally, Interior's Plan contemplates the creation of an administrative appeals process for account holders to challenge information contained in their HSAs and to obtain timely and cost-effective relief. Such a process will necessarily follow the publication of proposed regulations, the receipt of public comments, and finalization of regulations. AR-565 at 22-23.

### C. Interior's Plan Complies With Applicable Statutory Requirements

43. "The most relevant statute for ascertaining [Interior's] duty to provide a historical accounting is the 1994 Act. . . ." Cobell XVII, 428 F.3d at 1074. The 1994 Act requires the Secretary of the Interior to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of . . . an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a)." 1994 Act, Pub. L. No. 103-412, § 102(a), 108 Stat. 4239, 4240 (1994), codified at 25 U.S.C.A. § 4011(a).[10]

44. Interior has a duty to account for "all funds" as set out in section 4011(a) of the 1994 Act, "irrespective of when they were deposited (or at least so long as they were deposited after the Act of June 24, 1938)." Cobell VI, 240 F.3d at 1102.

45. Although the term "historical accounting" does not appear in the 1994 Act, this Court has previously explained its use of the term as follows:

> It is important to note that there is no difference between a "historical accounting" and an "accounting." . . . Any accounting of funds necessarily involves examining past transactions and events that could [affect] the current balance. In this opinion, the Court has predominantly used the term historical accounting to emphasize that the Interior Department must take past transactions into consideration to ensure that the current balances in the IIM trust accounts are accurate.

Cobell v. Norton, 226 F. Supp. 2d at 116 n.135 (2002); accord Cobell VI, 240 F.3d at

---

[10] The quote in the text appears in Section 102 of the 1994 Act, and identical language is found in the United States Code Annotated at 25 U.S.C.A. § 4011(a). However, when the text was codified in the United States Code at 25 U.S.C. § 4011(a), a technical change was made (which was not enacted by Congress) that changed the phrase "which are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a)" to "which are deposited or invested pursuant to section 162a of this chapter." For the sake of consistency with the court opinions and prior filings in this case, the language from the 1994 Act and the 2001 edition of United States Code Annotated is used throughout this document.

1102 (one cannot "give a fair and accurate accounting of *all* accounts without first reconciling the accounts, taking into account past deposits, withdrawals, and accruals" ) (original emphasis).

46. In addition to the judicially inferred historical accounting obligation, the 1994 Act includes an express current accounting obligation, that requires Interior to account for the daily and annual balance of all funds it holds in trust and to provide a quarterly statement of performance to each IIM account holder that identifies "(1) the source, type, and status of the funds; (2) the beginning balance; (3) the gains and losses; (4) receipts and disbursements; and (5) the ending balance." 25 U.S.C. § 4011(b).

**1. Interior's Plan Satisfies the 1994 Act's Mandate to Account for "All Funds"**

47. Interior's Plan comports fully with the language of the 1994 Act, which requires an accounting of "all funds" which are "held in trust by the United States for the benefit of . . . an individual Indian" and "which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a) (emphasis added).

48. That the accounting required by the 1994 Act is an accounting of funds, rather than of land or other assets from which funds may be generated, is clear from the plain language of the statute, which requires the Secretary to account for "all funds held in trust."[11] 25

[11] The term "all funds" also appears in Sections 102(c) and 103(a) of the 1994 Act. In both instances, it is clear in context that the term has a current balance connotation. Section 102(c) provides that "[t]he Secretary shall cause to be conducted an annual audit on a fiscal year basis of all funds held in trust by the United States for the benefit of . . . an individual Indian which are deposited or invested pursuant to the Act of June 24, . . . ." 25 U.S.C. § 4011(c) (emphasis added). Section 103(a) provides that "[a]ll funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested . . . in public debt securities. . . ." 25 U.S.C. § 161a (emphasis added). "[T]here is a presumption that where the same words are used in different parts of an act, and where the

U.S.C. § 4011(a). Accordingly, in Cobell V, this Court entered a declaratory judgment that the 1994 Act requires "defendants to provide plaintiffs an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited." Cobell V, 91 F. Supp. 2d at 58; see also Cobell v. Norton, 226 F. Supp. 2d at 116 ("[T]he defendants must provide plaintiffs an accurate accounting of all money in the IIM trust.") (emphasis added).

49. In this case, the "trust corpus consists of the revenues derived from the land." Cobell v. Norton, 391 F.3d 251, 254 (D.C. Cir. 2004). With the focus on money, the accounting should include a complete financial transaction history, including funds received into or disbursed from the trust, interest earned, and expenses paid. See Cobell VI, 240 F.3d at 1102; Cobell v. Norton, 260 F. Supp. 2d 110, 123 (D.D.C. 2003).

50. Consistent with the requirement that Interior provide an accounting of funds, Interior's Plan states, "At the end of the historical accounting process, Interior plans to provide an HSA to each IIM account holder containing information on how much money was credited to their account, the amount of interest credited to their account, the disbursements made from their account, and available references for each transaction." AR-565 at 5.

51. To the extent that this statutory direction to the trustee is ambiguous, Interior's interpretation should be accorded the usual deference given to a trustee in administering its trust responsibilities. See Trial 1.5 Tr. 74:18-76:18, 78:19-79:1 (Langbein, 6/3/03 PM). This deference is particularly important in circumstances where Interior, as trustee,

---

meaning in one instance is clear, other uses of the word in the act have the same meaning as that where the definition is clear." Wilson v. Brooks Supermarket, Inc. (In re Missionary Baptist Foundation of America, Inc.), 667 F.2d 1244, 1246 (5th Cir. 1982).

must make decisions about how to allocate scarce resources to comply with its various responsibilities. See, e.g., Trial 1.5 Tr. 33:12-34:19, 39:9-18, 67:20-68:8 (Langbein, 6/3/03 AM).

### 2. Interior's Plan Provides for Historical Accountings to All IIM Account Holders With Accounts Open on or After October 25, 1994

52. The "requirement to account" established by the 1994 Act applies to "all funds held in trust by the United States for the benefit of . . . an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a) (emphasis added). The 1994 Act does not require accountings for accounts closed prior to its enactment. The Act does not mandate an accounting for all funds that "were" or "have ever been" deposited or invested.[12]

53. Moreover, as set forth below, the language of the 1994 Act establishes specific accounting obligations that can only be performed for accounts in existence on or after the passage of the 1994 Act on October 25, 1994.

---

[12] Statutes are to be accorded only prospective application unless Congress has "directed with the requisite clarity that the law be applied retrospectively." INS v. St. Cyr, 533 U.S. 289, 316 (2001) (citing Martin v. Hadix, 527 U.S. 343, 352 (1999)).

> The standard for finding such unambiguous direction is a demanding one. "[C]ases where this Court has found truly 'retroactive' effect adequately authorized by statute have involved statutory language that was so clear that it could sustain only one interpretation."

Id. at 316-17 (quoting Lindh v. Murphy, 521 U.S. 320, 328 n.4 (1997)) (brackets in original); see also United States v. Zacks, 375 U.S. 59, 65-67 (1963) (cited in Lindh v. Murphy, 521 U.S. at 328 n.4); Automobile Club v. Comm., 353 U.S. 180, 184 (1957); Graham v. Goodcell, 282 U.S. 409, 416-20 (1931).

54. The 1994 Act contains two specific provisions relevant to the Secretary's accounting duties, and both make sense only in the context of existing accounts. Section 101 of the 1994 Act is captioned "Affirmative Action Required." 1994 Act, Pub. L. No. 103-412, § 101, 108 Stat. 4239; H.R. Rep. No. 103-778, at 2 (Oct. 3, 1994) (codified at 25 U.S.C. § 162a(d)). Section 101(d) provides in relevant part:

> The Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:
>
> (1) Providing adequate systems for accounting for and reporting trust fund balances.
>
> (2) Providing adequate controls over receipts and disbursements.
>
> (3) Providing periodic, timely reconciliations to assure the accuracy of accounts.
>
> (4) Determining accurate cash balances.
>
> (5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.
>
> (6) Establishing consistent, written policies and procedures for trust fund management and accounting.
>
> (7) Providing adequate staffing, supervision, and training for trust fund management and accounting. . . .

25 U.S.C. § 162a(d).

55. Congress' use of forward-looking language demonstrates that it did not intend that Section 101 of the 1994 Act apply to accounts distributed and closed prior to the enactment of the 1994 Act. For example, closed accounts do not have "balances" to which to apply the duty to "[p]rovid[e] adequate systems for accounting for and reporting trust fund balances," 25 U.S.C. § 162a(d)(1), or the duty to "[d]etermin[e] accurate cash balances," id. at § 162a(d)(4), or the duty to "[p]repar[e] and supply[] account holders

with periodic statements of their account performance and with balances of their account which shall be available on a daily basis," id. § 162a(d)(5). Nor do such accounts have current receipts or disbursements to which to apply the duty to "[p]rovid[e] adequate controls over receipts and disbursements." Id. at § 162a(d)(2).

56. Section 102 of the 1994 Act, entitled "Responsibility of Secretary to Account for the Daily and Annual Balances of Indian Trust Funds," sets forth three specific accounting requirements. Subsection (a) (entitled "Requirement to Account") provides: "The Secretary shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to section 162a of this title." 25 U.S.C. § 4011(a) (emphasis added). Subsection (b) (captioned "Periodic Statement of Performance") provides:

> Not later than 20 business days after the close of a calendar quarter, the Secretary shall provide a statement of performance to each Indian tribe and individual with respect to whom funds are deposited or invested pursuant to section 162a of this title. The statement, for the period concerned, shall identify –
>
> (1) the source, type, and status of the funds;
>
> (2) the beginning balance;
>
> (3) the gains and losses;
>
> (4) receipts and disbursements; and
>
> (5) the ending balance.

25 U.S.C. § 4011(b) (emphasis added). Finally, subsection (c) requires the Secretary to conduct an annual audit of all funds held in trust and directs that the Secretary "shall include a letter relating to the audit in the first statement of performance provided under

subsection (b) of this section after the completion of the audit." Id. at § 4011(c).

57. As with section 101, Congress' use of forward-looking language in section 102 confirms that Congress did not intend for section 102 to apply to accounts closed prior to the enactment of the 1994 Act. The periodic statement of performance mandated by section 102(b) is to be provided "[n]ot later than 20 business days after the close of a calendar quarter," and the specific elements of the statement described in subsection (b) are to be provided "for the period concerned." 25 U.S.C. § 4011(b). It is, of course, impossible for the Secretary to provide such a statement for any calendar quarter ending prior to October 25, 1994, within twenty business days after the close of the calendar quarter. Insofar as retrospective application of the 1994 Act can only be mandated through a construction leading to this impossible and absurd result, such a construction is improper and must be rejected. See e.g., FTC v. Ken Roberts Co., 276 F.3d 583, 590 (D.C. Cir. 2001) (citing Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982)).

58. Section 102 is as significant for what it does not say as for what it does say. For example, section 102 does not say that the Secretary shall account for all funds that "have ever been" or "were" deposited or invested pursuant to 25 U.S.C. § 162a. Instead, Congress specifically used the present tense and limited the requisite accounting to funds "which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a)-(c) (emphasis added). If Congress had intended the 1994 Act's accounting requirements to apply to funds previously deposited or invested, or to closed accounts, it would have "directed with the requisite clarity that the law be applied retrospectively" to those funds or those closed accounts. INS v. St. Cyr, 533 U.S. at 316. No such direction is to be found within the accounting provisions of the 1994 Act. Sections 101 and 102 of

the 1994 Act, therefore, must be construed as applying only to IIM accounts existing on or after the enactment of the 1994 Act and not to IIM accounts that were distributed and closed prior to October 25, 1994.

**a. Legislative History Underlying the 1994 Act Confirms Congressional Intent That the Accounting Requirements Set Forth in the 1994 Act Apply With Respect To Funds Held In Trust On Or After the Date of the Statute's Enactment**

59. The legislative history accompanying the 1994 Act confirms that Congress never intended that the Secretary prepare an accounting for IIM accounts that had been distributed and closed prior to October 25, 1994.

60. In its report accompanying H.R. 4833, the bill ultimately enacted as the 1994 Act, the House Natural Resources Committee discussed the Misplaced Trust Report previously issued by the House Committee on Government Operations.[13] H.R. Rep. No. 103-778, at 10. The Misplaced Trust Report described BIA's costly efforts in the early 1990s to conduct a complete audit and reconciliation of all IIM accounts and concluded that "it might cost as much as $281 million to $390 million to audit the IIM accounts at all 93 BIA agency offices." Misplaced Trust Report, at 26. The Report continued:

> Obviously, it makes little sense to spend so much when there was only $440 million deposited in the IIM trust fund for account holders as of September 30, 1991. Given that cost and time have become formidable obstacles to completing a full and accurate accounting of the Indian trust fund, it may be necessary to review a range of sampling techniques and other alternatives before proceeding with a full accounting of <u>all 300,000 accounts in the Indian trust fund</u>. However, it remains imperative that as complete an audit and reconciliation as practicable must be undertaken.

<u>Id.</u> (emphasis added and footnote omitted).

[13] "Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund," H.R. Rep. No. 102-499, 102d Cong., 2d Sess. (1992) ("Misplaced Trust Report").

61. The Misplaced Trust Report's reference to the "300,000 accounts in the Indian trust fund," Misplaced Trust Report at 26, is particularly relevant. The Misplaced Trust Report explained:

> The IIM trust fund is a deposit fund, usually not voluntary, for individual participants and tribes. It was originally intended to provide banking services for legally incompetent Indian adults and Indian minors without legal guardians. In addition to these fiduciary accounts, the IIM trust fund now contains deposit accounts for certain tribal operations and for some tribal enterprises. Approximately 300,000 accounts are held in the IIM trust fund.

Misplaced Trust Report, at 2. Thus, its use of the present tense in describing how many IIM accounts "are held" makes clear Congress's focus on the then-existing trust accounts. See also H.R. Rep. No. 103-778, at 9 (legislative history also stated that "[t]he BIA is currently managing . . . nearly 337,000 separate IIM accounts").

62. Finally, as this Court noted in Cobell V, Congressman Synar, the principal author of the Misplaced Trust Report, stated during a 1989 hearing of the House Subcommittee on Interior Appropriations:

> I'm going to tell you, speaking on behalf of myself and [Congressman] Yates and four Congresses, it is our clear intention – and let the Record show – it is our clear intention that these [Indian Trust] accounts will be reconciled and audited before there is any movement or transfer [of the funds]. If you interpret that any other way, or if your lawyers or your personnel do, you're interpreting it wrong.

Misplaced Trust Report at 21 (footnote omitted), (quoted in Cobell V, 91 F. Supp. 2d at 41). Congressman Synar's statement is indicia of Congress's intent to address then-existing, not closed, accounts.

**b. The Court of Appeals Has Not Resolved the Issue Whether the 1994 Act Mandates Accounting Duties for Accounts That Closed Prior to Passage of the Statute**

63. In Cobell VI, the Court of Appeals stated, "'All funds' means all funds, irrespective of when they were deposited (or at least so long as they were deposited after the Act of June 24, 1938)," 240 F.3d at 1102 (original emphasis), in rejecting Defendants' assertion that it could assume the accuracy of account balances as of 1994 and only account prospectively. Defendants had argued that the 1994 Act could not be interpreted to require any historical accounting because the language did not contain an "unambiguous directive" or show clear congressional intent that the statute have such an effect. See Landsgraf v. USI Film Prods., 511 U.S. 244, 263 (1994). The Court held that this retroactivity principle did not preclude reconciling past transactions because the Secretary had a preexisting duty to account for trust funds. See 240 F.3d at 1102-04.[14]

64. Cobell VI did not decide whether the accounting must cover accounts closed prior to the date of enactment because that issue was not then before the Court. The issue of closed accounts was not squarely presented in Cobell V and so was not before the Court of Appeals in Cobell VI.[15] The question was squarely presented in Cobell X, wherein this

[14] In Cobell VI, the Court also stated that the 1994 Act "did not alter the nature or scope of the fiduciary duties owed by the government to IIM trust beneficiaries. Rather, by its very terms the 1994 Act identified a portion of the government's specific obligations and created additional means to ensure that the obligations would be carried out." 240 F.3d at 1100; see also id. at 1102 ("the 1994 Act clarified and augmented aspects of the government's preexisting obligation to facilitate their fulfillment"). This language does not hold that closed accounts are within the 1994 Act. Rather, the "very terms" of the 1994 Act at issue here require an accounting for funds "which are deposited or invested." Thus, the "additional means" created by the 1994 Act are not available to enforce obligations not "identified," that is, accounting for funds that "were" but no longer "are" deposited or invested.

[15] Plaintiffs argue that, because the class certified in February 1997 includes all present and former IIM account holders, and because that population would include persons whose accounts

Court determined that section 102(a) of the 1994 Act "consists of a *prospective* command to the Secretary of the Interior to account for the daily and annual balance of all funds held in trust by the United States for the benefit of an individual Indian that were deposited or invested pursuant to the 1938 Act." 283 F. Supp. 3d at 170 (original emphasis). On appeal, the decision was vacated, but the Court of Appeals avoided the merits of the closed-accounts issue, stating that it was "unnecessary at this stage" to address the issue. Cobell XVII, 428 F.3d at 1077. Such a determination to defer ruling would have been unnecessary if the Court of Appeals believed it had resolved the issue in 2001.

---

were closed prior to the enactment of the 1994 Act, the class certification order is dispositive as to whether closed accounts must be part of the historical accounting. Tr. June 18, 2007, at 20:13-21. However, the closed accounts issue was not presented at the time the class was certified, and it is, of course, the language of the 1994 Act, not the class certification order, that is dispositive of the issue. Moreover,

> [w]hile it is clear that a class definition must be sufficient to allow a court to determine the scope of the class and the propriety of class certification, and care should be taken to define a class in objective terms capable of ascertaining membership at some relevant stage, with respect to [a] Rule 23(b)(2) class seeking predominantly injunctive or declaratory relief, ascertaining the precise membership of the class is of less moment at the certification and liability stage where the class is seeking broad declaratory or injunctive relief.

Hohider v. United Parcel Serv., Inc., 243 F.R.D. 147, 211 (W.D.Pa. 2007) (citations omitted). The class herein was certified under Federal Rule 23(b)(1)(A) and (b)(2).

### 3. Consistent With the Express Statutory Language of the 1994 Act, Interior's Plan Reviews Transactions Going Back to the Later of the Initial Transaction Opening Of An Account or the Act of June 24, 1938

65. The "requirement to account" established by the 1994 Act applies to "all funds held in trust by the United States for the benefit of . . . an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a) (emphasis added).

66. The 1994 Act does not establish a statutory duty to account for transactions prior to June 24, 1938, because amounts deposited or invested before that date are not deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a).

67. Because there is no statutory duty to account for transactions prior to June 24, 1938, Interior's Plan properly reviews transactions going back to the later of the initial transaction opening an account or the Act of June 24, 1938.

### 4. The 1994 Act Does Not Establish an Obligation to Perform Historical Accountings for the Closed Accounts Of Deceased IIM Account Holders

68. Congress did not prescribe an accounting for accounts closed prior to the passage of the 1994 Act. See Section III.B.2.a, supra.

#### a. Concerns About the Account Balances of Deceased IIM Account Holders Are Properly Addressed by Comprehensive Probate Proceedings

69. The validity of Indian probate determinations, which generally conclude one trust relationship and define a new one, are challenged through applicable statutory and administrative regulations. Interior's probate proceedings have performed functions similar to that of state probate courts: determining the lawful heirs of deceased Indians while ensuring due process to interested parties, including the IIM account holders.

Interior's probate procedures[16] comport with constitutional standards of due process. See Kicking Woman v. Hodel, 878 F.2d 1203, 1208 (9th Cir. 1989) (holding that Interior regulations afforded due process and a meaningful appeal and declining to engage in a substantive review of an Indian probate proceeding).

70. Judicial review of probate determinations in Federal court is available once administrative remedies have been exhausted.[17] Arenas v. United States, 197 F.2d 418, 422 (9th Cir. 1952) (Indian who did not file administrative appeal could not challenge administrative heirship determination); Mammedaty v. Kleppe, 412 F. Supp. 283, 284-85 (W.D. Okla. 1976) (failure to file timely notice of appeal with Board of Indian Appeals precluded judicial review).

71. Probate determinations are, therefore, the product of either administrative proceedings or state judicial proceedings that provide a full measure of due process to interested parties. In light of the comprehensive administrative and statutory scheme for review of probate decisions, it is proper for Interior to rely upon probate orders in the course of verifying the accuracy of the account activity to be reported to IIM account holders.

#### b. Plaintiffs Lack Standing to Assert Any Alleged Rights of Deceased IIM Account Holders

72. Plaintiffs lack Article III standing to compel accountings of their predecessors' IIM accounts, much less accounts of decedents who left no heirs. See, e.g., Transmission Agency of No. Calif. v. FERC, 495 F.3d 663, 670 (D.C. Cir. 2007) ("To establish

[16] Oklahoma state courts probate the estates of Members of the Five Civilized Tribes and the Osage Tribe and provide similar due process protections to prospective heirs. See Okla. Stat. Ann. tit. 58, §§ 23, 25, 128, 281, 552, and 553 (West 2002).

[17] In 1990, Congress amended the Act of June 25, 1910 to allow judicial review of Indian probate decisions in Federal court. See An Act To Make Miscellaneous Amendments To Indian Laws, and for Other Purposes, Pub. L. No. 101-301, § 12(c), 104 Stat. 206, 211 (1990).

constitutional standing, petitioners must show three elements: (1) injury in fact, (2) causation, and (3) redressability.") (citations omitted). Plaintiffs must show – and they have not – that they have suffered an injury that will be redressed by the Court ordering Interior to account for every transaction in every deceased IIM beneficiary's account.

73. Plaintiffs' accounting rights under the 1994 Act do not embrace transactions in predecessor accounts. IIM account holders' heirs have no actionable right to an accounting of predecessor accounts but have a mere expectancy of heirship. See Irving v. Clark, 758 F.2d 1260, 1263-66 (8th Cir. 1985), aff'd sub nom. Hodel v. Irving, 481 U.S. 704 (1987). The expectation of inheriting funds in an IIM account does not rise to the level of an interest in the predecessor account entitling the heir to sue for an accounting. The heir's accounting right should be limited to transactions in his or her own IIM account, including the transfer of inherited funds, but not the complete transactional activity in the decedent's account. To order reconciliation of all transactions in a decedent's IIM account solely for the purpose of determining what, if anything, "should have been" transferred to an heir's IIM account but for some error in administering the predecessor's account, would merely be a predicate for a monetary claim that lies outside the Court's jurisdiction.

74. Any standing that a member of the Plaintiff class might have, in a representative capacity, to assert a predecessor's accounting rights would apply only to predecessors who died after enactment of the 1994 Act. That is because the right being enforced in this case is the right to the accounting found by the courts. If decedents' accounting rights survive, estate representatives could assert their decedents' rights, but no decedents had the right to sue for any accounting under the 1994 Act prior to that statute's becoming law on

October 25, 1994. Thus, for an estate representative to assert the decedent's right to an accounting under the 1994 Act, that statutory right must have accrued as of October 25, 1994, and prior to the death of the decedent. See, e.g., Neal v. Neal, 250 F. 2d 885, 890 (10th Cir. 1957) ("A cause of action does not survive in favor of a personal representative of a decedent unless it accrues in favor of the decedent in his lifetime."); Kington v. United States, 265 F. Supp. 699, 702 (E.D. Tenn. 1967) (under the law of Tennessee and New Mexico, claim was barred by the statute of limitations because the claim must have accrued during the decedent's life time in order to survive), aff'd on other grounds, 396 F.2d 9 (6th Cir. 1968).

**5. The 1994 Act Does Not Establish an Obligation to Perform Historical Accountings for Amounts That Never Entered the IIM Trust, Such as Direct Payments to IIM Beneficiaries**

75. The 1994 Act requires Interior to account for funds "held in trust by the United States . . . which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a). Funds which the United States never received because they were paid directly to Indian landowners, guardians, private trustees, and the like are neither "held in trust by the United States" nor "deposited or invested pursuant to the Act of June 24, 1938,"[18] and, therefore, the statutory duty to account does not extend to such funds.

76. The conclusion that the 1994 Act does not require Interior to account for direct payments to beneficiaries is consistent with this Court's ruling in Cobell V, that the 1994 Act

[18] Interior's regulations do not permit the deposit of "direct pay" funds into an IIM account unless the direct payment cannot be effectuated. The regulations provide that Interior "will not accept funds from sources that are not identified in the table in § 115.702 for deposit into a trust account." 25 C.F.R. § 115.703. The table in 25 C.F.R. § 115.702 includes only those direct pay funds that have been returned by mail to the payor as undeliverable.
25 C.F.R. § 115.702 .

requires Interior Defendants "to provide plaintiffs an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited." Cobell V, 91 F. Supp. 2d at 58.

77. Direct payments to beneficiaries are unknown to the world of private trusts, see Trial 1.5 Tr. at 72:18-74:19 (Langbein 6/2/03 PM), but the individual Indian trust is a "unique animal," Trial 1.5 Tr. 72:22 (Langbein 6/3/03 PM), and direct-pay leases must be viewed in that light.

78. Interior's longstanding direct payment practice accommodates the desires of trust beneficiaries and is consistent with the intent of the General Allotment Act that "the allottee, and not the United States, . . . [would] manage the land." United States v. Navajo Nation, 537 U.S. 503, 504, 508 (2003) (quoting Mitchell I, 445 U.S. at 543).

79. Case law, opinions of the Solicitor, Department of the Interior regulations, and GAO reports confirm that, for purposes of the accounting requirements of the 1994 Act, direct payments differ fundamentally from funds deposited into IIM accounts. See Chisholm v. House, 160 F.2d 632 (10th Cir. 1947); Lease of Restricted Land – Federal Supervision over Rentals Payable Directly to Lessor, 72 I.D. 83, 1965 WL 12755 (Sol. Gen.) (Feb. 17, 1965).

80. Plaintiffs' contentions regarding a 1960 memorandum from Interior Solicitor Theodore Stevens are in error. See Regulation Authorizing Lessees of Allotted Indian Land to Pay Rental and Royalty Directly to the Indian Owner, 1960 WL 12652 (Sol. Gen.) (Nov. 1, 1960) ("Stevens Memo"). The Stevens Memo addresses the Secretary's potential enforcement of claims against lessees for failure to pay amounts due. The U.S. Geological Survey had expressed concerns that direct-pay lease arrangements did not

allow it to verify the accuracy of payments made by oil and gas lessees. In light of those concerns, the Stevens Memo opines that an administrative decision "may involve a change in the present accounting procedure" to allow verification of the accuracy of lease payments. Id. (emphasis added). Thus, the purpose of the accounting procedure that the Stevens Memo addressed was to help identify claims against lessees, which is not the purpose of the accounting procedure at issue in this case, i.e., to account to beneficiaries for funds held in trust on their behalf.

81. In any event, notwithstanding the U.S. Geological Survey's proposed elimination of the direct payment practice, the U.S. General Accounting Office (now the U.S. Government Accountability Office) recommended that Interior use direct payments to Indian lessors "whenever possible" to effect economies in BIA. Audit Report to the Congress of the United States, Administration of Individual Indian Monies by Bureau of Indian Affairs, Department of the Interior 26 (Comp. Gen. Nov. 1955) (DX-63 at 30) (stating that the direct pay policy, "if effectively carried out by area and agency officials, should reduce considerably the number of IIM accounts").

82. To the extent Plaintiffs challenge Interior's direct payment procedures, e.g., whether Interior's monitoring system is compatible with any obligation it may have to pursue potential claims, such challenges constitute asset management issues and are beyond the scope of this lawsuit. See Cobell v. Babbitt, 30 F. Supp. 2d at 40 n.18.

### D. Plaintiffs' Claims of "Impossibility" Are Premised On Requirements That The Court Has Rejected

83. As was the case in 2003, Plaintiffs' attacks on Interior's Plan are premised substantially on a presumption that individual accountings are impossible. See Cobell v. Norton, 283

F. Supp. 2d 66, 207 (D.D.C. 2003) ("Cobell X"), vacated in part, Cobell XIII, 392 F.3d 461 (D.C. Cir. 2004) . Rather than using actual financial records to review transactional activity in IIM accounts, Plaintiffs' 2003 plan used a model to calculate aggregate historical revenues and required Defendants to prove proper distribution of the revenues to members of the plaintiff class. Cobell X, 283 F. Supp. 2d at 208. Plaintiffs' financial modeling expert, Mr. Fasold, repeated that analysis for the hearing in October 2007. Tr. 1606:5-11, 1676:10-24 (Fasold); PX-4208 at 2 ("Background" section).

84. In 2003, this Court held a ten-week "Phase 1.5" trial and, on September 25, 2003, entered a structural injunction embodying its ruling. Cobell X. The structural injunction made substantial alterations to Interior's 2003 Accounting Plan that would have increased the estimated cost of the accounting twenty times or more. See Cobell XVII, 428 F.3d at 1077. For the most part, however, the Court ignored Plaintiffs' alternative plan based on Mr. Fasold's model, and on December 10, 2004, the Court of Appeals vacated the structural injunction almost entirely. Cobell XIII, 392 F.3d at 478. The court held that Public Law 108-108[19] changed the underlying substantive law and removed the legal

[19] Public Law 108-108 provided in relevant part that

> nothing in the American Indian Trust Management Reform Act of 1994, Public Law 103-412, or in any other statute, and no principle of common law, shall be construed or applied to require the Department of the Interior to commence or continue historical accounting activities with respect to the Individual Indian Money Trust until the earlier of the following shall have occurred: (a) Congress shall have amended the American Indian Trust Management Reform Act of 1994 to delineate the specific historical accounting obligations of the Department of the Interior with respect to the Individual Indian Money Trust; or (b) December 31, 2004.

Cobell XIII, 392 F.3d at 465 (quoting Pub. L. No. 108-108 (2003)).

basis for the historical accounting elements of the injunction. Id. at 465-66.[20] On February 23, 2005, following expiration of the limit imposed by Public Law 108-108, this Court again disregarded Plaintiffs' impossibility arguments and reissued the accounting portion of the structural injunction, without further hearing and without modification. Cobell v. Norton, 357 F. Supp. 2d 298 (D.D.C. 2005). The Government appealed, and the Court of Appeals vacated the structural injunction on November 15, 2005. Cobell XVII. At no time, however, did Plaintiffs challenge any of this Court's determinations, following the Phase 1.5 hearing, that Interior should proceed with conducting the historical accounting. In the course of this hearing, Plaintiffs have adduced no evidence that alters the Court's implicit conclusion that an accounting could be performed.

### IV. Notwithstanding More Generous Elements of Interior's Plan, Claims for Accounting of Transactions Prior to October 1, 1984, are Barred by the General Six-Year Statute of Limitations, 28 U.S.C. § 2401, and Tolling Language in Annual Appropriations Riders Since 1990

85. Defendants raised statute of limitations and laches defenses in a summary judgment motion preceding the Phase 1.5 trial. See Defendants' Corrected Memorandum Of Points And Authorities In Support Of Motion For Partial Summary Judgment Regarding Statute Of Limitations And Laches (Jan. 31, 2003) (filed under seal) (Dkt. No. 1782). Therein, Defendants argued that, given the general six-year statute of limitations in 28 U.S.C.

86. § 2401 and tolling language appearing in an appropriations rider that has been enacted annually since 1990, claims for an accounting of transactions six years prior to 1990, or October 1, 1984, were time barred. In April 2003, the Court ruled that claims for "trust

[20] The Court of Appeals held, further, that much of the fixing-the-system elements of the injunction exceeded the Court's remedial discretion and vacated all but the requirement that Interior complete and file its "To-Be Plan." 392 F.3d at 465.

mismanagement," including failure to provide an accounting, cannot accrue for purposes of 28 U.S.C. § 2401(a) "until the trustee has repudiated the beneficiary's right to the benefits of the trust."[21] Cobell v. Norton, 260 F. Supp. 2d 98, 105 (D.D.C. 2003) (the "April 2003 ruling").

87. Defendants briefed the statute of limitations issue in both appeals of this Court's structural injunctions in 2003 and 2004, but neither appellate decision addressed the issue. Thus, this Court's April 2003 ruling would allow Indian beneficiaries to sue for any claimed breach of trust occurring at any point in the history of the Indian trust, even if the beneficiary had full knowledge of the alleged breach and failed to bring an action within the six-year limitations period. This result flows from the trust relationship between the Federal Government and Indian tribes and individual Indian beneficiaries, which is established by statute and, thus, cannot be "repudiated," as the Court's April 2003 ruling apparently would require.

88. The Court's April 2003 ruling conflicts with other decisions which have repeatedly held, without discussing any "repudiation" of the trust, that actions brought by Indian beneficiaries for breaches of trust are barred by the applicable statutes of limitations if the

---

[21] In Shoshone Indian Tribe v. United States, 364 F.3d 1339 (Fed. Cir. 2004), cert. denied, 544 U.S. 973 (2005), the Federal Circuit ruled against the United States with respect to the statute of limitations, but its ruling was based not on the absence of "repudiation," but instead on the appropriations rider that has been enacted annually since 1990. Although the precise language of the rider has changed over the years, in substance it provides as follows:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with the accounting of such funds.

Pub. L. No. 101-512, 104 Stat. 1915, 1930 (1990). The Federal Circuit held that the rider operated to revive even claims for which the statute of limitations had already expired in 1990.

beneficiaries knew or should have known of the alleged breach. See, e.g., United States v. Mottaz, 476 U.S. 834, 843-44 (1986); Sisseton-Wahpeton Sioux Tribe v. United States, 895 F.2d 588, 592 (9th Cir. 1990); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576 (Fed. Cir. 1988); cf. City of Sherrill v. Oneida Nation, 544 U.S. 197 (2005) (tribe's claim against municipality barred by laches). Moreover, it is long established that the limitations period in 28 U.S.C. § 2401 applies to both legal and equitable claims. See Blassingame v. Secretary of the Navy, 811 F.2d 65, 70 (2d Cir. 1987); Geyen v. Marsh, 775 F.2d 1303, 1306-07 (5th Cir. 1985). Indeed, that limitations period has been applied in Indian trust cases presenting claims for equitable relief. See Sisseton-Wahpeton, 895 F.2d at 592; Christensen v. United States, 755 F.2d 705, 707 (9th Cir. 1985).

89. Accordingly, claims for accounting of transactions prior to October 1, 1984, are barred by the general six-year statute of limitations, 28 U.S.C. § 2401.

# CONCLUSION

1. Based upon the findings of fact above and the foregoing conclusions of law, the Court determines that the Secretary of the Interior's 2007 Plan and its execution do not present steps so defective that they would necessarily delay rather than accelerate the ultimate provision of an adequate historical accounting to IIM account holders.

2. The record demonstrates that the Secretary's completion of the 2007 Plan will not result in final agency actions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." E.g., Islamic American Relief Agency v. Gonzales, 477 F.3d 728, 732 (D.C. Cir. 2007) (citing 5 U.S.C. § 706(2)(A)); see Nuvio

Corp. v. FCC, 473 F.3d 302, 305 (D.C. 2007) ("Under the Administrative Procedure Act, which governs our review of this challenge, petitioners' burden is to show that the Order is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citing 5 U.S.C. § 706(2)(A)).

3. The Court having satisfied itself of the Secretary's compliance with the Administrative Procedure Act in the ongoing execution of its accounting duties, this matter should be remanded to the Secretary to complete its fulfillment of the historical accounting in accordance with its Plan. Cobell VI, 240 F.3d at 1104, 1109 (noting that this Court had properly remanded the matter to Interior, leaving to the agency the choice of how the accounting activities would be conducted); Cobell V, 91 F. Supp. 2d at 54 n. 36 ("the proper course is to remand the case for further agency consideration in harmony with the court's holding.") (quoting Global Van Lines, Inc. v. ICC, 804 F.2d 1293, 1305 n. 95 (D.C. Cir.1986)).

Dated: November 30, 2007

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
MICHAEL F. HERTZ
Deputy Assistant Attorney General
J. CHRISTOPHER KOHN
Director

/s/ Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Deputy Director
(D.C. Bar No. 406635)
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 616-0238
Facsimile: (202) 514-9163

CERTIFICATE OF SERVICE

I hereby certify that, on November 30, 2007 the foregoing *Defendants' Proposed Findings of Fact and Conclusions of Law Following the Evidentiary Hearing That Commenced on October 10, 2007* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

/s/ Kevin P. Kingston
Kevin P. Kingston