# In the United States Court of Federal Claims

No. 06-900L
Filed: March 23, 2011
**TO BE PUBLISHED**

*************************************

|  |  |
|---|---|
| * | American Indian Trust Fund Management |
| * |    Reform Act of 1994, Pub. L. No. 103-412, |
| * |    25 U.S.C. §§ 161a, 162a; |
| * | Breach of Trust; |
| * | Claim Preclusion; |
| * | Duties of the Assistant Secretary of Interior |
| * |    for Indian Affairs, 25 U.S.C. § 2; |
| * | Four Reservations Act of 1864, 13 Stat. 39; |
| * | Indian Claims Commission Act, 60 Stat. 1049 |
| * |    (1946); |
| * | Indian Tucker Act, 28 U.S.C. § 1505 (2006); |
ROUND VALLEY INDIAN TRIBES, | * | Jurisdictional Act of 1928, 45 Stat. 602; |
| * | Reconciliation Report Act of 2002, 25 U.S.C. |
   Plaintiff, | * |    § 4044 note; |
| * | RESTATEMENT (SECOND) OF JUDGMENTS §§ |
| * |    24(1), 42 (1982); |
v. | * | Waiver and Release; |
| * | 25 U.S.C. §§ 151-66 (Deposit, Care and |
| * |    Investment of Indian Moneys); |
| * | 25 U.S.C. §§ 311-28 (Developing Rights-of- |
THE UNITED STATES, | * |    Way Across Tribal Lands); |
| * | 25 U.S.C. §§ 391-416j (Lease, Sale or |
   Defendant. | * |    Surrender of Allotted or Unallotted |
| * |    Lands); |
| * | 25 U.S.C. §§ 2101-08 (Development of |
| * | Tribal Mineral Resources); |
| * | 25 U.S.C. §§ 3101-20 (National Indian Forest |
| * |    Resources Management); |
| * | Pub. L. No. 101-512, 104 Stat. 1915 (1990 |
| * |    Interior Appropriations); |
| * | Pub. L. No. 111-88, 123 Stat. 2904 (2010 |
| * |    Interior Appropriations); |
| * | RCFC 56(c) (summary judgment). |

*************************************

**Scott B. Henrie**, Williams, Kastner & Gibbs, PLLC, Seattle, Washington, Counsel for Plaintiff.

**Stephen R. Terrell**, United States Department of Justice, Environmental and Natural Resources Division, Washington, D.C., Counsel for Defendant.

**MEMORANDUM OPINION AND ORDER ON THE GOVERNMENT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND ORDER**

**BRADEN,** *Judge.*

To facilitate a review of this Memorandum Opinion and Order, the court has provided the following outline:

**I.      RELEVANT FACTUAL BACKGROUND.**

    **A.      Prior to November 5, 1990.**

    **B.      After November 5, 1990.**

**II.     PROCEDURAL HISTORY.**

**III.    DISCUSSION.**

    **A.      Jurisdiction.**

    **B.      Standing.**

    **C.      Standard On A Motion For Summary Judgment.**

    **D.      The Government's Motion For Partial Summary Judgment Regarding The
    Tribes' Pre-July 20, 1964 Breach Of Trust Claims.**

        **1.      Regarding Claim Preclusion.**

            **a.      The Government's Argument.**

            **b.      Plaintiffs' Response.**

            **c.      The Government's Reply.**

            **d.      The Court's Resolution.**

        **2.      Regarding Waiver And Release.**

            **a.      The Government's Argument.**

            **b.      Plaintiffs' Response.**

            **c.      The Government's Reply.**

            **d.      The Court's Resolution.**

E.      The Government's Alternative Motion For Summary Judgment Regarding The Tribes' Pre-August 13, 1946 Breach Of Trust Claims.

1.      The Government's Argument.

2.      Plaintiffs' Response.

3.      The Government's Reply.

4.      The Court's Resolution.

IV.   CONCLUSION.

\*    \*    \*

## I.   RELEVANT FACTUAL BACKGROUND.[1]

### A.      Prior to November 5, 1990.

The Round Valley Indian Tribes consist of the Yuki Tribe, the Concow Maidu Tribe, the Little Lake Tribe, the Pomo Tribe, the Nomlaki Tribe, the Cahto Tribe, the Wailaki Tribe, and the Pit River Tribe (collectively hereinafter referred to as "the Tribes"). 10/2/09 Robenalt Dec. Ex. B at 2. For thousands of years, ancestors of the Tribes have lived in the area known today as the State of California. 10/2/09 Robenalt Dec. Ex. B at 2. In 1856, the Department of Interior ("Interior") selected the Nome Cult Valley in Mendocino County, California as the site for an "Indian farm." DEPARTMENT OF INTERIOR, EXECUTIVE ORDERS RELATING TO INDIAN RESERVATIONS, 1855-1922 at 55 (1975) ("EXEC. ORDERS"). On November 18, 1858, the Secretary of Interior issued an Order that set aside the Nome Cult Valley as an Indian reservation. EXEC. ORDERS at 55.

On April 8, 1864, the Four Reservations Act of 1864, 13 Stat. 39, was enacted, authorizing the President to designate up to "four tracts of land, within the limits of [California], to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state. . . ." *Id.* at 40. On March 30, 1870, the Secretary of Interior forwarded a Report to President Ulysses S. Grant delineating the proposed boundaries of an area to be designated Round Valley Reservation. EXEC. ORDERS at 56-58. On that date, President Grant issued an Executive Order that designated 31,683 acres in

---

[1] The facts cited herein were derived from the: December 27, 2006 Complaint ("Compl."); October 2, 2009 Declaration of James Robenalt ("10/2/09 Robenalt Dec.") and attached Exhibits ("10/2/09 Robenalt Dec. Ex. A-K"); December 14, 2009 Declarations of Katherine Ramirez ("12/14/09 Ramirez Dec.") and Donna Erwin ("12/14/09 Erwin Dec."); the Government's Appendix of Exhibits to the September 3, 2010 Motion For Partial Summary Judgment ("Gov't App. Ex. 1-15"); and the November 1, 2010 Declaration of Carlino Bettega ("11/1/10 Bettega Dec.").

California as the Round Valley Indian Reservation (the "Reservation").[2] EXEC. ORDERS at 58. By 1873, the Tribes were relocated to the Reservation.  10/2/09 Robenalt Dec. Ex. A at 21.

On January 24, 1923, Congress established the Bureau of Indian Affairs ("BIA") within Interior to manage the lands and natural resources of all American Indian Tribes, including, but not limited to, mineral deposits and timber resources.  42 Stat. 1180 (1923), codified at 25 U.S.C. § 1; *see also* 25 U.S.C. § 2 ("The [Assistant Secretary of the Interior for Indian Affairs] shall, under the direction of the Secretary of the Interior . . . have the management of all Indian affairs and of all matters arising out of Indian relations."); 25 U.S.C. §§ 151-66 (Deposit, Care and Investment of Indian Moneys); 25 U.S.C. §§ 311-28 (Developing Rights-of-Way Across Indian Tribal Lands); 25 U.S.C. §§ 391-416j (Lease, Sale, or Surrender of Allotted or Unallotted Lands); 25 U.S.C. §§ 2101-08 (Development of Indian Tribal Mineral Resources); 25 U.S.C. §§ 3101-20 (National Indian Forest Resources Management); 25 U.S.C §§ 4011-12 (Recognition of Trust Responsibility); 25 U.S.C §§ 4021-29 (Indian Trust Fund Management Program).

On May 18, 1928, the Jurisdictional Act of 1928 was enacted to authorize "the [A]ttorney [G]eneral of the State of California to bring suit in the Court of Claims on behalf of the Indians of California."  45 Stat. 602 (1928).  This Act defined the "Indians of California" as "all Indians who were residing in the State of California on June 1, 1852, and their descendants now living in said State."  *Id*.; *see also Indians of California by Webb* v. *United States*, 98 Ct. Cl. 583, 585 (Ct. Cl. 1942) ("[P]laintiffs, herein designated as The Indians of California, comprise all those Indians of the various tribes, bands and rancherias who were living in the State of California on June 1, 1852, and their descendants living in the state on May 18, 1928—such definition and designation having been prescribed in the Jurisdictional Act [of 1928].").

The Attorney General of California was authorized thereunder to file any claims

the Indians of California . . . may have against the United States by reason of lands taken from them in the State of California by the United States without compensation, or for the failure or refusal of the United States to compensate them for their interest in lands in said State which the United States appropriated to its own purposes without the consent of said Indians. . . .

45 Stat. 602 (1928).

On August 14, 1929, the Attorney General of California filed an action in the Court of Claims, pursuant to the Jurisdictional Act of 1928, on behalf of the Indians of California.  *See Indians of California by Webb*, 98 Ct. Cl. at 595.

On October 5, 1942, the Court of Claims held that the Indians of California were entitled to recover damages from the United States ("the Government") and referred the case to a Commissioner to determine the amount of damages.  *Id*. at 601.

---

[2] Subsequently, the boundaries of the Round Valley Indian Reservation were changed so that today it consists of 31,571 acres.  10/2/09 Robenalt Dec. Ex. B at 2-3; *see also* attached Court Exhibit A.

On October 30, 1944, the Attorney General of California and the Government signed a Stipulation, requesting that the Court of Claims enter a final judgment for the Indians of California in the amount of $5,024,842.34 that "shall be in full and complete settlement, satisfaction, and discharge of any and all claims and demands of every kind and character whatsoever which the plaintiff Indians, or any of them, may have against the United States under and by virtue of the [Jurisdictional Act of 1928]."  Gov't App. Ex. 1 at 5; *see also Indians of California* v. *United States*, 102 Ct. Cl. 837 (Ct. Cl. 1944) (entering the Stipulation as a final judgment).  In fiscal year 1945, Congress appropriated $5,024,842.34 for "Judgments, Court of Claims, Department of the Interior, Indians."  Gov't App. Ex. 2.

On August 13, 1946, the Indian Claims Commission Act, 60 Stat. 1049 ("ICCA"), was enacted, establishing an Indian Claims Commission ("ICC") to "hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States":

> (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.

*Id.* at 1050 (1946).[3]

Pursuant to the ICCA, American Indian Tribes or their representatives were authorized to file claims against the Government at the ICC until August 13, 1951.  *See* 60 Stat. 1049, 1052 (1946).  Section 12 of the ICCA provides that "no claim existing before [August 13, 1946,] but not presented [to the ICC by August 13, 1951,] may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress."  60 Stat. 1049, 1052 (1946).  In addition, the ICCA authorized the Court of Claims to adjudicate certified questions of law, as well as appeals of any final determinations, from the ICC.  *See* 60 Stat. 1049, 1054 (1946).

---

[3] Prior to the enactment of the ICCA, "no [Indian Tribes were] able to bring their disputes with the Federal Government before the Court of Claims without a special act of Congress. . . ." H.R. REP. NO. 79-1466, at 2 (1945).

On July 20, 1948, Clyde F. Thompson, *et al*. ("*Thompson*"), filed a Petition with the ICC on behalf of the "Indians of California," *i.e.*, "all Indians who were residing in the State of California on June 1, 1852 and their descendants now living."   Gov't App. Ex. 3 at 3.[4]   This Petition requested that

> [the Government] make a full and true discovery and disclosure of the acreage used, occupied and possessed, in the accustomed Indian manner, by the Indians of California and (1) taken and sold for its own account and (2) taken and appropriated for its own use, as aforesaid, and render a complete and accurate account thereof and of all relevant facts connected therewith . . . and that [the Government] be adjudged liable to the Indians of California for such taking and appropriation in such amount as upon a complete and accurate accounting [as the ICC] may find due and owing to Indians of California as just or proper compensation. . . .

Gov't App. Ex. 3 at 9.

On May 6, 1952, the Court of Claims, responding to a certified question of law from the ICC, held that "[f]or the purpose of presenting claims, by petition, to the Indian Claims Commission for hearing and determination, we think the petitioners as the 'Indians of California' come within the term 'identifiable group,' as used in the [ICCA]."   *Thompson* v. *United States*, 122 Ct. Cl. 348, 356 (Ct. Cl. 1952) ("*Thompson I*").   The Court of Claims also determined that the ICCA's legislative history established that

> Congress clearly intended in circumstances such as we have here, to confer upon the Indian Claims Commission jurisdiction to hear and determine claims that might be presented to it by groups of Indians, such as the Indians of California,

---

[4] On September 14, 1948, the Council of California Indians, Inc. ("Council of California Indians") filed a separate Petition with at the ICC on behalf of the "Indians of California," *i.e.*, "all Indians who were residing in the State of California on June 1, 1852 and their descendants now living."   Gov't App. Ex. 4 at 4.   This Petition requested that

> [the Government] make a full and true discovery and disclosure of the acreage used, occupied and possessed, in the accustomed Indian manner, by the Indians of California and which were taken from them by the United States and appropriated to its own purposes without their consent and render a complete and accurate account thereof and of all relevant facts connected therewith . . . and that [the Government] be adjudged liable to the Indians of California for such taking and appropriation in such amount as upon a complete and accurate accounting [as the ICC] may find due and owing to the Indians of California as just and proper compensation. . . .

Gov't App. Ex. 4 at 9.   On March 24, 1949, Earnest Risling, *et al*. ("*Risling*"), filed an Amended Petition on behalf of the Council of California Indians.   Gov't App. Ex. 5.

> even though the ancestors of such group existed as separate bands or villages at the time the claim arose.

*Id*. at 357.

On August 17, 1963, the Covelo Indian Community Council ("Covelo Council")[5] convened a special meeting to "[discuss] generally the California Indians claim against the Federal [G]overment."  Gov't App. Ex. 7.  The Covelo Council considered forming "a [C]ommittee to represent the Covelo community at meetings pertaining to the Indians of California," but instead "decided to invite [Clyde Thompson] to a meeting to discuss the per capita payments to the [Indians of California]."  Gov't App. Ex. 7.

On March 3, 1964, the ICC consolidated the *Thompson* and *Risling* petitions and issued an Opinion holding:

> In this case [the] identifiable group represented by petitioners in [*Thompson* and *Risling*] and entitled to the ultimate award envisioned by this Commission would be the Indians of California except those tribes, bands or identifiable groups which filed their own separate claims, as specifically defined in our decisions of January 20, 1958, and October 6, 1958.

*Thompson* v. *United States*, 13 Ind. Cl. Comm. 89, 94 (Ind. Cl. Comm. 1964) ("*Thompson II*").

The Tribes, however, never filed a separate claim with the ICC.  Gov't App. Ex. 9 (ICC Order of Jan. 20, 1958, determining that *Thompson* and *Risling* did not have the exclusive right to bring claims on behalf of the Indians of California); *see also* Gov't App. Ex. 10 (ICC Order of Oct. 6, 1958, dividing the claims of the Indians of California into two groups, *i.e.*, the claims filed by individual tribes, as defined in the January 20, 1958 Order, and the Indians of California claims filed by *Thompson* and *Risling*).

On April 30, 1964, the *Thompson* and *Risling* petitioners filed a Joint Motion For Entry Of Final Judgment in the ICC and Stipulations, requesting that a final judgment be entered in the amount of $29,100,000 in favor of the Indians of California.  Gov't App. Ex. 11 at 1.

On July 20, 1964, the ICC issued a Final Determination Or Judgment in the *Thompson* and *Risling* actions, granting the parties' Joint Motion For Entry Of Final Judgment and entering final judgment in the amount of $29,100,000 "in favor of all of the petitioners (as representatives of the tribes, bands or groups on whose behalf said petitioners were presented, as construed and defined by our order of March 3, 1964 in [*Thompson II*]) as a single class."  Gov't App. Ex. 12 at 2.  On October 14, 1964, the Department of the Treasury transferred $29,100,000 to an account created by BIA for the Indians of California, pursuant to the July 20, 1964 ICC Final Determination and Judgment.  Gov't App. Ex. 13, 14.

---

[5]  Prior to September 14, 1994, the Round Valley Indian Tribes were known as the "Covelo Indian Community."  Compl. ¶ 2; *see also* 11/1/10 Bettega Dec. ¶ 3.

**B.     After November 5, 1990.**

On November 5, 1990, Congress approved Interior's annual appropriations bill that included the following language:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with the accounting of such funds. . . .

Pub. L. No. 101-512, 104 Stat. 1915, 1930 (1990).

For each subsequent fiscal year, Congress has included substantially similar language in all Interior appropriations.[6]

In May 1991, the BIA retained the accounting firm of Arthur Andersen, LLP to collect and analyze all Indian fund data and issue a report to Congress providing an accounting, pursuant to Interior's Tribal Trust Funds Reconciliation Project ("TRP").  12/14/09 Erwin Dec. ¶ 6.

In 1994, the BIA's fiduciary responsibilities again were reaffirmed by the American Indian Trust Fund Management Reform Act of 1994, Pub. L. No. 103-412, 25 U.S.C. §§ 161a, 162a, 4001-4061 ("ITFMA").  Section 304 of this Act provides that

> [t]he Secretary [of the Interior] shall transmit to the Committee on Natural Resources of the House of Representatives and the Committee on Indian Affairs of the Senate, by May 31, 1996, a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995. . . . The report shall include—

---

[6]  On February 20, 2003, Interior's appropriations were authorized, containing the following language, referred to herein as the "Appropriations Provisio":

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss. . . .

Pub. L. No. 108-7, 117 Stat. 11, 236 (2003) (FY 2003 Interior Appropriations).  Congress has included this same language in Interior's appropriations for each subsequent year. *See, e.g.,* Pub. L. No. 108-108, 117 Stat. 1241, 1263 (2003) (FY 2004); Pub. L. No. 108-447, 118 Stat. 2809, 3060-61 (2004) (FY 2005); Pub. L. No. 109-54, 119 Stat. 499, 519 (2005) (FY 2006); Pub. L. No. 110-5, 121 Stat. 8, 9 (2007) (continuing resolution for FY 2007); Pub. L. No. 110-161, 121 Stat. 1844, 2115 (2007) (FY 2008); Pub. L. No. 111-8, 123 Stat. 524, 718-19 (2009) (FY 2009); Pub. L. No. 111-88, 123 Stat. 2904, 2922 (2009) (FY 2010).

> (1) a description of the Secretary's methodology in reconciling trust fund accounts;
>
> (2) attestations by each account holder that—
>
>> (A) the Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance as reconciled by the Secretary; or
>>
>> (B) the account holder disputes the balance of the account holder's account as reconciled by the Secretary and statement explaining why the account holder disputes the Secretary's reconciled balance; and
>
> (3) a statement by the Secretary with regard to each account balance disputed by the account holder outlining efforts the Secretary will undertake to resolve the dispute.

Pub. L. No. 103-412, § 304 (1994) (codified at 25 U.S.C. § 4044).

In addition, the ITFMA required that Interior perform "an annual audit on a fiscal year basis of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian," pursuant to 25 U.S.C. § 4011(c), and issue a report that identifies "for each tribal trust fund account for which [Interior's] Secretary is responsible[,] a balance reconciled as of September 30, 1995." 25 U.S.C. § 4044.

Since ITFMA was enacted, BIA's Office of the Special Trustee for American Indians has provided the Tribes with "periodic" statements of trust fund account performance. 12/14/09 Erwin Dec. ¶ 7; *see also* Gov't Ex. U (sample account statement). Typically, these statements list: "types of receipts, including realized gains, losses, and disbursements; beginning and ending balances; financial investment holdings, including assets owned, 'cost,' 'percentage of account at market,' 'market value,' 'estimate of annual income,' and 'unrealized gains and losses.'" 12/14/09 Erwin Dec. ¶ 7.

On January 19, 1996, Arthur Andersen, LLP issued a TRP Report ("1996 Andersen TRP Report") that was forwarded to the Tribes. 12/14/09 Ramirez Dec. ¶¶ 2-16; *see also* Gov't Ex. A-R (packing lists, Federal Express tracking reports and recipients' signatures).

On March 28, 1996, the Tribes advised BIA that they required additional time to review the 1996 Arthur Andersen TRP Report. 12/14/09 Ramirez Dec. ¶ 17. On May 31, 1996, the Secretary of Interior forwarded Congress a Report, as required by 25 U.S.C. § 4044, indicating that only 77 of the 280 Indian trust fund account holders that TRP Reports had responded to the BIA. Gov't Ex. W. Only 2 of the 77 responsive account holders accepted the findings of their TRP Report. Gov't Ex. W. The other 75 responsive account holders disputed the findings, requested additional review time, or requested a meeting with BIA. *Id.*

The Tribes in this case ultimately declined to accept the 1996 Andersen TRP Report because of a disclaimer[7] in the report and their concern that the report was neither certified nor complete.[8]  Compl. ¶¶ 28-29.

In 2002, Congress passed "An Act to encourage the negotiated settlement of tribal claims," that provided:

> Notwithstanding any other provision of law, for purposes of determining the date on which an Indian tribe received a reconciliation report for purposes of applying a statute of limitations, any such report provided to or received by an Indian tribe in response to the [ITFMA] shall be deemed to have been received by the Indian tribe on December 31, 1999.

Pub. L. No. 107-153, 116 Stat. 79 (2002) (codified at 25 U.S.C. § 4044 note) ("Reconciliation Report Act").

## II.   PROCEDURAL HISTORY.

On December 27, 2006, the Tribes filed a Complaint in the United States Court of Federal Claims alleging "breaches of trust duties in regard to the management by [the Government] of the trust funds of the Round Valley Tribe[s] from 1855 to present."  Compl. ¶ 1. On February 22, 2007, the parties filed a Joint Motion For Extension Of Time to allow the Government to file an Answer.  On February 28, 2007, the court granted that motion.

On July 13, 2007, the parties filed a Joint Motion To Stay to engage in settlement discussions.  On August 13, 2007 and August 29, 2007, the court convened telephone status conferences with the parties to discuss the status of these negotiations.  On August 29, 2007, the

---

[7] The 1996 Andersen TRP Report contained the following disclaimer, *i.e.*, the assignment undertaken did "not constitute an audit made in accordance with generally accepted auditing standards."  Compl. ¶ 25; *see also* Gov't Ex. W at 2, 7 ("[The 1996 Andersen TRP Report was] not an audit[,] as defined by the American Institute of Certified Public Accountants[,] because all the necessary financial records required to perform an audit could not be located.  Consequently, the conclusions that can be drawn from the results can only be related to the records reviewed and cannot be applied to any unreconciled transaction.").  In other words, Arthur Andersen utilized accounting protocol procedures BIA prescribed, instead of those routinely accepted and used by the accounting profession.  Compl. ¶ 28.1.

[8] The 1996 Andersen TRP Report likely was not certified because BIA's electronic records contain only accounting data from July 1, 1972.  12/14/09 Ramirez Dec. ¶¶ 18-19.  Prior to that time, the tribal trust records kept were in paper form.  *See* The Committee on Government Operations of the House of Representatives Report to the Speaker entitled: *Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund*.  H.R. REP. NO. 102-499 (1992) (discussing deficiencies in BIA's trust fund management practices and finding that BIA failed to discharge several fiduciary duties to American Indian tribes).  This Report concluded that the Indian Trust Fund was "a bank that doesn't know how much money it has."  H.R. REP. NO. 102-499, at 56 (1992).

Tribes withdrew from the settlement discussions, but the court declined to grant a Joint Motion To Stay.  On September 10, 2007, the Government filed an Answer.

On October 1, 2007, the court entered a Protective Order and a Scheduling Order that directed the parties to file a joint proposed confidentiality agreement.  On October 1, 2007, the parties filed a Joint Preliminary Status Report.  On October 24, 2007, the court entered a negotiated Confidentiality Order.

On May 22, 2008, the court convened a status conference to discuss the Tribes' pending discovery requests and contents of the BIA's record database.  On July 29, 2008, the court held a hearing to discuss these issues.  On October 9, 2008, the Tribes filed a Motion To Compel Discovery of certain historical trust records.  On October 14, 2008, the court convened a status conference to discuss that motion.  On October 24, 2008, the court granted the Government leave to defer filing a written response to the Tribes' October 9, 2008 Motion To Compel.  On December 1, 2008, the court met with the parties at the Department of Interior's Washington, D.C. Office to discuss the Tribes' October 9, 2008 Motion To Compel.  On December 11, 2008, the court denied the Tribes' Motion To Compel, pursuant to oral representations made by the Government at the December 1, 2008 conference that additional efforts would be made to produce the requested BIA records.  12/1/08 TR at 41-48.

On March 12, 2009, the Tribes filed a second Joint Motion To Stay Litigation to conduct settlement discussions, that the court granted the following day.  On April 15, 2009, the Tribes filed a Joint Motion To Lift Stay.  On April 23, 2009, the court convened a status conference to discuss the March 12, 2009 Joint Motion and subsequently issued an Order lifting the stay.

On August 6, 2009, the Government filed a Motion For Approval And Entry Of A Proposed Scheduling Order and informed the court that the Government had identified 35,234 boxes that "contain or may contain documents that are relevant or potentially relevant" to this case.  Gov't Prop. Sch. Order at 4.  The Government estimated that at least 15,482 of those boxes would require further review before they could be released to the Tribes.  *Id.*  On that same date, the court convened a telephone status conference, during which the Tribes informed the court and the Government of their intent to file a motion for partial summary judgment.  8/6/09 TR at 7:1-7.

On October 2, 2009, the Tribes filed a Motion For Partial Summary Judgment On Liability For Breach Of Fiduciary Duty; Proposed Findings Of Uncontroverted Fact, together with the Declaration of James L. Robenalt ("10/2/09 Robenalt Dec."); and attached Exhibits ("10/2/09 Robenalt Dec. Ex. A-K").  On December 14, 2009, the Government filed an Opposition, together with Proposed Findings of Uncontroverted Fact; the Declarations of Katherine Ramirez ("12/14/09 Ramirez Dec.") and Donna Erwin ("12/14/09 Erwin Dec."); and a Response to the Tribes' Proposed Findings of Fact and attached Exhibits ("Gov't Ex. A-W").

On February 1, 2010, the Tribes filed a Reply, together with the Supplemental Declaration of James Robenalt ("2/1/10 Robenalt Dec."), attached Exhibits ("2/1/10 Robenalt Dec. Ex. A-C"), and Revised Proposed Findings Of Uncontroverted Fact.

On April 27, 2010, the court entered a Scheduling Order to convene an August 5, 2010 oral argument in San Francisco, California on the Tribes' October 2, 2009 Motion For Partial Summary Judgment.  At the August 5, 2010 oral argument, with the Tribes' consent, the court deferred ruling on the Tribes' Motion For Partial Summary Judgment.  8/5/10 TR at 71-72.  On that same date, the court was advised that the Government intended to file a Motion For Partial Summary Judgment.  *Id.* at 74-75.

On September 3, 2010, the Government filed a Motion For Partial Summary Judgment regarding the Tribes' claims that pre-date July 20, 1964 ("Gov't Mot."), together with a Statement of Undisputed Material Facts, and an Appendix of Exhibits ("Gov't App. Ex. 1-15").

On November 1, 2010, the Tribes filed a Response ("Pl. Resp.") to the Government's September 3, 2010 Motion For Partial Summary Judgment, together with the Declaration of Carlino Bettega ("11/1/10 Bettega Dec.") and a Response to the Government's Statement of Undisputed Material Facts.  On November 15, 2010, the Government filed a Reply ("Gov't Reply").

## III.   DISCUSSION.

### A.   Jurisdiction.

The Indian Tucker Act, 28 U.S.C. § 1505, specifically authorizes Indian tribes to bring claims in this court "arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the [United States] Court of Federal Claims if the claimant were not an Indian tribe, band or group."  28 U.S.C. § 1505.

To state a claim cognizable under the Indian Tucker Act "a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties."  *United States* v. *Navajo Nation*, 537 U.S. 488, 506 (2003) ("*Navajo I*"); *see also United States* v. *Mitchell*, 463 U.S. 206, 226 (1983) ("Because the statutes and regulations at issue . . . clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.").  The "general trust relationship between the United States and the Indian people" alone, however, is insufficient to establish jurisdiction in this court.  *Navajo I*, 537 U.S. at 506.

The December 27, 2006 Complaint alleges that the Government breached its duties as trustee to the Tribes in violation of several federal statutes that establish those duties.  Compl. ¶¶ 4, 31.  Therefore, the court has jurisdiction to adjudicate the claims alleged in the December 27, 2006 Complaint.

### B.     Standing

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975).   Standing must be determined "as of the commencement of suit."   *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005).  The party invoking federal jurisdiction bears the burden of establishing standing.   *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."   *Friends of the Earth, Inc*. v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted).

The December 27, 2006 Complaint alleges that the Tribes have suffered injury in fact, that is concrete, particular, actual, and traceable to Interior or BIA's breach of its duties as trustee of the Tribes' trust funds, and the resulting economic injury can be determined in a specific amount.   Compl. ¶¶ 31-32.  For these reasons, the court has determined that the Tribes have standing to pursue this action for breach of trust.

### C.     Standard On A Motion For Summary Judgment.

On a motion for summary judgment, the moving party must show that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law.   *See Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also* RCFC 56(c).  Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment.   *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."). The "existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ."   *Id*. at 247-48.  To avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable finder of fact to return a verdict for that party.   *Id*. at 248-50.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.   *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing' – that is, pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."); *see also Riley & Ephraim Constr. Co., Inc.* v. *United States*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.").  Once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to show the existence of a genuine issue for trial.   *See Novartis Corp.* v. *Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once a movant

demonstrates the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial").

A trial court must resolve any doubt over factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987) ("[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.") (internal quotations and citation omitted). Further, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *see also Casitas Mun. Water Dist.* v. *United States*, 543 F.3d 1276, 1283 (Fed. Cir. 2008) ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment.").

> ### D.     The Government's Motion For Partial Summary Judgment Regarding The Tribes' Pre-July 20, 1964 Breach Of Trust Claims.

The Government asserts that either the doctrine of claim preclusion or the doctrines of waiver and release require the court to grant summary judgment as to all of the Tribes' pre-July 20, 1964 breach of trust claims. Gov't Mot. at 1.

> ### 1.     Regarding Claim Preclusion.

In *Federated Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394 (1981), the United States Supreme Court held that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Id.* at 398 (citation omitted). Claim preclusion applies when there is (1) "a judgment on the merits in a prior suit"; (2) "a second suit involving the same parties or their privies"; and (3) the second suit is "based on the same cause of action." *Parklane Hosiery Co.* v. *Shore*, 439 U.S. 322, 326 n.5 (1979).

> #### a.     The Government's Argument.

The Government argues that the first element of claim preclusion is satisfied by the final judgments in *Indians of California by Webb* and *Thompson*, as they bar the Tribes from seeking an adjudication of any claims that pre-date July 20, 1964. Gov't Mot. at 9-10. Although these cases were resolved by stipulated judgments, the United States Court of Appeals for the Federal Circuit has held that "[f]or claim preclusion purposes, consent judgments are considered to have the same force and effect as judgments entered after a trial on the merits." *Hallco Mfg. Co., Inc.* v. *Foster*, 256 F.3d 1290, 1294-95 (Fed. Cir. 2001) (citation omitted).

As to the second element, the defendant in both cases was the United States, so "[t]here is an identity of party defendant between the prior actions and this action." Gov't Mot. at 11. As for the Tribes, the Jurisdictional Act of 1928 defined "Indians of California" as "all Indians who were residing in the State of California on June 1, 1852, and their descendants now living in said State." 45 Stat. 602. As such, the Tribes are "Indians of California" for the purposes of any suits brought under the Jurisdictional Act of 1928. Gov't Mot. at 11; *see also* 10/2/09 Robenalt Dec. Ex. B at 2. The Attorney General of the State of California filed *Indians of California by Webb*

on behalf of the "Indians of California" under the Jurisdictional Act of 1928.  Gov't Mot. at 11.
Therefore, the Tribes were "a represented party . . . and [are] bound by the judgment in that
action."  Gov't Mot. at 11 (citation omitted); *see also* RESTATEMENT (SECOND) OF JUDGMENTS §
41 (1982) ("A person who is not a party to an action but who is represented by a party is bound
by and entitled to the benefits of a judgment as though he were a party.").

In addition, the *Thompson* and *Risling* petitions also were filed on behalf of the "Indians
of California," defined therein as "all Indians who were residing in the State of California on
June 1, 1852 and their descendants now living."  Gov't App. Ex. 3 at 3; Gov't App. Ex. 4 at 4.
The relevant statute, the ICCA, authorized claims to be brought at the ICC on behalf of "any
Indian tribe, band, or other identifiable group of American Indians residing within the territorial
limits of the United States or Alaska."  60 Stat. 1049, 1050.  The ICC's January 20, 1958 Order
in *Thompson* determined that "the tribal claimants [from the Indian tribes in California named in
this Order] are each entitled to present and have determined their respective claims relating to
lands in California; and that the petitioners in [*Thompson* and *Risling*] can prosecute claims for
all lands in California not involved in the [individual] tribal suits."  Gov't App. Ex. 9 at 7.
Therefore, the ICC determined in *Thompson II* that the "identifiable group . . . entitled to the
ultimate award envisioned by this Commission would be the Indians of California except those
tribes, bands or identifiable groups which filed their own separate claims, as specifically defined
in our [decision] of January 20, 1958. . . ."  *Thompson II*, 13 Ind. Cl. Comm. at 94.

Even though the Tribes in this case did not file a separate claim at the ICC, the
Government argues that they were represented by the *Thompson* and *Risling* petitioners and are
bound by the judgment in those actions.  Gov't Mot. at 13 (citing *Stark* v. *United States*, 2005
WL 697315, at *8 (2005) ("Plaintiff's claims . . . previously were litigated [at the ICC], and
therefore are barred by the doctrine of *res judicata*.")).

As for the third element, "the claims (or portions thereof) asserted by [the Tribes] . . . are
based on the same transactional facts as the ones in the [aforementioned] actions and [the claims
asserted here] . . . were, or should or could have been, litigated in those prior actions."  Gov't
Mot. at 15.  The United States Court of Appeals for the Federal Circuit in *Vitaline
Corp.* v. *General Mills, Inc.*, 891 F.2d 273 (Fed. Cir. 1989), held that a prior final judgment
extinguishes a claim, including

> all rights of the plaintiff to remedies against the defendant with respect to all or
> any part of the transaction, or series of connected transactions, out of which the
> action arose.

*Id.* at 275 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(1) at 196 (1982)).  Therefore,
"a plaintiff is barred from a subsequent assertion of the same transactional facts in the form of a
different cause of action or theory of relief."  *Vitaline Corp.*, 891 F.2d at 275 (quotation marks
and citation omitted).

The Government contends that the Tribes improperly seek to re-litigate claims that were
or could have been addressed in *Indians of California by Webb*, because the Jurisdictional Act of
1928 authorized the United States Court of Claims to adjudicate claims by the "Indians of

California" for lands taken or appropriated by the Government without just compensation. *See* 45 Stat. 602. The December 27, 2006 Complaint also "appears to seek compensation for the equitable 'taking' of [the Tribes'] trust corpus, including its lands." Gov't Mot. at 18 (citation omitted). The *Thompson* and *Risling* petitioners, however, "did, or could have or should have, sought an accounting, damages for trust fund mismanagement[] and damages for non-monetary trust asset mismanagement," because these actions were "based upon the [Government's] fiduciary obligations as trustee to Indian tribes." Gov't Mot. at 17-18 (citation omitted); *see also* Gov't App. Ex. 5 at 8 ("From July 4, 1848, when the United States assumed dominion over the lands in California, [the Government] has been guardian and trustee of the property and affairs of the Indians of California and as such is subject to the same principles of law and equity as would apply to an ordinary fiduciary. . . .").

In this case, the December 27, 2006 Complaint also seeks an accounting and damages for trust mismanagement. Compl. ¶ 14 ("Because the United States holds tribal land in trust, it has assumed the obligations of a trustee. As trustee, the United States has a fiduciary relationship and obligations of the highest responsibility and trust to administer the trust with the greatest skill and care possessed by the trustee.") (citations omitted). Therefore, the Tribes' claims in this case that "pre-date" July 20, 1964 were, or could have been, adjudicated in the *Thompson* and *Risling* actions, as they are "based on the same transactional facts as are at issue here." Gov't Mot. at 18.

### b.       Plaintiffs' Response.

The Tribes respond that their claims are not barred, because

> (1) the [Tribes are] a distinct political entity that [were] in no way in privity with, or represented by the "Indians of California"; (2) the [Tribes] did not participate in or ratify the Indians of California's litigation and settlement, as would be required under their Constitution; and (3) the present litigation presents separate claims and issues of fact relating to breaches of fiduciary duty concerning the management of Round Valley Trust funds.

Pl. Resp. at 6.

The Tribes are a "federally recognized, distinct political entity with inherent sovereign powers." Pl. Resp. at 8. Even if "some of the [Tribes'] individual members were considered to be members of the Indians of California, there is no evidence they were involved in the prior litigation; and, most importantly, even if they were involved, they could not bind the [Tribes] or act on [their] behalf." *Id*. In fact, "Indians of California" does not designate a name nor does it identify a nation, band, or Tribe. *Id*. Instead, "Indians of California" is a "geographical category," not a defined term in the ICCA. *Id*. at 9.

More importantly, the Tribes did not "participate in, control, or ratify the 'Indians of California' litigation and stipulated judgment." Pl. Resp. at 10. The minutes from the August 17, 1963 meeting of the Covelo Council reflect only preliminary discussions about what role the

Tribes should play in the *Thompson* and *Risling* petitions, if any.  *Id*. at 9.  They do not "establish that the [Tribes] actively participated in, or controlled the Indians of California litigation."  *Id*.

As the United States Court of Appeals for the Ninth Circuit held in *United States* v. *Bhatia*, 545 F.3d 757 (9th Cir. 2008):

> To determine whether a nonparty assumed control over a previous action so as to be bound by its judgment, a court must evaluate whether the relationship between the nonparty and a party was such that the nonparty had the same practical opportunity to control the course of the proceedings.

*Id*. at 759-60 (quotation marks and citation omitted).

Likewise, in this case there is no evidence that the Tribes had any relationship with the representative petitioners in the "Indians of California" cases, nor is there any evidence that the Covelo Council took any action to participate in or ratify the *Thompson* and *Risling* judgments. Pl. Resp. at 10.  Since the Tribes were not a party to either of these prior actions, or in privity with the parties in the prior actions, the Tribes are not precluded from seeking an adjudication of the breach of trust claims alleged in the December 27, 2006 Complaint.  Pl. Resp. at 10.

In addition, the Tribes counter that the claims alleged in the December 27, 2006 Complaint and the claims brought in the aforementioned actions are "separate actions that do not arise from the same set of transactional facts."  Pl. Resp. at 11.  The *Indians of California by Webb* case and the *Thompson* and *Risling* Petitions do not concern a breach of trust, but the unlawful and unjust taking of Indian lands.  *Id*. at 12-13.  In contrast, the December 27, 2006 Complaint sets forth a claim for "Breach of Trust duty – Trust Funds Mismanagement," with distinctly different transactional facts and, as such, claim preclusion is inapplicable.  Compl. ¶¶ 31-32.

Finally, the Tribes also take issue with the Government's simple assertion that the money appropriated to satisfy the judgments in the aforementioned cases was deposited into accounts for the benefit of the Tribes.  Pl. Resp. at 11.  There is absolutely no evidence that the Tribes have ever received any of these funds.  *Id*.  In fact, the Tribes are not mentioned in any of the relevant documents.  *Id*.

### c.   **The Government's Reply.**

The Government replies that claim preclusion is applicable, because the Court of Claims determined that the "Indians of California" are an "identifiable group" under the ICCA, that permits a representative action on behalf of an identifiable group.  *See Thompson I*, 122 Ct. Cl. at 356-57.  In addition, the Final Determination Or Judgment in *Thompson* and *Risling* provides that it was "in favor of all of the petitioners [as] representatives of the tribes, bands or groups on whose behalf said petitions were presented. . . ."  Gov't App. Ex. 12 at 2.  As a matter of binding precedent, an ICC action brought on behalf of an identifiable group "can encompass, and bind, sovereign Indian tribes that are not the named representative plaintiff(s) in the action."  Gov't Reply at 8 (citing *Temoak Band of Western Shoshone Indians* v. *United States*, 593 F.2d 994,

997 (Ct. Cl. 1979)); *see also Western Shoshone Legal Defense and Ed. Ass'n* v. *United States*, 531 F.2d 495, 504 (Ct. Cl. 1976) ("An Indian claim under the [ICCA] is unlike a class suit in that there is no necessity that the position of each individual member of the group be represented; it is only the group claim which need be put forward."). Therefore, the Tribes were not required to participate in, control, or ratify any prior ICC action or litigation to be bound by any final ICC judgment. Gov't Reply at 9-10.

As to privity, in *United States* v. *Dann*, 470 U.S. 39 (1985), the United States Supreme Court held that once judgment funds are deposited into a trust account for the benefit of a Tribe, the Government has effectuated payment. *Id.* at 50 ("In short, the [ICC] ordered the Government *qua* judgment debtor to pay $26 million to the Government *qua* trustee for the Tribe as the beneficiary. Once the money was deposited into the trust account, payment was effected.").

Regarding the third element of claim preclusion, the Tribes' claims in this case are based on the same transactional facts as the aforementioned actions, all of which "sought damages from the United States as upon a complete and accurate accounting as may be found due and owing," and were "based upon the United States' role as statutory trustee to [the Tribes] and other Indians." Gov't Reply at 11 (quotation marks and citations omitted). It is not relevant whether the instant claims actually were litigated, as long as they could have been litigated in the previous action. *Id.* The United States Supreme Court repeatedly has held that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores*, 452 U.S. at 398; *see also San Remo Hotel, L.P.* v. *City and County of San Francisco*, 545 U.S. 323, 336 n.16 (2005) (same); *Kremer* v. *Chemical Const. Corp.*, 456 U.S. 461, 467 n.6 (1982) (same).

In addition, the *Thompson* and *Risling* Stipulation governs the Tribes' trust fund mismanagement claims, because it unambiguously released the Government from "all claims or demands which any of the petitioners and claimants . . . have asserted or could have asserted against [the Government] . . . and petitioners (and all claimants represented thereby) . . . shall be barred from asserting all such claims or demands in any future action." Gov't App. Ex. 11 at 5. Therefore, this Stipulation "clearly bars [the Tribes'] current trust mismanagement claims." Gov't Reply at 14.

### d.    The Court's Resolution.

Assuming *arguendo* that the Tribes' claims are barred by the doctrine of claim preclusion, only those claims that arose prior to August 13, 1946 would be barred. Although the ICC issued a Final Determination Or Judgment in the *Thompson* and *Risling* actions on July 20, 1964, the ICC only had jurisdiction to adjudicate claims that accrued prior to or on August 13, 1946. *See* 60 Stat. 1049, 1050 ("No claim accruing after the date of the approval of this Act shall be considered by the [ICC]."). Accordingly, as a matter of law, any final judgment entered by the ICC only applies to claims that accrued prior to August 13, 1946.

In *Nasalok Coating Corp.* v. *Nylok Corp.*, 522 F.3d 1320 (Fed. Cir. 2008), the United States Court of Appeals for the Federal Circuit adopted the *Parklane Hosiery* "three-part test for claim preclusion: (1) there is identity of parties (or their privies); (2) there has been an earlier

final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first." *Id*. at 1324 (quotation marks and citation omitted).

As to the first part of this test, the court has determined in this case that the Tribes were represented by the Plaintiffs in the *Indians of California by Webb* action in the Court of Claims, because the Jurisdictional Act of 1928 defined "Indians of California" as "*all Indians* who were residing in the State of California on June 1, 1852, and their descendants now living in said State." 45 Stat. 602 (emphasis added). Likewise, the *Thompson* and *Risling* petitions were brought on behalf of the "Indians of California," defined as "all Indians who were residing in the State of California on June 1, 1852 and their descendants now living." Gov't App. Ex. 3 at 3; Gov't App. Ex. 4 at 4. And, in *Thompson I*, the Court of Claims held that, "[f]or the purpose of presenting claims, by petition, to the ICC . . . the 'Indians of California' come within the term 'identifiable group.'" *Thompson I*, 122 Ct. Cl. at 356; *see also id*. at 357 (holding that the legislative history of the ICCA established that Congress authorized "any group of American Indians that could be sufficiently identified," such as the Indians of California, with authority to pursue a claim at the ICC). Since ancestors of the Tribes have lived in California since at least June 1, 1852, even though the Tribes did not file a separate claim with the ICC, the court has determined that the Tribes' interests were represented by the "Indians of California" in that proceeding. *Id*.

As to the second element of claim preclusion, the United States Court of Appeals for the Federal Circuit has determined that when cases have been resolved by stipulations of the parties and subsequently entered as judgments, they "are considered to have the same force and effect as judgments entered after a trial on the merits." *Hallco Mfg. Co.*, 256 F.3d at 1295; *see also Young Engineers, Inc.* v. *United States International Trade Commission*, 721 F.2d 1305, 1314 (Fed. Cir. 1983) ("[C]laim preclusion may operate between the parties simply by virtue of the final judgment. Thus, principles of merger and bar may apply even though a judgment results by default, consent, or dismissal with prejudice. . . .") (citation omitted).

With respect to the third element of claim preclusion, however, the court has determined that the claims alleged in the December 27, 2006 Complaint are not based upon the same set of transactional facts as the aforementioned actions. The United States Court of Appeals for the Federal Circuit has held that "a claim is defined by the transactional facts from which it arises." *Acumed LLC* v. *Stryker Corp.*, 525 F.3d 1319, 1324 (Fed. Cir. 2008) (citation omitted). The term "transactional facts" has been defined "in terms of a 'core of operative facts,' the 'same operative facts,' or the 'same nucleus of operative facts,' and 'based on the same, or nearly the same factual allegations.'" *Ammex. Inc.* v. *United States*, 334 F.3d 1052, 1056 (Fed. Cir. 2003) (citations omitted). The December 27, 2006 Complaint alleges that the Government has mismanaged the Tribes' trust funds in breach of the Government's duty as trustee. Compl. ¶¶ 31-32. The December 27, 2006 Complaint also seeks a "full and complete accounting," to determine the amount of monetary damages that the Government owes the Tribes. Compl., Prayer For Relief ¶¶ 1-2.

In contrast, the *Indians of California by Webb* action was filed pursuant to the Jurisdictional Act of 1928, that only authorized the California Attorney General to bring claims on behalf of the Indians of California for "*lands taken* from them in the State of California by the

United States without compensation, or for the failure or refusal of the United States to compensate [the Indians of California] for their interest in lands in said State which the United States appropriated to its own purposes without the consent of said Indians. . . ."  45 Stat. 602 (emphasis added).  None of the underlying transactional facts alleged in the Tribes' claim for breach of trust duty, however, are relevant to claims regarding the taking of land without just compensation.  *See* Compl. ¶¶ 31-32.  Therefore, the court has determined that the December 27, 2006 Complaint in the case pending in the United States Court of Federal Claims is not based upon the same transactional facts as *Indians of California by Webb*.

Likewise, the *Thompson* and *Risling* Petitions allege that the Government's actions effectuated "a taking by the United States of lands occupied by the Indians of California without payment of just compensation or of any compensation agreed to by them. . . ."  Gov't App. Ex. 3 at 6-7; Gov't App. Ex. 4 at 7; *see also* Gov't App. Ex. 3 at 6 ("The acts committed by [the Government] . . . constituted a taking of the lands possessed by the Indians of California.").  Therefore, the court has determined that the December 27, 2006 Complaint pending in the United States Court of Federal Claims is not based upon the same transactional facts as either the *Thompson* or *Risling* actions.  *See* Court Exhibit B, comparing the Claim For Relief and Prayer For Relief in the December 27, 2006 Complaint and the Claim For Relief and Prayer For Relief in the *Thompson* and *Risling* Petitions.

For these reasons, the court has determined that the Tribes are not barred from seeking an adjudication in the United States Court of Federal Claims of the breach of trust claim alleged in the December 27, 2006 Complaint that pre-date July 20, 1964.

### 2.        Regarding Waiver And Release.

#### a.        The Government's Argument.

The Government also argues that the doctrines of waiver and release bar the Tribe's breach of trust claims in this case that pre-date July 20, 1964.  Gov't Mot. at 19.  The United States Court of Appeals for the Federal Circuit in *King* v. *Department of the Navy*, 130 F.3d 1031 (Fed. Cir. 1997), held that "the words used by the parties to express their agreement are given their ordinary meaning, unless it is established that the parties mutually intended and agreed to some alternative meaning."  *Id*. at 1033 (citation omitted).

The October 30, 1944 Stipulation in *Indians of California by Webb* provides:

[S]aid judgment when entered shall be in full and complete settlement, satisfaction, and discharge of any and all claims and demands of every kind and character whatsoever which the plaintiff Indians, *or any of them*, may have against the United States under and by virtue of the [Jurisdictional Act of 1928].

Gov't App. Ex. 1 at 6 (emphasis added).

Likewise, the July 20, 1964, Final Judgment in *Thompson* and *Risling* incorporated the following April 30, 1964 Stipulation For Compromise And Settlement And Entry Of Final Judgment:

> The stipulation and entry of final judgment shall finally dispose of all claims or demands which any of the petitioners and claimants represented in [the *Thompson* and *Risling* actions] have asserted or could have asserted against [the Government] in any of said cases, either before or after any consolidation, and petitioners (and all claimants represented thereby), and each of them, shall be barred from asserting all such claims or demands in any future action.

Gov't App. Ex. 11 at 5; *see also* Gov't App. Ex. 12 at 2.

Therefore, the "words used by the parties" in these Stipulations release and discharge the Government for the claims in those actions, as well as those in this case. Gov't Mot. at 21. Accordingly, the Tribes' claims in this case "that pre-date July 20, 1964 have been waived and released by the stipulations and judgments in the prior Indians of California actions." *Id*. at 22.

### b.    Plaintiffs' Response.

As to the Government's waiver and release argument, the Tribes respond that since they were not a party to the stipulated final judgments in the "Indians of California" case or *Thompson* or *Rising* petitions, as a matter of law, they are not bound by them. Pl. Resp. at 14-15 (citing *Imprimis Investors LLC* v. *United States*, 83 Fed. Cl. 46, 65 (2008) (holding that "no case supports the notion that a general release should extend to bind actions against non-parties to the agreement, especially when not made explicit in the agreement")).

In addition, the claims alleged and released in the aforementioned actions concerned the Government's "unlawful and unjust taking of aboriginal lands." Pl. Resp. at 15. Accordingly, neither adjudicated the breach of trust allegations alleged in this case. *See Acumed*, 525 F.3d at 1326 (holding that a claim is not barred by claim preclusion "merely because it could have been" raised in a prior action).

### c.    The Government's Reply.

The Government replies that the scope of the *Thompson* and *Risling* stipulations governs the Tribes' trust fund mismanagement claims in this case, as the stipulations unambiguously released the Government from "all claims or demands which any of the petitioners and claimants . . . have asserted or could have asserted against [the Government.]" Gov't App. Ex. 11 at 5. As such, "petitioners (and all claimants represented thereby) . . . shall be barred from asserting all such claims or demands in any future action." *Id*. Therefore, this release "clearly bars [the Tribes'] current trust mismanagement claims." Gov't Reply at 14.

**d.      The Court's Resolution.**

The Stipulation in *Indians of California by Webb* provides that any final judgment: "shall be in full and complete settlement, satisfaction, and discharge of any and all claims and demands of every kind and character whatsoever which the plaintiff Indians, or any of them, may have against the United States *under and by virtue of the [Jurisdictional Act of 1928]*."  Gov't App. Ex. 1 at 5 (emphasis added).  Since that Act concerned only the taking of Indian property interests, the Tribes' claim for breach of trust *ipso facto* could not have been brought thereunder, and the Stipulation and resulting final judgment in *Indians of California by Webb* did and could not waive the claims asserted in this case.

The Final Determination Or Judgment entered by the ICC in *Thompson* and *Risling* released claims that accrued by August 13, 1946, because the ICC did not have jurisdiction to adjudicate any claims that accrued after that date.  *See* 60 Stat. 1049, 1050 (1946).  Therefore, the court has determined that the Tribes' breach of trust claims alleged in the December 27, 2006 Complaint could not have been asserted in *Thompson* and *Risling* actions, because they did not accrue by August 13, 1946.  *See Shoshone Indian Tribe of the Wind River Reservation* v. *United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004) (holding that "[a] cause of action for breach of trust traditionally accrues when the trustee 'repudiates' the trust and the *beneficiary has knowledge of that repudiation*.") (emphasis added) (citations omitted).

In *Shoshone Indian Tribe*, our appellate court recognized that the nature of the trustee-beneficiary relationship often allows a trustee to mask "repudiation" of a breach without the knowledge of the beneficiary.  *Id.*  For this reason, in breach of trust cases, it is "common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust."  *Id.* (citations omitted); *see also Hopland Band of Pomo Indians* v. *United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (holding that a claim does not accrue until "all the events which fix the [G]overnment's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence.") (emphasis in original). Recognizing these principles, in the Reconciliation Report Act of 2002, Congress provided that any accounting received by an Indian tribe under the ITFMA "shall be deemed to have been received by the Indian tribe on December 31, 1999."  P.L. 107-153, 116 Stat. 79 (codified at 25 U.S.C. § 4044 note).

Therefore, the court has determined that the Tribes' claims for breach of trust in this case were not waived or released by either of the prior actions, as they did not accrue until December 31, 1999.  *See Osage Nation* v. *United States*, 57 Fed. Cl. 392, 397 (2003) ("Therefore, assuming the Arthur Andersen Report qualifies as a reconciliation report [under the ITFMA], plaintiff's claims as to losses or mismanagement of trust funds accrued on December 31, 1999. . . .") (internal quotation marks omitted).

**E.   The Government's Alternative Motion For Summary Judgment Regarding The Tribes' Pre-August 13, 1946 Breach Of Trust Claims.**

In the alternative, the Government asserts that summary judgment is required by Section 12 of the ICCA, as to all of the Tribes' pre-August 13, 1946 breach of trust claims.  Gov't Mot. at 1.

**1.   The Government's Argument.**

The Government argues that, even if the Tribes' breach of trust claims in this case were not subject to the doctrines of claim preclusion or waiver and release, nevertheless, Section 12 of the ICCA[9] prohibits the court from asserting subject matter jurisdiction over the Tribes' claims that pre-date August 13, 1946.  Gov't Mot. at 23.

The United States Supreme Court, in *United States* v. *Dann*, 470 U.S. 39 (1985) held that "[t]he 'chief purpose of the [ICCA was] to dispose of the Indian claims problem with finality.'" *Id.* at 45 (quoting H.R. REP. NO. 79-1466, at 10 (1945)).  Therefore, the intent of Congress, "as well as the plain wording of Section 12 of the ICCA, firmly establish that the ICC was the only tribunal with authority to adjudicate pre-1946 Indian tribal, and identifiable group, claims against the United States," including the breach of trust claims asserted in the December 27, 2006 Complaint.  Gov't Mot. at 24-25 (citing 60 Stat. 1049, 1050 (listing all of the claims that Congress authorized the ICC to adjudicate)).  Since the Tribes' claims were not filed with the ICC by August 13, 1951, necessarily they are barred from being adjudicated in this court or any other forum.  Gov't Mot. at 25.

Nor did the 1990 and subsequent "Appropriations Provisos," ressurect the Tribes' extinguished claims.  As Congress recently stated:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss. . . .

123 Stat. 2904, 2922 (2009).

---

[9] Section 12 of the ICCA provides:

The Commission shall receive claims for a period of five years after the date of approval of this Act[, August 13, 1946,] and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress.

60 Stat. 1049, 1052 (1946).

The Government insists that, despite the "Appropriations Provisos," the Tribes' claim for breach of trust duty is barred by Section 12 of the ICCA because that Section is a statute of repose, not a statute of limitations.  Gov't Mot. at 26 (citing *Alexander* v. *Beech Aircraft Corp.*, 952 F.2d 1215, 1218, n.2 (10th Cir. 1991) ("A statute of repose typically bars the right to bring an action after the lapse of a specified period, unrelated to the time when the claim accrued. The bar instead is tied to an independent event. . . .  A statute of limitations generally bars the bringing of an action after the passage of a given period of time following the accrual of the claim.").

Section 12 of the ICCA is "a statute of repose[,] because the time for filing claims against the United States was independent of the date those claims accrued."  Gov't Mot. at 26 (citing *Sioux Tribe* v. *United States*, 500 F.2d 458, 489 (Ct. Cl. 1974) ("The [ICCA] provides in no uncertain terms that *any claim existing* prior to August 13, 1946, must be filed within five years (*i.e.*, before August 13, 1951), and if it is not filed within that period, it cannot thereafter be submitted to any court, administrative agency, or Congress for consideration. There is no doubt about the fact that Congress intended to cut off all claims not filed before August 13, 1951, and the [ICCA] so provides in clear and unmistakable language.") (emphasis added)).

Since Congress intended Section 12 of the ICCA to set a final date certain for any residual Indian claims to be asserted, Congress enacted specific additional legislation when it deemed an exception was required.  *See* 110 Stat. 2418 (1996) (authorizing the Court of Federal Claims to adjudicate land claims by the Pueblo of Isleta Indian Tribe, "[n]otwithstanding [28 U.S.C. §§ 2401, 2501] and [ICCA § 12], or any other law which would interpose or support a defense of untimeliness").

Finally, *Shoshone Indian Tribe* does not bear on the foregoing analysis, because that decision did not address claims that were extinguished by the ICCA.  Gov't Mot. at 28. Although the United States Court of Appeals for the Federal Circuit held that the "Appropriations Provisos" delayed the accrual of the plaintiffs' breach of trust claims, no claims that existed prior to the enactment of the ICCA were at issue in that case.  *Id.*; *see also Shoshone Indian Tribe*, 364 F.3d at 1343 ("[T]he Tribes brought suit in the United States Court of Claims, alleging that the Government breached fiduciary and statutory duties owed to the Tribes from August 14, 1946 onward by mismanaging the reservation's natural resources and the income derived from such resources. The date of August 14, 1946 chosen by the Tribes coincides with the passage of the [ICCA].").

Therefore, "[t]he ICCA's jurisdictional bar applied to, and requires the dismissal of, any trust accounting or trust mismanagement claims (or portions thereof) that existed as of August 13, 1946."  Gov't Mot. at 29.

### 2.      Plaintiffs' Response.

The Tribes respond that Section 12 of the ICCA does not bar their claims for breach of trust, because those claims did not accrue until December 31, 1999.  Pl. Resp. at 16.  Under the ITFMA, Interior was required to prepare a "Reconciliation Report" for each Indian trust fund to

provide "the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date. . . ."  25 U.S.C. § 4044(2)(A).

In 2002, however, Congress approved the Reconciliation Report Act of 2002, that provided:

> Notwithstanding any other provision of law, for purposes of determining the date on which an Indian tribe received a reconciliation report for purposes of applying a statute of limitations, any such report provided to or received by an Indian tribe in response to the [ITFMA] shall be deemed to have been received by the Indian tribe on December 31, 1999.

P.L. 107-153, 116 Stat. 79 (codified at 25 U.S.C. § 4044 note).

Therefore, Congress has determined that the Tribes, and others affected, should not be "deemed" to have received an accounting of their trust funds until December 31, 1999, *i.e.,* the earliest possible date those claims could have accrued.  Pl. Resp. at 20.

Similarly, the breach of trust duty claims alleged in the December 27, 2006 Complaint did not accrue until December 31, 1999, and are not barred by Section 12 of the ICCA.  Pl. Resp. at 20.

Finally, the Tribes argue that Section 12 of the ICCA is not a statute of repose.  Pl. Resp. at 22.  The United States Supreme Court has emphasized that there is a "strong presumption that Congress expresses its intent through the language it chooses."  *Immigration and Naturalization Service* v. *Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987) (citations omitted).   In the "Appropriations Provisos" and Reconciliation Report Act of 2002, Congress used such definitive phrases as "notwithstanding any other provision of law" and "statute of limitations" to specify that a breach of trust claim by an American Indian tribe was not subject to the doctrine of repose, but instead was governed by the applicable statute of limitations.  Pl. Resp. at 22.

### 3.    The Government's Reply.

The Government replies that this case is distinguishable from *Osage Nation*, because the text of the ICCA "directly contradict[s] [the Tribes'] view of [S]ection 12 as a statute of limitations."  Gov't Reply at 15-16.  By "unambiguously establishing a date—August 13, 1951—after which Tribes would be barred from bringing claims that existed in 1946 against the United States, [S]ection 12 extinguished [all] claims regardless of the date on which they accrued."  *Id*. at 16.

The Government reasons that the ICCA is a statute of repose because Section 12 is titled "Limitations," in contrast to Section 24, relied upon in *Osage Nation*, titled "Future Indian Claims."  Gov't Reply at 17.  In *Russello* v. *United States*, 464 U.S. 16 (1983), the United States Supreme Court held that "[w]here Congress includes particular language in one section of a statute[,] but omits it in another section of the same Act, it is generally presumed that Congress

acts intentionally and purposely in the disparate inclusion or exclusion." *Id*. at 23 (quotation marks and citation omitted).

Section 12 of the ICCA refers to claims *existing* before August 13, 1946, in contrast to Section 24 that refers to claims *accruing* after that date. Gov't Reply at 17. Therefore, it would be erroneous for the court to interpret Section 12 of the ICCA only to bar claims that accrued before August 13, 1946, since it is a statute of repose, making accrual irrelevant. Gov't Reply at 17. For this reason, the "Appropriations Provisos" "only address the statute of limitations," and do not revive claims extinguished by a statute of repose. *Id*. at 18. Although the "Appropriations Provisos" toll accrual of claims for losses to or mismanagement of trust funds from August 14, 1946 forward, they do not reach back before August 13, 1946. *Id*. Accordingly, regardless of when the Tribes' breach of trust claims accrued, all claims that existed as of August 13, 1946 are barred as a matter of law. *Id*. at 19.

### 4.    The Court's Resolution.

The ICCA was enacted to give Indian tribes the "full and untrammeled right to have their grievances heard under nondiscriminatory conditions by the appropriate courts of the United States." H.R. REP. NO. 79-1466, at 2 (1945). To meet this objective, Congress established the ICC to hear all Indian claims that had accrued as of August 13, 1946. *See* 60 Stat. 1049, 1050 ("No claim accruing after the date of the approval of this Act shall be considered by the [ICC].") To ensure that Indians would have a venue to bring any future claims, Congress authorized the Court of Claims to adjudicate any claims that accrued after August 13, 1946. *See* 60 Stat. 1049, 1055; *see also* H.R. REP. NO. 79-1466, at 3 (1945) ("[I]n order to prevent any future accumulation of unsettled claims, the statutory prohibition against litigation in the Court of Claims growing out of agreements with Indian tribes would be lifted and the Indian would henceforth have the same right as his . . . neighbor to secure a full and free hearing in the Court of Claims . . . on any controversy that may arise in the future.").

Section 12 of the ICCA provides that the ICC "shall receive claims for a period of five years . . . and no claim existing before such date *but not presented* within such period may thereafter be submitted to any court or administrative agency for consideration. . . ." 60 Stat. 1049, 1052 (1946) (emphasis added). Therefore, for a claim to be barred by Section 12, it must be one that could have been presented to the ICC, but was not presented by August 13, 1951. Since the ICC only had jurisdiction to adjudicate claims that accrued by August 13, 1946, Section 12 does not bar claims that accrued thereafter. [10]

---

[10] The legislative history of the ICCA supports this interpretation. A June 11, 1945 Report of the Department of Interior to the House Committee on Indian Affairs stated:

> The purpose of this suggested amendment [to Section 12 of the ICCA] is to make it as clear as possible that the bill intends to bar forever the litigation in any forum whatsoever of claims which are not presented to the [ICC] within the prescribed five-year period. This limitation would be made applicable only to claims existing at the time of the enactment of the bill, *since claims arising subsequent to that time would not be cognizable by the [ICC]*.

As the United States Court of Appeals for the Federal Circuit stated in *Shoshone Indian Tribe*:

> The clear intent of the [Appropriations Provisos] is that the statute of limitations will not begin to run on a tribe's claims until an accounting is completed. We therefore hold that the [Appropriations Provisos ensure] that claims falling within [their] ambit shall not accrue, *i.e.*, "shall not commence to run," until the claimant is provided with a meaningful accounting. This is simple logic-how can a beneficiary be aware of any claims unless and until an accounting has been rendered?

364 F.3d at 1347 (footnote omitted).

Since the court has determined that the Tribes' breach of trust claims accrued on December 31, 1999, Section 12 of the ICCA does not bar the Tribes from having their breach of trust claims, as alleged in the December 27, 2006 Complaint, adjudicated in the United States Court of Federal Claims.

## IV.  CONCLUSION.

For the reasons stated herein, the Government's Motion For Partial Summary Judgment is denied as to the Tribes' claims that pre-date July 20, 1964.  Within 15 days, the court will convene a status conference to set a trial date.

**IT IS SO ORDERED.**

__s/Susan G. Braden _
**SUSAN G. BRADEN**
**Judge**

---

*Creation of Indian Claims Commission: Hearing on H.R. 1198 and H.R. 1341 Before the H. Comm. on Indian Affairs*, 79th Cong. 120 (1945) (statement of Felix S. Cohen, Associate Solicitor, Interior) (emphasis added); *see also* H.R. REP. NO. 79-1466, at 10 (1945) ("The bill accordingly requires that all cases . . . *be presented* to the [ICC] within 5 years or forever waived.") (emphasis added).

COURT

EXHIBIT

A

ROUND VALLEY

SMITH RIVER
ELK VALLEY
KARUK
QUARTZ VALLEY
RESIGHINI
YUROK
BIG LAGOON
TRINIDAD
HOOPA VALLEY
BLUE LAKE
TABLE BLUFF
ROHNERVILLE
REDDING

FT. BIDWELL
XL RANCH
ALTURAS
CEDARVILLE
LIKELY
LOOKOUT
BIG BEND
ROARING CREEK
MONTGOMERY CREEK
SUSANVILLE
GREENVILLE
GRINDSTONE CREEK
Quincy
Portola
ENTERPRISE
BERRY CREEK
MOORETOWN
Tahoe City
South Lake Tahoe
WOODFORD COLONY
SHINGLE SPRINGS
JACKSON
BRIDGEPORT
TUOLUMNE
CHICKEN RANCH
BENTON PAIUTE
Yosemite Village
BISHOP
BIG PINE
NORTH FORK
PICAYUNE
BIG SANDY
COLD SPRINGS
FORT INDEPENDENCE
LONE PINE
DEATH VALLEY
TIMBA-SHA SHOSHONE
SANTA ROSA
TULE RIVER

Crescent City
Weed
Yreka
Dunsmuir
Weaverville
Garberville
Leggett
LAYTONVILLE
REDWOOD VALLEY
COYOTE VALLEY
PINOLEVILLE
HOPLAND
MANCHESTER
CLOVERDALE
STEWARTS POINT
DRY CREEK
SHERWOOD VALLEY
POTTER VALLEY
BUENA VISTA
SHEEP RANCH

Additional Northern
California Indian Lands
A- BIG VALLEY
B- COLUSA
C- CORTINA
D- MIDDLETOWN
E- ROBINSON
F- RUMSEY
G- SULPHUR BANK
H- UPPER LAKE

San Francisco
Oakland
San Jose
Santa Cruz
Monterey
Salinas
King City
Hanford
Fresno
Bakersfield
Mojave
Barstow
FORT MOJAVE
CHEMEHUEVI
SAN MANUEL
MORONGO
TWENTY-NINE PALMS
COLORADO RIVER
AGUA CALIENTE
PALA
TORRES-MARTINEZ
LOS COYOTES
FORT YUMA
SAN DIEGO
Calexico

Additional Southern California Indian Lands
1- AUGUSTINE
2- BARONA
3- CABAZONE
4- CAHUILLA
5- CAMPO (SYCAMORE VALLEY)
6- CAPTAIN GRANDE
7- CUYAPAIPE
8- JAMUL INDIAN VILLAGE
9- INAJA-COSMIT
10- LA JOLLA
11- LA POSTA
12- MANZANITA
13- MESA GRANDE
14- PAUMA & YUIMA
15- PECHANGA
16- RAMONA
17- RINCON
18- SAN PASQUAL
19- SANTA ROSA
20- SOBOBA
21- SAN YSABEL
22- SYCUAN
23- VIEJA

# Court Exhibit B

(all emphasis added by the court)

**December 27, 2006 Complaint**

CLAIM FOR RELIEF

31. The Defendant has violated its trust duty to Plaintiff with regard to Defendant's **management of the Tribe's trust funds** [by failing to:]

. . . credit the [Tribes'] trust fund account for the total amount of income derived from the sale or lease of non-monetary trust assets . . .

. . . credit the [Tribes'] trust fund account for amounts paid to it or due to it . . .

. . . properly record all transactions pertaining to the [Tribes'] trust fund account . . .

. . . maintain adequate records with regard to tribal trust funds. . . .

PRAYER FOR RELIEF

WHEREFORE, [the Tribes pray] for . . .

1. An Order directing Defendant to prepare a full and complete accounting, reconciliation, and certification of the Tribe's trust funds;

2. **Monetary damages in Plaintiff's favor and against Defendant in an amount to be determined at trial based upon a full and complete accounting of the Tribe's trust funds**. . . .

**Thompson Petition**

CLAIM FOR RELIEF

XIV. Indians of California Entitled to Recover. The acts committed by Defendant enumerated in paragraph XII [of this Petition, "Taking by Defendant of Plaintiff's Interest in Land,"] constituted a **taking of the lands possessed by the Indians of California**. . . . [S]uch taking constituted a taking by the United States of lands occupied by the Indians of California without payment of compensation. . . .

PRAYER FOR RELIEF

Wherefore Plaintiffs pray that [the Government] make a full and true discovery and disclosure of the acreage used, occupied and possessed . . . by the Indians of California and (1) taken and sold for its own account and (2) taken and appropriated for its own use, as aforesaid, and render a complete and accurate account thereof and of all relevant facts connected therewith . . . and that **[the Government] be adjudged liable to the Indians of California for such taking and appropriation** in such amount as upon a complete and accurate accounting [as the ICC] may find due and owing to Indians of California as just or proper compensation. . . .

**Risling Petition**

CLAIM FOR RELIEF

XI. Indians of California Entitled to Recover. The acts committed by Defendant enumerated in paragraph IX [of this Petition, "Taking by Defendant of Plaintiff's Interest in Land,"] hereof constituted a **taking of the lands possessed by the Indians of California**. . . . [S]uch taking constituted a taking by the United States of lands occupied by the Indians of California without payment of compensation. . . .

PRAYER FOR RELIEF

Wherefore, Plaintiff prays that [the Government] make a full and true discovery and disclosure of the acreage used, occupied and possessed . . . by the Indians of California and which were taken from them by the United States and appropriated to its own purposes without their consent and render a complete and accurate account thereof and of all relevant facts connected therewith . . . and that **[the Government] be adjudged liable to the Indians of California for such taking and appropriation** in such amount as upon a complete and accurate accounting [as the ICC] may find due and owing to the Indians of California as just and proper compensation. . . .